No. 23-15016

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARK BAIRD, *et ano.*,
*Plaintiffs-Appellants*,

v.

ROB BONTA, in his official capacity as
Attorney General of the State of California,
*Defendant-Appellee*,

Appeal from United States District Court for the Eastern District of California
Civil Case No. 2:19-cv-00617-KJM-AC (Honorable Kimberly J. Mueller)

## PLAINTIFFS-APPELLANTS' EXCERPTS OF RECORD
## VOLUME II, ER174-ER349

Amy L. Bellantoni
THE BELLANTONI LAW FIRM, PLLC
2 Overhill Road, Suite 400
Scarsdale, New York 10583
(914) 367-0090 (t)
(888) 763-9761(f)
*abell@bellantoni-law.com*

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Date**                                                                    **Page**

## VOLUME I

| Date | | Page |
|------|------|------|
| 12/7/22 | Order Denying Preliminary Injunction (Docket No. 83) | ER001 |
| 1/3/23 | Notice of Appeal (Docket No. 84) | ER017 |
| 11/4/22 | Reporter's Transcript of Proceedings (Hearing on Motion For Preliminary Injunction) | ER019 |
| 8/7/22 | Declaration of Mark Baird in Support of Plaintiffs' Third Motion for a Preliminary Injunction (Docket No. 65-1) | ER054 |
| 8/8/22 | Declaration of Richard Gallardo in Support of Plaintiffs' Third Motion for a Preliminary Injunction (Docket No. 65-2) | ER056 |
| 2/21/19 | Public Records Act Response, State of California Department of Justice (Docket No. 47-3) | ER059 |
| 9/30/22 | Declaration of R. Matthew Wise In Support of Defendant's Opposition To Plaintiffs' Third Motion For Injunction (Docket No. 69-1) | ER060 |
| 9/30/22 | Declaration of Former Covina Chief of Police Kim Raney In Support of Defendant's Opposition To Plaintiffs' Third Motion For Injunction (Docket No. 69-2) | ER162 |

## VOLUME II

| Date | | Page |
|------|------|------|
| 10/11/22 | Reply Declaration of Amy L. Bellantoni In Support of Plaintiffs' Third Motion Preliminary Injunction (Docket No. 73-1) | ER174 |

# TABLE OF CONTENTS

**Date**                                                                                    **Page**

Exhibit 1 to Declaration of Amy L. Bellantoni
Deposition Transcript of Kim Raney (Docket No. 73-2)          ER181

Exhibit 2 to Declaration of Amy L. Bellantoni
Deposition Transcript of Charles D. Haggard
(Docket No. 73-3)                                                             ER287

## **VOLUME III**

9/26/22      Second Amended Complaint for Declaratory and
             Injunctive Relief (Docket No. 68)                           ER421

10/31/22     Attorney General Rob Bonta's Answer to Second
             Amended Complaint (Docket No. 76)                           ER439

4/9/19       Complaint for Declaratory and Injunctive Relief
             (Docket No. 1)                                              ER453

8/28/20      Order Denying Plaintiffs' First Motion for A
             Preliminary Injunction (Docket No. 33)                      ER511

## **VOLUME IV**

9/20/20      First Amended Complaint for Declaratory and
             Injunctive Relief (Docket No. 34)                           ER529

11/2/20      Attorney General Rob Bonta's Answer to First
             Amended Complaint (Docket No. 38)                           ER567

             United States District Court
             Civil Docket Sheet for Case No. 2:19-cv-00617-KJM-AC        ER596

COSCA LAW CORPORATION
CHRIS COSCA   SBN 144546
1007 7th Street, Suite 210
Sacramento, CA 95814
916-440-1010

AMY L. BELLANTONI
THE BELLANTONI LAW FIRM, PLLC
2 Overhill Road, Suite 400
Scarsdale, NY 10583
Telephone: 914-367-0090
Facsimile:  888-763-9761
*Pro Hac Vice*

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

MARK BAIRD and
RICHARD GALLARDO,

                    Plaintiffs,

        v.

ROB BONTA, in his official capacity as
Attorney General of the State of California,

                    Defendant.

Case No. 2:19-CV-00617

**REPLY DECLARATION OF
AMY L. BELLANTONI IN SUPPORT OF
PLAINTIFFS' THIRD MOTION FOR
PRELIMINARY INJUNCTION**

Date:        November 4, 2022
Time:        10:00 a.m.
Room:        3
Judge:       Hon. Kimberly J. Mueller

1

## DECLARATION OF AMY L. BELLANTONI

1.      I am an attorney with The Bellantoni Law Firm, PLLC, attorneys for Plaintiffs, Mark Baird and Richard Gallardo. I am admitted to practice law before the United States District Court for the Eastern District of California, *pro hac vice*. I am also admitted to practice law before the United States District Courts for the Southern, Eastern, and Northern Districts of New York, the District of Columbia, the Second Circuit Court of Appeals, and the United States Supreme Court. I have personal knowledge of the facts set forth herein and, if called and sworn as a witness, could and would testify competently thereto.

2.      This Third Motion for a Preliminary Injunction[1] is made to enjoin, during the pendency of these proceedings, Defendant Bonta, his agents, servants, employees, and those working in active concert with him, from enforcing and/or giving effect to California Penal Code sections 25850 and 26350 as they relate to the mere possession of a handgun by manner of open carry in public.

3.      The instant motion for a preliminary injunction is made based on the irreparable and continued harm to Plaintiffs resulting from the enforcement and effect of California Penal Code Sections  25850 and 26350, which will continue absent an injunction of the statutes. The plain language of the aforementioned statutes, as well as the *de facto* ban on open carry in the State of California enforced by defendant Attorney General Rob Bonta through the California Department of Justice, his agents, employees, servants, including the respective state's firearms licensing agencies, to wit, the sheriffs and chiefs of police throughout the state, constitutes a violation of the Second Amendment.

---

[1] During the parties' July 28, 2022 Status Conference with the Court, held by videoconference, the Court granted Plaintiffs' oral application to withdraw their Second Motion for a Preliminary Injunction, filed on April 13, 2021, which was pending decision.

2

4.      It is the opinion of the Ninth Circuit that the concealed carry of a firearm does not fall within the scope of the protections provided by the Second Amendment. Upholding a challenge to California's "good cause" requirement for the issuance of a CCW license in *Peruta v County of San Diego*, 824 F3d 919, 942 (9th Cir 2016) (en banc) (*Peruta II*) (cert. den.), the Ninth Circuit held that the Second Amendment did not protect *in any degree* the right to carry a concealed firearm in public and that *any* prohibition or restriction a state might choose to impose on concealed carry, was not unconstitutional. (emphasis added). Concealed carry, the Circuit reasoned, was a mere privilege, not a 'right'.

5.      As set forth in the accompanying Memorandum of Points and Authorities and Reply Memorandum of Points and Authorities, with accompanying Declarations, the Supreme Court and history of this nation and the State of California bear out that the open carriage of handguns for self-defense falls squarely within Second Amendment protected activity. A contrary view is irrational and in conflict with the plain text of the Amendment.

6.      As detailed in the accompanying Memoranda, the complained of statutes preclude non-prohibited, regular people, including Plaintiffs, from the free exercise of the right to open carry a firearm for self-defense in public by criminalizing the "mere possession" of a handgun carried open and exposed outside of one's home, which exposes ordinary individuals to criminal penalties for exercising the right to open carry, whether loaded or unloaded.

7.      Defendant, who alone has the burden, has failed to forth *any evidence* that the challenged regulations – Penal Code sections 25850 and/or 26350 - are consistent with this Nation's historical traditions of regulating firearms.

8.      The Supreme Court has, more than once, flatly rejected any manner of 'public safety', means-end scrutiny as a response to Second Amendment challenges. See, *D.C. v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 562 U.S. 742 (2010); *NYSRPA v. Bruen*, 142

3

S.Ct. 2111 (2022).

9.     Yet, defiantly, Defendant continues to offer 'public safety' arguments, like those espoused by his law enforcement 'expert', former Covina Chief of Police Kim Raney, speculating about how open carry will affect public safety. Attached hereto as Exhibit 1 is Mr. Raney's deposition testimony.

10.     Mr. Raney has never served as a law enforcement officer in an open carry jurisdiction. [Ex. 1 at 19:1-3]. Everything Mr. Raney testified to regarding 'public safety' in an open carry jurisdiction is based on speculation.

11.     While 'public safety' is an *improper consideration* when it comes to Second Amendment challenges[2], Plaintiffs' law enforcement expert, Chuck Haggard, *does* serve in an open carry jurisdiction and was employed as a police officer when the state of Kansas legalized open carry overnight. No "instant mayhem" occurred, as Raney hypothesizes. [See, the deposition testimony of Chuck Haggard attached hereto as Ex. 2 at pp. 46-48; 61-62].

12.     "So, just the mere fact that somebody's carrying a gun - - and I'll go with a holstered handgun, let's say, in and of itself. It just is what it is. It isn't a negative or doesn't have an effect on public safety. The idea that the police would show up and be, "Oh, my God, that guy's got a gun, we better shoot him" borders on the ridiculous in my mind, that- -  and a bunch of that is personal observation." [Ex. 2 at p. 53]. Mr. Haggard's observation is based on his personal observation as a police officer and civilian firearms trainer in Kansas, as well as in other states where he has either conducted training or been involved in training including Texas, Oklahoma, Missouri, Utah, and Wyoming, where carrying a firearm open and exposed would garner the reaction, "It's a sunny day out, that guy's carrying a gun. It's not a positive, it's not a negative, it

---

[2] *D.C. v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 562 U.S. 742 (2010); *NYSRPA v. Bruen*, 142 S.Ct. 2111 (2022).

4

just is." [Ex. 2 at pp. 53-54]. "I can tell you I've walked up on car stops where I've had people with shotguns and rifles in the back window of a pickup truck, guns in consoles, guns laying on seats, I've dealt with people who are wearing holstered guns on their hip, that sort of thing, and, quite frankly, the guns that I can see, the weapons that I can see, I was never very worried about. I was worried about the behavior of the people who were, you know, literally being furtive, who were trying to conceal what they were up to. It was more behavior-focused…It's what you don't know that is a problem." [Ex. 2 at p. 70-71].

13.     Attached hereto as Exhibit 3 is the deposition testimony of Richard Gallardo, which indicates that he was compliant with California Penal Code 171 (b)(B)(3) when he had his firearm on the CAL FIRE property in his locked vehicle; the statute allowed him to have his concealed weapon on CAL FIRE property with the concealed weapons permit that he had at the time. [Ex. 3 at 19]. Mr. Gallardo further showed a co-worker his handgun at the co-worker's request, he did 'display' it in any sort of threatening manner as Defendant would have the Court believe. "Working at CAL FIRE, we were there anywhere from three days a week to two to three weeks in a row. And so, you know, lunchtime or evening hours or whenever we were not on the formal clock, what's called hard time, we're allowed to talk about that kind of stuff, so we talked about it often. And one of my fellow employees at the time was thinking about getting his concealed weapons permit, and he asked me what kind of gun I carried, and so I showed it to him." Mr. Gallardo was compliant with the law. [Ex. 3 at 38-40]. Revoking his permit because he disagreed with an officer during a traffic stop also demonstrates the problem with California's subjective, discretionary licensing scheme. [Ex. 3 at 24].

14.     The within Declaration, exhibits, and accompanying Memoranda of Points and Authorities warrant the requested relief and issuance of an order enjoining defendant Bonta, his agents, servants, employees, and those working in active concert with him, from enforcing and/or

REPLY DECLARATION OF AMY L. BELLANTONI ISO
THIRD MOTION FOR PRELIMINARY INJUNCTION

**ER178**

giving effect to California Penal Code sections  25850 and 26350 as they relate to merely carrying

a handgun open and exposed on one's person in public during the pendency of this proceeding.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  October 11, 2022

_Amy L. Bellantoni_

Amy L. Bellantoni, Esq.
_Attorney for Plaintiffs_
_Pro Hac Vice_
abell@bellantoni-law.com

REPLY DECLARATION OF AMY L. BELLANTONI ISO
THIRD MOTION FOR PRELIMINARY INJUNCTION

**ER179**

# EXHIBIT   1

Kim Raney

Page 1

1                     UNITED STATES DISTRICT COURT

2                     EASTERN DISTRICT OF CALIFORNIA

3                              -o0o-

4

5       MARK BAIRD and RICHARD        )

        GALLARDO,                     )

6                                     )

                                      )

7            Plaintiffs,              )

                                      )

8       vs.                           )Case No. 2:19-cv-00617-KJM-AC

                                      )

9       ROB BONTA, in his official    )

        capacity as Attorney General of)

10      the State of California, and  )

        DOES 1-10,                    )November 29, 2021

11                                    )

                                      )

12           Defendants.              )

        _____)

13

14

15                              -o0o-

16

17                   DEPOSITION OF KIM RANEY

18            TAKEN REMOTELY FROM LaQUINTA, CALIFORNIA

19

20                              -o0o-

21

22

23      Reported Remotely By:

24      Lynne A. Howe, CSR

25      License No. 13003

ER181

Kim Raney

Page 2

1                          INDEX

2

3

4    KIM RANEY                                    PAGE

5    Examination by Ms. Bellantoni.......................5

6

7

8

9

10                  INDEX OF EXHIBITS

11   Exhibit 1, Plaintiffs' Amended Notice of Deposition

12        of Expert Witness Kim Raney...................16

13   Exhibit 2, Expert Declaration and Report of Former

14        Covina Chief of Police Kim Raney..............17

15

16

17

18

19

20                        -o0o-

21

22

23

24

25

Kim Raney

Page 3

1                        REMOTE APPEARANCES

2

3    FOR THE PLAINTIFF:

4          THE BELLANTONI LAW FIRM, PLLC
           BY:  AMY L. BELLANTONI, ESQUIRE

5          2 Overhill Road, Suite 400
           Scarsdale, NY 10583

6          (914) 367-0090
           abell@bellantoni-law.com

7

8

9    FOR THE DEFENDANTS:

10         OFFICE OF THE ATTORNEY GENERAL
           BY:  R. MATTHEW WISE, DEPUTY ATTORNEY GENERAL

11         P.O. Box 944255
           Sacramento, California 94244-2550

12         (916) 210-6046
           matthew.wise@doj.ca.gov

13

14

15   Also Present:  Mark Baird

16

17

18

19

20

21

22

23

24

25

Kim Raney

Page 4

1

2

3

4

5                                  -o0o-

6

7        BE IT REMEMBERED, that pursuant to Notice of this

8    deposition, and on Monday, the 29th day of November,

9    2021, commencing at the hour of 12:03 p.m. thereof, taken

10   remotely with the witness appearing in LaQuinta,

11   California, before me, LYNNE A. HOWE, a Certified

12   Shorthand Reporter in and for the State of California,

13   the following proceedings were held.

14

15

16

17

18

19

20

21

22

23

24

25

ER184

Page 5

1                              KIM RANEY

2       having been first duly sworn, was examined and testified

3                              as follows:

4

5                              EXAMINATION

6       BY MS. BELLANTONI:

7            Q.  Good afternoon, Mr. Raney.

8            A.  Good afternoon.

9            Q.  My name is Amy Bellantoni and I am the attorney

10      representing the plaintiffs in this matter entitled Baird

11      v. Bonta, the plaintiffs being Mark Baird and Richard

12      Gallardo.  And I'll be asking you some questions today in

13      connection with your retention as an expert for the

14      defendants in this case.

15              Before we begin, can you state your full name

16      and spell your last name, please.

17           A.  Kimber James Raney, R-a-n-e-y.

18           Q.  Have you been deposed before?

19           A.  Yes.

20           Q.  So you're familiar with kind of the ground rules

21      in moving forward with a deposition.

22              There is a court reporter here who will be

23      taking down everything that we say.  So it's important

24      that we don't talk over one another, which can sometimes

25      happen in the course of the deposition.  You may

Kim Raney

Page 6

1  anticipate once I'm halfway through a question what the

2  rest of my question might be and begin answering before

3  I'm finished, and likewise I may anticipate what the rest

4  of your answer's going to be and start on my next

5  question, which I've done many times in past depositions.

6        So I will make my best efforts not to speak over

7  you, and I would ask that you make your best efforts not

8  to speak over me so we can have a clear record.  Sound

9  good?

10       A.  I understand.

11       Q.  Do you understand that you've been sworn in to

12  tell the truth under the penalty of perjury and as such,

13  your testimony here in this deposition is the same as if

14  you would be testifying in a courtroom?

15       A.  Yes, I do.

16       Q.  If you need to take a break at any time, just

17  let me know.  I would only ask that if there is an open

18  question that you answer the question first before we

19  take a break and then if you -- after the break, you need

20  to clarify something about your testimony in answering

21  that question, you can feel free to do so.  All right?

22       A.  Okay.

23       Q.  If at any time during the deposition you think

24  back to an answer that you gave or one that you weren't

25  sure about or were unable to give at the time and you'd

Kim Raney

Page 7

1   like to clarify an earlier answer, please let me know so

2   that we can ensure that we have an accurate and clear

3   record.  All right?

4       A.  Okay.

5       Q.  At the end of the deposition you will be

6   provided with a copy of the transcript when it's been

7   prepared by the court reporter, and you'll have an

8   opportunity to review your testimony in that transcript

9   and to make any changes or corrections to your testimony

10  here today.

11          I would only let you know that in doing so, I

12  would be allowed to comment on any of the changes that

13  you made.  You understand?

14      A.  I understand.

15      Q.  From time to time your attorney may have an

16  objection to a question that I ask, maybe to the form of

17  the objection or to the substance, and your attorney will

18  state that objection on the record.

19          You will still be required to answer that

20  question unless your attorney specifically tells you not

21  to answer or instructs you not to answer that question.

22  Do you understand?

23      A.  I understand.

24      Q.  If at any time I ask you a question that you're

25  not sure what I'm asking or the form of the question just

Kim Raney

Page 8

1    is a little confusing -- that may happen because

2    sometimes my questions are lengthy and they're not meant

3    to confuse or to cause an unclear record.  But if that

4    does happen and you're unsure of what I'm asking, please

5    let me know and I'll try to rephrase the question or make

6    it a little more clearer.  Okay?

7         A.  Okay.

8         Q.  If I ask a question and you answer, I'm going to

9    assume that you understood what I was asking.  I want to

10   make sure we're both on the same page.  All right?

11        A.  Okay.

12        Q.  Is there anything that would affect your ability

13   as you sit here to understand and respond truthfully and

14   in a responsive manner to my questions today?

15        A.  No.

16        Q.  Have you ever testified in court before?

17        A.  Yes.

18        Q.  And is that in your capacity as a law

19   enforcement officer?

20        A.  A law enforcement officer and then after

21   retirement I've testified as an expert witness.

22        Q.  And how many -- in court?

23        A.  Yes.

24        Q.  How many times have you testified as an expert

25   witness in court?

Kim Raney

Page 9

1          A.   Once.

2          Q.   In what case was that?

3          A.   I think it was Moreno, et al, versus The City of

4     Beverly Hills.

5          Q.   And what was the scope of your expertise in that

6     case?

7          A.   A lawsuit was filed by several members of the

8     Beverly Hills Police Department command staff, and I was

9     retained as an expert witness by the city in regards to

10    police department management questions, leadership

11    questions, in that area.

12         Q.   And generally, just briefly, what was the issue

13    in that case?  What was the case about?  What were they

14    suing for?

15         A.   They were suing the chief of police for

16    discrimination, hostile work environment, inappropriate

17    comments.  Just there were I think 22 different

18    allegations.

19         Q.   Nothing in that case had to do with open carry

20    or open carry policies?

21         A.   No.

22         Q.   And so many times throughout of the course of

23    this deposition I will be using the term or the phrase

24    "open carry."  And by open carry, I'm referring to the

25    open --

Kim Raney

```
                                                              Page 10

 1                    (Technical difficulties)

 2            THE COURT REPORTER:  I'm sorry, Ms. Bellantoni.

 3    You were breaking up.  I missed half that question.

 4            MS. BELLANTONI:  All right.  Can you hear me

 5    now?

 6            THE COURT REPORTER:  Yes.

 7    BY MS. BELLANTONI:

 8        Q.  Mr. Raney, during the course of this deposition

 9    I'll be using the phrase "open carry," and by that term I

10    mean the open carriage of a handgun that is holstered and

11    carried upon the person.

12            Can we agree on that definition of that term?

13        A.  I understand that, yes.

14        Q.  Were you retained as an expert for the defendant

15    in this case?

16        A.  Yes.

17        Q.  And were you also retained as an expert in the

18    case Flanagan versus Becerra?

19        A.  Yes.

20        Q.  And other than those two cases and the case

21    involving Beverly Hills, have you been retained as an

22    expert in any other case?

23        A.  Yes.

24        Q.  In which case?

25        A.  I don't know the name of the defendants.  One
```

Kim Raney

Page 11

1    was a case that commenced several command staff members

2    of the Buena Park Police Department making allegations of

3    discrimination against the chief of police for failure to

4    promote them.

5              I've been retained by the City of Ontario for a

6    case where two police volunteers are suing the police

7    department and chief of police for I guess discrimination

8    and unlawful termination.

9              I was retained by the City of Chandler, Arizona,

10   in a lawsuit filed by a motorcycle club against the city

11   for closing down a business.

12             And those are the only ones I can remember right

13   now.

14        Q.  Is the Chandler, Arizona, case in the nature of

15   First Amendment claim?

16        A.  No.  It was more of I think licensing

17   discrimination where they alleged that the City of

18   Chandler, Arizona, the police department, closed them

19   down because of their affiliation to the Hell's Angels.

20        Q.  Is it fair to say that your retention as an

21   expert has only been on behalf of the defendants in

22   litigation?

23        A.  Yes.

24        Q.  And you've not been retained as an expert for

25   plaintiffs in litigation; is that correct?

Kim Raney

                                                        Page 12

1        A.   That's correct.

2        Q.   Were you deposed in the Flanagan versus Becerra

3    case?

4        A.   I was.

5        Q.   And did you review your deposition in that

6    matter in preparation for your deposition here today?

7        A.   I did.

8        Q.   And when did you have the opportunity to review

9    that deposition?

10       A.   I believe it was two or three weeks ago before

11   the last deposition was canceled.

12       Q.   Has your opinion on open carry changed since you

13   gave that deposition?

14       A.   No.

15       Q.   And have you conducted any additional research

16   on the issue of open carry since you gave the deposition

17   in that matter?

18       A.   Well, I've read a lot of newspaper articles,

19   periodicals.  Just because for the last three or four

20   years since that deposition there's been a lot of public

21   information about Second Amendment issues, so I've tried

22   to stay contemporary.

23       Q.   And the research that you've conducted since

24   your deposition in the Flanagan case, was that research

25   specific to open carry?

Kim Raney

Page 13

1       A.  No.  And I wouldn't necessarily call it

2   research.  It's more of just reading information that was

3   available on Second Amendment issues, sometime the

4   conflict between Second Amendment and First Amendment

5   issues with all the public demonstrations that have

6   happened in the country the last two or three years.  So

7   more in that vein.

8       Q.  So what, if anything, have you read since that

9   time that was specifically addressing open carry or open

10  carry jurisdictions?

11      A.  I reviewed a report by I think it's Professor

12  John Donohue out of Stanford on open carry.  Another

13  document, and I don't remember what organization put it

14  out, dealt with I think research over from January 2020

15  until June 2021 kind of the dichotomy between First

16  Amendment and public demonstrations versus the Second

17  Amendment rights and some issues that have popped up

18  around the country.

19      Q.  And regarding that article, was that specific to

20  open carry?

21      A.  No.  It wasn't specific to open carry.  It was

22  more about the presence of firearms at First Amendment

23  demonstrations.

24      Q.  Do you recall who published that article --

25      A.  I don't.

Kim Raney

Page 14

1        Q.   -- or authored?

2        A.   I don't.

3        Q.   Would you be able to provide a copy of it if you

4    do remember to your counsel?

5        A.   Yes.

6        Q.   And the information that you read that had been

7    published by Mr. Donohue, was that specific to open

8    carry?

9        A.   Well, I believe it was from knowledge he used

10   was right to carry.  So I don't know if it was specific

11   to open carry in regards to handguns or open carry

12   regards to both handguns and long guns.

13       Q.   Aside from whether it referenced or was

14   pertaining to handguns versus long guns, I'm just going

15   to ask again just for clarification for myself and the

16   record, was that dealing with -- the Donohue periodical,

17   was that specific to open carry or was it geared towards

18   concealed carry?

19       A.   That was open carry.

20       Q.   Do you still have a copy of that periodical?

21       A.   Might have a link to it.

22       Q.   All right.  Do you think you could provide that

23   to your attorney?

24       A.   I could, yes.

25       Q.   Thank you very much.

Kim Raney

Page 15

1              MS. BELLANTONI:  And Mr. Wise, I would just ask

2       if you could forward that along, I would appreciate that.

3              MR. WISE:  Sure.

4       BY MS. BELLANTONI:

5           Q.  Other than those two articles or publications,

6       do you recall anything else that you reviewed since the

7       Flanagan deposition that dealt specifically with open

8       carry of a handgun?

9           A.  Not specifically, no.

10          Q.  And are you being compensated for your time as

11      an expert for the defendants?

12          A.  I am.

13          Q.  How so?

14          A.  $250 an hour for document review, written

15      reports, et cetera, and $350 an hour for deposition and

16      trial testimony.

17          Q.  Have you read the complaint that was filed in

18      this matter and/or the amended complaint, because the

19      complaint was amended once as well?

20          A.  Yes.

21          Q.  Have you read both?

22          A.  I believe the amended complaint.

23          Q.  And what do you understand the plaintiffs'

24      claims to be?

25          A.  I understand that the plaintiffs are suing the

Kim Raney

Page 16

1    State of California for their inability to get a permit

2    from -- for them as rural counties, populations of less

3    than 200,000, to openly carry a handgun.  And I believe

4    they're contesting the lack of a process of an

5    application that they haven't been able to submit to

6    openly carry their handguns I think in those specific

7    counties and I believe one of them also mentioned

8    throughout the state of California.

9        Q.  Can you describe how you prepared for your

10   deposition today?

11       A.  I prepared my declaration for the attorney

12   general's office I think in August of this year.  I

13   reviewed the declaration of your expert witness.  I

14   reviewed his deposition transcripts.  I reviewed my

15   deposition transcripts in the Flanagan matter.  And I

16   reviewed the Penal Code sections in California regarding

17   the open carry codified sections.

18       Q.  I'm going to share my screen here to show you

19   Exhibit 1.

20       (Whereupon, Plaintiffs' Exhibit 1 was marked for

21       identification purposes only and attached hereto.)

22   BY MS. BELLANTONI:

23       Q.  Are you able to see this document on screen?

24       A.  Yes.

25       Q.  And this document, for the record, is entitled

Kim Raney

Page 17

1    Plaintiff's Amended Notice of Deposition of Expert

2    Witness Kim Raney.

3           And Mr. Raney, do you recognize the document as

4    being the notice for your deposition to bring you here

5    today?

6        A.  Yes.

7        Q.  All right.  And now having switched to the

8    second document, which will be marked as Exhibit 2, which

9    for the record is entitled Expert Declaration and Report

10   of Former Covina Chief of Police Kim Raney.

11       (Whereupon, Plaintiffs' Exhibit 2 was marked for

12        identification purposes only and attached hereto.)

13   BY MS. BELLANTONI:

14       Q.  Mr. Raney, can you see this document clearly?

15       A.  Yes.

16       Q.  I'm just going to scroll through.  Do you

17   recognize this as being the declaration that was

18   submitted in connection with this case on your behalf?

19           Is that your declaration, sir?

20       A.  Yes.

21       Q.  And is that your signature there on Page 9?

22       A.  Yes.

23       Q.  Did you prepare this declaration or was it

24   prepared for you?

25       A.  I prepared it.

Kim Raney

Page 18

1      Q.  Okay.  And when you prepared it, did you provide

2  a copy, a draft copy to Mr. Wise?

3      A.  Yes.

4      Q.  And is this the same -- is the document that

5  you're looking at here the same in substance and form as

6  the first draft that you had sent to Mr. Wise?

7      A.  Yes.

8      Q.  And going past Page 9 at Exhibit A, can we also

9  find a copy of your curriculum vitae?

10     A.  Yes.

11     Q.  And that CV is comprised of two pages?

12     A.  Yes.

13     Q.  And does this declaration here and your expert

14  report at Exhibit 2, does that document reflect your

15  opinions in this matter in regard to open carry?

16     A.  Yes, it does.

17     Q.  And what specifically were you assigned to do?

18  What were you asked to do in connection with this case?

19     A.  I was asked to comment as a municipal chief of

20  police my opinion on the concept or the laws around open

21  carry in the state of California.

22     Q.  And other than the documents that are referenced

23  in this declaration, were there any other documents or

24  information that you relied on in coming to your opinion?

25     A.  No.

Kim Raney

Page 19

1          Q.  Have you ever served as a law enforcement

2     officer in an open carry jurisdiction?

3          A.  No.

4          Q.  And what, if any, research, other than the

5     information that we discussed earlier from Mr. Donohue,

6     his publication, and the publication that you had

7     referenced regarding First Amendment issues and Second

8     Amendment issues surrounding protests, what, if any,

9     other research have you conducted regarding public safety

10    issues in connection with the open carriage of handguns

11    in public?

12         A.  As far as specific point of research, none other

13    than than what's been mentioned.  But in 39 years of law

14    enforcement in California and the last 15 years as a

15    chief of police, it was 15 years of being at the table

16    both at the municipal level, the county level, and the

17    state level, the majority of the public policy

18    conversations and decisions that were made in all those

19    jurisdictions, so I think quite extensive experience in

20    regard to public safety policy for the State of

21    California.

22         Q.  What personal experience do you have related to

23    public safety regarding the open carriage of handguns?

24         A.  The only personal experience again would be a

25    period in I believe in 2010 or 2011 when some people

**ER199**

Kim Raney

Page 20

1  associated with, and I'll just use my term, the open

2  carry or in the open carry movement were showing up at

3  places like Starbucks and different coffee shops

4  throughout Southern California, most of them in

5  possession of long guns openly exposed, just to create a

6  law enforcement response and then document that contact.

7      Q.  How many such occurrences were there?

8      A.  My jurisdiction was involved in several of

9  those, and it was the topic of discussion at Los Angeles

10  County Police Chiefs Association wherein there were

11  anywhere of a dozen or so throughout the jurisdictions in

12  Los Angeles County.

13      Q.  Over the course of what time period as far as

14  Covina is concerned?

15      A.  I would say a period of a month.

16      Q.  And during what time period?  In what year?

17      A.  Yeah, I believe it was 2010 or 2011, but I'm not

18  not quite sure of the exact time period.  There was just

19  a movement from a group in what's called the South Bay

20  Area of Los Angeles County where they were going out in

21  the region and just I think seeing what the law

22  enforcement response would be to a call for service if

23  they showed up at a Starbucks openly carrying rifles.

24      Q.  Were any of these individuals in Covina, were

25  any of them open carry handguns?

Kim Raney

Page 21

1        A.   I believe they were open carry of rifles.

2        Q.   Not handguns?

3        A.   I don't believe so.

4        Q.   And with regard to -- well, I'm going to

5   withdraw that.

6             Can you describe what you mean by the phrase

7   "open carry movement"?

8        A.   I believe there's a segment of the population

9   who actively are working to use their Second Amendment

10  rights, including in California as in this case, just

11  trying to do what they can to openly carry a handgun.  In

12  this case, it looks like in conformance with the state

13  laws.  And their claims, to my understanding, is that

14  they have been unable to get into the permit process in

15  the one or two counties that they have applied to.

16       Q.   I just want to back up.  So I'm asking you about

17  the open carry movement that you were describing in

18  Covina that involved only the possession of long guns.

19            What specifically were you referring to when you

20  say "open carry movement"?

21       A.   Well, I believe there's again a segment of

22  society who wants the ability to carry -- openly carry in

23  communities handguns and rifles pursuant to their

24  interpretation of the Second Amendment.

25       Q.   And during that time period, which I believe you

Kim Raney

Page 22

1    described as around 2010 or 2011, it was completely legal

2    in California to open carry a rifle or a handgun,

3    correct?

4        A.  I believe it was -- it wasn't illegal.  I think

5    there was a loophole or a gap in the law, and so I think

6    part of that was closed by legislation 2011, 2012.

7            But yes, I think there was -- it wasn't a

8    criminal act to openly carry a rifle in California.

9        Q.  And it was also not illegal to carry a handgun

10   open and exposed if it was unloaded at that point in

11   time, correct?

12       A.  Correct.

13       Q.  And putting Covina to the side, during that same

14   period you mentioned that there were certain gatherings

15   in Los Angeles County as well.

16           Were those events, did those involve long guns

17   or handguns or both?

18       A.  I don't know.  It was just -- the Los Angeles

19   Police Chiefs Association is made up of 45 municipal

20   police chiefs and we have a monthly meeting.  At that

21   meeting there's a round table conversation about any

22   issues going on in your jurisdiction, and several of the

23   chiefs just shared their experience when those situations

24   arose in their jurisdictions.  Basically is information

25   with other chiefs that seem to be an organized practice

Kim Raney

Page 23

1    that was starting throughout Los Angeles County.

2         Q.  Of individuals carrying openly in public?  That

3    was the movement?

4         A.  Well, it was more where they were going to a

5    Starbucks with several people and just seeing if there

6    was a law enforcement call for service and the reaction

7    of that call for services.

8         Q.  Well, how do you know that was their intention

9    or their motive --

10        A.  I don't know if that -- that just seemed to be

11   where the calls were coming from was coffee shops.

12        Q.  But you don't know if the individuals

13   specifically intended to see what the law enforcement

14   response would be or to cause a law enforcement response?

15        A.  Well, I don't know what their intent was.  I

16   know what happened because the chiefs shared that there

17   were calls for service.  And it seemed like there was

18   dialogue.

19            I know in our jurisdiction there was dialog with

20   the group that was there and I think it was basically --

21   it wasn't a confrontational situation.  It was more of

22   just what was going to be the law enforcement response,

23   what was the officers' knowledge of the law in California

24   at that time.

25        Q.  And what was the response in your jurisdiction?

Kim Raney

Page 24

1    A.  I wasn't there.  I was briefed on it.  It was a

2    call for service.  There was more than one person who was

3    at a Starbucks or a coffee shop location when they were

4    contacted by the police.  They just explained what they

5    were doing.  They weren't breaking any laws.  I think the

6    weapons were checked to ensure they weren't loaded.  I

7    think there was just an exchange of information and the

8    parties left and the law enforcement left.

9    Q.  Sounds pretty uneventful; would you agree?

10   A.  I wouldn't agree with the term "uneventful."  I

11   don't know what happened, how the call was dispatched.  I

12   think it was resolved appropriately.

13   Q.  Would you characterize it as being

14   nonconfrontational?

15   A.  Again I wasn't there.  I wasn't briefed that

16   there was a confrontation, so I'd have to make an

17   assumption.

18   Q.  Were you the chief of police at the time?

19   A.  Yes.

20   Q.  And you were briefed on the incident?

21   A.  Yes.

22   Q.  And no arrests were made, right?

23   A.  No.

24   Q.  And these people that were carrying the rifles,

25   were they creating a disturbance of the peace or charged

Kim Raney

Page 25

1    with any disturbance?

2         A.   I don't know what they were creating, but it did

3    generate a call for service.  As far as violating any

4    laws, no, they were not arrested.

5         Q.   So what was the major complaints at the chiefs

6    of police meeting regarding these events?

7         A.   It was more of a heads-up that, and again I'm

8    just going to paraphrase the information that came out

9    from the meeting, that this was an organized effort to

10   gauge the law enforcement response to see if law

11   enforcement was going to make an arrest, even though from

12   all the information we had it wasn't a codified criminal

13   act.  More of a gauge just to gauge the law enforcement

14   response to the calls.

15        Q.   Was it an uncodified criminal act?

16        A.   No.  It wasn't a criminal act.

17        Q.   Did these events have any -- well, withdrawn.

18             Did these events motivate the passing of the law

19   in I think it was 2012, 2013 to criminalize the open

20   carry of a loaded handgun?

21             MR. WISE:  Objection.  Calls for speculation.

22   BY MS. BELLANTONI:

23        Q.   Well, do you know any of the -- were you

24   involved in or do you know of the legislation behind such

25   a law?

Page 26

1      A.   I'm familiar with the legislation, but I wasn't

2   involved in the formation or the discussions around that

3   legislation.

4      Q.   Did you have any discussions with individuals

5   who were involved in creating that legislation?

6      A.   No.

7      Q.   Was it an inconvenience to the police department

8   to respond to these handful of calls?

9      A.   I don't know if I'd use the word "inconvenient"

10  even though I don't disagree with that term.  I think it

11  was just unnecessary.

12     Q.   And why is that?

13     A.   Because I think the -- again this is my

14  opinion -- that the purpose of the conduct was to

15  generate a call from the public so there would be a

16  confrontation with the police to see how the police

17  handled it.

18     Q.   But you don't know that to be the actual

19  purpose?

20     A.   No.  I just said that was my opinion.  I don't

21  know what the persons involved in this or person involved

22  in this, I don't know what their motivation was.

23     Q.   Have you reviewed any law enforcement policies

24  in any jurisdictions in which open carry is lawful?

25     A.   No.

Kim Raney

Page 27

1        Q.   Have you spoken with anyone in law enforcement
2   in an open carry jurisdiction regarding their policies or
3   their procedures regarding open carry?
4        A.   No.
5        Q.   Have you spoken with anyone in law enforcement
6   in an open carry jurisdiction regarding whether open
7   carry has affected public safety in their communities?
8        A.   No.
9        Q.   You read the declaration of Chuck Haggard that
10  was submitted in this case I believe you testified to,
11  correct?
12       A.   Correct.
13       Q.   Have you reached out to Mr. Haggard to discuss
14  with him how the change in the open carry laws has
15  affected public safety in Kansas?
16       A.   No.
17       Q.   Can you describe or just clarify for me what a
18  man with a gun call is in terms of law enforcement?
19       A.   A man with a gun call is generated by a member
20  of the public calling 911 or their local police
21  department saying that there's a man with a gun in their
22  vicinity, whether it's in a business, whether it's in a
23  park.  But obviously, they've made an observation that
24  there is an armed person within their eyesight and
25  they're calling for law enforcement response.

Kim Raney

Page 28

1      Q.  And were these -- I'm just going to call them I
2  guess the Starbucks incidents.  Were those considered man
3  with a gun call or responses?
4      A.  Yes.
5      Q.  And you know that's how they came in to the 911
6  dispatch?
7      A.  That's how I was told them came in as a 911.  It
8  was a 911 call was a man with a gun.  I haven't reviewed
9  the tapes.
10      Q.  And when the police responded, do you know if
11  the officer drew their weapons?
12      A.  I don't know what the officers' conduct was.
13      Q.  If the officers -- well, withdrawn.
14          In connection with the law enforcement response,
15  if an officer draws their weapon, is there necessarily a
16  certain procedure that takes place?
17      A.  I'm not sure what you mean by "procedure."
18      Q.  Well, is there -- withdrawn.
19          If an officer had drawn their firearm in
20  responding to that type of event, is that something that
21  you would have been alerted to?
22      A.  No.
23      Q.  Have you had the opportunity to speak with
24  anyone in law enforcement in an open carry jurisdiction
25  regarding how they handle man with a gun complaints?

Kim Raney

Page 29

1      A.   No.

2      Q.   In the context of this litigation here, what

3  exactly is your expertise?

4      A.   Again 39 years of municipal law enforcement

5  experience, increasing responsibility the last 15 years

6  as chief of police responsible for providing public

7  safety to a city of 50,000.

8           On top of that, president of the Los Angeles

9  County Police Chiefs Association where I represented the

10  45 police chiefs in 2008 in a majority, if not all, the

11  public regional public safety conversations that occurred

12  in Los Angeles.  And then from 2011 through 2014 on the

13  executive board of the California Police Chiefs

14  Association, including president in 2014, where we were

15  involved in the majority of the state-wide issues that

16  came up with public safety legislation.

17      Q.   Specific to open carry, what is your expertise?

18      A.   Again my expertise would be both working and

19  living in a community where if firearms are available and

20  openly carried in the public, from my experience and my

21  opinion, what that could create and especially in the

22  urban and suburban areas of California.

23      Q.   And how do you know that those results will

24  actually take place?

25           MR. WISE:  Objection.  Vague.

**ER209**

Kim Raney

Page 30

1    BY MS. BELLANTONI:

2        Q.  Well, you said you're giving your opinion on

3    what could possibly happen if your jurisdiction allowed

4    for lawful open carry.  And how do you know that the

5    events that you think are going to happen will actually

6    take place?

7        A.  I think by my experience as a resident of

8    California for 64 years, as my experience as a police

9    officer, it would be a seismic shift for the state of

10   California.  And in my opinion, it will create

11   unnecessary law enforcement responses.  It will create

12   unnecessary anxiety and concern in communities.  It would

13   be -- even if it were a legal practice, it would be an

14   unwise or an unsafe practice.  There would be a lot of

15   unanticipated consequences as a result of that, and I

16   think the risks outweigh the benefits.

17       Q.  What risks would those be?

18       A.  Well, I think they're multiple.  I think if you

19   go to an environment where you have open carry, you're

20   setting up an environment where there could be a

21   multitude of issues that have to be dealt with.

22            One is the person with open carry could very

23   well be the victim of an assault themselves.  Their gun

24   could be taken from them.  I'm not sure what their weapon

25   retention skills are, what the quality of their holsters

Kim Raney

Page 31

1    are.  If they were in a business where there's about to

2    be a robbery and they were openly carrying, there's a

3    likelihood or a possibility they would be the first

4    victim.  They would either be disarmed or the first

5    victim shot.

6           If they had to lock up that gun or put that gun

7    away, say there was restrictions on in what public places

8    you could carry that gun or areas you could carry that

9    gun, I would expect that most people then put the weapons

10   in their cars.  That could lead to a rash of guns being

11   stolen out of cars.

12          And the environment we have right now where

13   vehicle burglaries are on the rise in California, you

14   have people out there who you don't know what their

15   de-escalation skills are.  You don't know what their

16   emotional maturity is, you don't know what their

17   intoxication levels are, and now they're making decisions

18   and sometimes split-second decisions on whether they're

19   going to use deadly force or not.  And I think just the

20   risks far outweigh the benefits.

21       Q.  And what are the benefits?

22       A.  Well, I think the benefit would be if somebody

23   who was openly carrying and was going to be the immediate

24   victim of a violent crime or saw a violent crime

25   happening in their presence or a deadly crime, if it was

Kim Raney

Page 32

1    appropriate, they would have the option to, you know,

2    engage with that firearm to end the circumstances and the

3    contact.

4           But it's a lot of discretion to give somebody

5    who is -- you don't know again their training, their

6    maturity level, their intoxication, whether the incident

7    they perceive is really that incident or it's just a

8    perception issue and there's a way to retrieve or

9    de-escalate.  There's a lot of variables.

10          Q.  Can we agree that retreat is not always an

11   option to a victim of a violent confrontation?

12          A.  I think it's always an option.  It might not be

13   the best option, but it's always an option.

14          Q.  It's your opinion that retreat is always an

15   option?

16          A.  Unless you're barricaded or you have no means of

17   retreat.  I mean, I don't know what the physical

18   environment is you're describing, but I think retreat

19   would almost always be an option.  I don't know if it

20   would be the appropriate option, but it's always an

21   option.

22          Q.  Do you agree that every individual has the right

23   to self-defense?

24          A.  Yes.

25          Q.  Do you agree that that's a

Kim Raney

Page 33

1    Constitutionally-protected right?

2          MR. WISE:  Objection.  Calls for a legal

3    conclusion.

4    BY MS. BELLANTONI:

5       Q.  Is a law enforcement officer sworn to uphold the

6    Constitution?

7       A.  You broke up for a second.

8       Q.  As a law enforcement officer, were you sworn to

9    uphold the United States Constitution?

10      A.  Yes.

11      Q.  And were you also sworn to uphold the

12   Constitution of the State of California?

13      A.  Yes.

14      Q.  And can we agree that the Second Amendment of

15   the United States Constitution protects the right to keep

16   and carry firearms or weapons for self-defense?

17         MR. WISE:  Objection.  Calls for a legal

18   conclusion.

19         MS. BELLANTONI:  Well, he's testified that it

20   was his job to uphold the Constitution, to know the

21   Constitution.

22   BY MS. BELLANTONI:

23      Q.  So what is your understanding, Mr. Raney, of the

24   Second Amendment?

25      A.  I understand the Second Amendment to provide

Kim Raney

Page 34

1    people with the right to bear arms.

2        Q.   And what does that mean to you?

3        A.   For me, it means the right to own firearms, to

4    keep a firearm in your home for protection, and if

5    necessary, to use that firearm in your home to protect

6    yourself or your family.

7        Q.   Are you aware that there's no duty of law

8    enforcement to protect under the law, to protect any

9    particular individual?

10            MR. WISE:  Objection.  Calls for a legal

11   conclusion.

12   BY MS. BELLANTONI:

13       Q.   Are you aware of a statute in California that

14   absolves law enforcement for refusing or failing to

15   protect a specific individual?

16            MR. WISE:  Same objection.

17   BY MS. BELLANTONI:

18       Q.   You can answer.

19       A.   I'm not sure I understand your question.

20       Q.   Are you aware of the statute in California that

21   absolves or provides protection for law enforcement

22   officers from being sued for failing to protect an

23   individual resident of California?

24       A.   Well, I know there's -- I don't know if it's a

25   statute or if it's a case law decision, but I know

Kim Raney

Page 35

1    there's a mechanism that describes what you're talking

2    about.

3         Q.  And what is your understanding of that

4    mechanism?

5         A.  That the police don't have a duty to respond or

6    protect.

7         Q.  So how is an individual to protect themselves

8    from violent crime in public if they're not allowed to

9    carry a weapon for self-defense?

10             MR. WISE:  Objection --

11             THE WITNESS:  I don't agree --

12             MR. WISE:  -- I'm sorry.  Objection.  Calls for

13   speculation.

14   BY MS. BELLANTONI:

15        Q.  Well, it's your testimony, Mr. Raney, that your

16   understanding of the Second Amendment is that it only

17   protects the right to have a handgun in your home; is

18   that accurate?

19             MR. WISE:  Objection.  Misstates earlier

20   testimony.

21             MS. BELLANTONI:  Well, I'm asking him if it's

22   accurate.

23             THE WITNESS:  My understanding of the Second

24   Amendment is the right to bear arms.  I know there's

25   language in there about a militia.

Kim Raney

                                                              Page 36

1              So anyway, I think -- again I'm not a

2     Constitutional scholar, but I think that's the issue

3     that's going to the Supreme Court right now as far as

4     interpretation and application of the Second Amendment.

5     BY MS. BELLANTONI:

6         Q.  But it's your understanding that the scope of

7     the Second Amendment applies to possessing a handgun in

8     the home.  That's the extent of the right; is that

9     accurate?

10        A.  No.

11             MR. WISE:  Objection.  Misstates earlier

12     testimony.

13     BY MS. BELLANTONI:

14        Q.  So what is your understanding of the Second

15     Amendment?

16        A.  The Second Amendment allows a person to bear

17     arms.  I don't think it differentiates between a handgun

18     and a long gun.  I believe it just talks about the right

19     to bear arms.

20             And my interpretation of that and my

21     understanding of that is it's the right of gun ownership.

22     It's the right to maintain that gun in your home.

23        Q.  Okay.  So in your understanding of the Second

24     Amendment, it does not apply to maintaining or bearing a

25     handgun outside of the home; is that accurate?

Kim Raney

Page 37

1        A.  Well, I think it's accurate.  I think -- I think

2    what we're seeing right now is states across the country

3    with different applications or interpretations of the

4    Second Amendment.  Because there are a lot of states that

5    have authorized open carry and right to carry in public.

6    California is one of the few that hasn't done that.  And

7    I think that's the decision the Supreme Court's on track

8    to discuss.

9        Q.  I'm just trying to understand what your

10   understanding is because you now both times have limited

11   it to the home.  So I'm trying to understand what your

12   interpretation is.

13           Am I correct in understanding that your

14   understanding of the Second Amendment is that it's

15   limited to the home?

16           MR. WISE:  Objection.  Calls for a legal

17   conclusion.

18           MS. BELLANTONI:  I'm asking what his

19   understanding is.  He limited it to the home, so I want

20   know if that's his understanding.

21           MR. WISE:  Same objection.

22   BY MS. BELLANTONI:

23       Q.  You can answer.

24       A.  My understanding, it's the right to bear arms.

25           Again I don't want mean to argue with you.  I'm

Kim Raney

Page 38

1    not being disagreeable with you.  But I think my

2    understanding as applies to again the State of

3    California, it's the right to bear arms and own firearms

4    and maintain those in your residence.

5        Q.  Can we agree that crime rates are higher in the

6    urban areas of California than they are in rural areas?

7            MR. WISE:  Objection.  Calls for speculation.

8    BY MS. BELLANTONI:

9        Q.  When you were the chief of police did you have

10   access to crime statistics throughout the state?  Is that

11   part of your knowledge and your understanding in

12   reviewing law enforcement around the state of California?

13       A.  I didn't review every jurisdiction and every

14   county's crime statistics in the state of California.

15       Q.  Were you generally aware of the crime rates in

16   the urban areas of California and the suburban areas

17   versus the rural areas of California?

18       A.  No.

19       Q.  So we can agree that the urban areas of

20   California have a higher crime rate than the rural areas

21   of California?

22           MR. WISE:  Objection.  Calls for speculation.

23   BY MS. BELLANTONI:

24       Q.  You can answer.

25       A.  Based on my experience, I would think the more

Kim Raney

Page 39

1    people you have, the more densely populated you have, the

2    likelihood is that you would have higher crime rates than

3    you would in sparsely populated areas.

4         Q.  And does one's right to self-defense diminish

5    depending on the population size of their county in your

6    opinion?

7              MR. WISE:  Objection.  Calls for a legal

8    conclusion.

9    BY MS. BELLANTONI:

10        Q.  You can answer.

11        A.  I don't know if I'd agree with the term

12   "diminish."  I'm not sure what you mean by that term.

13        Q.  So reduces, is a reduction of the ability to

14   defend one's self depending on their location within the

15   state of California?  In other words, is someone's right

16   to self-defense the same in a rural area as it is in an

17   urban area?

18             MR. WISE:  Same objection.

19   BY MS. BELLANTONI:

20        Q.  You can answer.

21        A.  So is your question is someone's right to

22   self-defense different in an urban area as compared to a

23   rural area?

24        Q.  Yes.

25        A.  No.  I don't believe the right to self-defense

Kim Raney

Page 40

1    changes based upon that demographic.

2         Q.  Can we agree that criminals generally choose the

3    time, place, and manner in which they're going to commit

4    a crime?

5              MR. WISE:  Objection.  Vague, calls for

6    speculation.

7    BY MS. BELLANTONI:

8         Q.  You can answer.

9         A.  I don't know if I wholeheartedly agree with

10   that.  I think some criminals do preplan and I think some

11   criminals it's a crime of opportunity.

12        Q.  And in being a crime of opportunity, would you

13   agree that most criminals use the circumstances that are

14   best advantageous to them?

15             MR. WISE:  Objection.  Vague, calls for

16   speculation.

17   BY MS. BELLANTONI:

18        Q.  You can answer.

19        A.  I would think most do.  I'm not sure if all of

20   them have that tactical or reasoning process.

21        Q.  Would you agree that most violent crime is

22   committed outside the presence of a police officer?

23        A.  Yes.

24        Q.  Would you agree that most violent criminals

25   choose a victim who is vulnerable?

Kim Raney

Page 41

```
 1              MR. WISE:  Objection.  Calls for speculation,
 2   vague.
 3   BY MS. BELLANTONI:
 4        Q.  You can answer.
 5        A.  I'm not sure if I'd use the term or agree with
 6   the term "vulnerable."
 7        Q.  What term would you agree with?
 8              MR. WISE:  Same objection.
 9              THE WITNESS:  Again I think -- I'd have to try
10   to get in the mind of a criminal.  I think in a lot of
11   cases it's more of which victim's available.
12   BY MS. BELLANTONI:
13        Q.  Would you agree that most victims have no
14   advance knowledge of being attacked?
15              MR. WISE:  Objection.  Calls for speculation.
16   BY MS. BELLANTONI:
17        Q.  You can answer.
18        A.  I'd agree.
19        Q.  Would you agree that law enforcement is trained
20   to determine the behavior of individuals and assess a
21   specific threat level when responding to an incident or a
22   scene?
23        A.  I don't understand your question as far as who's
24   the individual?
25        Q.  Just generally in the course of law enforcement,
```

Kim Raney

Page 42

1    in performing law enforcement duties, would you agree

2    that police officers are trained to assess various levels

3    of threat depending on the nature of the events, whether

4    they're patrolling or whether they're responding to an

5    actual call?

6              MR. WISE:  Objection.  Vague.

7              THE WITNESS:  If I understand your question, I

8    think what you're asking me is do law enforcements have

9    the training, the intuition, the experience to assess the

10   threat or dangers in a situation or environment that

11   they're entering or exposed to?

12   BY MS. BELLANTONI:

13        Q.  Yes.

14        A.  I'd agree with that.

15        Q.  And what factors do law enforcement officers

16   take into consideration in making those assessments?

17        A.  There's a myriad of factors that come in.  It

18   could be the location, the time of day, the behavior of

19   the person you're coming in contact with, access or --

20   the access to something that might cause you injury or

21   danger, their ability to flee.

22              There's a variety of factors that would come

23   into any situation that you'd have to assess.

24        Q.  When you were working either as a patrolman or

25   as a sergeant did you have any assignments involving gang

Kim Raney

                                                            Page 43

1    activity?

2         A.   Yes.

3         Q.   And can we agree that most gang activity is drug

4    related and/or related to crimes of violence?

5              MR. WISE:  Objection.  Calls for speculation.

6              MS. BELLANTONI:  It's his experience.

7    BY MS. BELLANTONI:

8         Q.   In your experience, is the gang activity that

9    you investigated or been involved in related to drugs

10   and/or violent criminal activity?

11        A.   I'd say the majority of that is either drug

12   activity or some type of criminal enterprise, yes.

13        Q.   That you would describe as violent?

14        A.   Some are violent, yes.

15        Q.   Can we agree that most gang activity is geared

16   towards violence or is of a violent culture?

17             MR. WISE:  Objection.  Calls for speculation.

18   BY MS. BELLANTONI:

19        Q.   In your experience.  You can answer.

20        A.   Not that I agree with the term of "most," but

21   it's not unusual that there's violence associated with

22   gang members.

23        Q.   And what was the scope of your experience with

24   gang-related activity?

25        A.   I was a sergeant in charge of the detective

Kim Raney

Page 44

1    division, which included a gang unit.  When I was a

2    lieutenant I was in charge of our entire criminal

3    investigations department, which included the gang unit.

4    Even back into the '80s I was working narcotics in the

5    cocaine trade in Southern California that dealt with both

6    the Columbian and the crack cocaine epidemic.

7        Q.  And in your experience, have you ever come

8    across a gang member who was carrying a handgun openly in

9    a holster?

10       A.  Yes.

11       Q.  And approximately how many occasions did you

12   encounter that?

13       A.  I think just a handful.

14       Q.  Can we agree that most gang members or violent

15   criminals will carry their firearm concealed on their

16   person?

17            MR. WISE:  Objection.  Calls for speculation.

18   BY MS. BELLANTONI:

19       Q.  In your experience.

20            In your experience in law enforcement, I think

21   it's over 40 years now maybe, has it been your experience

22   that criminals will carry their firearms concealed on

23   their person?

24       A.  It's my experience is they would carry it either

25   concealed on their person, concealed in their car, or

Kim Raney

Page 45

1    have a female member of their gang or group carry it.

2         Q.  And would the female member of their gang or

3    group carry it concealed as well?

4         A.  Yes.

5         Q.  And in your experience, is it -- is the purpose

6    of carrying such weapons concealed to provide an

7    advantage to the criminal over law enforcement and/or a

8    victim?

9         A.  Can you repeat your question?

10        Q.  Sure.

11            MS. BELLANTONI:  Could you read that back,

12   please?

13   (Whereupon, the requested portion of the record was read

14                   back by the Reporter.)

15            THE WITNESS:  I don't know what their intent is.

16   I don't know if it's to provide them an advantage.  It's

17   just to conceal it so it's not probable cause for

18   contact.  I'd have to guess.

19   BY MS. BELLANTONI:

20        Q.  Can we agree that it would provide a criminal an

21   advantage, either advantage against law enforcement or an

22   advantage against a victim, to carry a firearm concealed

23   on their person as to open?

24        A.  Sure, it could.  Yes.

25        Q.  Can we also agree that the conduct and behavior

Kim Raney

Page 46

1    and emotional reaction of a criminal will differ markedly

2    from that of a law-abiding person?

3             MR. WISE:  Objection.  Calls for speculation,

4    vague.

5             THE WITNESS:  Yeah, I'm not sure I understand

6    your question.

7    BY MS. BELLANTONI:

8        Q.  Well, in the course of your law enforcement

9    experience, have you ever come across an individual who

10   was in lawful -- in public in lawful possession of a

11   handgun?

12       A.  Yes.

13       Q.  And can we agree that a person who is in lawful

14   possession of a handgun will have different behavior or

15   conduct or emotional reaction to police contact than a

16   criminal or a gang member?

17            MR. WISE:  Objection.  Calls for speculation.

18   BY MS. BELLANTONI:

19       Q.  You can answer.

20       A.  I would agree generally with that, yes.

21            MS. BELLANTONI:  Does anyone need a break?

22   We've been going for a little while here.  Lynne?

23            THE COURT REPORTER:  Do you mind just five

24   minutes?

25            MS. BELLANTONI:  Not at all.

Kim Raney

Page 47

```
 1            THE COURT REPORTER:  Thank you.
 2            MS. BELLANTONI:  Back in five.
 3               (Whereupon, a recess was taken.)
 4    BY MS. BELLANTONI:
 5       Q.  Mr. Raney, back on the record after a short
 6    break.  Is there anything about your prior testimony up
 7    to this point that you'd like to clarify or change?
 8       A.  No.
 9       Q.  During what period of time did you serve as the
10    chief of police in Covina?
11       A.  From 2001 through 2016.
12       Q.  And I know I'm going back a little ways.  Do you
13    have a sense of how many murders were committed or how
14    many arrests, charges of murder were there during the
15    time that you were a police chief?
16       A.  I don't have a total number for the entire 15
17    years.  Each year was different.  Some years we would
18    have two or three, some years we would have 12.  One year
19    we had a mass murder in 2008 where we had nine people
20    killed at a Christmas Eve event.
21            So each year was different.
22       Q.  And so you mentioned a Christmas Eve event in
23    your declaration; is that right?
24       A.  Yes.
25       Q.  And were you one of the -- did you respond to
```

Kim Raney

Page 48

1    the scene of that event?

2         A.   The incident started about 11:30 on Christmas

3    Eve.  I got a phone call at home about 11:40 and came in,

4    so I was probably there within 20 minutes.

5         Q.   And with regard to the scope of your expertise

6    in this case on the issue of open carry, was that

7    particular incident -- is that particular incident

8    relevant to the issue of open carry?

9         A.   No.

10        Q.   Were -- did the homeowners or the individuals

11   that were the victims, did they know the person that had

12   attacked them?

13        A.   Yes.  It was their former son-in-law.

14        Q.   This was not gang-related activity; is that

15   correct?

16        A.   No.

17        Q.   And the individuals in the home, do you know if

18   they had access to either a handgun or a rifle or

19   shotgun?

20        A.   I don't know.

21        Q.   Do you recall whether there was any attempt to

22   defend with the use of a firearm?

23        A.   No.  There was no attempt to defend themselves.

24        Q.   And so how ultimately was the attacker -- was he

25   caught or how did it resolve itself?

Kim Raney

Page 49

1      A.   So he dressed up as Santa Claus.  Because the

2    family had a tradition at Christmas Eve where a neighbor

3    would dress up as Santa Claus and come to the house and

4    distribute gifts to the children at the event.  It was a

5    large family tradition.

6           So there had been a contentious divorce with one

7    of the daughters.  And the son-in-law, he started his

8    planning months earlier, had a Santa Claus suit designed

9    and tailored where he could conceal four handguns.  And

10   then he prepared a compressor with a hose and the ability

11   to mix oxygen and racing fuel and wrapped that as a

12   Christmas present and carried that to the front porch and

13   put it down and knocked on the door.

14          So a little girl opened the door.  She was

15   immediately shot in the face by the suspect, who then

16   went inside the house and executed nine family members

17   sitting around a table.  Went back to the porch and now

18   retrieved his flamethrowing device and went in the house

19   and started distributing the oxygenated-racing fuel.

20          The flaw in his plan was he didn't anticipate

21   either the fireplace or candles to be lit, and the house

22   exploded and blew him up and he suffered third degree

23   thermal burns, but he survived.

24          So he fled to a car and then fled the scene and

25   drove to an area, his brother's house in the northern

Kim Raney

Page 50

1    part of Los Angeles County about an hour away, and

2    sometime before seven or eight o'clock the next morning

3    he committed suicide.

4         Q.   Do you know in what manner did he commit

5    suicide?

6         A.   Put a gun in his mouth, pulled the trigger.

7         Q.   At the time in 2008 it was against the

8    California Penal Code to carry a loaded firearm, correct?

9         A.   Yes.

10        Q.   Can we agree that criminals who seek to do harm

11   to others, if they're intent on doing harm, are going to

12   just disregard the law?

13             MR. WISE:   Objection.   Calls for speculation.

14   BY MS. BELLANTONI:

15        Q.   You can answer.

16        A.   I'd agree with that.

17        Q.   I mean, the very definition, can we agree, of

18   criminal is someone who is violating established laws,

19   right?

20        A.   They commit a crime.

21        Q.   Right.   Of the homicides that were committed

22   during the time you were chief of police, do you recall

23   any that were committed by individuals who were in lawful

24   possession of a handgun?

25        A.   Is your question was the victim or any of the

Kim Raney

Page 51

1    victims in lawful possession of a handgun?

2         Q.   Apologies, no.

3              Was the criminal, was the perpetrator of the

4    homicide, in lawful possession of the handgun that was

5    used to commit the crime?

6         A.   Not that I recall, no.

7         Q.   And going to the victim side of the equation, in

8    your experience in law enforcement, not just as chief but

9    the entire law enforcement experience in Covina, have you

10   had occasion to learn of or be involved in a circumstance

11   where the victim was able to defend themselves from a

12   violent attack by using a handgun?

13        A.   I don't specifically remember one where the

14   victim defended themselves with a firearm.

15        Q.   Are you aware just through reading publications

16   and announcements from other law enforcement agencies,

17   either in California or from other jurisdictions, of

18   circumstances where a victim has survived a violent

19   attack through the use of their own handgun?

20        A.   Yes.  I have read of instances where that has

21   happened.

22        Q.   Of the homicides that were committed during the

23   time where you were chief of police, were the majority of

24   those homicides committed in the context of gang-related

25   activity?

Kim Raney

Page 52

1      A.  I would guess maybe 20 percent were gang

2  activity, some were domestic, and some were random acts

3  of violence.

4      Q.  And I know you're just approximating here, so

5  I'm just trying to get an approximation as well.

6          If 20 percent was roughly related to gang

7  activity, do you know or can you recall how the remaining

8  80 percent was calculated?  Did it fall into domestic

9  circumstances or just random --

10      A.  Some -- some were in commission of other crimes,

11  commission of robberies.  And some were just the results

12  of an argument or disagreement, some other event that led

13  up to a homicide.

14      Q.  And when we speak of domestics or the robberies

15  or arguments, are these generally shootings -- withdrawn.

16          How many, if you can recall, what's the

17  percentage in your experience that were related to

18  firearms as opposed to another means of homicide?

19      A.  I would say over 90 to 95 percent were firearms.

20  The other 5 percent were either blunt force or

21  sharp-edged weapons.

22      Q.  And of the 90 percent that utilized a firearm,

23  can you think back as to what percentage generally

24  occurred inside of a home as opposed to outside of a home

25  in public?

Kim Raney

Page 53

1      A.  I'd be guessing.  Maybe 50, 60 percent inside a

2   home, 40, 50 percent outside the home.

3      Q.  And when we talk about the incidents of firearm

4   use in a criminal matter inside of a home, in your

5   experience as chief of police, were these domestic-type

6   situations or were they more a random like a break-in

7   burglary or robbery in a home or rape?

8      A.  Almost I wouldn't say exclusively but the vast

9   majority were either domestic or a former family member.

10  But there were occasional homicides during the course of

11  a break-in for sexual assault.  We did have a rash, a

12  handful of those that occurred in a series.

13     Q.  And can we agree in your experience, has it been

14  that violent crime can take place either in the home or

15  out in public?

16     A.  I'm sorry?  I missed that.

17     Q.  Is it the case that violent crime can take place

18  in the home or outside of the home in public?

19     A.  Yes.

20     Q.  In California under the California Penal Code,

21  from your experience in law enforcement, is it lawful to

22  use deadly force in defense of certain types of crimes?

23  In other words, in defense of a rape or a kidnapping or

24  attempted murder.

25     A.  I don't believe there's a catalog of crimes that

Kim Raney

Page 54

1    automatically allow you to resort to deadly force.  I

2    think it's described as the use of deadly force to

3    prevent immediate death or serious injury.

4        Q.  So just as an example, based on your experience,

5    if a woman was being raped and shot her rapist, is that

6    one of the types of crimes that would provide the defense

7    of her use of deadly force?

8        A.  Yes.  I think that would provide a defense.

9        Q.  Are you aware of California's history prior to

10   1976 open carry being legal in the state?

11       A.  You know, I've read I wouldn't say a lot of that

12   but some of that, but I don't remember the particulars.

13   But I couldn't disagree with that.

14       Q.  Do you have any knowledge of what specifically

15   happened in and around 1967 to cause a change in the law

16   in California?

17       A.  No.  I don't know the specific reason.

18       Q.  Have you heard of the Mulford Act?  Is that

19   familiar to you?

20       A.  No.

21       Q.  And in the course of your law enforcement

22   experience, possibly even specifically as the chief of

23   police, did you become aware of trends or particular

24   issues relating to law enforcement in other jurisdictions

25   in other states?

Kim Raney

Page 55

1          A.  In regards to what?

2          Q.  Anything.  I mean, is that within the scope of

3    your employment as the chief of police that you would

4    either in getting a bulletin or subscribing to an email

5    service that you would just see what, for instance, use

6    of force trends are happening or specific, you know,

7    drug-related courier activities are taking place

8    throughout the country?

9              Did you have an opportunity to learn of other

10   law enforcement issues that were happening around the

11   country?

12             MR. WISE:  Objection.  Vague, compound.

13             MS. BELLANTONI:  Very compound.

14   BY MS. BELLANTONI:

15         Q.  Did you understand the question?

16         A.  I think I understand it.  Now was there a formal

17   service that we got information from that was shared

18   either nationally?  No, except for information that would

19   come from the FBI.

20             There is an association called the International

21   Association of Chiefs of Police.  They do have a

22   conference every year.  We would attend that conference.

23   So within that, again it's a conference environment where

24   there are programs or seminars or presentations that are

25   put on from different agencies across the country and

Kim Raney

Page 56

1    across the world on things that are either relative, that

2    are significant, that are trending, or that are things

3    that the planners of the event feel that the profession

4    could benefit from.

5         Q.  Did you attend any of those events?

6         A.  Yes.  I was a presenter at two of them.

7         Q.  What topic did you present on?

8         A.  Medical marijuana.

9         Q.  Yeah, so I was reading that you had engaged in

10   some publications in your declaration.  Were you --

11   didn't know what side of the fence you ended up being on.

12        Were you a proponent of -- you're not medical

13   marijuana.  I'm talking about the legalization of

14   marijuana.  Two different things.

15        A.  Well, medical marijuana was a Trojan horse for

16   legalization.  So it started as medical marijuana and

17   then it evolved into the legalization of marijuana.  So

18   that was one of the topics I was involved with for six

19   years.

20        Q.  So I guess my curiosity was which side of the

21   fence did you find yourself on?  Were you a proponent of

22   legalizing marijuana or an opponent?

23        A.  So I was personally an opponent, and the Police

24   Chiefs Association was an opponent and we were very

25   active in 2010 when Proposition 19 was on the ballot and

Kim Raney

Page 57

1    we defeated that.  That was for the legalization of I

2    think it was termed "medical marijuana" or "marijuana,"

3    but we defeated that.

4            But we could see -- and this is the hypocrisy of

5    it.  We could see through the state legislature, every

6    year California state legislature was trying to legalize

7    marijuana and every year we would defeat it.  Even got to

8    the point where they would pass something, meet with the

9    governor, and he would veto.  Then we had to get

10   strategic.

11           So the analogy was it's going to be like playing

12   hockey and eventually they're going to get one in the

13   net.  They're going to sneak one by the goal.  So we

14   thought strategically eventually the California State

15   legislature is going to pass some marijuana legislation

16   that is really problematic to the community and the

17   public safety.

18           So we worked with other law enforcement

19   associations and with State Senator Lou Correa, who's now

20   a Congressman Lou Correa, and he carried the bill, the

21   outline on the legalization or decriminalization of

22   marijuana in California.  It was a two year process.

23   Eventually that bill was signed I think in 2015.  2015 or

24   2016.  And we were the sponsor of that.

25           Q.  So --

Kim Raney

Page 58

1        A.  -- responsible for legislation because we knew

2     it was coming.

3        Q.  So what were the I guess benefits versus the

4     downside when you were the opponent and then ultimately

5     what led you to the conclusion that it would be

6     beneficial or that the benefits would outweigh the

7     detriments?

8        A.  Because we knew it was going to pass.  We knew

9     just based upon the state legislature that they were

10    eventually going to pass some legislation.  So we wanted

11    to ensure that not only law enforcement but community

12    stakeholders, the California League of Cities, other

13    people are stakeholders in communities had a voice in the

14    drafting and creation of this legislation to provide

15    safeguards to the community.

16            So that was our focus on that to ensure that the

17    safeguards were in place before -- and I think the term

18    was decriminalize.  They couldn't legalize it because of

19    the federal issue, but decriminalize certain amounts of

20    marijuana in the state of California.

21       Q.  And specifically, what safeguards were put in

22    place?

23       A.  It's been a long time.

24       Q.  If you can recall.  Generally.

25       A.  You know, it was more about the regulation of

Kim Raney

Page 59

1    it, cities being involved in the approval and permitting

2    process of dispensaries or not approving.  So cities

3    would have the ability to say yes or no to a marijuana

4    dispensary in their jurisdiction, not leave that up to

5    the state, override cities.  Because the vast majority of

6    cities were against that.

7             So we ensured that the cities had the ability to

8    either to approve, deny, license or regulate marijuana

9    distribution within their cities.  And most cities have

10   opted not to do that.

11      Q.  In the I believe it was the International

12   Association...

13      A.  International Association of Chiefs of Police.

14      Q.  Chiefs of Police, yeah.  In the times that you

15   attended those conferences, was the topic of open carry

16   ever raised or was that -- to your recollection.  I'm

17   sure there are many courses given.  To your recollection,

18   is that an issue that was brought up?

19      A.  I don't recall open carry being an issue.  I

20   think more it got into the issue of ammunition stamping,

21   waiting periods, gun shows, things like that.

22      Q.  Do you recall seeing any law enforcement

23   announcements that related to addressing public safety

24   issues regarding open carry of handguns?

25      A.  I don't know.

Kim Raney

Page 60

1          Q.  Are you aware that only five states of the 50

2     states including the District of Columbia, so six

3     jurisdictions, only six of them banned open carry?

4               MR. WISE:  Objection.  Lacks foundation.

5     BY MS. BELLANTONI:

6          Q.  Are you aware of that?

7          A.  Yes, I am.

8          Q.  Are you familiar with the term "Constitutional

9     carry"?

10         A.  I've heard of the term, yes.

11         Q.  What is your understanding of Constitutional

12    carry?

13         A.  I'm not sure I understand it.  So I don't want

14    to be wrong, I don't want to guess.

15         Q.  Are you aware that over 20 states have approved

16    Constitutional carry?  And that means to be able to carry

17    concealed or open without needing a license?

18              MR. WISE:  Objection.  Lacks foundation.

19              THE WITNESS:  No.  I'm not aware of that.

20    BY MS. BELLANTONI:

21         Q.  And -- withdrawn.

22              Is it your opinion that police officers in an

23    open carry jurisdiction are better trained to deal with

24    public safety issues regarding open carry?

25         A.  So is your question are police officers --

Kim Raney

Page 61

1    that's what I understand, are they better trained in open

2    carry issues compared to police officers that don't allow

3    open carry?

4        Q.  Right.  And I guess I'm asking that in the

5    context of your declaration speaking to the myriad of

6    problems that would be posed to law enforcement officers

7    in California if open carry were legalized.

8            So I'm just wondering if it's your opinion that

9    the law enforcement officers in open carry jurisdictions

10   are better trained to deal with those issues that would

11   rise as a result of open carry being legal?

12           MR. WISE:  Objection.  Vague.

13   BY MS. BELLANTONI:

14       Q.  You can answer.

15       A.  I don't know if I'd agree with the term

16   "better."  I would agree that they have received some

17   training since those jurisdictions have implemented open

18   carry.  I think then they have experience with open

19   carry.  So on those things I'd agree with that component

20   of it.

21       Q.  Can we agree that if law enforcement officers in

22   California were properly trained to deal with the change

23   in the law to allow open carry that they would rise to

24   the challenge and respond appropriately in an open carry

25   jurisdiction?

Kim Raney

Page 62

1              MR. WISE:  Objection.  Vague.

2              THE WITNESS:  Yeah --

3    BY MS. BELLANTONI:

4         Q.  Sorry, I didn't get your answer.

5         A.  Sure.  Law enforcement would rise to the

6    occasion, law enforcement would be trained.  But law

7    enforcement training is only one component of the global

8    issue of open carry, so that's my concern.

9         Q.  Okay.

10        A.  And that was my complaint with your expert

11   witness's report is that he's a training expert, he's a

12   firearms expert, but he was singley focused for the most

13   part on the training component, and that is just one

14   piece of this global issue on open carry.

15        Q.  And by global, what do you mean by "global"?

16        A.  Law enforcement training is one component.  You

17   have the complete change of environment in communities

18   where now people who are going to restaurants, going to

19   theaters, going to parks with their kids are now having

20   to deal with somebody who they don't know who's openly

21   carrying and possessing a firearm.

22        Q.  So let's stop right there for a moment.

23             So how do you think that's going to change

24   anything in the community if open carry is allowed, is

25   legalized?  What do you anticipate is going to happen?

Kim Raney

Page 63

1        A.  I think there's potential for increased volume

2    of service.  Because people are going to see that and

3    either (1) not be aware that it's been legalized, or (2)

4    in spite of it being legalized, they are just

5    uncomfortable with having somebody with a handgun sitting

6    next to them in a theater or a restaurant or on the

7    playground with their kids and they're going to call 911

8    for law enforcement response.

9            That's my concern.  That's my estimate that will

10   happen.

11       Q.  And do you base that on any actual events or is

12   that just a concern that you have?

13       A.  I think just -- I'm not using this term

14   flippant -- I think just wisdom.  Just I've lived here

15   all my life.  I'm familiar with the communities.  I'm

16   familiar with especially in the suburban/urban

17   environment there will be a public reaction to that.

18       Q.  So it's only been about I would say less than

19   ten years since open unloaded carry has been

20   criminalized.  How was it dealt with before 2013?

21       A.  How was open unloaded carry?

22       Q.  Yes.  In other words, you mentioned a concern

23   that there would be chaos and people would be

24   uncomfortable and there would be a lot of law enforcement

25   response and certain other unknown events and reactions.

Kim Raney

Page 64

1    But to your knowledge and your experience as a law

2    enforcement officer prior to 2012, 2013, open carry,

3    albeit unloaded, was lawful.  So how was it dealt with

4    then?

5              MR. WISE:  Objection.  Misstates earlier

6    testimony.

7    BY MS. BELLANTONI:

8         Q.  Go ahead.  You can respond.

9         A.  I don't think I've used the term "chaos."

10        Q.  Okay, so the reaction that you anticipate --

11        A.  -- I'm concerned that -- as a resident even

12   though I'm a retired cop, I would have that same concern.

13             Why is it different now than it was in 2010,

14   2008, or whatever?  Because I don't think the publicity,

15   the awareness, just the volume of this issue was

16   prevalent in our society as much as it is today, as much

17   as the last few years.  So 2007, 2008, 2010, those were

18   very rare occurrences.  Not saying they didn't happen,

19   but they were rare.

20             But I think as society is changing I think there

21   will be a lot more people who would take the opportunity

22   to openly carry a firearm if it was legalized in

23   California.  And because of that volume, I'm concerned

24   that, I'll use the word, the anxiety level of people

25   would rise, which would then generate a law enforcement

Kim Raney

Page 65

1   response.  Not that law enforcement response is going to

2   create a crisis, but it's going to create a law

3   enforcement response to a gun call.  It's going to

4   create --

5       Q.  Why is --

6       A.  -- it's going to --

7       Q.  -- a problem?

8       A.  Is that a problem?  No, it's not a problem.

9   It's a resource issue, number one.  It's a quality of

10  life issue, number two.  And again I'm speaking just as a

11  retired cop who has the ability to carry a concealed

12  weapon, but I'm not clairvoyant.  I can't -- if someone's

13  openly carrying a gun sitting next to me, I don't know

14  what's going through their mind.  I don't know what

15  they're processing.  I don't know where they're at.

16          And I use the term that the majority of people

17  are law-abiding citizens, law-abiding citizens until

18  they're not.  And it's when that crosses the line when

19  they're not that creates the problem.

20      Q.  How do you know you're not sitting next to a

21  person who has a concealed weapon and could be thinking

22  something criminal or could be plotting to do something

23  violent sitting next to you at the movie theater?  At

24  least if there's an open -- openly-carried handgun you

25  would know that the person's armed, right?

Kim Raney

Page 66

1      A.  I'd agree with that last part.  I'd know that

2  they were armed, yeah.

3      Q.  As you sit next to anyone anywhere --

4  restaurant, movie theater, park -- you have no idea who's

5  carrying.  Is that a fair statement, correct?

6      A.  I don't know if it's a fair statement.  I think

7  it's a possibility.

8      Q.  We don't know who's carrying concealed unless

9  you can actually see a handgun, right, or some printing

10  or have an idea or from a statement that they made that

11  they have a firearm on them, right?

12      A.  Right.

13      Q.  Have you taken any steps to conduct research or

14  a poll in the community to see whether people would

15  actually feel uncomfortable with other people carrying a

16  handgun in a holster on their person?

17      A.  No.

18      Q.  Do you know if there had been any polls

19  conducted in the state of California as to whether

20  individuals, residents would be opposed to allowing for

21  open carry?

22      A.  I'm not aware of any.

23      Q.  I mean, the legislature provided a statute,

24  right, for open carry permits to be issued, correct?

25      A.  Correct.

Kim Raney

Page 67

1      Q.  When you were chief of police, were you in

2  charge of issuing or reviewing applications for carry

3  permits?

4      A.  For CCW permits?

5      Q.  Let's start with, yeah, concealed carry.

6          Were you able to issue concealed carry permits?

7      A.  Yes.

8      Q.  Did there come a point in time when your

9  department no longer -- I guess no longer reviewed those

10  applications and they were left to the sheriff's

11  department?

12      A.  My successor did that.  I did not.

13      Q.  And did you issue any concealed carry permits?

14      A.  I did not.

15      Q.  Did you have any applications for a concealed

16  carry permit to consider --

17      A.  I did not.

18      Q.  -- during your time as chief?

19      A.  I did not.

20      Q.  Nobody applied?

21      A.  No application reached my desk.

22      Q.  Does that mean people applied, but it just

23  didn't get to you --

24      A.  People might have inquired, but nobody ever

25  followed through with a completed application process

Kim Raney

Page 68

1    that I had to do.

2        Q.  Did you have a policy or make any public

3    statements during your tenure or otherwise that you were

4    an opponent of issuing concealed carry permits?

5        A.  No.

6        Q.  Do you believe that self-defense -- when you

7    were chief of police, was it your opinion that

8    self-defense was a valid reason for good cause to issue a

9    concealed carry permit?

10       A.  Solely self-defense?

11       Q.  Yes.

12       A.  No.

13       Q.  And why is that?

14       A.  Because I think anybody can make that claim.  So

15   my parameters, and again I never had to review one or

16   deal with one, was there had to be extenuating

17   circumstances.

18           For me, say hypothetically a district attorney

19   was prosecuting a high profile gang crime that received

20   threats and wasn't either going to get the level of

21   protection from the district attorney's investigator's

22   office, then I would consider a CCW for a district

23   attorney, for a judge, and not solely just self-defense.

24       Q.  Doesn't everyone have the right to self-defense?

25           MR. WISE:  Objection.  Argumentative.

Kim Raney

Page 69

1   BY MS. BELLANTONI:

2       Q.  In your opinion does every individual have the

3   right to defend themselves against a violent attack?

4       A.  Yes.

5       Q.  Then how is it that self-defense was not enough

6   to issue a concealed carry permit while you were chief of

7   police?

8       A.  Because for me, there had to be a more

9   significant threat.  Because anybody could come in and

10  say I want it for self-defense.  And there had to be a

11  higher threshold for that for me.

12      Q.  In your position as the chief of police, was

13  that an appointed position or an elected position?

14      A.  Appointed

15      Q.  Appointed?  I'm sorry?

16      A.  Appointed.

17      Q.  And who were -- not the person's name, but who

18  were you appointed by?

19      A.  The city manager.

20      Q.  Is that akin to like the mayor of the city or

21  the executive of the city?

22      A.  That's the paid executive.  Not the elected, the

23  paid executive.

24      Q.  Is the city manager who appoints you also

25  appointed?

Kim Raney

Page 70

1      A.   Yes.

2      Q.   And who appoints that person?

3      A.   City council.

4      Q.   And your concealed carry permit philosophy or

5  policy when you were the chief of police, was that yours

6  alone or was that a view that was reached in connection

7  or in conjunction with the city manager or the city

8  council?

9      A.   That was mine.  I did have discussions with the

10  city manager.  I did not discuss it with the city

11  council.

12      Q.   And were you and the city manager of the same

13  mind-set with regard to the issuance of the concealed

14  carry weapons permits?

15      A.   I worked for four different city managers.  So

16  the only one who brought the topic up was the first city

17  manager.  The last three never brought the topic up.

18      Q.   And did the first city manager indicate to you

19  their preference for not issuing concealed carry

20  licenses?

21      A.   No.  Just I had to go through a testing process,

22  competitive testing process, and then there were two of

23  us that were left and then we each had an interview with

24  the city manager.  During the course of that interview

25  that was one of the questions he asked as far as our

Kim Raney

Page 71

1    philosophy about that.  That was the extent of it.

2         Q.  Do you know if your philosophy was different

3    than the other person who interviewed for the job?

4         A.  Don't know.

5         Q.  Did the city manager share that same philosophy?

6         A.  Well, he never disagreed with me.  We didn't get

7    into it, but he never disagreed with me on that topic.

8         Q.  Did anyone apply for an open carry permit during

9    your tenure as chief of police?

10        A.  There was no open carry as far as permit

11   process.  I retired in 2016 and I believe it was limited

12   to counties under 200,000 in population.

13        Q.  And just for the record, what county was your

14   jurisdiction located in?

15        A.  Los Angeles County.

16        Q.  And roughly, what's the population of LA County?

17   Is it over 200,000?

18        A.  About five to six million.

19        Q.  And during your tenure as the chief of police

20   did you have meetings with executive law enforcement from

21   counties throughout the state?

22        A.  Yes.

23        Q.  And did that include sheriffs' offices as well

24   as police departments?

25        A.  My situation was unique.  California Police

Kim Raney

Page 72

1    Chiefs Association is made up of 330 municipal police

2    chiefs.  So we had our own association and the board of

3    directors had quarterly meetings and we had an annual

4    symposium, seminar, whatever the word of the month is.

5            Sheriff's department, the California State

6    Sherriffs Association had their own association.  It's

7    made up of the 57 or 58 county sheriffs in the state of

8    California.  So the two don't meet together.

9            But as the president of the Police Chiefs

10   Association I was invited to all of their regional

11   meetings.  So I'd attended five of their quarterly

12   meetings, if that makes sense, where I would be at the

13   table as they discussed policies, legislative issues,

14   political issues, and we'd have an exchange of

15   information.

16       Q.  Is it fair to say that the sheriffs are the

17   agencies that are the executive law enforcement for the

18   counties that have populations of 200,000 people or less?

19   Does it break down that way?

20       A.  So is your question are they the executive law

21   enforcement?

22       Q.  I'm going to rephrase that.  That was messy.

23           For counties -- generally, for counties in

24   California that have a population of 200,000 people or

25   less, is the licensing authority in those jurisdictions

Kim Raney

Page 73

1    typically a sheriff's agency?

2         A.  I believe it is the sheriff or the chief of

3    police.

4         Q.  So it would be either one, is that --

5         A.  I believe that, yes.

6         Q.  And in attending the sheriffs' meetings, do you

7    recall any discussions during any of those meetings with

8    regard to the open carry process or issuing open carry

9    licenses?

10        A.  Not so much open carry.  There were

11   conversations about concealed carry because the sheriffs

12   are involved in issuance of CWWs as well, so there were

13   conversations about that.  But open carry, I was at table

14   with them in 2013, so that legislation hadn't quite

15   ripened yet.

16        Q.  And with regard to the chiefs of police for the

17   counties that are under the 200,000 population, do you

18   recall any view or approach to issuing or not issuing

19   open carry licenses subsequent to 2013?

20        A.  No.  I don't remember having any conversations

21   or big focused issues or conversations about that.

22             MS. BELLANTONI:  Can we take a five minute

23   break?  I want to go over my notes.  I think I'm pretty

24   much ready to wrap it up.  Is that okay?

25             THE WITNESS:  Yes.

Kim Raney

Page 74

1                    (Whereupon, a recess was taken.)

2    BY MS. BELLANTONI:

3         Q.  We are back on the record, and Mr. Raney, I just

4    want to take a look at your declaration.  I'm going to go

5    to Page 7 and can you see the document all right?

6         A.  Yes.  There's a lot of lines and then 25 percent

7    is covered by the images.

8         Q.  Let me see if I can... hold on.  Let me see if I

9    can resolve that.

10        A.  I can read it if you want to make it a little

11   bit smaller.  I'm not that blind yet.

12        Q.  There it is.  Sorry.  You okay?

13        A.  Yeah.

14        Q.  So if you're looking at Paragraph 25, I just

15   want to talk a little bit about the Dallas shooting that

16   you referenced in the declaration just to clarify it a

17   little bit.

18             Paragraph 25 addresses a mass shooting that

19   occurred in Dallas, Texas; is that correct?

20        A.  Yes.

21        Q.  And this is information that you learned as a

22   result of an article, or did you have conversations with

23   anyone who was present and/or law enforcement in Dallas

24   at the time?

25        A.  No.  It was from an article.

Kim Raney

Page 75

1        Q.  All right.  And with regard to this mass

2    shooting, is it fair to say that the people in the crowd

3    who were attending whatever gathering was taking place

4    outside were armed with long guns?  They had rifles,

5    AR-15s specifically?

6        A.  In my understanding, they were long guns.

7        Q.  So this is not a case where the crowd was

8    engaged in open carry of a handgun in a holster, correct?

9        A.  That's not my understanding, that they were in

10   possession of long guns or AR-15s or M4s or whatever you

11   have.

12       Q.  And are you aware of whether law enforcement

13   actually shot anybody who was at the gathering?

14       A.  I'm not aware that they shot anybody at the

15   gathering.

16       Q.  So then is it fair to say that when police

17   responded to the mass shooting at this location where

18   numerous people in the crowd were carrying AR-15s, that

19   the police did not arrive and then began shooting the

20   demonstrators, the people who were demonstrating, simply

21   because they were armed; is that fair?

22           MR. WISE:  Object as to form.

23           THE COURT REPORTER:  Was there an answer?

24           THE WITNESS:  That's fair.

25

Kim Raney

Page 76

1    BY MS. BELLANTONI:

2         Q.   Are you aware of whether Texas has legalized

3    open carry of a handgun?

4         A.   I believe they have, yes.

5         Q.   And the quote that's indicated at the bottom of

6    Paragraph 25, quote, "We don't know" -- and this was a

7    quote from the Dallas chief of police; is that correct?

8         A.   That's my understanding, yes.

9         Q.   And his quote is, "We don't know who the good

10   guy is versus the bad guy when everyone starts shooting."

11        Is that what the quote is in your declaration?

12        A.   Yes.

13        Q.   But in fact, it was not the case that everyone,

14   quote, "started shooting."  In other words, the people in

15   the crowd, the people demonstrating, didn't start

16   shooting anyone; is that accurate?

17        A.   Yes, that's accurate.  I believe the shooter was

18   the gunman.

19        Q.   Right.  So there was one gunman who was

20   shooting.  But when the shooting began and thereafter,

21   the people in the crowd who had guns were not shooting

22   anyone; is that accurate to say?

23        A.   Not that I'm aware of, no.

24        Q.   So that's a double negative.  So yes, it is

25   accurate?

Kim Raney

Page 77

1          A.   Can you repeat your question?

2          Q.   Sure.

3               MS. BELLANTONI:   Can you read that back, please?

4     (Whereupon, the requested portion of the record was read

5                    back by the Reporter.)

6               THE WITNESS:   That's my understanding, yes.

7     BY MS. BELLANTONI:

8          Q.   In your opinion and based on your experience as

9     a law enforcement officer, if there's an uptick or an

10    increase in crime, should that result in more restrictive

11    measures on individual Constitutional rights?

12         A.   No.

13         Q.   I'm referencing Paragraph 26 here in your

14    declaration, which in the second sentence indicates that

15    after years of declining crime rates, violent crime in

16    California has ticked upward in recent years.

17              It has ticked upward, correct?

18         A.   Yes, as has property crimes.

19         Q.   And I just want to reconcile -- and I'm going to

20    shop sharing the screen here.

21              I just want to reconcile some earlier testimony,

22    and that is with regard to the issuance of the concealed

23    carry permits and it was a hypothetical.

24              You gave a hypothetical about if there was an

25    assistant district attorney whose investigators couldn't

Kim Raney

Page 78

1    protect him or her in relation to whatever case was going

2    on at the time.  That's someone that you would consider

3    giving a concealed carry permit to.

4            Is that accurate depiction of your prior

5    testimony?

6        A.  I believe so.  I might have also indicated if

7    they were doing a high profile or a violent gang crime

8    and there had been threats on their life or again as the

9    district attorney's office, the investigators, couldn't

10   provide protection, then that would be one I would

11   consider.

12       Q.  And can we agree that not every individual is

13   going to have the ability to have personal protection 24

14   hours a day or a personal bodyguard?  Is that a fair

15   statement?

16       A.  Yes.

17       Q.  And you did earlier testify, but correct me if

18   I'm wrong, that everyone has the right to self-defense.

19   You did agree with that statement; is that accurate to

20   say?

21       A.  Yes.

22       Q.  And so then I'm trying to reconcile this with is

23   it your opinion that the right to self-defense only --

24   for everyone, regular people, only exists inside the

25   house or in their home or is their right to defend

Page 79

1    themselves from violent attack, does that right travel

2    with them wherever they are?

3         A.  I think the right travels with them.

4         Q.  I have no further questions.

5              Is there anything about your testimony that you

6    would need to clarify or change?

7         A.  Not change.  Maybe clarify.

8              I'm not sure if I was clear or was misunderstood

9    on I think I talked about the Donohue study, and I

10   believe that was his terminology was right to carry.  So

11   it wasn't restricted to open carry with his research, it

12   was right to carry states.

13        Q.  Okay.  Thank you.

14             Oh, and I was mistaken.  The last thing:  You

15   referenced a San Mateo County Sheriff's Office

16   publication, quote, "Unloaded Open Carry."  And that

17   was -- I can refer to the declaration if you don't recall

18   that, but if you recall that then I won't.

19        A.  I recall.

20        Q.  Okay.  And so what was the substance of that

21   writing?

22        A.  I believe that was at the time when again law

23   enforcement were getting calls for service when

24   individuals would show up at a business in their

25   communicates openly caring a rifle.

Kim Raney

Page 80

1      Q.  So that's the events that we were talking about

2      the Starbucks and other places --

3      A.  -- training bulletin in regards to that.

4      Q.  And do you have copies of the -- do you still

5      have access to that publication or the training

6      bulletins?

7      A.  I believe so.

8      Q.  If you could locate your documents and provide

9      them to Mr. Wise?

10     A.  Okay.

11     Q.  Would you kindly do that, sir?

12     A.  Yes.

13         MS. BELLANTONI:  All right.  I have no further

14     questions.

15         And like we had indicated before, you will

16     receive a copy of the transcript to review and make any

17     corrections or changes.  I will have an opportunity to

18     comment on the changes, but that's it.  Okay?

19         Thank you for your time today.  I appreciate

20     that.

21         THE COURT REPORTER:  Mr. Wise, do you wish to

22     purchase a copy of the transcript?

23         MR. WISE:  Yes.  We would like a copy of the

24     transcript and we'd like to review it.  I think you had

25     mentioned to Mr. Raney earlier, we would like to review

Kim Raney

**Page 81**

1   it and sign it.  Thanks.

2          MS. BELLANTONI:  Thank you, Lynne.

3          THE COURT REPORTER:  You're welcome.

4       (Whereupon, the deposition concluded at 2:09 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kim Raney

Page 82

1

2              DECLARATION UNDER PENALTY OF PERJURY

3                            ***

4       I, KIM RANEY, the witness herein, declare under

5    penalty of perjury that I have read the foregoing

6    deposition in its entirety and that the testimony

7    contained therein, as corrected by me, is a true and

8    accurate transcription of my testimony elicited at said

9    time and place.

10

11      Dated this        day of                         ,

12    20    , at                     , California.

13

14

15

16

17                    KIM RANEY

18

19

20

21

22

23

24

25

Kim Raney

Page 83

1    State of California,

2    County of Fresno.

3          I, LYNNE A. HOWE, License No. 13003, a Certified

4    Shorthand Reporter of the State of California, do hereby

5    certify:

6          That the witness in the foregoing deposition named

7    was present at the time and place herein specified;

8          That the said proceeding was taken before me as a

9    Certified Shorthand Reporter at the said time and place

10   and was taken down in shorthand writing by me;

11         That the said proceeding was thereafter, under my

12   direction, transcribed with the use of computer-assisted

13   transcription, and that the foregoing transcript

14   constitutes a full, true, and correct report of the

15   proceedings which then and there took place;

16         That I am a disinterested person to the said action.

17         IN WITNESS WHEREOF, I have hereunto subscribed my

18   hand this 10th day of December 2021.

19

20                              *Lynne A. Howe*

21

22

                                Lynne A. Howe, CSR

23                              License No. 13003

24

25

Kim Raney

Page 84

1                           ERRATA SHEET
                   VERITEXT/NEW YORK REPORTING, LLC
2

   CASE NAME: Baird, Mark And Richard Gallardo v. Bonta, Rob, et al
3  DATE OF DEPOSITION: 11/29/2021
   WITNESSES' NAME: Kim Raney
4
5     PAGE   LINE (S)        CHANGE              REASON
      ____|_____|_____|_____
6
      ____|_____|_____|_____
7
      ____|_____|_____|_____
8
      ____|_____|_____|_____
9
      ____|_____|_____|_____
10
      ____|_____|_____|_____
11
      ____|_____|_____|_____
12
      ____|_____|_____|_____
13
      ____|_____|_____|_____
14
      ____|_____|_____|_____
15
      ____|_____|_____|_____
16
      ____|_____|_____|_____
17
      ____|_____|_____|_____
18
      ____|_____|_____|_____
19
      ____|_____|_____|_____
20
21                                   _____
                                     Kim Raney
22  SUBSCRIBED AND SWORN TO BEFORE ME
    THIS ____ DAY OF _____, 20__.
23
24
      _____                   _____
25    (NOTARY PUBLIC)                        MY COMMISSION EXPIRES:

Kim Raney

**[00617 - ahead]**                                      Page 1

## 0

**00617**  1:8

## 1

**1**  2:11 16:19,20
63:3
**1-10**  1:10
**10583**  3:5
**10th**  83:18
**11/29/2021**  84:3
**11:30**  48:2
**11:40**  48:3
**12**  47:18
**12:03**  4:9
**13003**  1:25 83:3,23
**15**  19:14,15 29:5
47:16
**15s**  75:5,10,18
**16**  2:12
**17**  2:14
**19**  56:25
**1967**  54:15
**1976**  54:10

## 2

**2**  2:13 3:5 17:8,11
18:14 63:3
**20**  48:4 52:1,6
60:15 82:12 84:22
**200,000**  16:3 71:12
71:17 72:18,24
73:17
**2001**  47:11
**2007**  64:17
**2008**  29:10 47:19
50:7 64:14,17
**2010**  19:25 20:17
22:1 56:25 64:13
64:17
**2011**  19:25 20:17
22:1,6 29:12

**2012**  22:6 25:19
64:2
**2013**  25:19 63:20
64:2 73:14,19
**2014**  29:12,14
**2015**  57:23,23
**2016**  47:11 57:24
71:11
**2020**  13:14
**2021**  1:10 4:9
13:15 83:18
**210-6046**  3:12
**22**  9:17
**24**  78:13
**25**  74:6,14,18 76:6
**250**  15:14
**25307**  83:20
**26**  77:13
**29**  1:10
**29th**  4:8
**2:09**  81:4
**2:19**  1:8

## 3

**330**  72:1
**350**  15:15
**367-0090**  3:6
**39**  19:13 29:4

## 4

**40**  44:21 53:2
**400**  3:5
**45**  22:19 29:10

## 5

**5**  2:5 52:20
**50**  53:1,2 60:1
**50,000**  29:7
**57**  72:7
**58**  72:7

## 6

**60**  53:1
**64**  30:8

## 7

**7**  74:5

## 8

**80**  52:8
**80s**  44:4

## 9

**9**  17:21 18:8
**90**  52:19,22
**911**  27:20 28:5,7,8
63:7
**914**  3:6
**916**  3:12
**94244-2550**  3:11
**944255**  3:11
**95**  52:19

## a

**abell**  3:6
**abiding**  46:2 65:17
65:17
**ability**  8:12 21:22
39:13 42:21 49:10
59:3,7 65:11
78:13
**able**  14:3 16:5,23
51:11 60:16 67:6
**absolves**  34:14,21
**ac**  1:8
**access**  38:10 42:19
42:20 48:18 80:5
**accurate**  7:2 35:18
35:22 36:9,25
37:1 76:16,17,22
76:25 78:4,19
82:8
**act**  22:8 25:13,15
25:16 54:18

**action**  83:16
**active**  56:25
**actively**  21:9
**activities**  55:7
**activity**  43:1,3,8
43:10,12,15,24
48:14 51:25 52:2
52:7
**acts**  52:2
**actual**  26:18 42:5
63:11
**additional**  12:15
**addresses**  74:18
**addressing**  13:9
59:23
**advance**  41:14
**advantage**  45:7,16
45:21,21,22
**advantageous**
40:14
**affect**  8:12
**affiliation**  11:19
**afternoon**  5:7,8
**agencies**  51:16
55:25 72:17
**agency**  73:1
**ago**  12:10
**agree**  10:12 24:9
24:10 32:10,22,25
33:14 35:11 38:5
38:19 39:11 40:2
40:9,13,21,24 41:5
41:7,13,18,19 42:1
42:14 43:3,15,20
44:14 45:20,25
46:13,20 50:10,16
50:17 53:13 61:15
61:16,19,21 66:1
78:12,19
**ahead**  64:8

[akin - available]                                                              Page 2

**akin** 69:20
**al** 9:3 84:2
**albeit** 64:3
**alerted** 28:21
**allegations** 9:18
  11:2
**alleged** 11:17
**allow** 54:1 61:2,23
**allowed** 7:12 30:3
  35:8 62:24
**allowing** 66:20
**allows** 36:16
**amended** 2:11
  15:18,19,22 17:1
**amendment** 11:15
  12:21 13:3,4,4,16
  13:17,22 19:7,8
  21:9,24 33:14,24
  33:25 35:16,24
  36:4,7,15,16,24
  37:4,14
**ammunition** 59:20
**amounts** 58:19
**amy** 3:4 5:9
**analogy** 57:11
**angeles** 20:9,12,20
  22:15,18 23:1
  29:8,12 50:1
  71:15
**angels** 11:19
**announcements**
  51:16 59:23
**annual** 72:3
**answer** 6:18,24
  7:1,19,21,21 8:8
  34:18 37:23 38:24
  39:10,20 40:8,18
  41:4,17 43:19
  46:19 50:15 61:14
  62:4 75:23

**answer's** 6:4
**answering** 6:2,20
**anticipate** 6:1,3
  49:20 62:25 64:10
**anxiety** 30:12
  64:24
**anybody** 68:14
  69:9 75:13,14
**anyway** 36:1
**apologies** 51:2
**appearances** 3:1
**appearing** 4:10
**application** 16:5
  36:4 67:21,25
**applications** 37:3
  67:2,10,15
**applied** 21:15
  67:20,22
**applies** 36:7 38:2
**apply** 36:24 71:8
**appointed** 69:13
  69:14,15,16,18,25
**appoints** 69:24
  70:2
**appreciate** 15:2
  80:19
**approach** 73:18
**appropriate** 32:1
  32:20
**appropriately**
  24:12 61:24
**approval** 59:1
**approve** 59:8
**approved** 60:15
**approving** 59:2
**approximately**
  44:11
**approximating**
  52:4
**approximation**
  52:5

**ar** 75:5,10,18
**area** 9:11 20:20
  39:16,17,22,23
  49:25
**areas** 29:22 31:8
  38:6,6,16,16,17,19
  38:20 39:3
**argue** 37:25
**argument** 52:12
**argumentative**
  68:25
**arguments** 52:15
**arizona** 11:9,14,18
**armed** 27:24
  65:25 66:2 75:4
  75:21
**arms** 34:1 35:24
  36:17,19 37:24
  38:3
**arose** 22:24
**arrest** 25:11
**arrested** 25:4
**arrests** 24:22
  47:14
**arrive** 75:19
**article** 13:19,24
  74:22,25
**articles** 12:18 15:5
**aside** 14:13
**asked** 18:18,19
  70:25
**asking** 5:12 7:25
  8:4,9 21:16 35:21
  37:18 42:8 61:4
**assault** 30:23
  53:11
**assess** 41:20 42:2,9
  42:23
**assessments** 42:16
**assigned** 18:17

**assignments** 42:25
**assistant** 77:25
**assisted** 83:12
**associated** 20:1
  43:21
**association** 20:10
  22:19 29:9,14
  55:20,21 56:24
  59:12,13 72:1,2,6
  72:6,10
**associations** 57:19
**assume** 8:9
**assumption** 24:17
**attached** 16:21
  17:12
**attack** 51:12,19
  69:3 79:1
**attacked** 41:14
  48:12
**attacker** 48:24
**attempt** 48:21,23
**attempted** 53:24
**attend** 55:22 56:5
**attended** 59:15
  72:11
**attending** 73:6
  75:3
**attorney** 1:9 3:10
  3:10 5:9 7:15,17
  7:20 14:23 16:11
  68:18,23 77:25
**attorney's** 68:21
  78:9
**august** 16:12
**authored** 14:1
**authority** 72:25
**authorized** 37:5
**automatically**
  54:1
**available** 13:3
  29:19 41:11

Kim Raney

**[aware - carry]**                                                    Page 3

**aware** 34:7,13,20
38:15 51:15 54:9
54:23 60:1,6,15,19
63:3 66:22 75:12
75:14 76:2,23
**awareness** 64:15

**b**

**back** 6:24 21:16
44:4 45:11,14
47:2,5,12 49:17
52:23 74:3 77:3,5
**bad** 76:10
**baird** 1:5 3:15
5:10,11 84:2
**ballot** 56:25
**banned** 60:3
**barricaded** 32:16
**base** 63:11
**based** 38:25 40:1
54:4 58:9 77:8
**basically** 22:24
23:20
**bay** 20:19
**bear** 34:1 35:24
36:16,19 37:24
38:3
**bearing** 36:24
**becerra** 10:18
12:2
**began** 75:19 76:20
**behalf** 11:21 17:18
**behavior** 41:20
42:18 45:25 46:14
**believe** 12:10 14:9
15:22 16:3,7
19:25 20:17 21:1
21:3,8,21,25 22:4
27:10 36:18 39:25
53:25 59:11 68:6
71:11 73:2,5 76:4
76:17 78:6 79:10

79:22 80:7
**bellantoni** 2:5 3:4
3:4,6 5:6,9 10:2,4
10:7 15:1,4 16:22
17:13 25:22 30:1
33:4,19,22 34:12
34:17 35:14,21
36:5,13 37:18,22
38:8,23 39:9,19
40:7,17 41:3,12,16
42:12 43:6,7,18
44:18 45:11,19
46:7,18,21,25 47:2
47:4 50:14 55:13
55:14 60:5,20
61:13 62:3 64:7
69:1 73:22 74:2
76:1 77:3,7 80:13
81:2
**beneficial** 58:6
**benefit** 31:22 56:4
**benefits** 30:16
31:20,21 58:3,6
**best** 6:6,7 32:13
40:14
**better** 60:23 61:1
61:10,16
**beverly** 9:4,8
10:21
**big** 73:21
**bill** 57:20,23
**bit** 74:11,15,17
**blew** 49:22
**blind** 74:11
**blunt** 52:20
**board** 29:13 72:2
**bodyguard** 78:14
**bonta** 1:9 5:11
84:2
**bottom** 76:5

**box** 3:11
**break** 6:16,19,19
46:21 47:6 53:6
53:11 72:19 73:23
**breaking** 10:3
24:5
**briefed** 24:1,15,20
**briefly** 9:12
**bring** 17:4
**broke** 33:7
**brother's** 49:25
**brought** 59:18
70:16,17
**buena** 11:2
**bulletin** 55:4 80:3
**bulletins** 80:6
**burglaries** 31:13
**burglary** 53:7
**burns** 49:23
**business** 11:11
27:22 31:1 79:24

**c**

**calculated** 52:8
**california** 1:2,10
1:18 3:11 4:11,12
16:1,8,16 18:21
19:14,21 20:4
21:10 22:2,8
23:23 29:13,22
30:8,10 31:13
33:12 34:13,20,23
37:6 38:3,6,12,14
38:16,17,20,21
39:15 44:5 50:8
51:17 53:20,20
54:16 57:6,14,22
58:12,20 61:7,22
64:23 66:19 71:25
72:5,8,24 77:16
82:12 83:1,4

**california's** 54:9
**call** 13:1 20:22
23:6,7 24:2,11
25:3 26:15 27:18
27:19 28:1,3,8
42:5 48:3 63:7
65:3
**called** 20:19 55:20
**calling** 27:20,25
**calls** 23:11,17
25:14,21 26:8
33:2,17 34:10
35:12 37:16 38:7
38:22 39:7 40:5
40:15 41:1,15
43:5,17 44:17
46:3,17 50:13
79:23
**canceled** 12:11
**candles** 49:21
**capacity** 1:9 8:18
**car** 44:25 49:24
**caring** 79:25
**carriage** 10:10
19:10,23
**carried** 10:11
29:20 49:12 57:20
65:24
**carry** 9:19,20,24
9:24 10:9 12:12
12:16,25 13:9,10
13:12,20,21 14:8
14:10,11,11,17,18
14:19 15:8 16:3,6
16:17 18:15,21
19:2 20:2,2,25
21:1,7,11,17,20,22
21:22 22:2,8,9
25:20 26:24 27:2
27:3,6,7,14 28:24
29:17 30:4,19,22

**[carry - compressor]**                                              Page 4

31:8,8 33:16 35:9
37:5,5 44:15,22,24
45:1,3,22 48:6,8
50:8 54:10 59:15
59:19,24 60:3,9,12
60:16,16,23,24
61:2,3,7,9,11,18
61:19,23,24 62:8
62:14,24 63:19,21
64:2,22 65:11
66:21,24 67:2,5,6
67:13,16 68:4,9
69:6 70:4,14,19
71:8,10 73:8,8,10
73:11,13,19 75:8
76:3 77:23 78:3
79:10,11,12,16

**carrying**  20:23
23:2 24:24 31:2
31:23 44:8 45:6
62:21 65:13 66:5
66:8,15 75:18

**cars**  31:10,11

**case**  1:8 5:14 9:2,6
9:13,13,19 10:15
10:18,20,22,24
11:1,6,14 12:3,24
17:18 18:18 21:10
21:12 27:10 34:25
48:6 53:17 75:7
76:13 78:1 84:2

**cases**  10:20 41:11

**catalog**  53:25

**caught**  48:25

**cause**  8:3 23:14
42:20 45:17 54:15
68:8

**ccw**  67:4 68:22

**certain**  22:14
28:16 53:22 58:19
63:25

**certified**  4:11 83:3
83:9

**certify**  83:5

**cetera**  15:15

**challenge**  61:24

**chandler**  11:9,14
11:18

**change**  27:14 47:7
54:15 61:22 62:17
62:23 79:6,7 84:5

**changed**  12:12

**changes**  7:9,12
40:1 80:17,18

**changing**  64:20

**chaos**  63:23 64:9

**characterize**  24:13

**charge**  43:25 44:2
67:2

**charged**  24:25

**charges**  47:14

**checked**  24:6

**chief**  2:14 9:15
11:3,7 17:10
18:19 19:15 24:18
29:6 38:9 47:10
47:15 50:22 51:8
51:23 53:5 54:22
55:3 67:1,18 68:7
69:6,12 70:5 71:9
71:19 73:2 76:7

**chiefs**  20:10 22:19
22:20,23,25 23:16
25:5 29:9,10,13
55:21 56:24 59:13
59:14 72:1,2,9
73:16

**children**  49:4

**choose**  40:2,25

**christmas**  47:20
47:22 48:2 49:2
49:12

**chuck**  27:9

**circumstance**
51:10

**circumstances**
32:2 40:13 51:18
52:9 68:17

**cities**  58:12 59:1,2
59:5,6,7,9,9

**citizens**  65:17,17

**city**  9:3,9 11:5,9
11:10,17 29:7
69:19,20,21,24
70:3,7,7,10,10,12
70:15,16,18,24
71:5

**claim**  11:15 68:14

**claims**  15:24 21:13

**clairvoyant**  65:12

**clarification**  14:15

**clarify**  6:20 7:1
27:17 47:7 74:16
79:6,7

**claus**  49:1,3,8

**clear**  6:8 7:2 79:8

**clearer**  8:6

**clearly**  17:14

**closed**  11:18 22:6

**closing**  11:11

**club**  11:10

**cocaine**  44:5,6

**code**  16:16 50:8
53:20

**codified**  16:17
25:12

**coffee**  20:3 23:11
24:3

**columbia**  60:2

**columbian**  44:6

**come**  42:17,22
44:7 46:9 49:3
55:19 67:8 69:9

**coming**  18:24
23:11 42:19 58:2

**command**  9:8 11:1

**commenced**  11:1

**commencing**  4:9

**comment**  7:12
18:19 80:18

**comments**  9:17

**commission**  52:10
52:11 84:25

**commit**  40:3 50:4
50:20 51:5

**committed**  40:22
47:13 50:3,21,23
51:22,24

**communicates**
79:25

**communities**
21:23 27:7 30:12
58:13 62:17 63:15

**community**  29:19
57:16 58:11,15
62:24 66:14

**compared**  39:22
61:2

**compensated**
15:10

**competitive**  70:22

**complaint**  15:17
15:18,19,22 62:10

**complaints**  25:5
28:25

**complete**  62:17

**completed**  67:25

**completely**  22:1

**component**  61:19
62:7,13,16

**compound**  55:12
55:13

**compressor**  49:10

**[comprised - danger]**                                                  Page 5

comprised  18:11
computer  83:12
conceal  45:17 49:9
concealed  14:18
  44:15,22,25,25
  45:3,6,22 60:17
  65:11,21 66:8
  67:5,6,13,15 68:4
  68:9 69:6 70:4,13
  70:19 73:11 77:22
  78:3
concept  18:20
concern  30:12
  62:8 63:9,12,22
  64:12
concerned  20:14
  64:11,23
concluded  81:4
conclusion  33:3,18
  34:11 37:17 39:8
  58:5
conduct  26:14
  28:12 45:25 46:15
  66:13
conducted  12:15
  12:23 19:9 66:19
conference  55:22
  55:22,23
conferences  59:15
conflict  13:4
conformance
  21:12
confrontation
  24:16 26:16 32:11
confrontational
  23:21
confuse  8:3
confusing  8:1
congressman
  57:20

conjunction  70:7
connection  5:13
  17:18 18:18 19:10
  28:14 70:6
consequences
  30:15
consider  67:16
  68:22 78:2,11
consideration
  42:16
considered  28:2
constitutes  83:14
constitution  33:6
  33:9,12,15,20,21
constitutional
  36:2 60:8,11,16
  77:11
constitutionally
  33:1
contact  20:6 32:3
  42:19 45:18 46:15
contacted  24:4
contained  82:7
contemporary
  12:22
contentious  49:6
contesting  16:4
context  29:2 51:24
  61:5
conversation
  22:21
conversations
  19:18 29:11 73:11
  73:13,20,21 74:22
cop  64:12 65:11
copies  80:4
copy  7:6 14:3,20
  18:2,2,9 80:16,22
  80:23
correa  57:19,20

correct  11:25 12:1
  22:3,11,12 27:11
  27:12 37:13 48:15
  50:8 66:5,24,25
  74:19 75:8 76:7
  77:17 78:17 83:14
corrected  82:7
corrections  7:9
  80:17
council  70:3,8,11
counsel  14:4
counties  16:2,7
  21:15 71:12,21
  72:18,23,23 73:17
country  13:6,18
  37:2 55:8,11,25
county  19:16
  20:10,12,20 22:15
  23:1 29:9 39:5
  50:1 71:13,15,16
  72:7 79:15 83:2
county's  38:14
courier  55:7
course  5:25 9:22
  10:8 20:13 41:25
  46:8 53:10 54:21
  70:24
courses  59:17
court  1:1 5:22 7:7
  8:16,22,25 10:2,6
  36:3 46:23 47:1
  75:23 80:21 81:3
court's  37:7
courtroom  6:14
covered  74:7
covina  2:14 17:10
  20:14,24 21:18
  22:13 47:10 51:9
crack  44:6
create  20:5 29:21
  30:10,11 65:2,2,4

creates  65:19
creating  24:25
  25:2 26:5
creation  58:14
crime  31:24,24,25
  35:8 38:5,10,14,15
  38:20 39:2 40:4
  40:11,12,21 50:20
  51:5 53:14,17
  68:19 77:10,15,15
  78:7
crimes  43:4 52:10
  53:22,25 54:6
  77:18
criminal  22:8
  25:12,15,16 41:10
  43:10,12 44:2
  45:7,20 46:1,16
  50:18 51:3 53:4
  65:22
criminalize  25:19
criminalized
  63:20
criminals  40:2,10
  40:11,13,24 44:15
  44:22 50:10
crisis  65:2
crosses  65:18
crowd  75:2,7,18
  76:15,21
csr  1:24 83:22
culture  43:16
curiosity  56:20
curriculum  18:9
cv  1:8 18:11
cwws  73:12

**d**

dallas  74:15,19,23
  76:7
danger  42:21

Kim Raney

[dangers - double]                                                              Page 6

dangers  42:10
date  84:3
dated  82:11
daughters  49:7
day  4:8 42:18
  78:14 82:11 83:18
  84:22
de  31:15 32:9
deadly  31:19,25
  53:22 54:1,2,7
deal  60:23 61:10
  61:22 62:20 68:16
dealing  14:16
dealt  13:14 15:7
  30:21 44:5 63:20
  64:3
death  54:3
december  83:18
decision  34:25
  37:7
decisions  19:18
  31:17,18
declaration  2:13
  16:11,13 17:9,17
  17:19,23 18:13,23
  27:9 47:23 56:10
  61:5 74:4,16
  76:11 77:14 79:17
  82:2
declare  82:4
declining  77:15
decriminalization
  57:21
decriminalize
  58:18,19
defeat  57:7
defeated  57:1,3
defend  39:14
  48:22,23 51:11
  69:3 78:25

defendant  10:14
defendants  1:12
  3:9 5:14 10:25
  11:21 15:11
defended  51:14
defense  32:23
  33:16 35:9 39:4
  39:16,22,25 53:22
  53:23 54:6,8 68:6
  68:8,10,23,24 69:5
  69:10 78:18,23
definition  10:12
  50:17
degree  49:22
demographic  40:1
demonstrating
  75:20 76:15
demonstrations
  13:5,16,23
demonstrators
  75:20
densely  39:1
deny  59:8
department  9:8,10
  11:2,7,18 26:7
  27:21 44:3 67:9
  67:11 72:5
departments
  71:24
depending  39:5,14
  42:3
depiction  78:4
deposed  5:18 12:2
deposition  1:17
  2:11 4:8 5:21,25
  6:13,23 7:5 9:23
  10:8 12:5,6,9,11
  12:13,16,20,24
  15:7,15 16:10,14
  16:15 17:1,4 81:4
  82:6 83:6 84:3

depositions  6:5
deputy  3:10
describe  16:9 21:6
  27:17 43:13
described  22:1
  54:2
describes  35:1
describing  21:17
  32:18
designed  49:8
desk  67:21
detective  43:25
determine  41:20
detriments  58:7
device  49:18
dialog  23:19
dialogue  23:18
dichotomy  13:15
differ  46:1
different  9:17 20:3
  37:3 39:22 46:14
  47:17,21 55:25
  56:14 64:13 70:15
  71:2
differentiates
  36:17
difficulties  10:1
diminish  39:4,12
direction  83:12
directors  72:3
disagree  26:10
  54:13
disagreeable  38:1
disagreed  71:6,7
disagreement
  52:12
disarmed  31:4
discretion  32:4
discrimination
  9:16 11:3,7,17

discuss  27:13 37:8
  70:10
discussed  19:5
  72:13
discussion  20:9
discussions  26:2,4
  70:9 73:7
disinterested
  83:16
dispatch  28:6
dispatched  24:11
dispensaries  59:2
dispensary  59:4
disregard  50:12
distribute  49:4
distributing  49:19
distribution  59:9
district  1:1,2 60:2
  68:18,21,22 77:25
  78:9
disturbance  24:25
  25:1
division  44:1
divorce  49:6
document  13:13
  15:14 16:23,25
  17:3,8,14 18:4,14
  20:6 74:5
documents  18:22
  18:23 80:8
doing  7:11 24:5
  50:11 78:7
doj.ca.gov  3:12
domestic  52:2,8
  53:5,9
domestics  52:14
donohue  13:12
  14:7,16 19:5 79:9
door  49:13,14
double  76:24

Case: 23-15016, 01/31/2023, ID: 12643587, DktEntry: 6-2, Page 101 of 179
Case 2:19-cv-00617-KJM-AC Document 73-2 Filed 10/11/22 Page 92 of 106
Kim Raney

[downside - family]                                                    Page 7

**downside** 58:4
**dozen** 20:11
**draft** 18:2,6
**drafting** 58:14
**drawn** 28:19
**draws** 28:15
**dress** 49:3
**dressed** 49:1
**drew** 28:11
**drove** 49:25
**drug** 43:3,11 55:7
**drugs** 43:9
**duly** 5:2
**duties** 42:1
**duty** 34:7 35:5

**e**

**e** 5:17
**earlier** 7:1 19:5
　35:19 36:11 49:8
　64:5 77:21 78:17
　80:25
**eastern** 1:2
**edged** 52:21
**effort** 25:9
**efforts** 6:6,7
**eight** 50:2
**either** 31:4 42:24
　43:11 44:24 45:21
　48:18 49:21 51:17
　52:20 53:9,14
　55:4,18 56:1 59:8
　63:3 68:20 73:4
**elected** 69:13,22
**elicited** 82:8
**email** 55:4
**emotional** 31:16
　46:1,15
**employment** 55:3
**encounter** 44:12
**ended** 56:11

**enforcement** 8:19
　8:20 19:1,14 20:6
　20:22 23:6,13,14
　23:22 24:8 25:10
　25:11,13 26:23
　27:1,5,18,25 28:14
　28:24 29:4 30:11
　33:5,8 34:8,14,21
　38:12 41:19,25
　42:1,15 44:20
　45:7,21 46:8 51:8
　51:9,16 53:21
　54:21,24 55:10
　57:18 58:11 59:22
　61:6,9,21 62:5,6,7
　62:16 63:8,24
　64:2,25 65:1,3
　71:20 72:17,21
　74:23 75:12 77:9
　79:23
**enforcements** 42:8
**engage** 32:2
**engaged** 56:9 75:8
**ensure** 7:2 24:6
　58:11,16
**ensured** 59:7
**entering** 42:11
**enterprise** 43:12
**entire** 44:2 47:16
　51:9
**entirety** 82:6
**entitled** 5:10 16:25
　17:9
**environment** 9:16
　30:19,20 31:12
　32:18 42:10 55:23
　62:17 63:17
**epidemic** 44:6
**equation** 51:7
**errata** 84:1

**escalate** 32:9
**escalation** 31:15
**especially** 29:21
　63:16
**esquire** 3:4
**established** 50:18
**estimate** 63:9
**et** 9:3 15:15 84:2
**eve** 47:20,22 48:3
　49:2
**event** 28:20 47:20
　47:22 48:1 49:4
　52:12 56:3
**events** 22:16 25:6
　25:17,18 30:5
　42:3 56:5 63:11
　63:25 80:1
**eventually** 57:12
　57:14,23 58:10
**evolved** 56:17
**exact** 20:18
**exactly** 29:3
**examination** 2:5
　5:5
**examined** 5:2
**example** 54:4
**exchange** 24:7
　72:14
**exclusively** 53:8
**executed** 49:16
**executive** 29:13
　69:21,22,23 71:20
　72:17,20
**exhibit** 2:11,13
　16:19,20 17:8,11
　18:8,14
**exhibits** 2:10
**exists** 78:24
**expect** 31:9
**experience** 19:19
　19:22,24 22:23

　29:5,20 30:7,8
　38:25 42:9 43:6,8
　43:19,23 44:7,19
　44:20,21,24 45:5
　46:9 51:8,9 52:17
　53:5,13,21 54:4,22
　61:18 64:1 77:8
**expert** 2:12,13
　5:13 8:21,24 9:9
　10:14,17,22 11:21
　11:24 15:11 16:13
　17:1,9 18:13
　62:10,11,12
**expertise** 9:5 29:3
　29:17,18 48:5
**expires** 84:25
**explained** 24:4
**exploded** 49:22
**exposed** 20:5
　22:10 42:11
**extensive** 19:19
**extent** 36:8 71:1
**extenuating** 68:16
**eyesight** 27:24

**f**

**face** 49:15
**fact** 76:13
**factors** 42:15,17
　42:22
**failing** 34:14,22
**failure** 11:3
**fair** 11:20 66:5,6
　72:16 75:2,16,21
　75:24 78:14
**fall** 52:8
**familiar** 5:20 26:1
　54:19 60:8 63:15
　63:16
**family** 34:6 49:2,5
　49:16 53:9

**[far - handguns]**                                                                  Page 8

**far**   19:12 20:13
25:3 31:20 36:3
41:23 70:25 71:10
**fbi**   55:19
**federal**   58:19
**feel**   6:21 56:3
66:15
**female**   45:1,2
**fence**   56:11,21
**filed**   9:7 11:10
15:17
**find**   18:9 56:21
**finished**   6:3
**firearm**   28:19
32:2 34:4,5 44:15
45:22 48:22 50:8
51:14 52:22 53:3
62:21 64:22 66:11
**firearms**   13:22
29:19 33:16 34:3
38:3 44:22 52:18
52:19 62:12
**fireplace**   49:21
**firm**   3:4
**first**   5:2 6:18
11:15 13:4,15,22
18:6 19:7 31:3,4
70:16,18
**five**   46:23 47:2
60:1 71:18 72:11
73:22
**flamethrowing**
49:18
**flanagan**   10:18
12:2,24 15:7
16:15
**flaw**   49:20
**fled**   49:24,24
**flee**   42:21
**flippant**   63:14

**focus**   58:16
**focused**   62:12
73:21
**followed**   67:25
**following**   4:13
**follows**   5:3
**force**   31:19 52:20
53:22 54:1,2,7
55:6
**foregoing**   82:5
83:6,13
**form**   7:16,25 18:5
75:22
**formal**   55:16
**formation**   26:2
**former**   2:13 17:10
48:13 53:9
**forward**   5:21 15:2
**foundation**   60:4
60:18
**four**   12:19 49:9
70:15
**free**   6:21
**fresno**   83:2
**front**   49:12
**fuel**   49:11,19
**full**   5:15 83:14
**further**   79:4 80:13

**g**

**gallardo**   1:5 5:12
84:2
**gang**   42:25 43:3,8
43:15,22,24 44:1,3
44:8,14 45:1,2
46:16 48:14 51:24
52:1,6 68:19 78:7
**gap**   22:5
**gathering**   75:3,13
75:15
**gatherings**   22:14

**gauge**   25:10,13,13
**geared**   14:17
43:15
**general**   1:9 3:10
3:10
**general's**   16:12
**generally**   9:12
38:15 40:2 41:25
46:20 52:15,23
58:24 72:23
**generate**   25:3
26:15 64:25
**generated**   27:19
**getting**   55:4 79:23
**gifts**   49:4
**girl**   49:14
**give**   6:25 32:4
**given**   59:17
**giving**   30:2 78:3
**global**   62:7,14,15
62:15
**go**   30:19 64:8
70:21 73:23 74:4
**goal**   57:13
**going**   6:4 8:8
14:14 16:18 17:16
18:8 20:20 21:4
22:22 23:4,22
25:8,11 28:1 30:5
31:19,23 36:3
40:3 46:22 47:12
50:11 51:7 57:11
57:12,13,15 58:8
58:10 62:18,18,19
62:23,25 63:2,7
65:1,2,3,6,14
68:20 72:22 74:4
77:19 78:1,13
**good**   5:7,8 6:9
68:8 76:9

**governor**   57:9
**ground**   5:20
**group**   20:19 23:20
45:1,3
**guess**   11:7 28:2
45:18 52:1 56:20
58:3 60:14 61:4
67:9
**guessing**   53:1
**gun**   27:18,19,21
28:3,8,25 30:23
31:6,6,8,9 36:18
36:21,22 50:6
59:21 65:3,13
**gunman**   76:18,19
**guns**   14:12,14 20:5
21:18 22:16 31:10
75:4,6,10 76:21
**guy**   76:10,10

**h**

**haggard**   27:9,13
**half**   10:3
**halfway**   6:1
**hand**   83:18
**handful**   26:8
44:13 53:12
**handgun**   10:10
15:8 16:3 21:11
22:2,9 25:20
35:17 36:7,17,25
44:8 46:11,14
48:18 50:24 51:1
51:4,12,19 63:5
65:24 66:9,16
75:8 76:3
**handguns**   14:11
14:12,14 16:6
19:10,23 20:25
21:2,23 22:17
49:9 59:24

Case: 23-15016, 01/31/2023, ID: 12643587, DktEntry: 6-2, Page 103 of 179
Case 2:19-cv-00617-KJM-AC   Document 73-2   Filed 10/11/22   Page 94 of 106
Kim Raney

[handle - issuing]                                                    Page 9

**handle**  28:25
**handled**  26:17
**happen**  5:25 8:1,4
  30:3,5 62:25
  63:10 64:18
**happened**  13:6
  23:16 24:11 51:21
  54:15
**happening**  31:25
  55:6,10
**harm**  50:10,11
**heads**  25:7
**hear**  10:4
**heard**  54:18 60:10
**held**  4:13
**hell's**  11:19
**hereto**  16:21 17:12
**hereunto**  83:17
**high**  68:19 78:7
**higher**  38:5,20
  39:2 69:11
**hills**  9:4,8 10:21
**history**  54:9
**hockey**  57:12
**hold**  74:8
**holster**  44:9 66:16
  75:8
**holstered**  10:10
**holsters**  30:25
**home**  34:4,5 35:17
  36:8,22,25 37:11
  37:15,19 48:3,17
  52:24,24 53:2,2,4
  53:7,14,18,18
  78:25
**homeowners**
  48:10
**homicide**  51:4
  52:13,18
**homicides**  50:21
  51:22,24 53:10

**horse**  56:15
**hose**  49:10
**hostile**  9:16
**hour**  4:9 15:14,15
  50:1
**hours**  78:14
**house**  49:3,16,18
  49:21,25 78:25
**howe**  1:24 4:11
  83:3,22
**hypocrisy**  57:4
**hypothetical**
  77:23,24
**hypothetically**
  68:18

**i**

**idea**  66:4,10
**identification**
  16:21 17:12
**illegal**  22:4,9
**images**  74:7
**immediate**  31:23
  54:3
**immediately**  49:15
**implemented**
  61:17
**important**  5:23
**inability**  16:1
**inappropriate**
  9:16
**incident**  24:20
  32:6,7 41:21 48:2
  48:7,7
**incidents**  28:2
  53:3
**include**  71:23
**included**  44:1,3
**including**  21:10
  29:14 60:2
**inconvenience**
  26:7

**inconvenient**  26:9
**increase**  77:10
**increased**  63:1
**increasing**  29:5
**index**  2:1,10
**indicate**  70:18
**indicated**  76:5
  78:6 80:15
**indicates**  77:14
**individual**  32:22
  34:9,15,23 35:7
  41:24 46:9 69:2
  77:11 78:12
**individuals**  20:24
  23:2,12 26:4
  41:20 48:10,17
  50:23 66:20 79:24
**information**  12:21
  13:2 14:6 18:24
  19:5 22:24 24:7
  25:8,12 55:17,18
  72:15 74:21
**injury**  42:20 54:3
**inquired**  67:24
**inside**  49:16 52:24
  53:1,4 78:24
**instance**  55:5
**instances**  51:20
**instructs**  7:21
**intended**  23:13
**intent**  23:15 45:15
  50:11
**intention**  23:8
**international**
  55:20 59:11,13
**interpretation**
  21:24 36:4,20
  37:12
**interpretations**
  37:3

**interview**  70:23,24
**interviewed**  71:3
**intoxication**  31:17
  32:6
**intuition**  42:9
**investigated**  43:9
**investigations**
  44:3
**investigator's**
  68:21
**investigators**
  77:25 78:9
**invited**  72:10
**involve**  22:16
**involved**  20:8
  21:18 25:24 26:2
  26:5,21,21 29:15
  43:9 51:10 56:18
  59:1 73:12
**involving**  10:21
  42:25
**issuance**  70:13
  73:12 77:22
**issue**  9:12 12:16
  32:8 36:2 48:6,8
  58:19 59:18,19,20
  62:8,14 64:15
  65:9,10 67:6,13
  68:8 69:6
**issued**  66:24
**issues**  12:21 13:3,5
  13:17 19:7,8,10
  22:22 29:15 30:21
  54:24 55:10 59:24
  60:24 61:2,10
  72:13,14 73:21
**issuing**  67:2 68:4
  70:19 73:8,18,18

**[james - long]**                                                    Page 10

**j**

**james**  5:17
**january**  13:14
**job**  33:20 71:3
**john**  13:12
**judge**  68:23
**june**  13:15
**jurisdiction**  19:2
   20:8 22:22 23:19
   23:25 27:2,6
   28:24 30:3 38:13
   59:4 60:23 61:25
   71:14
**jurisdictions**
   13:10 19:19 20:11
   22:24 26:24 51:17
   54:24 60:3 61:9
   61:17 72:25

**k**

**kansas**  27:15
**keep**  33:15 34:4
**kidnapping**  53:23
**kids**  62:19 63:7
**killed**  47:20
**kim**  1:17 2:4,12,14
   5:1 17:2,10 82:4
   82:17 84:3,21
**kimber**  5:17
**kind**  5:20 13:15
**kindly**  80:11
**kjm**  1:8
**knew**  58:1,8,8
**knocked**  49:13
**know**  6:17 7:1,11
   8:5 10:25 14:10
   22:18 23:8,10,12
   23:15,16,19 24:11
   25:2,23,24 26:9,18
   26:21,22 28:5,10
   28:12 29:23 30:4

31:14,15,16 32:1,5
   32:17,19 33:20
   34:24,24,25 35:24
   37:20 39:11 40:9
   45:15,16 47:12
   48:11,17,20 50:4
   52:4,7 54:11,17
   55:6 56:11 58:25
   59:25 61:15 62:20
   65:13,14,15,20,25
   66:1,6,8,18 71:2,4
   76:6,9
**knowledge**  14:9
   23:23 38:11 41:14
   54:14 64:1

**l**

**l**  3:4
**la**  71:16
**lack**  16:4
**lacks**  60:4,18
**language**  35:25
**laquinta**  1:18 4:10
**large**  49:5
**law**  3:4 8:18,20
   19:1,13 20:6,21
   22:5 23:6,13,14,22
   23:23 24:8 25:10
   25:10,13,18,25
   26:23 27:1,5,18,25
   28:14,24 29:4
   30:11 33:5,8 34:7
   34:8,14,21,25
   38:12 41:19,25
   42:1,8,15 44:20
   45:7,21 46:2,8
   48:13 49:7 50:12
   51:8,9,16 53:21
   54:15,21,24 55:10
   57:18 58:11 59:22
   61:6,9,21,23 62:5
   62:6,6,16 63:8,24

64:1,25 65:1,2,17
   65:17 71:20 72:17
   72:20 74:23 75:12
   77:9 79:22
**law.com**  3:6
**lawful**  26:24 30:4
   46:10,10,13 50:23
   51:1,4 53:21 64:3
**laws**  18:20 21:13
   24:5 25:4 27:14
   50:18
**lawsuit**  9:7 11:10
**lead**  31:10
**leadership**  9:10
**league**  58:12
**learn**  51:10 55:9
**learned**  74:21
**leave**  59:4
**led**  52:12 58:5
**left**  24:8,8 67:10
   70:23
**legal**  22:1 30:13
   33:2,17 34:10
   37:16 39:7 54:10
   61:11
**legalization**  56:13
   56:16,17 57:1,21
**legalize**  57:6 58:18
**legalized**  61:7
   62:25 63:3,4
   64:22 76:2
**legalizing**  56:22
**legislation**  22:6
   25:24 26:1,3,5
   29:16 57:15 58:1
   58:10,14 73:14
**legislative**  72:13
**legislature**  57:5,6
   57:15 58:9 66:23
**lengthy**  8:2

**level**  19:16,16,17
   32:6 41:21 64:24
   68:20
**levels**  31:17 42:2
**license**  1:25 59:8
   60:17 83:3,23
**licenses**  70:20 73:9
   73:19
**licensing**  11:16
   72:25
**lieutenant**  44:2
**life**  63:15 65:10
   78:8
**likelihood**  31:3
   39:2
**likewise**  6:3
**limited**  37:10,15
   37:19 71:11
**line**  65:18 84:5
**lines**  74:6
**link**  14:21
**lit**  49:21
**litigation**  11:22,25
   29:2
**little**  8:1,6 46:22
   47:12 49:14 74:10
   74:15,17
**lived**  63:14
**living**  29:19
**llc**  84:1
**loaded**  24:6 25:20
   50:8
**local**  27:20
**locate**  80:8
**located**  71:14
**location**  24:3
   39:14 42:18 75:17
**lock**  31:6
**long**  14:12,14 20:5
   21:18 22:16 36:18
   58:23 75:4,6,10

Kim Raney

[longer - ny]                                                    Page 11

| | | | |
|---|---|---|---|
| **longer** 67:9,9 | 58:20 59:3,8 | **mentioned** 16:7 | **murder** 47:14,19 |
| **look** 74:4 | **mark** 1:5 3:15 | 19:13 22:14 47:22 | 53:24 |
| **looking** 18:5 74:14 | 5:11 84:2 | 63:22 80:25 | **murders** 47:13 |
| **looks** 21:12 | **marked** 16:20 | **messy** 72:22 | **myriad** 42:17 61:5 |
| **loophole** 22:5 | 17:8,11 | **militia** 35:25 | |
| **los** 20:9,12,20 | **markedly** 46:1 | **million** 71:18 | **n** |
| 22:15,18 23:1 | **mass** 47:19 74:18 | **mind** 41:10 46:23 | **n** 5:17 |
| 29:8,12 50:1 | 75:1,17 | 65:14 70:13 | **name** 5:9,15,16 |
| 71:15 | **mateo** 79:15 | **mine** 70:9 | 10:25 69:17 84:2 |
| **lot** 12:18,20 30:14 | **matter** 5:10 12:6 | **minute** 73:22 | 84:3 |
| 32:4,9 37:4 41:10 | 12:17 15:18 16:15 | **minutes** 46:24 | **named** 83:6 |
| 54:11 63:24 64:21 | 18:15 53:4 | 48:4 | **narcotics** 44:4 |
| 74:6 | **matthew** 3:10 | **missed** 10:3 53:16 | **nationally** 55:18 |
| **lou** 57:19,20 | **matthew.wise** | **misstates** 35:19 | **nature** 11:14 42:3 |
| **lynne** 1:24 4:11 | 3:12 | 36:11 64:5 | **necessarily** 13:1 |
| 46:22 81:2 83:3 | **maturity** 31:16 | **mistaken** 79:14 | 28:15 |
| 83:22 | 32:6 | **misunderstood** | **necessary** 34:5 |
| | **mayor** 69:20 | 79:8 | **need** 6:16,19 46:21 |
| **m** | **mean** 10:10 21:6 | **mix** 49:11 | 79:6 |
| **m4s** 75:10 | 28:17 32:17 34:2 | **moment** 62:22 | **needing** 60:17 |
| **maintain** 36:22 | 37:25 39:12 50:17 | **monday** 4:8 | **negative** 76:24 |
| 38:4 | 55:2 62:15 66:23 | **month** 20:15 72:4 | **neighbor** 49:2 |
| **maintaining** 36:24 | 67:22 | **monthly** 22:20 | **net** 57:13 |
| **major** 25:5 | **means** 32:16 34:3 | **months** 49:8 | **never** 68:15 70:17 |
| **majority** 19:17 | 52:18 60:16 | **moreno** 9:3 | 71:6,7 |
| 29:10,15 43:11 | **meant** 8:2 | **morning** 50:2 | **new** 84:1 |
| 51:23 53:9 59:5 | **measures** 77:11 | **motivate** 25:18 | **newspaper** 12:18 |
| 65:16 | **mechanism** 35:1,4 | **motivation** 26:22 | **nine** 47:19 49:16 |
| **making** 11:2 31:17 | **medical** 56:8,12 | **motive** 23:9 | **nonconfrontatio...** |
| 42:16 | 56:15,16 57:2 | **motorcycle** 11:10 | 24:14 |
| **man** 27:18,19,21 | **meet** 57:8 72:8 | **mouth** 50:6 | **northern** 49:25 |
| 28:2,8,25 | **meeting** 22:20,21 | **movement** 20:2,19 | **notary** 84:25 |
| **management** 9:10 | 25:6,9 | 21:7,17,20 23:3 | **notes** 73:23 |
| **manager** 69:19,24 | **meetings** 71:20 | **movie** 65:23 66:4 | **notice** 2:11 4:7 |
| 70:7,10,12,17,18 | 72:3,11,12 73:6,7 | **moving** 5:21 | 17:1,4 |
| 70:24 71:5 | **member** 27:19 | **mulford** 54:18 | **november** 1:10 |
| **managers** 70:15 | 44:8 45:1,2 46:16 | **multiple** 30:18 | 4:8 |
| **manner** 8:14 40:3 | 53:9 | **multitude** 30:21 | **number** 47:16 |
| 50:4 | **members** 9:7 11:1 | **municipal** 18:19 | 65:9,10 |
| **marijuana** 56:8,13 | 43:22 44:14 49:16 | 19:16 22:19 29:4 | **numerous** 75:18 |
| 56:14,15,16,17,22 | | 72:1 | **ny** 3:5 |
| 57:2,2,7,15,22 | | | |

Kim Raney

**[o'clock - performing]**                                                    Page 12

| | | | |
|---|---|---|---|

**o**

**o'clock**  50:2
**o0o**   1:3,15,20 2:20
   4:5
**object**  75:22
**objection**   7:16,17
   7:18 25:21 29:25
   33:2,17 34:10,16
   35:10,12,19 36:11
   37:16,21 38:7,22
   39:7,18 40:5,15
   41:1,8,15 42:6
   43:5,17 44:17
   46:3,17 50:13
   55:12 60:4,18
   61:12 62:1 64:5
   68:25
**observation**  27:23
**obviously**  27:23
**occasion**  51:10
   62:6
**occasional**  53:10
**occasions**  44:11
**occurred**  29:11
   52:24 53:12 74:19
**occurrences**  20:7
   64:18
**office**  3:10 16:12
   68:22 78:9 79:15
**officer**   8:19,20
   19:2 28:11,15,19
   30:9 33:5,8 40:22
   64:2 77:9
**officers**  23:23
   28:12,13 34:22
   42:2,15 60:22,25
   61:2,6,9,21
**offices**  71:23
**official**   1:9
**oh**  79:14

**okay**   6:22 7:4 8:6
   8:7,11 18:1 36:23
   62:9 64:10 73:24
   74:12 79:13,20
   80:10,18
**once**   6:1 9:1 15:19
**one's**   39:4,14
**ones**   11:12
**ontario**   11:5
**open**   6:17 9:19,20
   9:24,24,25 10:9,10
   12:12,16,25 13:9,9
   13:12,20,21 14:7
   14:11,11,17,19
   15:7 16:17 18:15
   18:20 19:2,10,23
   20:1,2,25 21:1,7
   21:17,20 22:2,10
   25:19 26:24 27:2
   27:3,6,6,14 28:24
   29:17 30:4,19,22
   37:5 45:23 48:6,8
   54:10 59:15,19,24
   60:3,17,23,24 61:1
   61:3,7,9,11,17,18
   61:23,24 62:8,14
   62:24 63:19,21
   64:2 65:24 66:21
   66:24 71:8,10
   73:8,8,10,13,19
   75:8 76:3 79:11
   79:16
**opened**  49:14
**openly**   16:3,6 20:5
   20:23 21:11,22
   22:8 23:2 29:20
   31:2,23 44:8
   62:20 64:22 65:13
   65:24 79:25
**opinion**   12:12
   18:20,24 26:14,20

   29:21 30:2,10
   32:14 39:6 60:22
   61:8 68:7 69:2
   77:8 78:23
**opinions**  18:15
**opponent**  56:22,23
   56:24 58:4 68:4
**opportunity**   7:8
   12:8 28:23 40:11
   40:12 55:9 64:21
   80:17
**opposed**  52:18,24
   66:20
**opted**  59:10
**option**  32:1,11,12
   32:13,13,15,19,20
   32:21
**organization**
   13:13
**organized**  22:25
   25:9
**outline**  57:21
**outside**  36:25
   40:22 52:24 53:2
   53:18 75:4
**outweigh**  30:16
   31:20 58:6
**overhill**   3:5
**override**  59:5
**ownership**  36:21
**oxygen**  49:11
**oxygenated**   49:19

**p**

**p.m.**   4:9 81:4
**p.o.**   3:11
**page**   2:4 8:10
   17:21 18:8 74:5
   84:5
**pages**   18:11
**paid**  69:22,23

**paragraph**  74:14
   74:18 76:6 77:13
**parameters**  68:15
**paraphrase**  25:8
**park**   11:2 27:23
   66:4
**parks**  62:19
**part**   22:6 38:11
   50:1 62:13 66:1
**particular**  34:9
   48:7,7 54:23
**particulars**  54:12
**parties**  24:8
**pass**   57:8,15 58:8
   58:10
**passing**  25:18
**patrolling**  42:4
**patrolman**  42:24
**peace**  24:25
**penal**   16:16 50:8
   53:20
**penalty**   6:12 82:2
   82:5
**people**   19:25 23:5
   24:24 31:9,14
   34:1 39:1 47:19
   58:13 62:18 63:2
   63:23 64:21,24
   65:16 66:14,15
   67:22,24 72:18,24
   75:2,18,20 76:14
   76:15,21 78:24
**perceive**  32:7
**percent**  52:1,6,8
   52:19,20,22 53:1,2
   74:6
**percentage**  52:17
   52:23
**perception**  32:8
**performing**  42:1

**[period - proponent]**

**period** 19:25 20:13,15,16,18 21:25 22:14 47:9
**periodical** 14:16 14:20
**periodicals** 12:19
**periods** 59:21
**perjury** 6:12 82:2 82:5
**permit** 16:1 21:14 67:16 68:9 69:6 70:4 71:8,10 78:3
**permits** 66:24 67:3,4,6,13 68:4 70:14 77:23
**permitting** 59:1
**perpetrator** 51:3
**person** 10:11 24:2 26:21 27:24 30:22 36:16 42:19 44:16 44:23,25 45:23 46:2,13 48:11 65:21 66:16 70:2 71:3 83:16
**person's** 65:25 69:17
**personal** 19:22,24 78:13,14
**personally** 56:23
**persons** 26:21
**pertaining** 14:14
**philosophy** 70:4 71:1,2,5
**phone** 48:3
**phrase** 9:23 10:9 21:6
**physical** 32:17
**piece** 62:14
**place** 28:16 29:24 30:6 40:3 53:14 53:17 55:7 58:17

58:22 75:3 82:9 83:7,9,15
**places** 20:3 31:7 80:2
**plaintiff** 3:3
**plaintiff's** 17:1
**plaintiffs** 1:7 2:11 5:10,11 11:25 15:23,25 16:20 17:11
**plan** 49:20
**planners** 56:3
**planning** 49:8
**playground** 63:7
**playing** 57:11
**please** 5:16 7:1 8:4 45:12 77:3
**pllc** 3:4
**plotting** 65:22
**point** 19:12 22:10 47:7 57:8 67:8
**police** 2:14 9:8,10 9:15 11:2,3,6,6,7 11:18 17:10 18:20 19:15 20:10 22:19 22:20 24:4,18 25:6 26:7,16,16 27:20 28:10 29:6 29:9,10,13 30:8 35:5 38:9 40:22 42:2 46:15 47:10 47:15 50:22 51:23 53:5 54:23 55:3 55:21 56:23 59:13 59:14 60:22,25 61:2 67:1 68:7 69:7,12 70:5 71:9 71:19,24,25 72:1,9 73:3,16 75:16,19 76:7

**policies** 9:20 26:23 27:2 72:13
**policy** 19:17,20 68:2 70:5
**political** 72:14
**poll** 66:14
**polls** 66:18
**popped** 13:17
**populated** 39:1,3
**population** 21:8 39:5 71:12,16 72:24 73:17
**populations** 16:2 72:18
**porch** 49:12,17
**portion** 45:13 77:4
**posed** 61:6
**position** 69:12,13 69:13
**possessing** 36:7 62:21
**possession** 20:5 21:18 46:10,14 50:24 51:1,4 75:10
**possibility** 31:3 66:7
**possibly** 30:3 54:22
**potential** 63:1
**practice** 22:25 30:13,14
**preference** 70:19
**preparation** 12:6
**prepare** 17:23
**prepared** 7:7 16:9 16:11 17:24,25 18:1 49:10
**preplan** 40:10
**presence** 13:22 31:25 40:22

**present** 3:15 49:12 56:7 74:23 83:7
**presentations** 55:24
**presenter** 56:6
**president** 29:8,14 72:9
**pretty** 24:9 73:23
**prevalent** 64:16
**prevent** 54:3
**printing** 66:9
**prior** 47:6 54:9 64:2 78:4
**probable** 45:17
**probably** 48:4
**problem** 65:7,8,8 65:19
**problematic** 57:16
**problems** 61:6
**procedure** 28:16 28:17
**procedures** 27:3
**proceeding** 83:8 83:11
**proceedings** 4:13 83:15
**process** 16:4 21:14 40:20 57:22 59:2 67:25 70:21,22 71:11 73:8
**processing** 65:15
**profession** 56:3
**professor** 13:11
**profile** 68:19 78:7
**programs** 55:24
**promote** 11:4
**properly** 61:22
**property** 77:18
**proponent** 56:12 56:21

**[proposition - remember]**                                    Page 14

| | | | |
|---|---|---|---|
| **proposition** 56:25 | **purposes** 16:21 | **rapist** 54:5 | **reduces** 39:13 |
| **prosecuting** 68:19 | 17:12 | **rare** 64:18,19 | **reduction** 39:13 |
| **protect** 34:5,8,8 | **pursuant** 4:7 | **rash** 31:10 53:11 | **refer** 79:17 |
| 34:15,22 35:6,7 | 21:23 | **rate** 38:20 | **referenced** 14:13 |
| 78:1 | **put** 13:13 31:6,9 | **rates** 38:5,15 39:2 | 18:22 19:7 74:16 |
| **protected** 33:1 | 49:13 50:6 55:25 | 77:15 | 79:15 |
| **protection** 34:4,21 | 58:21 | **reached** 27:13 | **referencing** 77:13 |
| 68:21 78:10,13 | **putting** 22:13 | 67:21 70:6 | **referring** 9:24 |
| **protects** 33:15 | | **reaction** 23:6 46:1 | 21:19 |
| 35:17 | **q** | 46:15 63:17 64:10 | **reflect** 18:14 |
| **protests** 19:8 | | **reactions** 63:25 | **refusing** 34:14 |
| **provide** 14:3,22 | **quality** 30:25 65:9 | **read** 12:18 13:8 | **regard** 18:15 |
| 18:1 33:25 45:6 | **quarterly** 72:3,11 | 14:6 15:17,21 | 19:20 21:4 48:5 |
| 45:16,20 54:6,8 | **question** 6:1,2,5 | 27:9 45:11,13 | 70:13 73:8,16 |
| 58:14 78:10 80:8 | 6:18,18,21 7:16,20 | 51:20 54:11 74:10 | 75:1 77:22 |
| **provided** 7:6 | 7:21,24,25 8:5,8 | 77:3,4 82:5 | **regarding** 13:19 |
| 66:23 | 10:3 34:19 39:21 | **reading** 13:2 | 16:16 19:7,9,23 |
| **provides** 34:21 | 41:23 42:7 45:9 | 51:15 56:9 | 25:6 27:2,3,6 |
| **providing** 29:6 | 46:6 50:25 55:15 | **ready** 73:24 | 28:25 59:24 60:24 |
| **public** 12:20 13:5 | 60:25 72:20 77:1 | **really** 32:7 57:16 | **regards** 9:9 14:11 |
| 13:16 19:9,11,17 | **questions** 5:12 8:2 | **reason** 54:17 68:8 | 14:12 55:1 80:3 |
| 19:20,23 23:2 | 8:14 9:10,11 | 84:5 | **region** 20:21 |
| 26:15 27:7,15,20 | 70:25 79:4 80:14 | **reasoning** 40:20 | **regional** 29:11 |
| 29:6,11,11,16,20 | **quite** 19:19 20:18 | **recall** 13:24 15:6 | 72:10 |
| 31:7 35:8 37:5 | 73:14 | 48:21 50:22 51:6 | **regular** 78:24 |
| 46:10 52:25 53:15 | **quote** 76:5,6,7,9 | 52:7,16 58:24 | **regulate** 59:8 |
| 53:18 57:17 59:23 | 76:11,14 79:16 | 59:19,22 73:7,18 | **regulation** 58:25 |
| 60:24 63:17 68:2 | | 79:17,18,19 | **related** 19:22 43:4 |
| 84:25 | **r** | **receive** 80:16 | 43:4,9,24 48:14 |
| **publication** 19:6,6 | **r** 3:10 5:17 | **received** 61:16 | 51:24 52:6,17 |
| 79:16 80:5 | **racing** 49:11,19 | 68:19 | 55:7 59:23 |
| **publications** 15:5 | **raised** 59:16 | **recess** 47:3 74:1 | **relating** 54:24 |
| 51:15 56:10 | **random** 52:2,9 | **recognize** 17:3,17 | **relation** 78:1 |
| **publicity** 64:14 | 53:6 | **recollection** 59:16 | **relative** 56:1 |
| **published** 13:24 | **raney** 1:17 2:4,12 | 59:17 | **relevant** 48:8 |
| 14:7 | 2:14 5:1,7,17 10:8 | **reconcile** 77:19,21 | **relied** 18:24 |
| **pulled** 50:6 | 17:2,3,10,14 33:23 | 78:22 | **remaining** 52:7 |
| **purchase** 80:22 | 35:15 47:5 74:3 | **record** 6:8 7:3,18 | **remember** 11:12 |
| **purpose** 26:14,19 | 80:25 82:4,17 | 8:3 14:16 16:25 | 13:13 14:4 51:13 |
| 45:5 | 84:3,21 | 17:9 45:13 47:5 | 54:12 73:20 |
| | **rape** 53:7,23 | 71:13 74:3 77:4 | |
| | **raped** 54:5 | | |

Kim Raney

**[remembered - segment]**                                                      Page 15

remembered  4:7
remote  3:1
remotely  1:18,23
  4:10
repeat  45:9 77:1
rephrase  8:5
  72:22
report  2:13 13:11
  17:9 18:14 62:11
  83:14
reported  1:23
reporter  4:12 5:22
  7:7 10:2,6 45:14
  46:23 47:1 75:23
  77:5 80:21 81:3
  83:4,9
reporting  84:1
reports  15:15
represented  29:9
representing  5:10
requested  45:13
  77:4
required  7:19
research  12:15,23
  12:24 13:2,14
  19:4,9,12 66:13
  79:11
residence  38:4
resident  30:7
  34:23 64:11
residents  66:20
resolve  48:25 74:9
resolved  24:12
resort  54:1
resource  65:9
respond  8:13 26:8
  35:5 47:25 61:24
  64:8
responded  28:10
  75:17

responding  28:20
  41:21 42:4
response  20:6,22
  23:14,14,22,25
  25:10,14 27:25
  28:14 63:8,25
  65:1,1,3
responses  28:3
  30:11
responsibility
  29:5
responsible  29:6
  58:1
responsive  8:14
rest  6:2,3
restaurant  63:6
  66:4
restaurants  62:18
restricted  79:11
restrictions  31:7
restrictive  77:10
result  30:15 61:11
  74:22 77:10
results  29:23
  52:11
retained  9:9 10:14
  10:17,21 11:5,9,24
retention  5:13
  11:20 30:25
retired  64:12
  65:11 71:11
retirement  8:21
retreat  32:10,14
  32:17,18
retrieve  32:8
retrieved  49:18
review  7:8 12:5,8
  15:14 38:13 68:15
  80:16,24,25
reviewed  13:11
  15:6 16:13,14,14

16:16 26:23 28:8
  67:9
reviewing  38:12
  67:2
richard  1:5 5:11
  84:2
rifle  22:2,8 48:18
  79:25
rifles  20:23 21:1
  21:23 24:24 75:4
right  6:21 7:3 8:10
  10:4 11:12 14:10
  14:22 17:7 24:22
  31:12 32:22 33:1
  33:15 34:1,3
  35:17,24 36:3,8,18
  36:21,22 37:2,5,24
  38:3 39:4,15,21,25
  47:23 50:19,21
  61:4 62:22 65:25
  66:9,11,12,24
  68:24 69:3 74:5
  75:1 76:19 78:18
  78:23,25 79:1,3,10
  79:12 80:13
rights  13:17 21:10
  77:11
ripened  73:15
rise  31:13 61:11
  61:23 62:5 64:25
risks  30:16,17
  31:20
road  3:5
rob  1:9 84:2
robberies  52:11
  52:14
robbery  31:2 53:7
roughly  52:6
  71:16
round  22:21

rules  5:20
rural  16:2 38:6,17
  38:20 39:16,23

s

s  84:5
sacramento  3:11
safeguards  58:15
  58:17,21
safety  19:9,20,23
  27:7,15 29:7,11,16
  57:17 59:23 60:24
san  79:15
santa  49:1,3,8
saw  31:24
saying  27:21 64:18
scarsdale  3:5
scene  41:22 48:1
  49:24
scholar  36:2
scope  9:5 36:6
  43:23 48:5 55:2
screen  16:18,23
  77:20
scroll  17:16
second  12:21 13:3
  13:4,16 17:8 19:7
  21:9,24 31:18
  33:7,14,24,25
  35:16,23 36:4,7,14
  36:16,23 37:4,14
  77:14
sections  16:16,17
see  16:23 17:14
  23:13 25:10 26:16
  55:5 57:4,5 63:2
  66:9,14 74:5,8,8
seeing  20:21 23:5
  37:2 59:22
seek  50:10
segment  21:8,21

Kim Raney

**[seismic - stop]**

**seismic** 30:9
**self** 32:23 33:16
35:9 39:4,14,16,22
39:25 68:6,8,10,23
68:24 69:5,10
78:18,23
**seminar** 72:4
**seminars** 55:24
**senator** 57:19
**sense** 47:13 72:12
**sent** 18:6
**sentence** 77:14
**sergeant** 42:25
43:25
**series** 53:12
**serious** 54:3
**serve** 47:9
**served** 19:1
**service** 20:22 23:6
23:17 24:2 25:3
55:5,17 63:2
79:23
**services** 23:7
**set** 70:13
**setting** 30:20
**seven** 50:2
**sexual** 53:11
**share** 16:18 71:5
**shared** 22:23
23:16 55:17
**sharing** 77:20
**sharp** 52:21
**sheet** 84:1
**sheriff** 73:2
**sheriff's** 67:10
72:5 73:1 79:15
**sheriffs** 71:23 72:7
72:16 73:6,11
**sherriffs** 72:6
**shift** 30:9

**shooter** 76:17
**shooting** 74:15,18
75:2,17,19 76:10
76:14,16,20,20,21
**shootings** 52:15
**shop** 24:3 77:20
**shops** 20:3 23:11
**short** 47:5
**shorthand** 4:12
83:4,9,10
**shot** 31:5 49:15
54:5 75:13,14
**shotgun** 48:19
**show** 16:18 79:24
**showed** 20:23
**showing** 20:2
**shows** 59:21
**side** 22:13 51:7
56:11,20
**sign** 81:1
**signature** 17:21
83:20
**signed** 57:23
**significant** 56:2
69:9
**simply** 75:20
**singley** 62:12
**sir** 17:19 80:11
**sit** 8:13 66:3
**sitting** 49:17 63:5
65:13,20,23
**situation** 23:21
42:10,23 71:25
**situations** 22:23
53:6
**six** 56:18 60:2,3
71:18
**size** 39:5
**skills** 30:25 31:15
**smaller** 74:11

**sneak** 57:13
**society** 21:22
64:16,20
**solely** 68:10,23
**somebody** 31:22
32:4 62:20 63:5
**someone's** 39:15
39:21 65:12
**son** 48:13 49:7
**sorry** 10:2 35:12
53:16 62:4 69:15
74:12
**sound** 6:8
**sounds** 24:9
**south** 20:19
**southern** 20:4
44:5
**sparsely** 39:3
**speak** 6:6,8 28:23
52:14
**speaking** 61:5
65:10
**specific** 12:25
13:19,21 14:7,10
14:17 16:6 19:12
29:17 34:15 41:21
54:17 55:6
**specifically** 7:20
13:9 15:7,9 18:17
21:19 23:13 51:13
54:14,22 58:21
75:5
**specified** 83:7
**speculation** 25:21
35:13 38:7,22
40:6,16 41:1,15
43:5,17 44:17
46:3,17 50:13
**spell** 5:16
**spite** 63:4

**split** 31:18
**spoken** 27:1,5
**sponsor** 57:24
**staff** 9:8 11:1
**stakeholders**
58:12,13
**stamping** 59:20
**stanford** 13:12
**starbucks** 20:3,23
23:5 24:3 28:2
80:2
**start** 6:4 67:5
76:15
**started** 48:2 49:7
49:19 56:16 76:14
**starting** 23:1
**starts** 76:10
**state** 1:10 4:12
5:15 7:18 16:1,8
18:21 19:17,20
21:12 29:15 30:9
33:12 38:2,10,12
38:14 39:15 54:10
57:5,6,14,19 58:9
58:20 59:5 66:19
71:21 72:5,7 83:1
83:4
**statement** 66:5,6
66:10 78:15,19
**statements** 68:3
**states** 1:1 33:9,15
37:2,4 54:25 60:1
60:2,15 79:12
**statistics** 38:10,14
**statute** 34:13,20
34:25 66:23
**stay** 12:22
**steps** 66:13
**stolen** 31:11
**stop** 62:22

Kim Raney

**strategic** 57:10
**strategically** 57:14
**study** 79:9
**submit** 16:5
**submitted** 17:18
27:10
**subscribed** 83:17
84:22
**subscribing** 55:4
**subsequent** 73:19
**substance** 7:17
18:5 79:20
**suburban** 29:22
38:16 63:16
**successor** 67:12
**sued** 34:22
**suffered** 49:22
**suicide** 50:3,5
**suing** 9:14,15 11:6
15:25
**suit** 49:8
**suite** 3:5
**supreme** 36:3 37:7
**sure** 6:25 7:25
8:10 15:3 20:18
28:17 30:24 34:19
39:12 40:19 41:5
45:10,24 46:5
59:17 60:13 62:5
77:2 79:8
**surrounding** 19:8
**survived** 49:23
51:18
**suspect** 49:15
**switched** 17:7
**sworn** 5:2 6:11
33:5,8,11 84:22
**symposium** 72:4

**t**

**table** 19:15 22:21
49:17 72:13 73:13
**tactical** 40:20
**tailored** 49:9
**take** 6:16,19 29:24
30:6 42:16 53:14
53:17 64:21 73:22
74:4
**taken** 1:18 4:9
30:24 47:3 66:13
74:1 83:8,10
**takes** 28:16
**talk** 5:24 53:3
74:15
**talked** 79:9
**talking** 35:1 56:13
80:1
**talks** 36:18
**tapes** 28:9
**technical** 10:1
**tell** 6:12
**tells** 7:20
**ten** 63:19
**tenure** 68:3 71:9
71:19
**term** 9:23 10:9,12
20:1 24:10 26:10
39:11,12 41:5,6,7
43:20 58:17 60:8
60:10 61:15 63:13
64:9 65:16
**termed** 57:2
**termination** 11:8
**terminology** 79:10
**terms** 27:18
**testified** 5:2 8:16
8:21,24 27:10
33:19
**testify** 78:17

**testifying** 6:14
**testimony** 6:13,20
7:8,9 15:16 35:15
35:20 36:12 47:6
64:6 77:21 78:5
79:5 82:6,8
**testing** 70:21,22
**texas** 74:19 76:2
**thank** 14:25 47:1
79:13 80:19 81:2
**thanks** 81:1
**theater** 63:6 65:23
66:4
**theaters** 62:19
**thereof** 4:9
**thermal** 49:23
**thing** 79:14
**things** 56:1,2,14
59:21 61:19
**think** 6:23 9:3,17
11:16 13:11,14
14:22 16:6,12
19:19 20:21 22:4
22:5,7 23:20 24:5
24:7,12 25:19
26:10,13 30:5,7,16
30:18,18 31:19,22
32:12,18 36:1,2,17
37:1,1,1,7 38:1,25
40:10,10,19 41:9
41:10 42:8 44:13
44:20 52:23 54:2
54:8 55:16 57:2
57:23 58:17 59:20
61:18 62:23 63:1
63:13,14 64:9,14
64:20,20 66:6
68:14 73:23 79:3
79:9 80:24
**thinking** 65:21

**third** 49:22
**thought** 57:14
**threat** 41:21 42:3
42:10 69:9
**threats** 68:20 78:8
**three** 12:10,19
13:6 47:18 70:17
**threshold** 69:11
**ticked** 77:16,17
**time** 6:16,23,25
7:15,15,24 13:9
15:10 20:13,16,18
21:25 22:11 23:24
24:18 40:3 42:18
47:9,15 50:7,22
51:23 58:23 67:8
67:18 74:24 78:2
79:22 80:19 82:9
83:7,9
**times** 6:5 8:24
9:22 37:10 59:14
**today** 5:12 7:10
8:14 12:6 16:10
17:5 64:16 80:19
**told** 28:7
**top** 29:8
**topic** 20:9 56:7
59:15 70:16,17
71:7
**topics** 56:18
**total** 47:16
**track** 37:7
**trade** 44:5
**tradition** 49:2,5
**trained** 41:19 42:2
60:23 61:1,10,22
62:6
**training** 32:5 42:9
61:17 62:7,11,13
62:16 80:3,5

**[transcribed - wise]**                                    Page 18

---

**transcribed** 83:12
**transcript** 7:6,8
  80:16,22,24 83:13
**transcription** 82:8
  83:13
**transcripts** 16:14
  16:15
**travel** 79:1
**travels** 79:3
**trending** 56:2
**trends** 54:23 55:6
**trial** 15:16
**tried** 12:21
**trigger** 50:6
**trojan** 56:15
**true** 82:7 83:14
**truth** 6:12
**truthfully** 8:13
**try** 8:5 41:9
**trying** 21:11 37:9
  37:11 52:5 57:6
  78:22
**two** 10:20 11:6
  12:10 13:6 15:5
  18:11 21:15 47:18
  56:6,14 57:22
  65:10 70:22 72:8
**type** 28:20 43:12
  53:5
**types** 53:22 54:6
**typically** 73:1

**u**

**ultimately** 48:24
  58:4
**unable** 6:25 21:14
**unanticipated**
  30:15
**unclear** 8:3
**uncodified** 25:15
**uncomfortable**
  63:5,24 66:15

**understand** 6:10
  6:11 7:13,14,22,23
  8:13 10:13 15:23
  15:25 33:25 34:19
  37:9,11 41:23
  42:7 46:5 55:15
  55:16 60:13 61:1
**understanding**
  21:13 33:23 35:3
  35:16,23 36:6,14
  36:21,23 37:10,13
  37:14,19,20,24
  38:2,11 60:11
  75:6,9 76:8 77:6
**understood** 8:9
**uneventful** 24:9
  24:10
**unique** 71:25
**unit** 44:1,3
**united** 1:1 33:9,15
**unknown** 63:25
**unlawful** 11:8
**unloaded** 22:10
  63:19,21 64:3
  79:16
**unnecessary** 26:11
  30:11,12
**unsafe** 30:14
**unsure** 8:4
**unusual** 43:21
**unwise** 30:14
**uphold** 33:5,9,11
  33:20
**uptick** 77:9
**upward** 77:16,17
**urban** 29:22 38:6
  38:16,19 39:17,22
  63:16
**use** 20:1 21:9 26:9
  31:19 34:5 40:13
  41:5 48:22 51:19

53:4,22 54:2,7
  55:5 64:24 65:16
  83:12
**utilized** 52:22

**v**

**v** 5:11 84:2
**vague** 29:25 40:5
  40:15 41:2 42:6
  46:4 55:12 61:12
  62:1
**valid** 68:8
**variables** 32:9
**variety** 42:22
**various** 42:2
**vast** 53:8 59:5
**vehicle** 31:13
**vein** 13:7
**veritext** 84:1
**versus** 9:3 10:18
  12:2 13:16 14:14
  38:17 58:3 76:10
**veto** 57:9
**vicinity** 27:22
**victim** 30:23 31:4
  31:5,24 32:11
  40:25 45:8,22
  50:25 51:7,11,14
  51:18
**victim's** 41:11
**victims** 41:13
  48:11 51:1
**view** 70:6 73:18
**violating** 25:3
  50:18
**violence** 43:4,16
  43:21 52:3
**violent** 31:24,24
  32:11 35:8 40:21
  40:24 43:10,13,14
  43:16 44:14 51:12
  51:18 53:14,17

65:23 69:3 77:15
  78:7 79:1
**vitae** 18:9
**voice** 58:13
**volume** 63:1 64:15
  64:23
**volunteers** 11:6
**vs** 1:8
**vulnerable** 40:25
  41:6

**w**

**waiting** 59:21
**want** 8:9 21:16
  37:19,25 60:13,14
  69:10 73:23 74:4
  74:10,15 77:19,21
**wanted** 58:10
**wants** 21:22
**way** 32:8 72:19
**ways** 47:12
**we've** 46:22
**weapon** 28:15
  30:24 35:9 65:12
  65:21
**weapons** 24:6
  28:11 31:9 33:16
  45:6 52:21 70:14
**weeks** 12:10
**welcome** 81:3
**went** 49:16,17,18
**whereof** 83:17
**wholeheartedly**
  40:9
**wide** 29:15
**wisdom** 63:14
**wise** 3:10 15:1,3
  18:2,6 25:21
  29:25 33:2,17
  34:10,16 35:10,12
  35:19 36:11 37:16
  37:21 38:7,22

Kim Raney

**[wise - york]**                                                    Page 19

| | |
|---|---|
| 39:7,18 40:5,15 | **y** |
| 41:1,8,15 42:6 | |
| 43:5,17 44:17 | **y** 5:17 |
| 46:3,17 50:13 | **yeah** 20:17 46:5 |
| 55:12 60:4,18 | 56:9 59:14 62:2 |
| 61:12 62:1 64:5 | 66:2 67:5 74:13 |
| 68:25 75:22 80:9 | **year** 16:12 20:16 |
| 80:21,23 | 47:17,18,21 55:22 |
| **wish** 80:21 | 57:6,7,22 |
| **withdraw** 21:5 | **years** 12:20 13:6 |
| **withdrawn** 25:17 | 19:13,14,15 29:4,5 |
| 28:13,18 52:15 | 30:8 44:21 47:17 |
| 60:21 | 47:17,18 56:19 |
| **witness** 2:12 4:10 | 63:19 64:17 77:15 |
| 8:21,25 9:9 16:13 | 77:16 |
| 17:2 35:11,23 | **york** 84:1 |
| 41:9 42:7 45:15 | |
| 46:5 60:19 62:2 | |
| 73:25 75:24 77:6 | |
| 82:4 83:6,17 | |
| **witness's** 62:11 | |
| **witnesses'** 84:3 | |
| **woman** 54:5 | |
| **wondering** 61:8 | |
| **word** 26:9 64:24 | |
| 72:4 | |
| **words** 39:15 53:23 | |
| 63:22 76:14 | |
| **work** 9:16 | |
| **worked** 57:18 | |
| 70:15 | |
| **working** 21:9 | |
| 29:18 42:24 44:4 | |
| **world** 56:1 | |
| **wrap** 73:24 | |
| **wrapped** 49:11 | |
| **writing** 79:21 | |
| 83:10 | |
| **written** 15:14 | |
| **wrong** 60:14 78:18 | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

**ER285**

# EXHIBIT   2

ER286

1            IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF CALIFORNIA

3

4    MARK BAIRD and RICHARD
     GALLARDO,

5
              Plaintiff(s),

6
              vs.               CASE NO.

7                               2:9-cv-00617-KJM-AC
     ROB BONTA, in his official

8    capacity as Attorney
     General of the State of

9    California, et al.,

10            Defendant(s).

11

12

     _____
13

14

15          DEPOSITION OF CHARLES D. HAGGARD

16       Appearing Remotely From Topeka, Kansas

17             Tuesday, October 19, 2021

18                   Volume I

19

20

21   Reported by:
     Carrie Pederson

22   CSR No. 4373, RMR, CRR

23   Job No. 4838109

24   Pages 1 - 104

25

                                        Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2          FOR THE EASTERN DISTRICT OF CALIFORNIA
 3
 4    MARK BAIRD and RICHARD
      GALLARDO,
 5
                  Plaintiff(s),
 6
                  vs.                   CASE NO.
 7                                      2:9-cv-00617-KJM-AC
      ROB BONTA, in his official
 8    capacity as Attorney
      General of the State of
 9    California, et al.,
10              Defendant(s).
11
12    _____
13
14
15
16           Deposition of CHARLES D. HAGGARD, Volume I,
17    taken on behalf of the defendants, at Topeka, Kansas,
18    beginning at 9:06 a.m. and ending at 11:31 a.m. on
19    Tuesday, October 19, 2021, before Carrie Pederson,
20    Certified Shorthand Reporter No. 4373.
21
22
23
24
25
                                              Page  2
```

```
 1    APPEARANCES:

 2

 3    For Plaintiff(s):

 4              THE BELLANTONI LAW FIRM, PLLC

 5              BY:  AMY L. BELLANTONI

 6              Attorney at Law

 7              2 Overhill Road

 8              Suite 400

 9              Scarsdale, New York 10583

10              914-367-0090

11              abell@bellantoni-law.com

12

13    For Defendant(s):

14              ATTORNEY GENERAL OF CALIFORNIA

15              BY:  R. MATTHEW WISE

16              Attorney at Law

17              1300 I Street

18              Suite 125

19              P.O. Box 944255

20              Sacramento California

21              94244-2550

22              Matthew.Wise@doj.ca.gov

23

24    Also Present:

25              Mark Baird
```

Page 3

```
1                          INDEX
   WITNESS:
2

     CHARLES D. HAGGARD
3

     Volume I
4

5
                                                 PAGE
6
        Examination By Mr. Wise                    7
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

                                              Page 4

**ER290**

1                              EXHIBITS

2        DEFENDANT'S

3                                DESCRIPTION                    PAGE

4        Exhibit 1      Expert Declaration and Report of        11

                        Charles "Chuck" Haggard

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                        Page 5

1

CERTIFIED QUESTIONS/INSTRUCTED NOT TO ANSWER

2

PAGE        LINE

3

82          8

4

96         19

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1          Topeka, Kansas, Tuesday, October 19, 2021

2              9:06 a.m. - 11:31 a.m.

3

4              CHARLES D. HAGGARD,

5     having been administered an oath, was examined and

6     testified as follows:

7                    --o0o--

8                  EXAMINATION

9     BY MR. WISE:

10     Q.   Good morning.

11     A.   Morning.

12     Q.   My name's Matthew Wise.  I represent the

13     California Attorney General in this case which is

14     known as Baird v. Bonta.  Would you state your full

15     name and spell your last name for the record.

16     A.   My name is actually Charles, D as in David,

17     Haggard, H-a-g-g-a-r-d.  I go by Chuck.

18     Q.   Do you understand that you're testifying

19     here under the same oath that you would be testifying

20     under in a courtroom?

21     A.   I do.  Yes, I do.

22     Q.   You've been retained as an expert for

23     plaintiffs in this case?

24     A.   Yes, sir.

25     Q.   Have you ever had your deposition taken?

                                          Page 7

1      A.   Not in this case, but previously in life,

2   yes, I have.

3      Q.   The court reporter's recording everything

4   that we say, so we need to try to have only one

5   person speak at a time.

6      A.   Sure.

7      Q.   I'll try to let you finish your answer when

8   I ask a question and before I ask another one.  I

9   just ask that you try to let me finish asking my

10  question before you start to give your answer.

11     A.   Certainly.

12     Q.   If you need to take a break at any time,

13  just let me know.  The only thing I'd ask is that if

14  there's a question pending, that you'd answer that

15  question before we take our break.

16     A.   Okie-doke.

17     Q.   After I ask a question, it's possible that

18  your attorney might have an objection to the

19  question.  You should still answer the question

20  unless your attorney advises you not to answer the

21  question.

22     A.   Okay.

23     Q.   If you don't understand a question, please

24  let me know, and I'll try to rephrase the question.

25  Do you understand that?

Page 8

1      A.    Yep, I do.

2      Q.    You'll have an opportunity, after the

3   deposition, to review the transcript that was made

4   here today, and you'll be able to make corrections to

5   the transcript, but you should know that there will

6   be a record of the corrections that were made, and

7   I'll be allowed to comment on any corrections that

8   you make.

9      A.    Okay.

10      Q.    Is there anything affecting you today that

11   would prevent you from thinking clearly and

12   testifying truthfully?

13      A.    No.

14      Q.    How did you prepare for today's deposition?

15      A.    I actually did not do any real formal

16   preparation for this deposition.  Ms. Bellantoni and

17   I had a casual phone conversation a couple of days

18   ago and wasn't -- actually hasn't been much more than

19   that.  Read through -- I forget the -- I don't have

20   it in front of me on the email.

21          There was the other expert that has been

22   retained.  He's a chief of police or former chief of

23   police.  I was able to read his declaration or his

24   statement and -- but that's been -- you know, this

25   has been set up for a few weeks now, so I was able to

```
 1   read that in the meantime, but that's about it.
 2        Q.   Is that the declaration of Kim Raney?
 3        A.   Yes.
 4        Q.   And other than Ms. Bellantoni, did you speak
 5   with anyone about this deposition?
 6        A.   No, sir.
 7        Q.   When did you first become involved in this
 8   case?
 9        A.   It's been awhile.  As far as pulling a date
10   up, I'd have to defer to Ms. Bellantoni for when she
11   first contacted me to talk about this.  It would be
12   really hard for me to say.  It seems like a year or
13   two now.
14        Q.   Okay.  And was it Ms. Bellantoni who
15   contacted you or someone else?
16        A.   Yes, she did.
17        Q.   Did anyone tell you what they wanted you to
18   do as an expert in this case?
19        A.   We had a conversation, Ms. Bellantoni and I,
20   on she was looking for an expert witness to speak
21   towards police training and practices as it pertained
22   to this case, so my understanding of my input, like,
23   here today would be as a law enforcement expert.
24        Q.   Have you reviewed the complaint in this
25   matter?
```

Page 10

1      A.   Yes, sir.

2      Q.   Did you have a role in drafting the

3  complaint?

4      A.   No, I did not.

5      Q.   Are you being compensated for your work in

6  this case?

7      A.    I am, although I have yet to send a bill in

8  for anything, so, no, I have not been paid, but we --

9  Ms. Bellantoni and I agreed on a price.  Truthfully,

10  I volunteered to do this one pro bono, and she

11  insisted that I not do that, and so I believe it's in

12  my statement or in my declaration, I think we agreed

13  to 75 an hour or something like that.

14      Q.   Okay.  Let me share my screen.  I will try

15  to show you an exhibit here.  Could we go off the

16  record for just a moment?

17          (Discussion off the record)

18          MR. WISE:  Can we go back on the record now?

19  BY MR. WISE:

20      Q.   Okay.  We're back on the record.

21  Mr. Haggard, can you see Exhibit 1 on your screen?

22          (Exhibit 1 marked)

23          THE WITNESS:  Yes.

24  BY MR. WISE:

25      Q.   Okay.  Do you recognize this document?

Page 11

 1      A.   I do.

 2      Q.   What --

 3      A.   This would be the declaration that you asked

 4   me, in my preparation, what I had read.

 5      Q.   Did you prepare this declaration?

 6      A.   I did not.  I spoke to Ms. Bellantoni at

 7   length and wrote up my thoughts, and then she made it

 8   look real pretty on this document.

 9      Q.   Does this declaration reflect your thoughts?

10      A.   Yes, sir.

11      Q.   Okay.  And did you sign a copy of this

12   declaration?

13      A.   Yes, I did, and then because of the nature

14   of what we're doing, I had to sign and then scan that

15   and then send that in so that you guys would have a

16   legal copy.

17      Q.   Okay.  Let's look just at page 14 here.  I

18   notice that the declaration that I have is not

19   signed, but you do have a signed version?

20      A.   Yes, sir, I do.

21      Q.   Okay.  Would you work with plaintiff's

22   counsel to provide me a signed copy of this

23   declaration?

24      MS. BELLANTONI:  Yeah, I'll get that over to

25   you, Matthew.

                                      Page 12

1            MR. WISE:  Terrific.

2      BY MR. WISE:

3      Q.   Your declaration cites a number of

4  documents.  Besides the documents that you've cited,

5  did you rely on any other documents in reaching your

6  opinion on this case?

7      A.   I read the original -- my legal training is

8  failing me here -- the filing, the case that was put

9  forward, and then the other expert, Chief Raney, I

10  read those documents.

11      Q.   Did you conduct research to locate the

12  documents that form the basis of your opinion?

13      A.   I'm not sure how you mean that.  Which part

14  are you referring to?

15      Q.   Anything in the declaration itself.  Did you

16  conduct any research to try to come up with documents

17  that would support your opinion?

18      A.   Not really.  A big part of my declaration

19  would be personal observation and experience.

20      Q.   Did anyone else provide you with documents

21  that would support the basis of your opinion?

22      A.   I don't believe so.  Besides the documents

23  that Ms. Bellantoni provided to me that I've talked

24  about reading as far as, like, what's already

25  pertinent to this case, I don't believe so.  Like I

Page 13

 1    say, we've been doing this for quite awhile.  I will
 2    tell you that I do, you know, like, on a regular
 3    basis, read up on things like news, gun control
 4    issues, crime issues, things like that.  All of that
 5    is still pertinent to my life.  I am still an active
 6    duty police officer, so those are all things that I
 7    pay attention to, but I don't recall being provided,
 8    or, you know, anything like that, anything specific
 9    for this case, no, sir.
10        Q.   Anyone other than plaintiff's counsel
11    assisted you in preparing this declaration?
12        A.   No.  Huh-uh.
13        Q.   Have you ever served as an expert witness?
14        A.   Yes, sir, I have.
15        Q.   How many times?
16        A.   It's hard to say.  Probably a good dozen.
17    I've been retained as an expert witness on police use
18    of force both in civil court and in criminal court.
19    I have been retained as a defense expert on firearms
20    and firearms training in a murder trial.  I have been
21    retained as an expert witness on firearms in a
22    series.  We had kind of a gang robbery homicide thing
23    that turned into a series of probably eight separate
24    trials because of the nature of that one, so I don't
25    have an -- I'd say probably 10 to 12 times at least.

Page 14

1      Q.    Have you ever testified as an expert on the

2    public carry of firearms?

3      A.    No, I have not.

4      Q.    Did you attend college?

5      A.    I did.

6      Q.    What college?

7      A.    Kansas State University.

8      Q.    Did you graduate?

9      A.    I did not.  The police department decided to

10   hire, and I had to weigh my options, so ended up

11   taking the job.

12     Q.    Besides college experience you had, did you

13   complete any other formal education courses?

14     A.    I've completed courses, Kan State

15   University, and then other courses through the

16   military that were adjunct to other colleges such as

17   Washington University, Emporia State, couple of those

18   that were out-of-state things like Louisiana State

19   University that were part of the course that I was

20   doing.  That was both in a police capacity and a --

21   or, when I was in the military, military capacity,

22   and those were classes that if you did that, you

23   could gain college credit for that.

24          I've also -- not pertinent to this, but also

25   completed Kansas -- not Kansas State University --

Page 15

1    Kansas University classes through things like fire

2    science and that sort of thing that all count

3    towards -- you know, so I've earned college credit in

4    a whole bunch of places but never coalesced that into

5    a degree as it were.

6         Q.   Any other formal education that we haven't

7    touched on?

8         A.   Quite a bit.  I'm assuming that you have a

9    copy of my CV.  A whole lot of what I've done is

10   things like Force Science Research Center as a force

11   analyst, training on excited delirium and things that

12   are pertinent to police use of force, human dynamic

13   factors, deescalation, verbal judo, etc., etc., as

14   all is preparation and, you know, on-the-job

15   improvement for the jobs that I was doing mainly at

16   the Topeka Police Department, which since I've

17   retired from, but then in my current roles, I'm still

18   a national trainer for National Law Enforcement

19   Training Center.  I have my own business.  I'm an

20   adjunct instructor for Strategos International,

21   adjunct instructor for Hardwire Tactical, and then

22   I'm a police captain here at my current job.

23        Q.   You mentioned that you served in the

24   military.  When did you serve in the military?

25        A.   It would have been 1982 to -- it's been

1   awhile.  19 -- I'm going to -- I believe 1998, but I

2   might be off on that, but definitely started in '82.

3        Q.   What positions did you hold in the military?

4        A.   So I was a reconnaissance specialist, and

5   that's a fancy word for -- or fancy term for we go

6   out and find the bad guys and tell everybody else

7   where they are at.  So in those roles, I was vehicle

8   driver, I was a machine gunner, I was a squad leader,

9   I was a platoon sergeant.  At one point, I was an

10  acting platoon commander when we did not have a

11  lieutenant on who was assigned to our unit.

12       Q.   I think you just mentioned this, but did you

13  become familiar with firearms while in the military?

14       A.   Oh, yes.

15       Q.   Can you describe your experience with

16  firearms in the military?

17       A.   So actually in that role, in the job that I

18  had, we were required to train with and qualify on a

19  yearly basis more than most of the Army jobs.  If

20  you're, like, a truck driver or something like that,

21  it's very minimal.  Infantrymen, obviously you're

22  going to be more that, but just as an example, when I

23  first got into the job that I was in, I was required

24  to qualify -- train with, qualify with a .45 pistol,

25  M16a1 rifle, M60 machine gun, M2 50 caliber machine

Page 17

1    gun, the M203 40 millimeter grenade launcher, the LAW

2    antitank rocket, Claymore antipersonnel mines.

3            I'm probably leaving something out of the

4    list, but -- and then that -- as firearms changed

5    within the military, like they upgraded pistol, they

6    upgraded rifles, they added grenade launching machine

7    guns and things like that, we all got -- we got

8    trained on those as well.

9    Q.   You mentioned that you've had a career in

10   law enforcement.  At what point did you begin that

11   career?

12   A.   1987.

13   Q.   What department did you work for?

14   A.   The Topeka, Kansas Police Department.

15   Q.   What were your roles there?

16   A.   I started out as a patrolman.  I was a

17   patrol officer and eventually a patrol sergeant.  I

18   ended my career.  The last six years of my career, I

19   was a shift commander as a lieutenant, and then in

20   the interim, I was a member of our SWAT team for

21   little over 17 years, and so I was a breacher, I was

22   a sniper, I was a squad leader.

23           At one point I was the team leader when we

24   did not have a lieutenant assigned.  I was a firearms

25   trainer for the unit, a gas guy utilizing the grenade

Page 18

1    launchers, and in the wider role for the department,

2    I was a field training officer.  Then when I

3    promoted, I was a field training sergeant supervising

4    field training officers.

5         I was a firearms instructor, use of force

6    instructor on things like batons, taser, Pepper

7    Spray, handcuffing, arrest and control tactics,

8    things like that, ground fighting, weapon retention.

9         So we had a regional academy that was

10   approved through our state CPOST, so we had -- we did

11   recruit training and in-service training.  At one

12   point, I was responsible for all of the use of force

13   and firearms training for the department, and for

14   about -- it was just about three years there, I was

15   the range master where my primary job was to do all

16   of the recruit in-service firearms training,

17   Maintenance, and then my role as a defensive tactic

18   instructor, I was basically in charge of our use of

19   force program where I had officers working for me who

20   assisted with that training.

21   Q.   Did you ever develop protocols on how to

22   respond to an incident involving a firearm?

23   A.   Yes, actually, and some of it very specific.

24   Right after Columbine, we had -- you know, there was

25   kind of a watershed event in law enforcement where

1    people were like, "Oh, my God, we can't do that"

2    because the perception was that the officers there

3    kind of waited around, so you had to have what we

4    call a rapid response to an active shooter, and then,

5    of course, I don't know if you've ever seen pictures

6    coming outline of Columbine, but there was a wide

7    variety of officers.  There were detectives, there

8    were officers in plainclothes, there were officers

9    who showed up off duty, things like that, uniformed

10   police officer from multiple different departments.

11        So, you know, a big part of that would be

12   training the officers on what -- it's often called

13   PID or positive identification.  The last thing we

14   want to do is replicate tragedies that have happened

15   in the past in places like New York City where you

16   have a blue-on-blue, you have, like, say, a uniformed

17   officer shooting a plainclothes officer or something

18   like that, so a big part of our training was

19   responding to threat recognition and then proper

20   response, you know, to the scenario as you find it.

21   Q.    And what was your role in developing that

22   training?

23   A.    I actually developed it from scratch.  I was

24   given the job of -- because we wanted to have a rapid

25   response program, I was given the job of, "Hey, we

Page 20

 1    need to come up with something for that."

 2          So in my role as the primary firearms

 3    trainer at that point, or one of the primary firearms

 4    trainers at that point, I was given the role of

 5    coming up with an in-service training package so that

 6    we could run all our people through rapid response.

 7          I would say Columbine was a watershed event

 8    for law enforcement in recognition of this, but in my

 9    career, I had already responded to two active shooter

10    events, so that was something that was, you know, the

11    type of training that, taken seriously, was really

12    near and dear to my heart, that I'm glad they finally

13    got the -- the command staff finally got the message

14    that that needed to happen.

15    Q.   After working at the Topeka Police

16    Department, did you work in any other capacity as a

17    law enforcement officer?

18    A.   Yes, sir.  Shortly after retiring, because

19    we have a -- we have a technicality in our

20    retirement, you can't do anything for 60 days for a

21    paycheck, otherwise it screws up, you know, the --

22    how the retirement fund works.  We have to take

23    60 days off before you're allowed to do anything else

24    or you get paid, so I took short vacation, and then

25    the county north of me, Jackson County Sheriff's

                                        Page 21

1    Department, was shortly of people, so I became a

2    part-time deputy for them and was helping them out

3    with road patrol and training, and then approximately

4    almost exactly a year after I retired, I took the

5    current job that I have now with Metropolitan Topeka

6    Airport Authority Police and Fire.  I know that's a

7    mouthful.

8           And then since then, I am also -- I have --

9    I'm no longer working for Jackson County part-time,

10   but -- this is one of those you know, "You're getting

11   old when."  One of my recruit officers is now the

12   sheriff of the county that I live in, and he asked me

13   to come onboard as a part-time deputy, so I'm a sworn

14   deputy with the Shawnee County, Kansas Police

15   Department as well, and I'm currently doing that.

16       Q.   Got it.  Any other law enforcement roles

17   that we haven't touched on?

18       A.   No, sir.

19       Q.   Do you have any other current forms of

20   employment?

21       A.   Just my side business, and I do consulting.

22   Friend of mine's a retired officer, he has a security

23   company, so every once in awhile, I'll do the

24   qualifications for his guys and things like that, but

25   primarily my Agile Training consulting business.

Page 22

1        Q.    What is Agile Training and Consulting?

2    Would you describe it?

3        A.    So my business model is I try to meet

4    clients' needs instead of having a cookie cutter type

5    package like, you know, basic -- I have Basic

6    Pistol 1, Basic Pistol 2 or something like that.  I

7    kind of customize classes for people's needs.  I've

8    had people hit me up for things like -- I'm currently

9    going -- about to do a in-service package for

10   University Police Department over in Kansas City,

11   Missouri, and they want to have two hours of Pepper

12   Spray update, two hours of weapon retention update

13   and then four hours of arrest and control and a

14   handcuffing package just as an eight-hour day, "Can

15   you do" -- "Yeah, I can, you know, put together a

16   training package for your needs."

17            Much of what I've done lately has been

18   firearms training, and, quite frankly, the business

19   has been a lot better for civilian capacity training

20   than law enforcement training as far as people who

21   are paying for training.

22       Q.    Do you conduct any trainings that involve

23   how to respond to a person armed with a firearm?

24       A.    Yes.

25       Q.    An how do you train your clients to respond?

Page  23

1      A.    Are you talking a -- I'm assuming you mean a

2    nonsworn -- a non-police officer type person.

3      Q.    Yes.

4      A.    So part of the training I do is -- what we

5    look for in behavioral aspects of pre-criminal

6    assault behavior.  One of my friends put a very good

7    label on there, his name is Craig Douglas, and he

8    calls it MUC, M-U-C, managing unknown contacts.

9          Say you are approached by someone on the

10   street that you don't know.  How do you read that

11   type of encounter?  Is it threatening?  Are they

12   setting you up for, like, a mugging or a carjacking

13   or something like that?  And talk about the

14   behavioral aspects of what criminal assault looks

15   like.

16          So it comes as some surprise to some people

17   that bad guys can be very sneaky, and, you know,

18   they're not going to have a big sign or, you know,

19   something on the T-shirt that says "I'm a bad guy,"

20   so a big part of mine is the pre-criminal assault

21   behavior-type things, the recognition of what type of

22   scenario you may have found yourself in to -- and

23   then the how to respond correctly in those scenarios,

24   and I will do that with verbal skills, verbal

25   deescalation.

                                                Page 24

1        Very popular part of my training has been

2    Pepper Spray, how to do something that's not -- you

3    know, what I call something between a harsh word and

4    a gun, and then recognition of is -- you know, in my

5    end of scenario that actually requires a firearms

6    response, you know and, if so, how to do that, what

7    that might that look like.

8        Q.    In those classes, do you recommend that your

9    clients carry a firearm?

10       A.    I never recommend to anybody that they carry

11   a firearm.  That's a very personal decision.  I can

12   speak to the pluses and minuses of carrying a

13   firearm, but I have clients that I have worked with

14   who -- like, one friend of mine who used to be an

15   ADA, and, as you can imagine, in that capacity

16   putting people in prison, you can -- you know, she

17   picked up a stalker, and then I helped her with a

18   security package as a friend, how to harden her house

19   and have some defensive options.

20       She was adamant she did not want a gun.  She

21   was just not a gun person.  I'm not going to push a

22   gun on her.  So we came up with non-gun home defense

23   options for her that made her feel more comfortable.

24       So if people want firearms training, I will

25   offer firearms training.  If people are adamant that

1    they don't want firearms training, that they're

2    looking for something else, then, you know, that's

3    like anything else, like whether you drink or not,

4    that's an extremely personal decision.

5         Q.   And just for the record, when you said

6    "ADA," what were you referring to?

7         A.   Assistant district attorney.  I'm sorry.

8         Q.   Do you believe that carrying a gun in and of

9    itself makes a person safer?

10              MS. BELLANTONI:  Objection.

11              You can answer.

12              THE WITNESS:  Excuse me.  I've been talking

13   awhile.  My throat is dry.

14              I believe it can.  I have personally been

15   involved in scenarios where I was just another dude

16   off duty in which I know that if I had not had a

17   firearm, I would have been a victim of a violent

18   criminal assault or, you know, armed robbery, that

19   sort of thing.  I believe that having a firearm gives

20   one the option of being able to not leave oneself at

21   the other guy's mercy.

22   BY MR. WISE:

23        Q.   Would you consider a gun a tool of limited

24   utility in most situations?

25        A.   It is definitely a tool of deadly force,

Page 26

 1   and, you know, one of the things that people need to
 2   know is you can't legally shoot people a little bit.
 3   It is a tool for managing situations that require a
 4   deadly force option.
 5        Q.   I think you were mentioning this earlier,
 6   but are there particular steps that you recommend
 7   that your clients take before they carry a firearm in
 8   public?
 9             MS. BELLANTONI:  Objection.
10             You can answer.
11             THE WITNESS:  I would -- it sounds
12   self-serving because I am in a training business, but
13   I obviously counsel people that they need to have
14   some sort of training and education both how to
15   safely handle firearms -- I mean, something as
16   simple -- even in a hunting capacity, most people
17   would want to go through -- like we -- here in
18   Kansas, we have a hunter safety course, you know,
19   that just seems like a very logical thing, but going
20   through some -- both the mechanics of how the firearm
21   works and then how to effectively mechanically shoot
22   the gun, what you would think of as marksmanship
23   training and then having some sort of education on
24   when that's appropriate.
25             I suppose smart people can do things like

                                             Page 27

1   here in Kansas, you can pull up the state law, and

2   it's very clearly stated when defense of a person or

3   your domicile is allowed, but I counsel people that

4   they probably want to get some education, probably

5   want to get some training just like anything else.  I

6   counsel driver's ed before you get behind the wheel

7   of a car.  It just seems to make sense.

8   BY MR. WISE:

9       Q.   Before your clients carry a firearm in

10  public, do you recommend that they get physically

11  fit?

12          MS. BELLANTONI:  Objection.

13          You can answer.

14          THE WITNESS:  Was that, "Go ahead and

15  answer" or --

16          MS. BELLANTONI:  Go ahead and answer.

17          THE WITNESS:  Actually, I recommend

18  everybody get as physically fit as they can because

19  we know heart attacks kill a lot more people than

20  virtually anything else, you know, lifestyle.  I

21  don't want to get too deep in the whole COVID thing,

22  but when you look at what makes you susceptible to

23  COVID, the comorbidities are a very big deal.

24          However, comma, the most vulnerable

25  populations are the people who are elderly, less

1    physically fit, you know, and I have some sympathy to

2    that.  In my prime when I was in my 30s and I could

3    run two miles in 12 and a half minutes and pick up

4    600 pounds off of the ground any time I felt like it

5    and I was a judo and Jujitsu guy, I could handle

6    virtually any grown man that I ran into.

7         Now I'm 57, and I have a bad knee, and I've

8    jumped out of too many airplanes, and I've

9    rub-marched too many times.  I have no cartilage in

10   one of my knees and little cartilage in the other,

11   and I need a hip replacement according to -- two out

12   of three orthos say I need a hip replacement.

13        So the thought occurs to me that people who

14   are less physically capable need more means to defend

15   themselves, and that often means that they need tools

16   to solve that problem.

17   BY MR. WISE:

18   Q.   Before your clients carry a firearm, would

19   you recommend that they carry other items to defend

20   themselves?

21   A.   So part of my training is -- I've obviously

22   already mentioned that I'm a big proponent of Pepper

23   Spray, I have taught it for a long time, and I've

24   used it in a law enforcement capacity hundreds of

25   times.  I'm a big believer in that as a less than

Page 29

1   lethal tool, and I point out that there are

2   situations -- like, I know as a police officer, there

3   are situations where if you use sufficient force

4   early, that you could interdict having to use more

5   force later.

6         The case of Kyle Dinkheller, who was a

7   deputy who was famously murdered on his -- on car

8   camera in a gun fight is one of those cases that's a

9   glaring example.  But Pepper Spray is a less than

10   deadly force option for in a case where you find

11   yourself subject to physical force.  Guns are a tool

12   of deadly force, and those are two different

13   scenarios.

14    Q.   Why do you train your clients to take these

15   other steps before when they carry a firearm in

16   public?

17         MS. BELLANTONI:  I'm going to ask for some

18   clarification on what other steps you're referring

19   to.

20         THE WITNESS:  I was about to do the same,

21   so --

22   BY MR. WISE:

23    Q.   Sure.  And the other steps I mean are

24   getting training, carrying Pepper Spray, reading up

25   on the law, the steps that you just mentioned.

Page 30

1          MS. BELLANTONI:  I'm going to object to that

2     as well because I don't believe there was testimony

3     that he recommends they carry Pepper Spray, but maybe

4     we could get clarification on that.

5          THE WITNESS:  So I'm a big believer in human

6     beings being as capable as possible, and that may be

7     an artifice of my time as a police officer.  I

8     believe that, as a cop, you're in the lifesaving

9     business, and now, you know, I'm also a firefighter

10    on the side, so I'm in another lifesaving business,

11    you should be as capable as you possibly can, so my

12    counsel to human beings in general is that we should

13    be working to be better human beings this week than

14    we were last week, if you will, and that's kind of an

15    off-take of that.

16          Also, the more capability -- the more

17    training, education and capability you have, the more

18    situations you are going to be able to overcome if

19    you find yourself in a bad place.  I think we could

20    agree if you were an Olympic class swimmer, when your

21    sailboat sinks, you're going to be a lot better off

22    than your average dude that falls off a sailboat.

23          So if looking at my experience with street

24    crime, things like muggings, purse snatchings,

25    carjackings, person robberies, things like that,

Page 31

1    those can have a -- they can be a large range of

2    circumstances, so recognition of the problem,

3    figuring out ways to try to deescalate that, if

4    possible, having options if it's not a deadly force

5    scenario, and then having options if it is a deadly

6    force scenario is my counsel to people on how to best

7    cover the range of possibilities that people find

8    themselves in.

9    BY MR. WISE:

10       Q.   Do you have concerns that some persons that

11   carry openly don't know how to properly handle their

12   firearm in public?

13       A.   I'm not sure how to tactfully word this, but

14   I have concerns, and I don't mean just the public, I

15   mean the police and the military.  I have concerns

16   about the quality and quantity of training available

17   to the human race in general.

18            I'm currently in a bit of a dispute with our

19   state academy over what I believe is not -- the

20   training they're offering could be better, I'll just

21   say that.  Do I worry about other people carrying

22   guns?  I've been around other people carrying guns my

23   entire life, so not that much.

24       Q.   You have already responded in part to this,

25   but would you agree that a factor that affects

Page 32

1    whether a person uses a firearm safely is their

2    training?

3        A.    Probably, yeah, yeah, I'd say that.  Just

4    like anything else, I mean, if you were to -- if

5    you've never used a chainsaw before and you go pick

6    one up and start it up, you know, that might not be

7    the safest way to do business.

8        Q.    Would you agree that a factor that affects

9    whether a person uses a firearm safely is their

10   ability to deescalate a situation?

11             MS. BELLANTONI:  Objection.

12             You can answer.

13             THE WITNESS:  I don't know that I'd agree

14   per se with that.  Deescalation is a two-way

15   communication process, and the other person has a say

16   in what you are doing.  We have to deal with that in

17   depth right now in law enforcement, "deescalation"

18   has been a whole big ugly buzz word, but let's say I

19   have somebody in a state of excited delirium or very

20   high on drugs.  You know, I can't communicate or

21   deescalate with another person who isn't -- doesn't

22   even realize I'm on the same planet with them.

23             I've had to deal with people who are -- you

24   know, you try verbal deescalation, and you realize

25   you're dealing with somebody who's profoundly

Page 33

1    paranoid schizophrenic on a psychotic break, can't

2    really talk to that person, so the onus, the -- you

3    know, the weight of the deescalation on the person

4    carrying the gun, I think, is only -- you can only do

5    so much.

6    BY MR. WISE:

7        Q.   Are there certain situations, though, when

8    the ability to deescalate a situation allows a person

9    to carry a firearm more safely?

10           MS. BELLANTONI:  Objection.

11           You can answer.

12           THE WITNESS:  So I would argue that in some

13   scenarios, like I was in a case where I was off duty,

14   and I was with my girlfriend, we missed the last

15   Metro, we missed the last subway back to our hotel,

16   had to walk back in the dark, got confronted for what

17   would have been a street robbery by three dudes who

18   were all my size, so that's a fight I cannot win,

19   can't fight three guys empty-handed.

20           I ended up pulling a snub nose revolver on

21   them, and a combination of having a gun and then

22   verbal commands was what allowed me to deescalate

23   that scenario and kept it from turning into -- either

24   into a robbery where I got beat down or a situation

25   where I had to shoot one or more of them.

Page 34

1            So I would say with a gun, that the use of

2      the gun can be part -- or the availability of the gun

3      can be in fact part of the deescalation process

4      where, if you have a criminal, they realize that you

5      have the capability to defeat their means of

6      assaulting you, and that becomes part of the

7      deescalation process whereas if you did not have that

8      with you, they would go ahead and carry on.

9      BY MR. WISE:

10        Q.    And so in that situation, your ability to

11     deescalate the situation prevented you from having to

12     fire your gun, for example?

13        A.    Well, in that case, the display of the gun

14     and then the verbal -- you know, my commands to them

15     to stop what they were doing was what allowed me --

16     those in concert was what allowed me to keep that

17     from turning into either a beat-down on my part or a

18     shooting on their part.

19        Q.    Let me just circle back again and just make

20     sure I'm understanding correctly.

21        A.    Okay.

22        Q.    So are there any situations where a person's

23     ability to deescalate a situation allows them to

24     carry a firearm more safely?

25            MS. BELLANTONI:  I just want to just

                                        Page 35

1    clarify, I should have a couple of questions ago, but

2    when we talk about deescalation, are we talking in

3    terms of a uniformed police officer attempting a

4    deescalation or civilian?

5          MR. WISE:  Yeah.  I was talking about a

6    civilian.  Thanks for clarifying.

7          MS. BELLANTONI:  I object.

8          But you can go ahead and answer.

9          THE WITNESS:  I'm having trouble thinking of

10   a scenario where that would fit.

11   BY MR. WISE:

12      Q.   Okay.  Do you agree that a factor that

13   affects whether a person uses a firearm safely is

14   their decision making process under stress?

15      A.   I could agree with that.

16      Q.   Would you agree that a factor that affects

17   whether a person uses a firearm safely is their

18   marksmanship?

19          MS. BELLANTONI:  I'm going to object to

20   that, and I'm going to ask for clarification on

21   distance, if you can provide more of a scenario-based

22   circumstance because there's a lot of factors that go

23   into that decision.

24          THE WITNESS:  May I interject on that?  So

25   my answer was going to be not as much as people would

Page 36

1    suspect.  So in an overall view of most nonpolice

2    defensive shootings, if you take anecdotal databases

3    like the one that -- the ones we get off of the news

4    that go into the NRA magazine that's out every

5    month -- and they have an article called The Armed

6    Citizen.

7         The vast majority of the people involved in

8    these cases where you see, like, "78-year-old Grandma

9    Shoots Burglar Used Alleging .22 rifle."  Vast

10   majority of those people have very little or no

11   formal training.

12        And then the marksmanship issue that we see

13   in a -- on the street -- I'm not talking about a home

14   defense scenario, although that could -- it's pretty

15   similar, but in a street, what I would consider a

16   civilian street encounter or street crime encounter,

17   let's say a mugging or carjacking or something like

18   that, these encounters tend to be incredibly close.

19        The vast majority of bad guys, when they go

20   to do things like mug you or car jack you, things

21   like that, are within touching distance of the

22   victim.  Even in police encounters, we see that the

23   vast majority of police officers, when they're

24   feloniously killed with a firearm or killed within

25   three feet to three yards of the suspect, so if we

Page 37

1    look at the -- there's an old saying in pistol fights

2    that it's three yards, three shots, three seconds,

3    and if you look at a lot of these encounters, they

4    fit right into what we're talking about, is the

5    marksmanship issue actually isn't that tough.

6    BY MR. WISE:

7         Q.   Would you agree that a factor that affects

8    whether a civilian uses a firearm safely is their

9    mental state?

10             MS. BELLANTONI:  Objection.

11             You can answer.

12             THE WITNESS:  So I'm going to assume -- by

13   "mental state," do you mean their mental health or,

14   like, their emotional state at the moment, or what do

15   we mean?

16   BY MR. WISE:

17        Q.   Sure.  Let's just take that one-by-one then.

18   Their mental health.

19        A.   Well, I would hope that people who have

20   significant mental health issues would not be running

21   around with a gun.  We're kind of supposed to screen

22   for that.  But then as far as their current mental

23   state, having been in that scenario, being criminally

24   victimized is obviously a very exciting, and, you

25   know, it's an event in which it's going to be

Page 38

1   emotionally charged, so I don't think that you can

2   put somebody in a scenario like that and not have a

3   significant emotional response out of just human

4   beings in general.

5       Q.   Let's assume that they're not being

6   victimized by just their carrying a firearm, okay,

7   and so my question is would you agree that a factor

8   that affects whether a person uses a firearm safely

9   is, let's just say, their emotional state?

10       MS. BELLANTONI:  Objection.  So using a

11   firearm, but they're not being victimized, so if I

12   could just get more clarity on that question.

13   BY MR. WISE:

14       Q.   Let's say that -- I'm sorry.  I should just

15   say carrying a firearm.

16       A.   I'm not sure exactly how to quantify that

17   one.  I think like a lot of things that human beings

18   do like driving cars, you should probably --

19   utilizing chainsaws, you should probably be a mature

20   adult if you will.  There's a reason why we, you

21   know, don't give 13-year-olds driver's licenses and

22   things like that.  So that, I guess, emotional

23   stability or emotional maturity kind of comes with

24   that, so I guess I'm kind of agreeing with you.

25       Q.   Would you agree that a factor that affects

Page 39

1    whether a civilian uses a firearm safely is whether

2    they're intoxicated?

3         A.    Certainly.

4         Q.    Would you agree that in general, an off duty

5    officer is more likely to be prepared to use a

6    firearm safely than the average civilian?

7              MS. BELLANTONI:  Objection.

8              You can answer.

9              THE WITNESS:  I'm on the fence on that one.

10   I'm really on the fence on that one.  It's hard for

11   me to mentally average law enforcement officers.

12   It's also hard for me to mentally average non- -- I

13   know -- I can think of quite a few people who are not

14   cops that I would rather have backing me up on

15   something bad happening than some of the cops that I

16   know, and, of course, the flip side is also there, so

17   that would be one I would have to ponder.  I really

18   can't give you an answer on that one.

19   BY MR. WISE:

20        Q.    Would you agree that in general, an

21   undercover officer is more likely to be prepared to

22   use a firearm safely than the average person?

23             MS. BELLANTONI:  Objection.

24             You can answer.

25             THE WITNESS:  I'd have to have the caveat of

                                        Page 40

1   having to know what some of their training is.  Like,

2   here in my state, unfortunately, there's no

3   requirement for police officers to do anything but

4   shoot the qualification course from their police duty

5   belt, so there's no formal instruction in the police

6   system here in my state on, like, how to carry a gun

7   concealed or how to deploy a gun concealed.

8            Officers who are doing those things and are

9   very competent at them are either working that

10   problem themselves or seeking training outside of

11   their department to get that, or they have a very

12   progressive training department who is offering that

13   sort of training to their people.  So, again, I'm not

14   sure I can say that I agree with that.

15   BY MR. WISE:

16       Q.   Would you agree that in general, a retired

17   officer is more likely to be prepared to use a

18   firearm safely than the average person?

19            MS. BELLANTONI:  Objection.

20            You can answer.

21            THE WITNESS:  I would say that if you've got

22   a good street cop and they've had a lot of years on

23   the job, what they're going to be good at, because

24   they've been in a bunch of them, is handling critical

25   incidents, so potentially, yes.

Page 41

**ER327**

1    BY MR. WISE:

2        Q.   Would you agree that in general, a person

3    who a law enforcement agency has determined to have

4    good cause to possess a firearm is more likely to be

5    prepared to use a firearm safely than the average

6    civilian?

7            MS. BELLANTONI:  Objection.

8            You can answer.

9            THE WITNESS:  So I'm assuming, like, in a,

10   you know, show cause type of state, if -- like, in

11   New York, I know you have to prove that you have a

12   good reason to have a gun before they'll give you a

13   permit or something like that, so I assume you're

14   speaking to that type of paradigm.

15   BY MR. WISE:

16       Q.   That's right.

17       A.   I can't say that's the case.  You know, it

18   would entirely depend upon the criteria.  You know,

19   they could make a -- depending on the criteria, but

20   generally I disagree with that.  I know a lot of the

21   people who get permits, and I'll pick on New York.  I

22   have a little bit of knowledge of that, particularly

23   New York City.

24           Your cause has to do with things like, you

25   know, you're a high end jeweler and you carry a lot

                                        Page 42

1    of cash or you do cash transports or jewelry

2    transports or things like that, so the official

3    perception of your threat level wouldn't really have

4    anything to do with your ability to respond to that.

5         Q.   Do you train your clients on how to prevent

6    their firearm from being stolen?

7         A.   Yes, I do.

8              MS. BELLANTONI:  Objection.  Can I just get

9    more clarification on what you mean by "stolen"?

10   Like, from the person?  From their home?

11   BY MR. WISE:

12        Q.   Stolen from their person, from their home,

13   their car, wherever.

14        A.   Actually, all of the above.  I talk about --

15   let's say you have a concealed carry, but you go to

16   some someplace that has one of those no gun signs.

17   Like, here in my state, you can lock your gun up in

18   your car legally in the parking lot of that property,

19   but, you know, you're not supposed to go -- like,

20   let's say it's a department store.  You're not

21   supposed to go in the store with a gun, but you can

22   lock your gun up legally on the parking lot, so they

23   clarified that in the law.

24             You don't just want to leave your gun in

25   someplace like the glove box, that's ill-advised, so

Page 43

1    I advise things on like how to secure a gun in a car,

2    how to secure a gun in the home, how to avoid having,

3    like, your toddler get ahold of your gun or something

4    like that, but then also one of my specialties is

5    weapon retention and disarming skills.  I've been

6    teaching that for a very long time.  So how to keep

7    your gun from being taken away from you.

8        Q.   Why is it important for your clients not to

9    allow their firearms to be stolen?

10       A.   You don't want the bad guys to have your

11   guns, or, you know, something like leaving it out

12   where a toddler can get it or, you know, whatever the

13   case may be.  I can point to specific cases.  One

14   of -- the last officer that was killed on my old job

15   was a friend of mine, and he was shot in a gun stolen

16   out of a home burglary.  So somebody had an unsecured

17   loaded pistol laying around their house, and he was

18   shot dead with it during the course of a speeding --

19   a car stopped for speeding.

20            So those are the type of things that, you

21   know, I never -- I've worked a couple of cases where

22   small children were shot over playing with guns, and

23   those are pictures that are stuck in my head that are

24   never going to go away, so I counsel people on the

25   importance of things like safe storage but then also,

Page  44

1    you know, if you have the gun on your person, how to

2    go about safely doing that as well.

3         Q.   Have you ever published any articles on

4    topics related to the public carry of firearms?

5         A.   I have.

6         Q.   What articles did you publish?

7         A.   It's been a few.  So I've written for Recoil

8    Magazine which is a paper, you know, type magazine.

9    I have written for the Tactical Wire, which is a

10   strictly online type of thing, and I have talked

11   about, like, carriage of smaller guns, utilizing

12   revolvers, things like that.  So, yeah, I've dabbled

13   in that.

14        Q.   Were any of these articles based on

15   independent research that you conducted?

16        A.   I can't say formal research.  Like, I did

17   not do a scholarly-type paper or something like that,

18   no, sir.  It would be more things that I've read,

19   things that I've studied up on and then personal

20   observation and experience through my travels.

21        Q.   Do you have any academic background in

22   conducting research?

23        A.   Minimal.

24        Q.   Besides what we've discussed today, do you

25   have any other experience that informs your views on

Page 45

1    the public carry of firearms?

2        A.   I have quite a bit of experience with being

3    around it.  My state, of course, with Kansas, if you

4    go back, we had Wyatt Earp, Bat Masterson, things

5    like that, we had the Frontier Days, the cattle

6    drives, Oregon-California Trail, things like that

7    going on.  I'm a big history buff.

8            And then if you go back to when I started my

9    time in law enforcement, there was no way for anyone

10   besides a commissioned law enforcement officer to

11   carry a gun in the State of Kansas outside of, like,

12   hunt -- they had an exception for hunting and

13   fishing, you could carry a concealed handgun, and,

14   obviously, if you're hunting, you could do things

15   like carry your shotgun or your deer rifle, things

16   like that, but that's -- it was allowed -- the state

17   allowed individual cities to ban carry of firearms,

18   things like that.

19           It was legal to have a loaded gun in your

20   car but not on your person, weirdly enough, but then

21   a lot of the cities banned loaded guns in cars.  So

22   that's where I started my time in law enforcement,

23   and then since then, there's been decisions, legal

24   precedents, things like that, particularly after

25   Heller, the Kansas attorney general who came down

Page 46

1    with an opinion that certain Kansas laws were

2    unconstitutional.  Some of those laws were changed.

3         There were several court cases where cities

4    tried to go back to the old way of doing business,

5    and they were disallowed from that, so in my time as

6    a cop, we went from nobody could carry, and including

7    retired law enforcement officers could not carry a

8    gun.  The only people who could carry was on duty

9    cops or off duty cops but only with the permission of

10   their chief law enforcement officer, so some off duty

11   cops couldn't carry.

12        And then we went to a rather strict conceal

13   carry permit system, then a much looser conceal carry

14   permit system and then an attorney general's opinion

15   that allowed what people would call the

16   constitutional carry, if you will, where you could

17   carry concealed or open carry without a license, and

18   there were several lawsuits over -- like, I know

19   Overland Park, Kansas tried to ban open carry, and

20   the attorney general's office took them to court over

21   that or was at least part of those proceedings.

22        And so in my state, it is legal to carry

23   concealed, it is legal to carry unconcealed, it is

24   legal to -- you can get a conceal carry permit which

25   a lot of people do if that allows reciprocity.  Like,

Page  47

1   if you have a Kansas permit, you can carry in

2   Missouri, Nebraska, Oklahoma, Colorado, Texas.

3   There's a litany of places you could carry.

4        So some -- a lot of people will get the

5   permit because, you know, you can travel, but also a

6   lot of people don't.  So it's very common for me to

7   deal with nonpolice firearms carriers or to see

8   people carrying a gun in public.

9        Q.   Over the course of your career, have you

10  served in any law enforcement command positions?

11       A.   Yes, sir.  I was a lieutenant shift

12  commander for my department.  At one point, we had a

13  hiring freeze, and we had a promotion freeze, so I

14  was simultaneously the first shift and second shift

15  patrol commanders, and I was in charge of the

16  motorcycle unit and the school resource officers.

17       Q.   And what department were you working for?

18  What timeframe?

19       A.   That was Topeka, Kansas PD, and that would

20  have been approximately -- I'm doing the math here.

21  So I retired in December of 2014, and that would have

22  been about -- I believe I got promoted in 2008 to

23  lieutenant.  I'm going to have to look that one up.

24  It might have been '06, but it could have been '08,

25  but I did approximately right about -- would be about

Page 48

1    eight years, just under eight years as a lieutenant.

2            And then my current job, I'm the captain for

3    the Airport Police and Fire here in the south part of

4    Topeka at the airport, and so I'm in charge of all

5    three of the lieutenants.  I have all three of the

6    shifts that we have.  We have 24-hour shifts, so we

7    have an A, B and C shift, I'm in charge of them, and

8    then I'm also in charge of all of our firearms and

9    other police training.  We have another captain

10   that's in charge of all the fire part of the

11   organization.

12       Q.   How long have you served in that role as

13   captain?

14       A.   About a year.

15       Q.   Have you ever served as a deputy chief of

16   police?

17       A.   No, sir.

18       Q.   Have you ever served as a chief of police?

19       A.   No, sir.

20       Q.   And I should go to the sheriff's department

21   too.  Have you served in any similar capacity,

22   sheriff?

23       A.   No.  Just as a deputy.

24       Q.   Do you have any background in public policy?

25       A.   I have a background in police policy.  I

Page 49

1    have written a number of policy papers, what you

2    would think of as general orders, things like that,

3    but if you mean a larger -- like, the grandest thing

4    I have done is written a municipal ordinance as far

5    as, like, an overarching public policy.

6        Q.   What was that municipal ordinance?

7        A.   It was a Topeka city code on -- had to do

8    with protests, and it bans masks and body armor while

9    you're in the middle of a protest.  I could pull up

10   the number for you if you ever want to look at it.

11       Q.   That's okay for now.  Any other work that

12   you've done creating a municipal ordinance or similar

13   work?

14       A.   Not on that.  Mainly I -- I was the author

15   of some of the general orders that we had at Topeka

16   Police Department.  My current department, I have

17   written general orders, use of force policy, things

18   like that.  I have assisted in policy writing for the

19   IACP.

20           Like, I was part of the model policy for

21   response to excited delirium for International

22   Association for Chiefs of Police organization.  So

23   the vast majority of the stuff I've done in that

24   regard has all been cop stuff.

25       Q.   Have you ever worked with a policy maker in

                                              Page 50

1    the creation of public safety policy?

2         A.    If you mean like state laws or something

3    like that, not more than lobbying or that sort of

4    thing, no.

5         Q.    Have you ever worked with a community

6    stakeholder in the creation of public safety policy?

7         A.    On the police level, yes, we had input.

8    Like, things like our chase policy and our police use

9    of force, things like that, we did take -- that

10   wasn't all in-house.  There was other people involved

11   in that, mayor's office, city council members, other

12   community -- I'll use the "stakeholder" word.

13        Q.    Any other examples besides what you've just

14   reviewed?

15        A.    No, sir, none that I can think of.

16        Q.    Have you ever worked with a researcher in

17   the creation of public safety policy?

18        A.    No, not really, no.

19        Q.    Okay.  Let's turn to your opinions.  What

20   field would you consider yourself an expert in?

21             MS. BELLANTONI:  Objection.

22             You can answer.

23             THE WITNESS:  Personally, I think the term

24   "expert" is overused, but the courts have said I'm an

25   expert in police use of force, use of force decision

                                          Page 51

1    making, firearms, firearms training and ballistics,

2    terminal ballistics, firearms identification, police

3    use of force other than firearms, Pepper Spray,

4    taser, arrest and control tactics.  I've been

5    utilized as an expert on police response tactics.  At

6    any rate, those are the things that I've been

7    court-recognized as an expert.

8    BY MR. WISE:

9       Q.   What is the basis for your opinions in this

10   case?

11      A.   Basically the totality of my training and

12   experience as a police officer.

13      Q.   Okay.  Let's look at page seven of your

14   report.

15      A.   I have to find my glasses for this one.

16      Q.   Can you see the screen okay?

17      A.   Yes, sir.

18      Q.   Okay.  Great.

19      A.   I can now.

20      Q.   Let's look at paragraph 20.  You state "The

21   implementation of laws that allow open carry in

22   public does not have a negative impact on public

23   safety.  The act itself, a lawful person openly

24   carrying a firearm in public does not have any

25   negative or detrimental effect on public safety, does

Page 52

1    not itself create a safety hazard, and is not the

2    cause of accidental or mistake-of-fact shootings of

3    civilians by police officers."  Is this your opinion?

4        A.    Yes.

5        Q.    Okay.  Would you explain what you mean?

6        A.    So just the mere fact that somebody's

7    carrying a gun -- and I'll go with a holstered

8    handgun, let's say, in and of itself.  It just is

9    what it is.  It isn't a negative or doesn't have an

10   effect on public safety.

11           The idea that the police would show up and

12   be, "Oh, my God, that guy's got a gun, we better

13   shoot him" borders on the ridiculous in my mind, that

14   -- and a bunch of that is personal observation.

15           Both here in Kansas and part of the business

16   that I do both as a police trainer and in my own

17   business as a -- we'll just say civilian firearm

18   trainer, is travelling to other states.  You know,

19   just this year, I've been to -- I've conducted

20   training or been at training in Texas, Oklahoma,

21   Missouri, Utah, Wyoming.  I'm leaving something out.

22           But at any rate, I see -- I go to a lot of

23   places, see a lot of stuff, and this is something

24   that -- part of the reason in conversation when I

25   talk to Ms. Bellantoni, you know, what's my personal

```
 1    observations, like I guarantee you I can walk out of
 2    here now and go to someplace like Walmart here in my
 3    town and find somebody carrying a pistol in a holster
 4    visible on their belt or, quite frankly, carrying
 5    concealed poorly where everybody can tell that
 6    they're carrying a pistol, but, you know, you can see
 7    that there's an obvious bulge and things like that.
 8            I can find somebody -- I can walk out of
 9    here and find somebody in 15 or 20 minutes, and it's
10    just -- it just is what it is.  It's like saying,
11    "It's a sunny day out, that guy's carrying a gun."
12    It's not a positive, it's not a negative, it just is.
13            I haven't noted, in observation in my time
14    as a cop in dealing with people on the street, that
15    open carry does anything that doesn't bring any
16    detriment to the public safety realm.
17    Q.   Besides your personal observations, what
18    else did you rely on to reach this opinion?
19    A.   Primarily, that was it.  One of my big
20    things that I do is every chance that I get, I delve
21    into anything that involves the police.  A lot of
22    things that are out there in the police world get
23    write-ups.  There are famous things that we have to
24    look at.
25            Obviously, you know, the George Floyd thing
```

Page 54

 1    last year, that was a botched arrest and control

 2    scenario, and that's right in the middle of my

 3    bailiwick on, you know, teaching cops how to avoid

 4    things like in custody deaths; and then, you know,

 5    less well known but pretty famous, the bad shooting

 6    that turned into a riot that came out of Atlanta PD,

 7    which was, you know, basically another arrest and

 8    control scenario with a taser.

 9           So I try to stay on top of those trends

10    absolutely as much as I can, and I also pay attention

11    to anything in the police publications or any of the

12    newsletters, any of the stuff that comes through my

13    email.  My email lists are fairly extensive.

14           So I'm always looking for after actions on

15    incidents as much as possible, both to support my

16    business and helping, you know, regular people not be

17    the victims of crime, look for criminal, crime

18    trends, look for trends in law enforcement.  We know

19    in the past couple of years, ambushes has been a

20    thing that has been up, so trying to stay on top of

21    that sort of thing as well.

22      Q.   Did you rely on any research to support your

23    opinion?

24           MS. BELLANTONI:  Other than what he

25    testified to?

                                            Page 55

 1          THE WITNESS:  I can't point you to a

 2     specific paper or anything like that, no, sir.

 3     BY MR. WISE:

 4          Q.   You continue on page eight, paragraph 21 --

 5          A.   Uh-huh.

 6          Q.   -- stating "The lack of proper police

 7     training creates or can lead to a public safety

 8     hazard and the accidental shooting of civilians,

 9     whether unarmed, carrying concealed, or carrying

10     exposed open carry."  Would you explain what you

11     mean?

12          A.   So if you don't have -- you know, and this

13     is something that is deep in the training that good

14     law enforcement firearms instructors find themselves

15     in.  If we look at some of the court cases that are

16     out there like, you know, the places lost big

17     lawsuits, Zuchel v. Denver is an example that is

18     glaring in the police world that is brought up.

19          If you look at Popow v. Margate and we look

20     at what do the courts say valid police training

21     should look like versus what had happened -- you

22     know, if you look at the Popow case, they were

23     shooting at a man that was running, and gentleman

24     came out on his porch to see what was going on, and

25     then as the suspect was running past the gentleman on

                                        Page 56

1    his porch, he got shot by the police because he was

2    downrange of where the bad guy was.

3            So that would be a glaring historical

4    example of incorrect or improper or nonexistent

5    police training contributing to a public safety

6    hazard that, quite frankly, didn't exist before the

7    police showed up.  So avoiding mistake-of-fact

8    shootings is a big deal in the police world and the

9    training that is done right.

10   Q.   Is it your opinion that proper law

11   enforcement training is the most important factor to

12   prevent civilian shootings by law enforcement

13   officers?

14   A.   If you mean mistake-of-fact or not shooting,

15   shooting the wrong people, then I would say yes.

16   Q.   Incidentally, is that one of the reasons you

17   founded your company, Agile Tactical?

18   A.   So I founded the company because I was

19   getting -- I had been a police trainer for so long,

20   and then that was mainly what I did, and as I reached

21   retirement, I had so many people asking me outside of

22   the police world for training, I thought, well, I

23   should kind of formalize this thing.

24   Q.   Do you believe that a person who is carrying

25   a firearm in public, a civilian who's carrying a

Page 57

1    firearm in public is more likely, all things being

2    equal, to be shot than a civilian is who is unarmed?

3            MS. BELLANTONI:  Objection.

4            You can answer if you can.

5            THE WITNESS:  So historically, if you look

6    at people who are big crime victims according to --

7    and this is according to national stats, which, of

8    course, fluctuate every -- year to year, things like

9    that, but if you look at people who resist things

10   like robberies, that sort of thing, the safest way to

11   do that is to utilize a firearm.  Statistically,

12   that's the case, and that's been the case for quite

13   some time.

14           So I'm not exactly sure how to quantify your

15   question on are they more likely to be shot or not be

16   shot, but I think it's pretty clear statistically if

17   they resist being a crime victim through the use of a

18   firearm, then they're less likely to suffer any

19   injury at all.  That's been the running statistic

20   coming from the feds every year.

21   BY MR. WISE:

22      Q.   And when you're referring to the statistics,

23   what in particular are you referring to?

24      A.   The national -- so I'm going to look up the

25   formal name of that so I don't -- it's Bureau of

Page 58

```
 1    Justice Statistics.  I don't want to misstate the
 2    name of what I'm talking about.  I'm firing up my
 3    other magic Google box.
 4        Q.   If that would refresh your recollection, go
 5    ahead.
 6        A.   Okay.  So the formal name for that page is
 7    Bureau of Justice Statistics.  I was having a little
 8    Alzheimer's on the name of that one.
 9        Q.   Thank you.  Okay.  Do you believe that a
10    civilian who's carrying a firearm in public is more
11    likely, all things being equal, to be shot by a law
12    enforcement officer than a person or a civilian who's
13    unarmed?
14            MS. BELLANTONI:  Objection.
15            You can answer if you can.
16            THE WITNESS:  I don't because a lot of the
17    mistake-of-fact shootings, particularly the ones that
18    are very high profile, we can point to demonstrate
19    they did not have a firearm on their person, and they
20    were shot in a mistake-of-fact shooting because they
21    had something as innocuous as a cellphone or
22    something else.
23            If you look at the famous case out of NYPD,
24    I can't pronounce the gentleman's name or -- well,
25    it's something like Diallo, where their street crimes
```

Page 59

1  unit fired the -- you know, the famous 47 rounds that

2  Bruce Springsteen spoke of, he had a wallet in his

3  hand when he was shot.

4  BY MR. WISE:

5      Q.   I just want to make sure I'm understanding

6  you because you mentioned a few examples.  Are you

7  talking in general or just examples that come to

8  mind?  And what I'm trying to --

9      A.   I --

10     Q.   Yeah.

11     A.   I don't believe that you would be more

12  likely to be mistakenly shot by the police, and I'm

13  assuming someone who is not a criminal actor, but,

14  you know, just an average Joe, I don't think you're

15  more likely to be shot by the police whether you have

16  a gun or you don't have a gun.

17     Q.   Let's look at paragraph 24, still on

18  page eight.

19     A.   Okay.

20     Q.   You state "Mr. Raney's opinions are based on

21  speculation and a generalized fear that law-abiding

22  individuals, simply by the act of carrying their

23  firearm exposed, will cause panic among police

24  officers and the public, waste political" -- excuse

25  me -- "waste police resources and ultimately lead to

Page 60

```
 1    police officers shooting civilians carrying exposed."

 2        A.   Okay.

 3        Q.   Is that your opinion?

 4        A.   Yes.

 5        Q.   Okay.  Do you understand Mr. Raney to have

 6    the opinion that police officers will panic when

 7    responding to a call about a person who is carrying a

 8    firearm openly?

 9        A.   What he describes in his declaration sure

10    appears to color it that way.

11        Q.   Do you understand Mr. Raney to have the

12    opinion that police officers are likely to shoot a

13    person simply because they are carrying a firearm

14    openly?

15        A.   He also seemed to hint at that in his

16    opinion.

17        Q.   Do you understand those things to be his

18    opinion, or are you saying that --

19        A.   That's what I believe I read from his

20    opinion.

21        Q.   Okay.  Let's look at page 26.  We're still

22    on page eight.  I'm sorry.  Paragraph 26.  You state

23    that "When open carry without a permit became allowed

24    in Kansas, no instant mayhem was created"; is that

25    right?
```

Page 61

1       A.   Yes.

2       Q.   Okay.  Do you understand Mr. Raney to have

3   the opinion that instant mayhem will result if open

4   carry were allowed in California?

5       A.   Without rereading his opinion on the spot,

6   I'm not sure that I would -- I could say he said

7   those exact words, but his opinion that I read, the

8   impression of his opinion that I got from him was

9   people couldn't open carry because it would make

10  things much more chaotic, you know, the police would

11  have all kinds of problems differentiating good guys

12  from bad guys for, you know, cops and robbers, from

13  want of a better term, and that it would cause -- you

14  know, he'd almost colored it as though it would cause

15  some sort of mass public hysteria.

16      Q.   Let's look at page nine, paragraph 28.  You

17  state that "When open carry became allowed in Kansas,

18  our police officers were not spontaneously shooting

19  members of the public they observed carrying a

20  firearm exposed on their body in public;" is that

21  right?

22      A.   Was that a -- I'm assuming that was the

23  upper part.  You said -- 28 now talks about banning

24  open carry.

25      Q.   Yeah.  Let me see here.  One second.

Page 62

1      A.    I think you were on the previous --

2      Q.    Oh, sorry.   I meant paragraph 26 on

3    page eight still.

4      A.    Sure.

5      Q.    Is that your opinion in paragraph 26?

6      A.    That police officers were not shooting

7    members of the public?

8      Q.    Correct.

9      A.    Absolutely.

10     Q.    Do you understand Mr. Raney had the opinion

11   that if open carry were allowed in California, police

12   officers would spontaneously shoot members of the

13   public who were openly carrying firearms?

14     A.    His opinion read to me as though he believed

15   that open carry could not be allowed in the State of

16   California because it would pose too great of risk of

17   police officers shooting the wrong people merely for

18   carrying a gun in the open.   That is what I took from

19   part of his opinion.

20     Q.    Okay.   Now let's go to paragraph 28.

21     A.    Okay.

22     Q.    You state "Banning open carry does not

23   greatly enhance public safety, nor does it cure

24   deficiencies in departmental training of police

25   officers."   Would you explain what you mean?

Page 63