No. 23-15016

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARK BAIRD, *et ano.*,
*Plaintiffs-Appellants*,

v.

ROB BONTA, in his official capacity as
Attorney General of the State of California,
*Defendant-Appellee*,

Appeal from United States District Court for the Eastern District of California
Civil Case No. 2:19-cv-00617-KJM-AC (Honorable Kimberly J. Mueller)

## PLAINTIFFS-APPELLANTS' EXCERPTS OF RECORD
## VOLUME III, ER350-ER525

Amy L. Bellantoni
THE BELLANTONI LAW FIRM, PLLC
2 Overhill Road, Suite 400
Scarsdale, New York 10583
(914) 367-0090 (t)
(888) 763-9761(f)
*abell@bellantoni-law.com*

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

**Date**

## <u>VOLUME I</u>

| | | |
|---|---|---|
| 12/7/22 | Order Denying Preliminary Injunction (Docket No. 83) | ER001 |
| 1/3/23 | Notice of Appeal (Docket No. 84) | ER017 |
| 11/4/22 | Reporter's Transcript of Proceedings (Hearing on Motion For Preliminary Injunction) | ER019 |
| 8/7/22 | Declaration of Mark Baird in Support of Plaintiffs' Third Motion for a Preliminary Injunction (Docket No. 65-1) | ER054 |
| 8/8/22 | Declaration of Richard Gallardo in Support of Plaintiffs' Third Motion for a Preliminary Injunction (Docket No. 65-2) | ER056 |
| 2/21/19 | Public Records Act Response, State of California Department of Justice (Docket No. 47-3) | ER059 |
| 9/30/22 | Declaration of R. Matthew Wise In Support of Defendant's Opposition To Plaintiffs' Third Motion For Injunction (Docket No. 69-1) | ER060 |
| 9/30/22 | Declaration of Former Covina Chief of Police Kim Raney In Support of Defendant's Opposition To Plaintiffs' Third Motion For Injunction (Docket No. 69-2) | ER162 |

## <u>VOLUME II</u>

| | | |
|---|---|---|
| 10/11/22 | Reply Declaration of Amy L. Bellantoni In Support of Plaintiffs' Third Motion Preliminary Injunction (Docket No. 73-1) | ER174 |

# TABLE OF CONTENTS

**Date**                                                                            **Page**

Exhibit 1 to Declaration of Amy L. Bellantoni
Deposition Transcript of Kim Raney (Docket No. 73-2)          ER181

Exhibit 2 to Declaration of Amy L. Bellantoni
Deposition Transcript of Charles D. Haggard
(Docket No. 73-3)                                             ER287

## **VOLUME III**

9/26/22     Second Amended Complaint for Declaratory and
            Injunctive Relief (Docket No. 68)                 ER421

10/31/22    Attorney General Rob Bonta's Answer to Second
            Amended Complaint (Docket No. 76)                 ER439

4/9/19      Complaint for Declaratory and Injunctive Relief
            (Docket No. 1)                                    ER453

8/28/20     Order Denying Plaintiffs' First Motion for A
            Preliminary Injunction (Docket No. 33)            ER511

## **VOLUME IV**

9/20/20     First Amended Complaint for Declaratory and
            Injunctive Relief (Docket No. 34)                 ER529

11/2/20     Attorney General Rob Bonta's Answer to First
            Amended Complaint (Docket No. 38)                 ER567

            United States District Court
            Civil Docket Sheet for Case No. 2:19-cv-00617-KJM-AC   ER596

1      A.   Well, as I said, in my experience in the

2   world, I went from a place where nobody could carry

3   except the cops legally.  A lot of people did it, but

4   nobody could legally carry a gun beside the cops, and

5   you certainly couldn't run around open carrying to a

6   world where you could get a permit to a world to

7   where you could open carry or conceal carry as you

8   see fit.

9          During that period of time, we actually had

10  a great -- quite a bit of a -- and I cannot point to

11  a statistical cause and effect relationship, but I

12  did note that locally, you know, when I first started

13  in the police world with things like gang violence

14  and that sort of thing, our crime was significant.

15         There was a port in my career where I looked

16  up crime stats for the United States early in the

17  '90s, and that's when things were still banned, and

18  Topeka had a per capita crime rate greater than

19  Los Angeles, and now we come to a point where you can

20  carry a gun as you see fit, if you want to be open

21  carry or conceal carry without a permit, or you can

22  get a permit, and there was -- you know, that

23  coincided with no uptick in crime.

24         In fact, for the longest time, we had a

25  Leave It to Beaver era level crime where it was so --

Page 64

1    crime had dropped so much, everybody kind of forgot

2    what that was like, but there was certainly no uptick

3    in things like police shootings or, you know, other

4    crimes relevant to -- I see -- and I guess I'm -- I

5    don't know if I'm speaking out of turn here because

6    it's more of a larger than this case, but there's

7    people who push the opinion that if you allow people

8    to carry guns, they're just going to run around

9    killing people over things like parking lot disputes

10   or, you know, "You took my parking space" or

11   something like that.  We just didn't see it.  We

12   didn't see any of that.

13        Q.   When you state that "Banning open carry does

14   not cure deficiencies in law enforcement training,"

15   are you emphasizing, as we've discussed before, the

16   critical importance of training in public safety?

17        A.   Yes, and whether or not you're going to have

18   mistake-of-fact shootings, things like that.

19        Q.   Setting aside training for the moment, does

20   banning open carry enhance public safety at least to

21   some extent?

22        A.   I don't believe so.  I don't believe so.

23        Q.   When you state that banning open carry does

24   not, quote, "greatly enhance public safety," do you

25   mean that banning open carry improves public safety

Page 65

1   to some degree?

2       A.   I don't believe it does.  I don't believe it

3   does.  I see no -- I have personally noticed no cause

4   and effect relationship.  I have noticed no

5   difference in police-citizen encounters.

6           One could argue that there's a possibility,

7   although it's always -- it's impossible to measure in

8   negative.  Have people with an open carry firearm not

9   been targeted for a crime because a criminal could

10  see that that person is armed?  We won't know.  Those

11  things are nebulous.

12          So I can't point to an exact cause and

13  effect relationship or put statistics on that, but

14  what I haven't noticed is we had open carry, and

15  then, oh, my God, all of this bad stuff started

16  happening.  That was clearly not the case and hasn't

17  been the case, and it hasn't been the case for years

18  now.  I know I'm kind of generalizing on that.

19      Q.   I appreciate that.  And the reason I'm

20  asking is I'm just looking at your language, your

21  report that says "Banning open carry does not greatly

22  enhance public safety."  It doesn't say, for example,

23  banning open carry does not enhance public safety.

24  That's why I was asking whether it enhances public

25  safety to some extent.

Page 66

1        A.   I totally get where you're coming from, and

2    I don't believe it does either way, either one of

3    those ways of wording that sentence.

4        Q.   Let's look at page nine, paragraph 31.

5             (Discussion off the record)

6             (Recess)

7    BY MR. WISE:

8        Q.   Okay.  Let's go back on the record and look

9    at page nine, paragraph 31.  You observed that Kim

10   Raney's report states that when an officer comes upon

11   a scene where a person is carrying openly, the

12   officer must rapidly assess a person's behavior,

13   paragraph 22?

14       A.   Yes.

15       Q.   Split-second decisions sometimes have to be

16   made, paragraph 24, where the results could be

17   deadly, paragraph 22; is that right?

18       A.   Yes.

19            MS. BELLANTONI:  I'm going to ask that you

20   read that back.  Are you saying that that's what

21   Mr. Haggard is saying or that's what he's referring

22   to Mr. Raney's declaration?

23            MR. WISE:  Yeah.

24   BY MR. WISE:

25       Q.   You're referring to Mr. Raney's declaration;

Page 67

1    correct?

2        A.    Yes.

3        Q.    Okay.  Do you understand Mr. Raney to have

4    the opinion that it is uncommon in police work for an

5    officer to have to rapidly assess a person's

6    behavior?

7        A.    I can't say that exactly, but it appears as

8    though he tries to paint a picture that if you don't

9    have open carry, then you won't have all of that

10   going on.

11       Q.    Do you understand Mr. Raney to have the

12   opinion that it is uncommon in police work for an

13   officer to have to make a split-second decision where

14   the results could be deadly?

15       A.    I can't say that he would have that opinion.

16   Again, he appears to color his opinion as though if

17   we were to eliminate open carry, that that would

18   somehow solve that problem.

19       Q.    Do you understand Mr. Raney to have the

20   opinion that allowing open carry would increase the

21   circumstances in which an officer would have to

22   rapidly assess a person's behavior and make a

23   split-second decision where the results could be

24   deadly?

25       A.    He appears to have that opinion to me.

Page 68

 1    That's what I gather from reading his opinion.

 2       Q.   Do you agree that an officer that comes upon

 3    a scene where a civilian is carrying openly is more

 4    likely to have to rapidly assess that person's

 5    behavior?

 6            MS. BELLANTONI:  Objection.

 7            You can answer.

 8            THE WITNESS:  I do not.

 9    BY MR. WISE:

10       Q.   Why not?

11       A.   So something that is standard practice in

12    the police world and has been by progressive

13    departments who train hard since, if we get into the

14    history of very tragic incidents, late '60s, early

15    '70s, events such as the Newhall massacre there in

16    California, the incidents that were written up in the

17    famous book "Officer Down, Code 3," what we look at

18    is that officers should be assessing, "Just because I

19    can't see a gun doesn't mean somebody should have

20    one."

21            Standard officer safety practice is if you

22    pull somebody over for speeding or if you pull

23    somebody -- you make a stop for whatever, the only

24    safe assumption is to assume that a person is armed

25    and that you comport yourself and your tactics and

Page 69

 1    your approach and things like that with the

 2    assumption that a person could pull out a concealed

 3    weapon and utilize that weapon, and then, you know,

 4    if you run with that assumption, your tactics, your

 5    decision making, things like that, that it keeps you

 6    in the best frame of mind for good officer safety.

 7         So in my mind, if we think that we're

 8    solving a problem by banning open carry -- so let's

 9    say I could push a magic button and there was no open

10    carry.  I've never had to deal with that problem.

11    That doesn't solve the problem that we see in police

12    work.

13    Q.   Let's go to your example of the routine

14    traffic stop.  Would the presence of a firearm

15    heighten the danger for the officer?

16         MS. BELLANTONI:  Objection.

17         Can I get more -- can you be more specific

18    in that scenario?

19         MR. WISE:  I can ask the question again.

20    BY MR. WISE:

21    Q.   In a routine traffic stop, would the

22    presence of a firearm by the civilian in a car

23    heighten the danger for the officer?

24         MS. BELLANTONI:  Objection.

25         You can answer it if you can.

                                        Page 70

1           THE WITNESS:  It would depend on that

2    person's intent.  I can tell you personally I've

3    never really had to worry about the guns that I could

4    see.  I've walked up on car stops where I've had

5    people with shotguns and rifles in the back window of

6    a pickup truck, guns in consoles, guns laying on

7    seats, I've dealt with people who are wearing

8    holstered guns on their hip, that sort of thing, and,

9    quite frankly, the guns that I can see, the weapons

10   that I can see, I was never very worried about.

11          I was worried about the behavior of the

12   people who were, you know, literally being furtive,

13   who were trying to conceal what they were up to.  It

14   was more behavior-focused, you know, "Is this person

15   in the middle of a crime and, thus, might try to take

16   me out because they want to make an escape and

17   utilize a weapon as part of that escape process?"

18          And literally the guns that I could see, I

19   was never worried about.  It's what you don't know

20   that is a problem.

21   BY MR. WISE:

22      Q.   In a routine traffic stop, would the

23   presence of a firearm in the car make it more likely

24   that an officer would have to make a split-second

25   decision where the results could be deadly?

                                          Page 71

1          MS. BELLANTONI:  Objection.

2          You can answer it if you can.

3          THE WITNESS:  Again, I don't believe so.  I

4   have seen people do things like reach under the seat

5   of the car, reach into a glove compartment, reach

6   into a console in between the seats, bags, things

7   like that.

8          Again, it's the things you don't know, it's

9   the things you can't see that are the most worrisome,

10  and that's where the split-second decision really

11  comes into play, and then that becomes a

12  behavioral -- reading the behavior of the person

13  versus if they have, you know, a visible firearm or

14  not, you know, and then it becomes reading the

15  behavior and the scenario that you find yourself in.

16          Quite frankly, if I know -- let's say I have

17  an actual bad guy, I know he's a bad guy, he's a

18  suspect that we -- say we have a picture of the guy

19  or video of the guy and I know that's the guy and I

20  see he's got a gun on him, that's kind of a gimme on

21  the decision making process.

22          It's when you don't know and you have to

23  make those split second decisions because is he

24  armed?  Is he not armed?  I don't know.  That's where

25  things become very worrisome.

Page 72

1    BY MR. WISE:

2        Q.   Let me just drill down on that for a moment

3    then.  So what if you don't know the person's a bad

4    guy, as you were saying, and they have a firearm?

5    Does that affect the way that you approach that

6    person?

7            MS. BELLANTONI:  Objection.

8            You can answer if you can.

9            THE WITNESS:  It --

10           MS. BELLANTONI:  Can we get more clarity on

11   where this firearm is?  Very situational thing.  It's

12   very, like, amorphous scenario without much detail.

13           MR. WISE:  Sure.  I was going off the

14   scenario he was talking about.

15           THE WITNESS:  So I can point to -- I think

16   more pertinent to what we're talking about, I can

17   point to after we legalized the conceal carry, we had

18   a gentleman come into the state who believed he was

19   going to -- he was kind of antipolice, and he was

20   going to do a conceal carry, what he called an

21   audit -- or I mean a gun rights audit -- and see how

22   we would react.

23           So he was wearing a visible -- a very large

24   handgun in a holster visible, and he was walking up

25   and down the sidewalk, on a public sidewalk in front

Page 73

1    of a very well-to-do subdivision, small gated

2    community, and somebody thought he was acting kooky,

3    so they called police.

4          We made contact with the guy.  He was

5    carrying a gun.  We could see he had a gun, you know.

6    I would instruct the gentleman, you know, "Don't

7    reach for the gun that's clearly there," you know.

8    "What's going on?  We got a call."

9          And basically he was trying to turn it into

10   a, "See, the police are antigun" confrontation type

11   of thing, and the whole thing diffused because, you

12   know, quite frankly, we didn't overreact.  We had a

13   guy pacing back and forth on a sidewalk, you know, so

14   we have to ascertain, "is this a guy -- maybe he's

15   suffering from mental illness, or, you know, why is

16   he here?"

17         Because his behavior, his pacing back and

18   forth did alarm people more than anything, you know,

19   "Why is that guy acting kooky out here?"

20         And then when it turned out to be a

21   specific -- kind of a public, you know, "We're going

22   to get gotcha video on the police" type of a stunt

23   that he was pulling and he didn't get the reaction he

24   was hoping for, then the whole thing was over with.

25         And I've had to deal with a few things like

                                          Page 74

1    that, but overall, you know, if I were to have to

2    make an approach on somebody, part of that approach

3    would be, "What are the circumstances?" you know.

4         Is this guy in an alley behind a business in

5    the middle of the night, or is this guy just walking

6    down the sidewalk or -- you know, I guarantee you,

7    like I say, I could go someplace in town here, like

8    go to our Walmart, and I could find somebody with a

9    gun on their hip, and, you know, they're in the green

10   bean aisle and it's just an innocuous thing.

11   BY MR. WISE:

12       Q.   Let's go to page 12, paragraph 40.

13       A.   Again, it's silly, but every time you start

14   to do that, I reach for my own mouse, and I feel like

15   an idiot.

16       Q.   Okay.  Paragraph 40, you state "The behavior

17   and demeanor of a person exercising his right to open

18   carry will be markedly different than that of an

19   individual posing a threat to the public.  Any

20   experienced honest law enforcement officer knows that

21   to be the truth."  Would you explain what you mean?

22       A.   So it's a whole behavioral package.  If you

23   have a guy who's got a gun on his hip walking his

24   dog, you got a guy, gun on his hip, shopping for

25   groceries, whatever the case may be, there's no

Page 75

Veritext Legal Solutions
866 299-5127

ER361

1    criminalistic behavior involved in any of those

2    activities that would lead you -- like, whether he

3    had a gun on his hip or not, this is not something

4    that I could have probable cause for a stop, it is

5    not something that I could do a Terry stop on a

6    person over, you know, because it doesn't -- they're

7    not -- if they're -- if they just exist and they

8    happen to be carrying a gun and are going about their

9    business and there's no behavioral indicators that

10   would indicate criminal activity is afoot, then it

11   just isn't an issue.

12        If you look at -- well, if you look at the

13   classic case of Terry v. Ohio that speaks exactly

14   what I'm talking about, the criminals in that case

15   had handguns that were deeply concealed, but whether

16   they saw -- whether Detective McFadden saw the guns

17   or didn't see the guns, he obviously did not, it was

18   the behavior manifest that they were displaying in

19   that that led to the stop, the classic what we know

20   as a Terry stop nowadays.  Somebody just having a gun

21   on their hip isn't -- it's -- the totality of the

22   behavior is what a good cop is going to look at.

23   Q.   And what is the behavior that you're looking

24   for to be able to determine whether a person carrying

25   openly does not pose a threat to the public?

Page 76

1          MS. BELLANTONI:  Objection.

2          You can answer.

3          THE WITNESS:  That's wide open.  You know,

4     it has everything to do with the location, is their

5     activity congruent with the location, the time of

6     day, things like that.  You know, I mentioned

7     previously do I have a guy behind a business after

8     dark after it's closed?  You know, that would be a

9     guy that I'm going to take a second look at.  Is this

10    guy up to no good?  You know, is he looking to

11    burglarize this establishment?  That sort of thing.

12    So it's, you know, demeanor, their actual activity,

13    the time of day, the location.  All of that goes into

14    play.

15    BY MR. WISE:

16        Q.   And what's the basis for your opinion?

17             MS. BELLANTONI:  Which one?

18    BY MR. WISE:

19        Q.   In paragraph 40.

20        A.   Thirty-four years of law enforcement and

21    dealing with people both pre- and post-open carry

22    being legal, that's just -- I would call that good

23    police work at the street level is being able to read

24    human beings and then evaluate their behavior.

25        Q.   Let's talk about active shooter events.

Page 77

1    What is an active shooter event?

2       A.   I'm actually not a big -- so that's a term

3    of common usage that so many people utilize now.  I'm

4    not a fan of it, but if we want to talk about -- you

5    know, something I prefer is, like, a mass murder or

6    serial murder in progress where you have somebody

7    actively -- you know, and I know of cases where they

8    have been -- instead of an active shooter, they're an

9    active stabber, you know.

10        You know, we've had cases in the literature

11   of knives, swords.  They just had one in Norway the

12   other day that he was -- the dude was killing people

13   with a bow and arrow.  So I would call it a rabid

14   serial murder in progress if you want a more precise

15   term.

16      Q.   So during such an event, an active shooter,

17   mass shooting event, is the shooter always easily

18   identifiable?

19      A.   Well, at both of the ones that I went to, he

20   sure was.  Often if you don't know exactly where the

21   person is, then what we teach our tactics for

22   movement to contact, but the important part of an

23   active shooter is it's active.

24        You have some -- if you don't see that's the

25   guy shooting people or that's the guy stabbing

Page 78

**ER364**

1    people, or in one case I was involved in, the guy

2    was -- he was an active shooter, active bomber.  He

3    was throwing pipe bombs, what you would think of

4    nowadays as IEDs, inside the building.  If.

5         You don't see that or hear some stimulus to

6    draw you where the person is, then it's not really an

7    active shooter if you will.

8    Q.   So in the scenario where you're not

9    immediately able to identify where the shooting is

10   coming from, what is the -- can you describe the

11   atmosphere at such an event?

12        MS. BELLANTONI:  I'm going to object.

13        You can answer, but I think we're going

14   outside the scope of this case and causes of action

15   that are being brought.  But you can go ahead and

16   answer.

17        THE WITNESS:  In a word, it's going to be

18   pretty tense.  At the attack on our federal

19   courthouse here in Topeka, we had a gentleman that

20   was doing an active shooting, active bombing.  He was

21   throwing IEDs all over the building when I showed up.

22   Things had gotten real quiet, and we had to

23   transition from what you would think of now as a

24   rapid response to what we believed we had was a

25   hostage scenario in progress.

Page 79

1           So that's part of what we do in the training

2      is classically things like dealing with hostage

3      negotiations, dealing with barricaded gunmen, things

4      like that.  You want to slow the scenario down and

5      then utilize things like SWAT teams and negotiators

6      and things like that.

7           So part of what you do in police training is

8      a recognition of has the situation transitioned from

9      one type of scenario to another, because that's

10     entirely possible, but what you're looking for is

11     either identifying the suspect or a stimulus that

12     draws you to a location to where you can try to

13     identify the suspect.

14     BY MR. WISE:

15       Q.   In a scene like that, can the sensation be

16     chaotic or, you know, distort your perception, I

17     guess?

18       A.   Well, any --

19           MS. BELLANTONI:  Objection.  I'm going to

20     object again.  Same objection, that this is outside

21     the scope of the causes of action that are being

22     brought.

23           You can answer.

24           THE WITNESS:  Any critical incident I've

25     been involved in has been tense, and human beings are

                                              Page 80

1    subject to their perceptions under duress.

2    BY MR. WISE:

3        Q.   If a person who's not immediately

4    identifiable as a cop is openly carrying a firearm

5    during an active shooter event, how are the on duty

6    law enforcement officers likely to react to that

7    person?

8            MS. BELLANTONI:  Objection.

9            You can answer if you can.

10           THE WITNESS:  Well, I would hope that they

11   were extraordinarily well trained because in my

12   experience, every cop that knows about it is going to

13   go regardless of their equipment and their mode of

14   dress.

15           So if you look at photos of Columbine as an

16   example, you have people with guns wearing suit and

17   ties, you have people with guns -- there was one

18   gentleman wearing gym shorts.  If you look at video

19   of the very famous North Hollywood event, one of the

20   SWAT guys is wearing gym shorts and carrying an M-16.

21           So part of my assertion and my opinion on

22   this paper was if you're going to have well-trained

23   officers, they're going to have to allow for positive

24   identification of -- you know, have some training on

25   can't just see a gun and start shooting at that

Page 81

1    person because odds are pretty good it could be an

2    off duty or undercover cop or some other person who

3    is not in uniform who is not in fact your problem.

4    BY MR. WISE:

5        Q.    What if that civilian is openly carrying

6    their truck gun, let's say an AR-15?  How are the on

7    duty law enforcement officers likely to react?

8            MS. BELLANTONI:  I'm going to object and ask

9    you not to respond to that because we're not talking

10   about the open carriage of ARs and long guns.

11   Specifically about handguns here, so that's

12   completely outside the scope of this case and this

13   deposition.

14   BY MR. WISE:

15       Q.    You may recall that Dallas Chief of Police

16   David Brown, in the aftermath of an active shooter

17   event at a community protest that included the

18   presence of openly carrying civilians, stated, "We

19   don't know who the good guy is versus the bad guy

20   when everyone starts shooting."  Do you recall that?

21       A.    I do.

22       Q.    Do you agree with Chief Brown?

23       A.    I do not.

24       Q.    Why not?

25       A.    So I have a little bit of insider baseball

Page 82

1    on the Dallas Police Department, and they used to be,

2    used to be one of the most extraordinarily

3    well-trained police departments on the planet, and I

4    can't say that that is any longer the case.

5            Their firearms training, their use of force

6    training, their defensive tactics training, in my

7    opinion and observation, has suffered from politics

8    and neglect.  He may have found it to be problematic,

9    or he may have been making it as a political

10   statement for it to be problematic, but everything

11   that I have seen -- and I have studied that incident

12   at length because part of that incident was there was

13   a lot of controversy on the manner in which they took

14   that bad guy out, you know.

15           They utilized a police bomb to kill the

16   gunman in that case, delivered by a robot, so there

17   was a lot of controversy about that.  I think the

18   police officers who were right there on the scene

19   immediately knew who the bad guy was.

20           If you see people running away who happen to

21   be carrying -- and I know I'm dangerously segueing

22   into what Ms. Bellantoni stated she didn't want me to

23   answer because I knew people had long guns at that

24   event as part of their -- the political part of the

25   protest.  If you have people leaving the vicinity in

Veritext Legal Solutions
866 299-5127

1    a hurry, you can tell by demeanor and their carriage,

2    how they're acting, that, "Yeah, that's not the guy

3    I'm looking for."

4       Q.   And by "demeanor" and "carriage," are you

5    talking about the same factors you were saying

6    earlier, behavior and demeanor, or are there other

7    factors that we haven't discussed?

8       A.   People who look like they're trying to kill

9    you don't look like people who are afraid and trying

10   to get out of someplace.   That's been my experience.

11      Q.   What if somebody is running toward the scene

12   instead of away from the scene?

13      A.   Well, then you'd have to evaluate, "Is that

14   a good guy?  Is that a bad guy?  Is that an off duty

15   SWAT cop that had his gear in the car and he hasn't

16   had time to change clothes?  Etc., etc.

17      Q.   And how can you go about evaluating that?

18      A.   It's going to be right there in the moment,

19   you know.  If the guy is running towards the scene,

20   then I know he's not -- he hasn't been part of the

21   scene.  Is he -- do I look at that guy?  What is his

22   demeanor?  What is his body posture?  How does his

23   facial expressions look?  What is his movement like?

24   Is he trying to get -- you know, is he putting a

25   muzzle on people that are perceived to be victims?

Page 84

1     That sort of thing.  It all plays into that.

2         Q.   Let's look at pages 12 and 13, paragraph 42.

3     You state "There is, however, historical precedent to

4     note that citizen non-law enforcement interdiction of

5     active shooter suspects happens more frequently than

6     interdiction by law enforcement officers."  Would you

7     explain what you mean?

8         A.   So post-Columbine, the trend was to have

9     what we would call a rapid response team approach

10    where you would get -- depending on who was doing the

11    training, typically it was a four-officer team, would

12    gather together and then move in.

13          Let's take, for an example, because

14    everybody's familiar with the Columbine event, that

15    if you showed up at Columbine in the middle of that

16    event, that you would wait for three other officers

17    to show up, and then you would move in as a team in a

18    particular set of tactics and then attempt to make

19    contact with the suspects and do that as rapidly as

20    possible.

21          What we found -- so -- excuse me.  Sorry.

22    Ragweed is bad right now, and my allergies are acting

23    up.

24          So I wrote an article on solo response by

25    officers to an active shooter event because I'm a big

1    believer that you don't have time to wait for a team.

2    One of the active shooter events that I went to, I

3    had to respond by myself.  I didn't have anybody who

4    was there, going to be there in a timely manner to

5    assist me.  I couldn't wait for backup.

6            So in doing my research for these events,

7    what we find is is that more often than a law

8    enforcement officer -- in any kind of team or normal

9    police response that you would think of, more often

10   than not, that there's more events that are

11   interdicted by armed citizens than there are teams of

12   police officers showing up on the scene.

13           If you extrapolate that paradigm to include,

14   like, the Trolley Square mall shooting in Utah where

15   it was an off duty officer on his own time,

16   plainclothes, carrying a gun just like anybody else

17   would be carrying, that was another event where we

18   have off duty officer, but there are many events

19   where we have civilian.

20           And I use a generic term "conceal carrier"

21   but a civilian with a gun that's not -- somebody who

22   is not a cop is the person that is right there on the

23   scene and successfully interdicts or stops the bad

24   guy versus a law enforcement response putting an end

25   to it.

Page 86

1       Q.   Are the events that you just mentioned the

2    historical precedent you're referring to, or are you

3    referring to other historical precedent?

4       A.   If you take a history of active shooters in

5    the United States as a modern study, that's what I'm

6    referring to.

7       Q.   And are you aware of research that supports

8    this opinion?

9       A.   I am.

10       Q.   Okay.  What is that research?

11       A.   There's going to be a little bit of a pile

12    of that.  What we're talking about is -- what we're

13    talking about is when you actually quantify active

14    shooter events, you know, beyond the famous ones like

15    Columbine, etc., and you look at the factors involved

16    in those events, what has been successful, what has

17    not been successful, which has led to things like my

18    advocacy for police solo response versus waiting for

19    a team approach.

20            You know, one of the reasons, and I'm a big

21    advocate of that, is that's where the research,

22    that's where the data points to is what is

23    successful, what is not successful.  Team approach

24    takes too long.  It hasn't been successful.

25            The last I checked into that, there was one,

Page 87

1    maybe two of these events that were successful by the

2    team approach.  Vast majority of the time, the cops

3    show up too late if they utilize that model.

4          So one of the reasons I'm a big advocate for

5    solo response on the police part is because that's

6    been the model for success because it's more rapid,

7    and if you look at these incidents on an anecdotal

8    basis, if you have an armed good guy, whether they

9    have a badge or not, immediately on the scene that

10   takes action, that tends to be a successful

11   interdiction.

12         As far as, like, titles to papers like a

13   specific paper on the subject, I would definitely

14   have to get back to you on that.

15     Q.   Yeah.  If there's any specific research you

16   have in mind, would you work with Ms. Bellantoni to

17   provide that to me?

18     A.   Absolutely.

19     Q.   Thank you.  I appreciate that.

20         Do you mind if we go off the record for just

21   a moment?  I'm going to need 30 seconds to make sure

22   my computer does not turn off.

23         (Discussion off the record)

24         MR. WISE:  Thank you.  I appreciate that.

25   We can go back on the record.

```
 1                THE WITNESS:  Okay.
 2      BY MR. WISE:
 3          Q.   Let's look at page 13, paragraph 43.  You
 4      state "Allowing open carry will not create a danger
 5      to public safety"; is that right?
 6          A.   Yes, sir.
 7          Q.   Are you familiar with research finding that
 8      right to carry laws are associated with higher
 9      aggregate violent crime rates?
10                MS. BELLANTONI:  Objection.
11                You can answer.
12                THE WITNESS:  I have read some of that, yes,
13      sir.
14      BY MR. WISE:
15          Q.   And what is your view of those studies in
16      terms of your opinion on whether open carry of
17      firearms in public --
18          A.   It directly contradicts my firsthand
19      observation in multiple states.  I believe that those
20      papers -- it is easy to utilize statistics to come to
21      a prearranged opinion and to make opinion -- or to
22      push an opinion towards a political end.
23          Q.   And so have you evaluated the basis for that
24      research?
25                MS. BELLANTONI:  I'm going to object.
```

Page 89

1           You can answer.

2           THE WITNESS:  Depends on how you mean

3    "evaluate," but in my opinion of observing -- and I

4    don't know specifically which one you're -- which --

5    because there's been a couple of such studies that

6    have been pushing that idea.  I put it up there with

7    the same research that people like Kellerman were

8    pushing that if you have a gun in your home, you're

9    43 times more likely to be killed than if you don't

10   have a gun in your home which was statistically

11   cooking the books.

12           If you look at the realities of crime and

13   street crime and the people -- people will talk.

14   They'll push an alarming statement like, "You're more

15   likely to be killed by somebody you know than

16   somebody you don't."

17           Well, that's certainly my experience as far

18   as, like, gang crime because most people don't just

19   up and kill people they don't know.  They have a

20   specific beef with them.  You know, your rival drug

21   dealer whom you know by name, you're going to go

22   whack because he's coming -- he's, like, selling in

23   your territory, things like that.

24           So you have to take -- you have to look at

25   these things in context and, you know, look at the

Page 90

1   numbers, where the numbers come from, what's the

2   context of the numbers and that sort of thing because

3   it's very, very easy to come to false conclusions on

4   this sort of thing.

5   BY MR. WISE:

6       Q.   You've reviewed the preliminary injunction

7   submissions in this case?

8       A.   Okay.  I think so.  I believe that's part of

9   the -- Amy, was that all part of the paperwork that

10  you gave me, or was that not?

11          MS. BELLANTONI:  I'm not entirely sure.  I'd

12  have to look and see what I sent over.

13          THE WITNESS:  Okay.  I guess --

14          MS. BELLANTONI:  We could refer to your

15  declaration.  It says that there's something that was

16  turned over that you relied on.

17          MR. WISE:  I believe it does.  That's why I

18  was asking the question.

19  BY MR. WISE:

20      Q.   And the reason I'm asking is you had

21  mentioned you're familiar with a few of the studies.

22  Are you familiar with the peer reviewed studies

23  conducted by Professor John Donahue about right to

24  carry laws and the association with higher aggregate

25  violent crime rates?

Page 91

1          MS. BELLANTONI:  I'm going to object because

2     he's not a statistical expert, so that wouldn't have

3     been in the purview of what he reviewed.

4          MR. WISE:  He just mentioned he was familiar

5     with a few studies, so I was trying to know which

6     studies those might be.

7          MS. BELLANTONI:  And I'm going to object

8     because he's not a statistician, so I'm not going to

9     have him giving testimony on -- it's not his

10    expertise.

11         MR. WISE:  Uh-huh.

12         MS. BELLANTONI:  He's not a statistician,

13    so --

14    BY MR. WISE:

15    Q.   So just so I'm clear on what your opinion

16    is, then, you're indicating that the findings of

17    those studies are not consistent with your personal

18    observations in the field; is that right?

19    A.   Yes.

20    Q.   But to be clear, you haven't relied on

21    studies that -- for your opinion in this case at

22    least, that support your opinion or that contradict

23    the studies that we were just discussing?

24    A.   So a big part of why I am here is both to

25    speak to the law enforcement part of this and

Page 92

1    personal experience that I can point to in living in

2    the reality of an open carry state and not only my

3    state but other states that I travel to, other states

4    that I do business in and, you know, states where I

5    am commonly in an open carry environment, if you

6    will.

7         So a big part of why I'm here and we're

8    talking is that firsthand observation and experience

9    over a number of years as it deals with the open

10    carry and the dynamic of police involvement with open

11    carry people.

12    Q.   Let's look at paragraph 44.  We're still on

13    page 13.  You refer to U.S. News and World Reports

14    public safety rankings and note that the top three

15    states, in terms of public safety, Maine,

16    New Hampshire and Idaho, allow a broader right to

17    public carry than California; is that right?

18    A.   That was certainly true at that time, yes,

19    and then it's easy to look that up, the U.S. News and

20    World Report part of that.

21    Q.   Are you aware of how U.S. News and World

22    Report determined these rankings?

23    A.   I am not.  Again, I can't say, you know, did

24    they hire a statistician, did they look up Bureau of

25    Justice Statistics or what their research methodology

Page 93

```
 1    was.
 2       Q.   Do you know whether U.S. News and World
 3    Report compared factors such as population density
 4    that might account for the difference in crime rates
 5    between states such as Maine versus California?
 6       A.   I don't, nor do I know if they looked at
 7    things like sentencing guidelines or a variety of
 8    other factors.
 9       Q.   Do you agree that regional differences are
10    an important factor to consider in developing an
11    effective public safety response?
12         MS. BELLANTONI:   Objection.   And
13    specifically what public safety response are you
14    referring to?
15         MR. WISE:   Well, response that includes open
16    carry policy.
17         MS. BELLANTONI:   Could you be more specific?
18    I'm not understanding the question.
19         MR. WISE:   Sure.   Well, this case is about
20    California, and the expert here is from Kansas, and
21    I'm asking if he agrees.   Let me restate the
22    question.
23    BY MR. WISE:
24       Q.   Do you agree that regional differences are
25    an important factor to consider in developing an
```

Page 94

1    effective public safety response with regard to

2    firearms?

3        A.   And --

4             MS. BELLANTONI:  I object.

5             You can go ahead and answer.

6             THE WITNESS:  I'm going to say in this case,

7    it does not, just as, you know, if we look at police

8    use of force, everybody in the United States is bound

9    by things like Graham v. Conner, Garr versus

10   Tennessee.  It is what it is.  Is my First Amendment

11   right to free speech different in the State of

12   California versus the State of Kansas?  It is not.

13            Is my freedom of religion different in the

14   State of California versus the State of Kansas?  It

15   is not.  So as far as that context, we're still

16   talking about the United States of America.  So, no,

17   I don't believe so.

18   BY MR. WISE:

19       Q.   Do you agree that demographic differences

20   are an important factor to consider in developing an

21   effective public safety response, again, with regard

22   to firearms?

23            MS. BELLANTONI:  Objection.

24            You can answer.

25            THE WITNESS:  I don't.  I don't because I

Page 95

1    believe that public safety factors response policy

2    are all far, far, far broader than that.

3    BY MR. WISE:

4        Q.   Have you ever been to California?

5        A.   Yes.

6        Q.   Have you ever served as a law enforcement

7    officer in California?

8        A.   I have not.

9        Q.   Are you familiar with open carry laws in

10   California?

11       A.   Just from what I have been able to read as

12   far as what is publicly available and then what I

13   have been briefed on in this case by Ms. Bellantoni.

14       Q.   Would you describe your understanding of

15   where, if at all, open carry is permitted in

16   California?

17           MS. BELLANTONI:  Objection.  He's not

18   testifying as an expert in that area.  I'm going to

19   ask him not to answer that question.

20           MR. WISE:  So is he an expert in open carry

21   in Kansas only?  I'm confused.

22           MS. BELLANTONI:  He's an expert and a law

23   enforcement officer in open carry jurisdiction.  It's

24   kind of irrelevant since it's banned in California

25   anyway, so --

Veritext Legal Solutions
866 299-5127

1    BY MR. WISE:

2        Q.   Are you aware that open carry is allowed in

3    certain circumstances in the State of California?

4            MS. BELLANTONI:  Objection.  That's actually

5    not true.

6    BY MR. WISE:

7        Q.   Are you aware that there are laws permitting

8    open carry in certain circumstances in California?

9            MS. BELLANTONI:  Objection.

10           THE WITNESS:  Frankly, at this point, with

11   the two attorneys arguing about that, I believe that

12   that would be the type of thing that you guys would

13   be the experts in.  It appears that you guys are at

14   an impasse on whether it's legal or not.  That would

15   certainly leave a layperson at a disadvantage to know

16   whether they were breaking the law or not.

17   BY MR. WISE:

18       Q.   Let's look at paragraph 45, same page, still

19   on page 13.  You state "People who legally possess

20   and carry firearms are generally compliant and

21   law-abiding, statistically speaking among the most

22   law-abiding group of persons in our country."  Would

23   you explain what you mean?

24       A.   So if you take people with -- and I'm going

25   to go with the statistics because we can nail those

Page 97

1   down on persons with a concealed carry license

2   because we can actually quantify that because, quite

3   frankly, on a day-to-day basis, if nobody tells

4   anybody that they're carrying a gun, we're not --

5   who's going to know about it?

6           So if we look at statistically people with a

7   concealed carry license, they are more law-abiding

8   than virtually any other demographic in the United

9   States, and that includes police officers.

10          When you look at things like -- even minor

11  things like DUI arrests, that sort of thing, they

12  tend to have a far lower criminal rate than any other

13  demographic you would pluck out of whatever pool you

14  want to look at, if you want to look at a certain

15  profession or whatever the case may be.

16          And then, you know, the rest of that

17  paragraph, if you will, my experience is is that

18  people who are going to unlawfully do things don't

19  look for permission, they don't get concealed carry,

20  whether it's banned or not, you know.

21          In Kansas, when we banned all carry, even

22  retired officers could not carry a gun, and that

23  didn't slow down the gang members one little bit, you

24  know.  My belief, what we're talking about here is

25  law-abiding citizens trying to gain access to the

Page 98

1    ability to open carry legally within your state,

2    clearly trying to go about doing thing the right way

3    and stay within the boundaries of the law.

4        Q.    What is the basis for your opinion?

5        A.    Again, 34 years of street level police work

6    and then some consultation of things like, you know,

7    research that has been done in this area as far as,

8    you know -- in particular, one of the things I look

9    at is police use of force, and then I have been

10   involved extensively in internal affairs

11   investigations on police officers and then

12   investigation on, like, officer-involved shootings,

13   use of force, things like that.

14        So I've had occasion to look at the

15   statistics that are out there that are available

16   on -- if you look at how my profession stacks up to

17   other professions where actually, you know, we do a

18   lot better than a lot of other professions that are

19   out there even though we -- you know, we are commonly

20   demonized for violating people's rights and that sort

21   of thing.

22        And then having looked into that as somebody

23   in the past who I actually advocated for concealed

24   carry in Kansas, which was -- didn't make me real

25   popular in some law enforcement circles, but you have

Page 99

1    to make sure you have your ducks in a row if you're

2    going to advocate for something and make statements

3    like that.

4         And in other places before Kansas had

5    concealed carry, like Florida was very famous for

6    that beginning in the '80s, the states of

7    New Hampshire and Vermont were very, very liberal,

8    and, in fact, my belief is Vermont has always had no

9    permit carry within the state.  I may have switched

10   that with New Hampshire, but one of those two has

11   always, like, historically had no permit carry, and

12   if you look at the demographics of people with

13   concealed carry, they tend to be extraordinarily

14   law-abiding.

15   Q.   And I think you were mentioning research

16   this supports your opinion.  What is that research

17   specifically?

18   A.   Some of it would be -- I can point to John

19   Lott, the famous gun rights researcher, but then to

20   another of -- pardon me -- a number of other sources

21   as far as, like, the actual titles of that, again, I

22   would have to research that and get back with you.

23   Q.   Yeah, that'd be great if you could work with

24   plaintiff's counsel to provide me any research that

25   supports that opinion.  I'd appreciate it.

Page 100

1           Do you agree that there are incidents in

2    which a previously law-abiding person engages in

3    criminal behavior?

4       A.   Well, I would argue, counselor, that

5    everybody that doesn't have a criminal record who

6    becomes a criminal was previously not, I mean,

7    law-abiding.

8       Q.   That's all the questions.

9           Ms. Bellantoni, are you on mute?

10          MS. BELLANTONI:  Yeah, I was.  I'm sorry.

11   Can we just take a brief break?  Just need to -- is

12   that okay?

13          MR. WISE:  Of course.  I'm done with my

14   questions.  That was my last one.

15          MS. BELLANTONI:  Can we just hold on one

16   second before we wrap up?

17          MR. WISE:  Of course.

18          MS. BELLANTONI:  All right.  Thanks.

19          THE WITNESS:  I'm over here making myself a

20   note on looking back at what we've been talking about

21   so I can get back to Amy.

22          MR. WISE:  Thank you.

23          (Recess)

24          MS. BELLANTONI:  So I guess we're done.  I

25   don't have any questions.

                                   Page 101

1          MR. WISE:  Let's go back on the record

2     briefly.

3          Okay.  I am done with my questions.

4          THE REPORTER:  And, Ms. Bellantoni, do you

5     want a copy?

6          MS. BELLANTONI:  Mr. Wise, will you be

7     sending a copy to the witness for him to review?

8          THE REPORTER:  That's why I got his email.

9     Veritext will send him a locked PDF.

10         MS. BELLANTONI:  That's fine.  I'll take a

11    copy.

12         And also, Mr. Wise, can you just put some

13    requests -- I know there were some requests made.

14    Can you just put them in writing for me so I can

15    refer to them and properly have whatever additional

16    documents provided to you?

17         MR. WISE:  Sure, of course.  How formal

18    would you like me to make the request?

19         MS. BELLANTONI:  Email.

20         MR. WISE:  Email?  Okay.

21         MS. BELLANTONI:  Email.

22         MR. WISE:  Thank you.

23

24

25

                                    Page 102

1

2

3

4

5

6

7

8

9

10          I, CHARLES D. HAGGARD, do hereby declare

11    under penalty of perjury that I have read the

12    foregoing transcript; that I have made any

13    corrections as appear noted, in ink, initialed by me,

14    or attached hereto; that my testimony as contained

15    herein, as corrected, is true and correct.

16          EXECUTED this _____ day of _____,

17    20_____, at _____  _____,_____.
                       (City)             (State)

18

19

20

21          _____

            CHARLES D. HAGGARD

22

23

24

25

                                          Page 103

1              I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby

3     certify:

4              That the foregoing proceedings were taken

5     before me at the time and place herein set forth;

6     that any witnesses in the foregoing proceedings,

7     prior to testifying, were duly sworn; that a record

8     of the proceedings was made by me using machine

9     shorthand which was thereafter transcribed under my

10    direction; that the foregoing transcript is a true

11    record of the testimony given.

12             Further, that if the foregoing pertains to

13    the original transcript of a deposition in a Federal

14    Case, before completion of the proceedings, review of

15    the transcript [   ] was [   ] was not requested.

16             I further certify I am neither financially

17    interested in the action nor a relative or employee

18    of any attorney or party to this action.

19             IN WITNESS WHEREOF, I have this date

20    subscribed my name.

21

22    Dated: 10/30/2021

23

                              CARRIE PEDERSON

24                            CSR No. 4373

25

                                        Page 104

1    CHARLES D. HAGGARD

2    chuck@agiletactical.com

3                                    November 1, 2021

4    RE: BAIRD vs. BONTA

5    October 19, 2021, CHARLES D. HAGGARD, JOB NO. 4838109

6    The above-referenced transcript has been

7    completed by Veritext Legal Solutions and

8    review of the transcript is being handled as follows:

9    __ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext

10       to schedule a time to review the original transcript at

11       a Veritext office.

12   __ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF

13       Transcript - The witness should review the transcript and

14       make any necessary corrections on the errata pages included

15       below, noting the page and line number of the corrections.

16       The witness should then sign and date the errata and penalty

17       of perjury pages and return the completed pages to all

18       appearing counsel within the period of time determined at

19       the deposition or provided by the Code of Civil Procedure.

20   __ Waiving the CA Code of Civil Procedure per Stipulation of

21       Counsel - Original transcript to be released for signature

22       as determined at the deposition.

23   __ Signature Waived - Reading & Signature was waived at the

24       time of the deposition.

25

                                                   Page 105

1   _x_ Federal R&S Requested (FRCP 30(e)(1)(B)) - Locked .PDF

2      Transcript - The witness should review the transcript and

3      make any necessary corrections on the errata pages included

4      below, noting the page and line number of the corrections.

5      The witness should then sign and date the errata and penalty

6      of perjury pages and return the completed pages to all

7      appearing counsel within the period of time determined at

8      the deposition or provided by the Federal Rules.

9   __ Federal R&S Not Requested - Reading & Signature was not

10     requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 106

**ER392**

```
1   BAIRD vs. BONTA

2   CHARLES D. HAGGARD (#4838109)

3                   E R R A T A   S H E E T

4   PAGE_____ LINE_____ CHANGE_____

5   _____

6   REASON_____

7   PAGE_____ LINE_____ CHANGE_____

8   _____

9   REASON_____

10  PAGE_____ LINE_____ CHANGE_____

11  _____

12  REASON_____

13  PAGE_____ LINE_____ CHANGE_____

14  _____

15  REASON_____

16  PAGE_____ LINE_____ CHANGE_____

17  _____

18  REASON_____

19  PAGE_____ LINE_____ CHANGE_____

20  _____

21  REASON_____

22

23  _____       _____

24  WITNESS                             Date

25
```

Page 107

ER393

**[& - agiletactical.com]**

**&**

**&**   105:23 106:9

**0**

**00617**   1:7 2:7
**06**   48:24
**08**   48:24

**1**

**1**   1:24 5:4 11:21
  11:22 23:6 105:3
  106:1
**10**   14:25
**10/30/2021**   104:22
**104**   1:24
**10583**   3:9
**11**   5:4
**11:31**   2:18 7:2
**12**   14:25 29:3
  75:12 85:2
**125**   3:18
**13**   39:21 85:2 89:3
  93:13 97:19
**1300**   3:17
**14**   12:17
**15**   54:9 82:6
**16**   81:20
**17**   18:21
**19**   1:17 2:19 6:4
  7:1 17:1 105:5
**1982**   16:25
**1987**   18:12
**1998**   17:1

**2**

**2**   3:7 23:6
**20**   52:20 54:9
  103:17
**2008**   48:22
**2014**   48:21
**2021**   1:17 2:19 7:1
  105:3,5

**2025.520**   105:9,12
**21**   56:4
**22**   37:9 67:13,17
**24**   49:6 60:17
  67:16
**26**   61:21,22 63:2,5
**28**   62:16,23 63:20
**2:9**   1:7 2:7

**3**

**3**   69:17
**30**   88:21 106:1
**30s**   29:2
**31**   67:4,9
**34**   99:5

**4**

**40**   18:1 75:12,16
  77:19
**400**   3:8
**42**   85:2
**43**   89:3 90:9
**4373**   1:22 2:20
  104:24
**44**   93:12
**45**   17:24 97:18
**47**   60:1
**4838109**   1:23
  105:5 107:2

**5**

**50**   17:25
**57**   29:7

**6**

**60**   21:20,23
**600**   29:4
**60s**   69:14
**6995**   104:23

**7**

**7**   4:6
**70s**   69:15

**75**   11:13
**78**   37:8

**8**

**8**   6:3
**80s**   100:6
**82**   6:3 17:2

**9**

**90s**   64:17
**914-367-0090**   3:10
**94244-2550**   3:21
**944255**   3:19
**96**   6:4
**9:06**   2:18 7:2

**a**

**a.m.**   2:18,18 7:2,2
**abell**   3:11
**abiding**   60:21
  97:21,22 98:7,25
  100:14 101:2,7
**ability**   33:10 34:8
  35:10,23 43:4
  99:1
**able**   9:4,23,25
  26:20 31:18 76:24
  77:23 79:9 96:11
**absolutely**   55:10
  63:9 88:18
**ac**   1:7 2:7
**academic**   45:21
**academy**   19:9
  32:19
**access**   98:25
**accidental**   53:2
  56:8
**account**   94:4
**act**   52:23 60:22
**acting**   17:10 74:2
  74:19 84:2 85:22
**action**   79:14 80:21
  88:10 104:17,18

**actions**   55:14
**active**   14:5 20:4
  21:9 77:25 78:1,8
  78:9,16,23,23 79:2
  79:2,7,20,20 81:5
  82:16 85:5,25
  86:2 87:4,13
**actively**   78:7
**activities**   76:2
**activity**   76:10 77:5
  77:12
**actor**   60:13
**actual**   72:17 77:12
  100:21
**ada**   25:15 26:6
**adamant**   25:20,25
**added**   18:6
**additional**   102:15
**adjunct**   15:16
  16:20,21
**administered**   7:5
**adult**   39:20
**advise**   44:1
**advised**   43:25
**advises**   8:20
**advocacy**   87:18
**advocate**   87:21
  88:4 100:2
**advocated**   99:23
**affairs**   99:10
**affect**   73:5
**afoot**   76:10
**afraid**   84:9
**aftermath**   82:16
**agency**   42:3
**aggregate**   89:9
  91:24
**agile**   22:25 23:1
  57:17
**agiletactical.com**
  105:2

**ER394**

**[ago - avoid]**

**ago** 9:18 36:1
**agree** 31:20 32:25
33:8,13 36:12,15
36:16 38:7 39:7
39:25 40:4,20
41:14,16 42:2
69:2 82:22 94:9
94:24 95:19 101:1
**agreed** 11:9,12
**agreeing** 39:24
**agrees** 94:21
**ahead** 28:14,16
35:8 36:8 59:5
79:15 95:5
**ahold** 44:3
**airplanes** 29:8
**airport** 22:6 49:3
49:4
**aisle** 75:10
**al** 1:9 2:9
**alarm** 74:18
**alarming** 90:14
**alleging** 37:9
**allergies** 85:22
**alley** 75:4
**allow** 44:9 52:21
65:7 81:23 93:16
**allowed** 9:7 21:23
28:3 34:22 35:15
35:16 46:16,17
47:15 61:23 62:4
62:17 63:11,15
97:2
**allowing** 68:20
89:4
**allows** 34:8 35:23
47:25
**alzheimer's** 59:8
**ambushes** 55:19
**amendment** 95:10

**america** 95:16
**amorphous** 73:12
**amy** 3:5 91:9
101:21
**analyst** 16:11
**anecdotal** 37:2
88:7
**angeles** 64:19
**answer** 6:1 8:7,10
8:14,19,20 26:11
27:10 28:13,15,16
33:12 34:11 36:8
36:25 38:11 40:8
40:18,24 41:20
42:8 51:22 58:4
59:15 69:7 70:25
72:2 73:8 77:2
79:13,16 80:23
81:9 83:23 89:11
90:1 95:5,24
96:19
**antigun** 74:10
**antipersonnel**
18:2
**antipolice** 73:19
**antitank** 18:2
**anybody** 25:10
86:3,16 98:4
**anyway** 96:25
**appear** 103:13
**appearances** 3:1
**appearing** 1:16
105:18 106:7
**appears** 61:10
68:7,16,25 97:13
**appreciate** 66:19
88:19,24 100:25
**approach** 70:1
73:5 75:2,2 85:9
87:19,23 88:2

**approached** 24:9
**appropriate** 27:24
**approved** 19:10
**approximately**
22:3 48:20,25
**ar** 82:6
**area** 96:18 99:7
**argue** 34:12 66:6
101:4
**arguing** 97:11
**armed** 23:23
26:18 37:5 66:10
69:24 72:24,24
86:11 88:8
**armor** 50:8
**army** 17:19
**arrest** 19:7 23:13
52:4 55:1,7
**arrests** 98:11
**arrow** 78:13
**ars** 82:10
**article** 37:5 85:24
**articles** 45:3,6,14
**artifice** 31:7
**ascertain** 74:14
**aside** 65:19
**asked** 12:3 22:12
**asking** 8:9 57:21
66:20,24 91:18,20
94:21
**aspects** 24:5,14
**assault** 24:6,14,20
26:18
**assaulting** 35:6
**assertion** 81:21
**assess** 67:12 68:5
68:22 69:4
**assessing** 69:18
**assigned** 17:11
18:24

**assist** 86:5
**assistant** 26:7
**assisted** 14:11
19:20 50:18
**associated** 89:8
**association** 50:22
91:24
**assume** 38:12 39:5
42:13 69:24
**assuming** 16:8
24:1 42:9 60:13
62:22
**assumption** 69:24
70:2,4
**atlanta** 55:6
**atmosphere** 79:11
**attached** 103:14
**attack** 79:18
**attacks** 28:19
**attempt** 85:18
**attempting** 36:3
**attend** 15:4
**attention** 14:7
55:10
**attorney** 1:8 2:8
3:6,14,16 7:13
8:18,20 26:7
46:25 47:14,20
104:18
**attorneys** 97:11
**audit** 73:21,21
**author** 50:14
**authority** 22:6
**availability** 35:2
**available** 32:16
96:12 99:15
**average** 31:22
40:6,11,12,22
41:18 42:5 60:14
**avoid** 44:2 55:3

[avoiding - bulge]

**avoiding** 57:7
**aware** 87:7 93:21
97:2,7
**awhile** 10:9 14:1
17:1 22:23 26:13

**b**

**b** 49:7 106:1
**back** 11:18,20
34:15,16 35:19
46:4,8 47:4 67:8
67:20 71:5 74:13
74:17 88:14,25
100:22 101:20,21
102:1
**background** 45:21
49:24,25
**backing** 40:14
**backup** 86:5
**bad** 17:6 24:17,19
29:7 31:19 37:19
40:15 44:10 55:5
57:2 62:12 66:15
72:17,17 73:3
82:19 83:14,19
84:14 85:22 86:23
**badge** 88:9
**bags** 72:6
**bailiwick** 55:3
**baird** 1:4 2:4 3:25
7:14 105:4 107:1
**ballistics** 52:1,2
**ban** 46:17 47:19
**banned** 46:21
64:17 96:24 98:20
98:21
**banning** 62:23
63:22 65:13,20,23
65:25 66:21,23
70:8
**bans** 50:8

**barricaded** 80:3
**baseball** 82:25
**based** 36:21 45:14
60:20
**basic** 23:5,5,6
**basically** 19:18
52:11 55:7 74:9
**basis** 13:12,21
14:3 17:19 52:9
77:16 88:8 89:23
98:3 99:4
**bat** 46:4
**batons** 19:6
**bean** 75:10
**beat** 34:24 35:17
**beaver** 64:25
**beef** 90:20
**beginning** 2:18
100:6
**behalf** 2:17
**behavior** 24:6,21
67:12 68:6,22
69:5 71:11,14
72:12,15 74:17
75:16 76:1,18,22
76:23 77:24 84:6
101:3
**behavioral** 24:5
24:14 72:12 75:22
76:9
**beings** 31:6,12,13
39:4,17 77:24
80:25
**belief** 98:24 100:8
**believe** 11:11
13:22,25 17:1
26:8,14,19 31:2,8
32:19 48:22 57:24
59:9 60:11 61:19
65:22,22 66:2,2
67:2 72:3 89:19

91:8,17 95:17
96:1 97:11
**believed** 63:14
73:18 79:24
**believer** 29:25
31:5 86:1
**bellantoni** 3:4,5,11
9:16 10:4,10,14,19
11:9 12:6,24
13:23 26:10 27:9
28:12,16 30:17
31:1 33:11 34:10
35:25 36:7,19
38:10 39:10 40:7
40:23 41:19 42:7
43:8 51:21 53:25
55:24 58:3 59:14
67:19 69:6 70:16
70:24 72:1 73:7
73:10 77:1,17
79:12 80:19 81:8
82:8 83:22 88:16
89:10,25 91:11,14
92:1,7,12 94:12,17
95:4,23 96:13,17
96:22 97:4,9
101:9,10,15,18,24
102:4,6,10,19,21
**belt** 41:5 54:4
**best** 32:6 70:6
**better** 23:19 31:13
31:21 32:20 53:12
62:13 99:18
**beyond** 87:14
**big** 13:18 20:11,18
24:18,20 28:23
29:22,25 31:5
33:18 46:7 54:19
56:16 57:8 58:6
78:2 85:25 87:20
88:4 92:24 93:7

**bill** 11:7
**bit** 16:8 27:2 32:18
42:22 46:2 64:10
82:25 87:11 98:23
**blue** 20:16,16
**body** 50:8 62:20
84:22
**bomb** 83:15
**bomber** 79:2
**bombing** 79:20
**bombs** 79:3
**bono** 11:10
**bonta** 1:7 2:7 7:14
105:4 107:1
**book** 69:17
**books** 90:11
**borders** 53:13
**botched** 55:1
**bound** 95:8
**boundaries** 99:3
**bow** 78:13
**box** 3:19 43:25
59:3
**breacher** 18:21
**break** 8:12,15 34:1
101:11
**breaking** 97:16
**brief** 101:11
**briefed** 96:13
**briefly** 102:2
**bring** 54:15
**broader** 93:16
96:2
**brought** 56:18
79:15 80:22
**brown** 82:16,22
**bruce** 60:2
**buff** 46:7
**building** 79:4,21
**bulge** 54:7

Veritext Legal Solutions
866 299-5127

**ER396**

[bunch - chuck]

**bunch**  16:4 41:24
  53:14
**bureau**  58:25 59:7
  93:24
**burglar**  37:9
**burglarize**  77:11
**burglary**  44:16
**business**  16:19
  22:21,25 23:3,18
  27:12 31:9,10
  33:7 47:4 53:15
  53:17 55:16 75:4
  76:9 77:7 93:4
**button**  70:9
**buzz**  33:18

**c**

**c**  24:8 49:7
**ca**  105:9,12,20
**caliber**  17:25
**california**  1:2,9
  2:2,9 3:14,20 7:13
  46:6 62:4 63:11
  63:16 69:16 93:17
  94:5,20 95:12,14
  96:4,7,10,16,24
  97:3,8 104:2
**call**  20:4 25:3
  47:15 61:7 74:8
  77:22 78:13 85:9
**called**  20:12 37:5
  73:20 74:3
**calls**  24:8
**camera**  30:8
**capability**  31:16
  31:17 35:5
**capable**  29:14
  31:6,11
**capacity**  1:8 2:8
  15:20,21 21:16
  23:19 25:15 27:16
  29:24 49:21

**capita**  64:18
**captain**  16:22 49:2
  49:9,13
**car**  28:7 30:7
  37:20 43:13,18
  44:1,19 46:20
  70:22 71:4,23
  72:5 84:15
**career**  18:9,11,18
  18:18 21:9 48:9
  64:15
**carjacking**  24:12
  37:17
**carjackings**  31:25
**carriage**  45:11
  82:10 84:1,4
**carrie**  1:21 2:19
  104:23
**carrier**  86:20
**carriers**  48:7
**carry**  15:2 25:9,10
  27:7 28:9 29:18
  29:19 30:15 31:3
  32:11 34:9 35:8
  35:24 41:6 42:25
  43:15 45:4 46:1
  46:11,13,15,17
  47:6,7,8,11,13,13
  47:16,17,17,19,22
  47:23,24 48:1,3
  52:21 54:15 56:10
  61:23 62:4,9,17,24
  63:11,15,22 64:2,4
  64:7,7,20,21,21
  65:8,13,20,23,25
  66:8,14,21,23 68:9
  68:17,20 70:8,10
  73:17,20 75:18
  77:21 89:4,8,16
  91:24 93:2,5,10,11
  93:17 94:16 96:9

96:15,20,23 97:2,8
  97:20 98:1,7,19,21
  98:22 99:1,24
  100:5,9,11,13
**carrying**  25:12
  26:8 30:24 32:21
  32:22 34:4 39:6
  39:15 48:8 52:24
  53:7 54:3,4,6,11
  56:9,9 57:24,25
  59:10 60:22 61:1
  61:7,13 62:19
  63:13,18 64:5
  67:11 69:3 74:5
  76:8,24 81:4,20
  82:5,18 83:21
  86:16,17 98:4
**cars**  39:18 46:21
**cartilage**  29:9,10
**case**  1:6 2:6 7:13
  7:23 8:1 10:8,18
  10:22 11:6 13:6,8
  13:25 14:9 30:6
  30:10 34:13 35:13
  42:17 44:13 52:10
  56:22 58:12,12
  59:23 65:6 66:16
  66:17,17 75:25
  76:13,14 79:1,14
  82:12 83:4,16
  91:7 92:21 94:19
  95:6 96:13 98:15
  104:14
**cases**  30:8 37:8
  44:13,21 47:3
  56:15 78:7,10
**cash**  43:1,1
**casual**  9:17
**cattle**  46:5
**cause**  42:4,10,24
  53:2 60:23 62:13

62:14 64:11 66:3
  66:12 76:4
**causes**  79:14 80:21
**caveat**  40:25
**ccp**  105:9,12
**cellphone**  59:21
**center**  16:10,19
**certain**  34:7 47:1
  97:3,8 98:14
**certainly**  8:11
  40:3 64:5 65:2
  90:17 93:18 97:15
**certified**  2:20 6:1
  104:1
**certify**  104:3,16
**chainsaw**  33:5
**chainsaws**  39:19
**chance**  54:20
**change**  84:16
  107:4,7,10,13,16
  107:19
**changed**  18:4 47:2
**chaotic**  62:10
  80:16
**charge**  19:18
  48:15 49:4,7,8,10
**charged**  39:1
**charles**  1:15 2:16
  4:2 5:4 7:4,16
  103:10,21 105:1,5
  107:2
**chase**  51:8
**checked**  87:25
**chief**  9:22,22 13:9
  47:10 49:15,18
  82:15,22
**chiefs**  50:22
**children**  44:22
**chuck**  5:4 7:17
  105:2

Veritext Legal Solutions
866 299-5127

**ER397**

[circle - contacted]

**circle** 35:19
**circles** 99:25
**circumstance** 36:22
**circumstances** 32:2 68:21 75:3 97:3,8
**cited** 13:4
**cites** 13:3
**cities** 46:17,21 47:3
**citizen** 37:6 66:5 85:4
**citizens** 86:11 98:25
**city** 20:15 23:10 42:23 50:7 51:11 103:17
**civil** 14:18 105:19 105:20
**civilian** 23:19 36:4 36:6 37:16 38:8 40:1,6 42:6 53:17 57:12,25 58:2 59:10,12 69:3 70:22 82:5 86:19 86:21
**civilians** 53:3 56:8 61:1 82:18
**clarification** 30:18 31:4 36:20 43:9
**clarified** 43:23
**clarify** 36:1
**clarifying** 36:6
**clarity** 39:12 73:10
**class** 31:20
**classes** 15:22 16:1 23:7 25:8
**classic** 76:13,19

**classically** 80:2
**claymore** 18:2
**clear** 58:16 92:15 92:20
**clearly** 9:11 28:2 66:16 74:7 99:2
**clients** 23:4,25 25:9,13 27:7 28:9 29:18 30:14 43:5 44:8
**close** 37:18
**closed** 77:8
**clothes** 84:16
**coalesced** 16:4
**code** 50:7 69:17 105:9,12,19,20
**coincided** 64:23
**college** 15:4,6,12 15:23 16:3
**colleges** 15:16
**color** 61:10 68:16
**colorado** 48:2
**colored** 62:14
**columbine** 19:24 20:6 21:7 81:15 85:8,14,15 87:15
**combination** 34:21
**come** 13:16 21:1 22:13 60:7 64:19 73:18 89:20 91:1 91:3
**comes** 24:16 39:23 55:12 67:10 69:2 72:11
**comfortable** 25:23
**coming** 20:6 21:5 58:20 67:1 79:10 90:22
**comma** 28:24

**command** 21:13 48:10
**commander** 17:10 18:19 48:12
**commanders** 48:15
**commands** 34:22 35:14
**comment** 9:7
**commissioned** 46:10
**common** 48:6 78:3
**commonly** 93:5 99:19
**communicate** 33:20
**communication** 33:15
**community** 51:5 51:12 74:2 82:17
**comorbidities** 28:23
**company** 22:23 57:17,18
**compared** 94:3
**compartment** 72:5
**compensated** 11:5
**competent** 41:9
**complaint** 10:24 11:3
**complete** 15:13
**completed** 15:14 15:25 105:7,17 106:6
**completely** 82:12
**completion** 104:14 106:10
**compliant** 97:20
**comport** 69:25
**computer** 88:22

**conceal** 47:12,13 47:24 64:7,21 71:13 73:17,20 86:20
**concealed** 41:7,7 43:15 46:13 47:17 47:23 54:5 56:9 70:2 76:15 98:1,7 98:19 99:23 100:5 100:13
**concerns** 32:10,14 32:15
**concert** 35:16
**conclusions** 91:3
**conduct** 13:11,16 23:22
**conducted** 45:15 53:19 91:23
**conducting** 45:22
**confrontation** 74:10
**confronted** 34:16
**confused** 96:21
**congruent** 77:5
**conner** 95:9
**consider** 26:23 37:15 51:20 94:10 94:25 95:20
**consistent** 92:17
**console** 72:6
**consoles** 71:6
**constitutional** 47:16
**consultation** 99:6
**consulting** 22:21 22:25 23:1
**contact** 74:4 78:22 85:19 105:9
**contacted** 10:11 10:15

Veritext Legal Solutions
866 299-5127

[contacts - deescalate]

contacts  24:8
contained  103:14
context  90:25 91:2
  95:15
continue  56:4
contradict  92:22
contradicts  89:18
contributing  57:5
control  14:3 19:7
  23:13 52:4 55:1,8
controversy  83:13
  83:17
conversation  9:17
  10:19 53:24
cookie  23:4
cooking  90:11
cop  31:8 41:22
  47:6 50:24 54:14
  76:22 81:4,12
  82:2 84:15 86:22
cops  40:14,15 47:9
  47:9,11 55:3
  62:12 64:3,4 88:2
copy  12:11,16,22
  16:9 102:5,7,11
correct  63:8 68:1
  103:15
corrected  103:15
corrections  9:4,6,7
  103:13 105:14,15
  106:3,4
correctly  24:23
  35:20
council  51:11
counsel  12:22
  14:10 27:13 28:3
  28:6 31:12 32:6
  44:24 100:24
  105:18,21 106:7
counselor  101:4

count  16:2
country  97:22
county  21:25,25
  22:9,12,14
couple  9:17 15:17
  36:1 44:21 55:19
  90:5
course  15:19 20:5
  27:18 40:16 41:4
  44:18 46:3 48:9
  58:8 101:13,17
  102:17
courses  15:13,14
  15:15
court  1:1 2:1 8:3
  14:18,18 47:3,20
  52:7 56:15
courthouse  79:19
courtroom  7:20
courts  51:24 56:20
cover  32:7
covid  28:21,23
cpost  19:10
craig  24:7
create  53:1 89:4
created  61:24
creates  56:7
creating  50:12
creation  51:1,6,17
credit  15:23 16:3
crime  14:4 31:24
  37:16 55:17,17
  58:6,17 64:14,16
  64:18,23,25 65:1
  66:9 71:15 89:9
  90:12,13,18 91:25
  94:4
crimes  59:25 65:4
criminal  14:18
  24:5,14,20 26:18
  35:4 55:17 60:13

66:9 76:10 98:12
  101:3,5,6
criminalistic  76:1
criminally  38:23
criminals  76:14
criteria  42:18,19
critical  41:24
  65:16 80:24
crr  1:22
csr  1:22 104:24
cure  63:23 65:14
current  16:17,22
  22:5,19 38:22
  49:2 50:16
currently  22:15
  23:8 32:18
custody  55:4
customize  23:7
cutter  23:4
cv  1:7 2:7 16:9

**d**

d  1:15 2:16 4:2 7:4
  7:16,17 103:10,21
  105:1,5 107:2
dabbled  45:12
dallas  82:15 83:1
danger  70:15,23
  89:4
dangerously  83:21
dark  34:16 77:8
data  87:22
databases  37:2
date  10:9 104:19
  105:16 106:5
  107:24
dated  104:22
david  7:16 82:16
day  23:14 54:11
  77:6,13 78:12
  98:3,3 103:16

days  9:17 21:20,23
  46:5
dead  44:18
deadly  26:25 27:4
  30:10,12 32:4,5
  67:17 68:14,24
  71:25
deal  28:23 33:16
  33:23 48:7 57:8
  70:10 74:25
dealer  90:21
dealing  33:25
  54:14 77:21 80:2
  80:3
deals  93:9
dealt  71:7
dear  21:12
deaths  55:4
december  48:21
decided  15:9
decision  25:11
  26:4 36:14,23
  51:25 68:13,23
  70:5 71:25 72:10
  72:21
decisions  46:23
  67:15 72:23
declaration  5:4
  9:23 10:2 11:12
  12:3,5,9,12,18,23
  13:3,15,18 14:11
  61:9 67:22,25
  91:15
declare  103:10
deep  28:21 56:13
deeply  76:15
deer  46:15
deescalate  32:3
  33:10,21 34:8,22
  35:11,23

Veritext Legal Solutions
866 299-5127

[deescalation - early]

**deescalation** 16:13 24:25 33:14,17,24 34:3 35:3,7 36:2,4
**defeat** 35:5
**defend** 29:14,19
**defendant** 1:10 2:10 3:13
**defendant's** 5:2
**defendants** 2:17
**defense** 14:19 25:22 28:2 37:14
**defensive** 19:17 25:19 37:2 83:6
**defer** 10:10
**deficiencies** 63:24 65:14
**definitely** 17:2 26:25 88:13
**degree** 16:5 66:1
**delirium** 16:11 33:19 50:21
**delivered** 83:16
**delve** 54:20
**demeanor** 75:17 77:12 84:1,4,6,22
**demographic** 95:19 98:8,13
**demographics** 100:12
**demonized** 99:20
**demonstrate** 59:18
**density** 94:3
**denver** 56:17
**department** 15:9 16:16 18:13,14 19:1,13 21:16 22:1,15 23:10 41:11,12 43:20 48:12,17 49:20 50:16,16 83:1

**departmental** 63:24
**departments** 20:10 69:13 83:3
**depend** 42:18 71:1
**depending** 42:19 85:10
**depends** 90:2
**deploy** 41:7
**deposition** 1:15 2:16 7:25 9:3,14 9:16 10:5 82:13 104:13 105:19,22 105:24 106:8,10
**depth** 33:17
**deputy** 22:2,13,14 30:7 49:15,23
**describe** 17:15 23:2 79:10 96:14
**describes** 61:9
**description** 5:3
**detail** 73:12
**detective** 76:16
**detectives** 20:7
**determine** 76:24
**determined** 42:3 93:22 105:18,22 106:7
**detriment** 54:16
**detrimental** 52:25
**develop** 19:21
**developed** 20:23
**developing** 20:21 94:10,25 95:20
**diallo** 59:25
**difference** 66:5 94:4
**differences** 94:9 94:24 95:19
**different** 20:10 30:12 75:18 95:11

95:13
**differentiating** 62:11
**diffused** 74:11
**dinkheller** 30:6
**direction** 104:10
**directly** 89:18
**disadvantage** 97:15
**disagree** 42:20
**disallowed** 47:5
**disarming** 44:5
**discussed** 45:24 65:15 84:7
**discussing** 92:23
**discussion** 11:17 67:5 88:23
**display** 35:13
**displaying** 76:18
**dispute** 32:18
**disputes** 65:9
**distance** 36:21 37:21
**distort** 80:16
**district** 1:1,2 2:1,2 26:7
**document** 11:25 12:8
**documents** 13:4,4 13:5,10,12,16,20 13:22 102:16
**dog** 75:24
**doing** 12:14 14:1 15:20 16:15 22:15 33:16 35:15 41:8 45:2 47:4 48:20 79:20 85:10 86:6 99:2
**doj.ca.gov** 3:22
**doke** 8:16

**domicile** 28:3
**donahue** 91:23
**douglas** 24:7
**downrange** 57:2
**dozen** 14:16
**drafting** 11:2
**draw** 79:6
**draws** 80:12
**dress** 81:14
**drill** 73:2
**drink** 26:3
**driver** 17:8,20
**driver's** 28:6 39:21
**drives** 46:6
**driving** 39:18
**dropped** 65:1
**drug** 90:20
**drugs** 33:20
**dry** 26:13
**ducks** 100:1
**dude** 26:15 31:22 78:12
**dudes** 34:17
**dui** 98:11
**duly** 104:7
**duress** 81:1
**duty** 14:6 20:9 26:16 34:13 40:4 41:4 47:8,9,10 81:5 82:2,7 84:14 86:15,18
**dynamic** 16:12 93:10

**e**

**e** 105:9,12 106:1 107:3,3,3
**earlier** 27:5 84:6
**early** 30:4 64:16 69:14

Veritext Legal Solutions
866 299-5127

**ER400**

[earned - famous]

**earned**  16:3
**earp**  46:4
**easily**  78:17
**eastern**  1:2 2:2
**easy**  89:20 91:3
 93:19
**ed**  28:6
**education**  15:13
 16:6 27:14,23
 28:4 31:17
**effect**  52:25 53:10
 64:11 66:4,13
**effective**  94:11
 95:1,21
**effectively**  27:21
**eight**  14:23 23:14
 49:1,1 56:4 60:18
 61:22 63:3
**either**  34:23 35:17
 41:9 67:2,2 80:11
**elderly**  28:25
**eliminate**  68:17
**email**  9:20 55:13
 55:13 102:8,19,20
 102:21
**emotional**  38:14
 39:3,9,22,23
**emotionally**  39:1
**emphasizing**
 65:15
**employee**  104:17
**employment**  22:20
**emporia**  15:17
**empty**  34:19
**encounter**  24:11
 37:16,16
**encounters**  37:18
 37:22 38:3 66:5
**ended**  15:10 18:18
 34:20

**enforcement**
 10:23 16:18 18:10
 19:25 21:8,17
 22:16 23:20 29:24
 33:17 40:11 42:3
 46:9,10,22 47:7,10
 48:10 55:18 56:14
 57:11,12 59:12
 65:14 75:20 77:20
 81:6 82:7 85:4,6
 86:8,24 92:25
 96:6,23 99:25
**engages**  101:2
**enhance**  63:23
 65:20,24 66:22,23
**enhances**  66:24
**entire**  32:23
**entirely**  42:18
 80:10 91:11
**environment**  93:5
**equal**  58:2 59:11
**equipment**  81:13
**era**  64:25
**errata**  105:14,16
 106:3,5
**escape**  71:16,17
**establishment**
 77:11
**et**  1:9 2:9
**evaluate**  77:24
 84:13 90:3
**evaluated**  89:23
**evaluating**  84:17
**event**  19:25 21:7
 38:25 78:1,16,17
 79:11 81:5,19
 82:17 83:24 85:14
 85:16,25 86:17
**events**  21:10 69:15
 77:25 86:2,6,10,18
 87:1,14,16 88:1

**eventually**  18:17
**everybody**  17:6
 28:18 54:5 65:1
 95:8 101:5
**everybody's**  85:14
**exact**  62:7 66:12
**exactly**  22:4 39:16
 58:14 68:7 76:13
 78:20
**examination**  4:6
 7:8
**examined**  7:5
**example**  17:22
 30:9 35:12 56:17
 57:4 66:22 70:13
 81:16 85:13
**examples**  51:13
 60:6,7
**exception**  46:12
**excited**  16:11
 33:19 50:21
**exciting**  38:24
**excuse**  26:12
 60:24 85:21
**executed**  103:16
**exercising**  75:17
**exhibit**  5:4 11:15
 11:21,22
**exhibits**  5:1
**exist**  57:6 76:7
**experience**  13:19
 15:12 17:15 31:23
 45:20,25 46:2
 52:12 64:1 81:12
 84:10 90:17 93:1
 93:8 98:17
**experienced**  75:20
**expert**  5:4 7:22
 9:21 10:18,20,23
 13:9 14:13,17,19
 14:21 15:1 51:20

51:24,25 52:5,7
 92:2 94:20 96:18
 96:20,22
**expertise**  92:10
**experts**  97:13
**explain**  53:5 56:10
 63:25 75:21 85:7
 97:23
**exposed**  56:10
 60:23 61:1 62:20
**expressions**  84:23
**extensive**  55:13
**extensively**  99:10
**extent**  65:21 66:25
**extraordinarily**
 81:11 83:2 100:13
**extrapolate**  86:13
**extremely**  26:4

**f**

**facial**  84:23
**fact**  35:3 53:2,6
 57:7,14 59:17,20
 64:24 65:18 82:3
 100:8
**factor**  32:25 33:8
 36:12,16 38:7
 39:7,25 57:11
 94:10,25 95:20
**factors**  16:13
 36:22 84:5,7
 87:15 94:3,8 96:1
**failing**  13:8
**fairly**  55:13
**falls**  31:22
**false**  91:3
**familiar**  17:13
 85:14 89:7 91:21
 91:22 92:4 96:9
**famous**  54:23 55:5
 59:23 60:1 69:17
 81:19 87:14 100:5

Veritext Legal Solutions
866 299-5127

**ER401**

[famous - give]

100:19
**famously** 30:7
**fan** 78:4
**fancy** 17:5,5
**far** 10:9 13:24
23:20 38:22 50:4
88:12 90:17 95:15
96:2,2,2,12 98:12
99:7 100:21
**fear** 60:21
**federal** 79:18
104:13 106:1,8,9
**feds** 58:20
**feel** 25:23 75:14
**feet** 37:25
**feloniously** 37:24
**felt** 29:4
**fence** 40:9,10
**field** 19:2,3,4
51:20 92:18
**fight** 30:8 34:18,19
**fighting** 19:8
**fights** 38:1
**figuring** 32:3
**filing** 13:8
**finally** 21:12,13
**financially** 104:16
**find** 17:6 20:20
30:10 31:19 32:7
52:15 54:3,8,9
56:14 72:15 75:8
86:7
**finding** 89:7
**findings** 92:16
**fine** 102:10
**finish** 8:7,9
**fire** 16:1 22:6
35:12 49:3,10
**firearm** 19:22
23:23 25:9,11,13
26:17,19 27:7,20

28:9 29:18 30:15
32:12 33:1,9 34:9
35:24 36:13,17
37:24 38:8 39:6,8
39:11,15 40:1,6,22
41:18 42:4,5 43:6
52:24 53:17 57:25
58:1,11,18 59:10
59:19 60:23 61:8
61:13 62:20 66:8
70:14,22 71:23
72:13 73:4,11
81:4
**firearms** 14:19,20
14:21 15:2 17:13
17:16 18:4,24
19:5,13,16 21:2,3
23:18 25:5,24,25
26:1 27:15 44:9
45:4 46:1,17 48:7
49:8 52:1,1,2,3
56:14 63:13 83:5
89:17 95:2,22
97:20
**fired** 60:1
**firefighter** 31:9
**firing** 59:2
**firm** 3:4
**first** 10:7,11 17:23
48:14 64:12 95:10
**firsthand** 89:18
93:8
**fishing** 46:13
**fit** 28:11,18 29:1
36:10 38:4 64:8
64:20
**flip** 40:16
**florida** 100:5
**floyd** 54:25
**fluctuate** 58:8

**focused** 71:14
**follows** 7:6 105:8
**force** 14:18 16:10
16:10,12 19:5,12
19:19 26:25 27:4
30:3,5,10,11,12
32:4,6 50:17 51:9
51:25,25 52:3
83:5 95:8 99:9,13
**foregoing** 103:12
104:4,6,10,12
**forget** 9:19
**forgot** 65:1
**form** 13:12
**formal** 9:15 15:13
16:6 37:11 41:5
45:16 58:25 59:6
102:17
**formalize** 57:23
**former** 9:22
**forms** 22:19
**forth** 74:13,18
104:5
**forward** 13:9
**found** 24:22 83:8
85:21
**founded** 57:17,18
**four** 23:13 77:20
85:11
**frame** 70:6
**frankly** 23:13 54:4
57:6 71:9 72:16
74:12 97:10 98:3
**frcp** 106:1
**free** 95:11
**freedom** 95:13
**freeze** 48:13,13
**frequently** 85:5
**friend** 22:22 25:14
25:18 44:15

**friends** 24:6
**front** 9:20 73:25
**frontier** 46:5
**full** 7:14
**fund** 21:22
**further** 104:12,16
**furtive** 71:12

| g |
| --- |

**g** 7:17,17
**gain** 15:23 98:25
**gallardo** 1:4 2:4
**gang** 14:22 64:13
90:18 98:23
**garr** 95:9
**gas** 18:25
**gated** 74:1
**gather** 69:1 85:12
**gear** 84:15
**general** 1:8 2:8
3:14 7:13 31:12
32:17 39:4 40:4
40:20 41:16 42:2
46:25 50:2,15,17
60:7
**general's** 47:14,20
**generalized** 60:21
**generalizing** 66:18
**generally** 42:20
97:20
**generic** 86:20
**gentleman** 56:23
56:25 73:18 74:6
79:19 81:18
**gentleman's** 59:24
**george** 54:25
**getting** 22:10
30:24 57:19
**gimme** 72:20
**girlfriend** 34:14
**give** 8:10 39:21
40:18 42:12

Veritext Legal Solutions
866 299-5127

**ER402**

**[given - hereto]**

given   20:24,25
21:4 104:11
gives   26:19
giving   92:9
glad   21:12
glaring   30:9 56:18
57:3
glasses   52:15
glove   43:25 72:5
go   7:17 11:15,18
17:5 27:17 28:14
28:16 33:5 35:8
36:8,22 37:4,19
43:15,19,21 44:24
45:2 46:4,8 47:4
49:20 53:7,22
54:2 59:4 63:20
67:8 70:13 75:7,8
75:12 79:15 81:13
84:17 88:20,25
90:21 95:5 97:25
99:2 102:1
god   20:1 53:12
66:15
goes   77:13
going   17:1,22 23:9
24:18 25:21 27:19
30:17 31:1,18,21
36:19,20,25 38:12
38:25 41:23 44:24
46:7 48:23 56:24
58:24 65:8,17
67:19 68:10 73:13
73:19,20 74:8,21
76:8,22 77:9
79:12,13,17 80:19
81:12,22,23 82:8
84:18 86:4 87:11
88:21 89:25 90:21
92:1,7,8 95:6
96:18 97:24 98:5

98:18 100:2
good   7:10 14:16
24:6 41:22,23
42:4,12 56:13
62:11 70:6 76:22
77:10,22 82:1,19
84:14 88:8
google   59:3
gotcha   74:22
gotten   79:22
graduate   15:8
graham   95:9
grandest   50:3
grandma   37:8
great   52:18 63:16
64:10 100:23
greater   64:18
greatly   63:23
65:24 66:21
green   75:9
grenade   18:1,6,25
groceries   75:25
ground   19:8 29:4
group   97:22
grown   29:6
guarantee   54:1
75:6
guess   39:22,24
65:4 80:17 91:13
101:24
guidelines   94:7
gun   14:3 17:25
18:1 25:4,20,21,22
25:22 26:8,23
27:22 30:8 34:4
34:21 35:1,2,2,12
35:13 38:21 41:6
41:7 42:12 43:16
43:17,21,22,24
44:1,2,3,7,15 45:1
46:11,19 47:8

48:8 53:7,12
54:11 60:16,16
63:18 64:4,20
69:19 72:20 73:21
74:5,5,7 75:9,23
75:24 76:3,8,20
81:25 82:6 86:16
86:21 90:8,10
98:4,22 100:19
gunman   83:16
gunmen   80:3
gunner   17:8
guns   18:7 30:11
32:22,22 44:11,22
45:11 46:21 65:8
71:3,6,6,8,9,18
76:16,17 81:16,17
82:10 83:23
guy   18:25 24:19
29:5 57:2 72:17
72:17,18,19,19
73:4 74:4,13,14,19
75:4,5,23,24 77:7
77:9,10 78:25,25
79:1 82:19,19
83:14,19 84:2,14
84:14,19,21 86:24
88:8
guy's   26:21 53:12
54:11
guys   12:15 17:6
22:24 24:17 34:19
37:19 44:10 62:11
62:12 81:20 97:12
97:13
gym   81:18,20

**h**

h   7:17 107:3
haggard   1:15 2:16
4:2 5:4 7:4,17
11:21 67:21

103:10,21 105:1,5
107:2
half   29:3
hampshire   93:16
100:7,10
hand   60:3
handcuffing   19:7
23:14
handed   34:19
handgun   46:13
53:8 73:24
handguns   76:15
82:11
handle   27:15 29:5
32:11
handled   105:8
handling   41:24
happen   21:14 76:8
83:20
happened   20:14
56:21
happening   40:15
66:16
happens   85:5
hard   10:12 14:16
40:10,12 69:13
harden   25:18
hardwire   16:21
harsh   25:3
hazard   53:1 56:8
57:6
head   44:23
health   38:13,18,20
hear   79:5
heart   21:12 28:19
heighten   70:15,23
heller   46:25
helped   25:17
helping   22:2 55:16
hereto   103:14

**[hey - job]**

**hey**  20:25
**high**  33:20 42:25 59:18
**higher**  89:8 91:24
**hint**  61:15
**hip**  29:11,12 71:8 75:9,23,24 76:3,21
**hire**  15:10 93:24
**hiring**  48:13
**historical**  57:3 85:3 87:2,3
**historically**  58:5 100:11
**history**  46:7 69:14 87:4
**hit**  23:8
**hold**  17:3 101:15
**hollywood**  81:19
**holster**  54:3 73:24
**holstered**  53:7 71:8
**home**  25:22 37:13 43:10,12 44:2,16 90:8,10
**homicide**  14:22
**honest**  75:20
**hope**  38:19 81:10
**hoping**  74:24
**hostage**  79:25 80:2
**hotel**  34:15
**hour**  11:13 23:14 49:6
**hours**  23:11,12,13
**house**  25:18 44:17 51:10
**huh**  14:12 56:5 92:11
**human**  16:12 31:5 31:12,13 32:17 39:3,17 77:24 80:25

**hundreds**  29:24
**hunt**  46:12
**hunter**  27:18
**hunting**  27:16 46:12,14
**hurry**  84:1
**hysteria**  62:15

**i**

**iacp**  50:19
**idaho**  93:16
**idea**  53:11 90:6
**identifiable**  78:18 81:4
**identification**  20:13 52:2 81:24
**identify**  79:9 80:13
**identifying**  80:11
**idiot**  75:15
**ieds**  79:4,21
**illness**  74:15
**imagine**  25:15
**immediately**  79:9 81:3 83:19 88:9
**impact**  52:22
**impasse**  97:14
**implementation**  52:21
**importance**  44:25 65:16
**important**  44:8 57:11 78:22 94:10 94:25 95:20
**impossible**  66:7
**impression**  62:8
**improper**  57:4
**improvement**  16:15
**improves**  65:25
**incident**  19:22 80:24 83:11,12

**incidentally**  57:16
**incidents**  41:25 55:15 69:14,16 88:7 101:1
**include**  86:13
**included**  82:17 105:14 106:3
**includes**  94:15 98:9
**including**  47:6
**incorrect**  57:4
**increase**  68:20
**incredibly**  37:18
**independent**  45:15
**index**  4:1
**indicate**  76:10
**indicating**  92:16
**indicators**  76:9
**individual**  46:17 75:19
**individuals**  60:22
**infantrymen**  17:21
**informs**  45:25
**initialed**  103:13
**injunction**  91:6
**injury**  58:19
**ink**  103:13
**innocuous**  59:21 75:10
**input**  10:22 51:7
**inside**  79:4
**insider**  82:25
**insisted**  11:11
**instant**  61:24 62:3
**instruct**  74:6
**instructed**  6:1
**instruction**  41:5
**instructor**  16:20 16:21 19:5,6,18

**instructors**  56:14
**intent**  71:2
**interdict**  30:4
**interdicted**  86:11
**interdiction**  85:4,6 88:11
**interdicts**  86:23
**interested**  104:17
**interim**  18:20
**interject**  36:24
**internal**  99:10
**international**  16:20 50:21
**intoxicated**  40:2
**investigation**  99:12
**investigations**  99:11
**involve**  23:22
**involved**  10:7 26:15 37:7 51:10 76:1 79:1 80:25 87:15 99:10,12
**involvement**  93:10
**involves**  54:21
**involving**  19:22
**irrelevant**  96:24
**issue**  37:12 38:5 76:11
**issues**  14:4,4 38:20
**items**  29:19

**j**

**jack**  37:20
**jackson**  21:25 22:9
**jeweler**  42:25
**jewelry**  43:1
**job**  1:23 15:11 16:14,22 17:17,23 19:15 20:24,25 22:5 41:23 44:14

Page 11

[job - lists]

49:2 105:5
**jobs** 16:15 17:19
**joe** 60:14
**john** 91:23 100:18
**judo** 16:13 29:5
**jujitsu** 29:5
**jumped** 29:8
**jurisdiction** 96:23
**justice** 59:1,7
93:25

**k**

**kan** 15:14
**kansas** 1:16 2:17
7:1 15:7,25,25
16:1 18:14 22:14
23:10 27:18 28:1
46:3,11,25 47:1,19
48:1,19 53:15
61:24 62:17 94:20
95:12,14 96:21
98:21 99:24 100:4
**keep** 35:16 44:6
**keeps** 70:5
**kellerman** 90:7
**kept** 34:23
**kill** 28:19 83:15
84:8 90:19
**killed** 37:24,24
44:14 90:9,15
**killing** 65:9 78:12
**kim** 10:2 67:9
**kind** 14:22 19:25
20:3 23:7 31:14
38:21 39:23,24
57:23 65:1 66:18
72:20 73:19 74:21
86:8 96:24
**kinds** 62:11
**kjm** 1:7 2:7
**knee** 29:7

**knees** 29:10
**knew** 83:19,23
**knives** 78:11
**know** 8:13,24 9:5
9:24 14:2,8 16:3
16:14 19:24 20:5
20:11,20 21:10,21
22:6,10 23:5,15
24:10,17,18 25:3,4
25:6,6,16 26:2,16,18
27:1,2,18 28:19,20
29:1 30:2 31:9
32:11 33:6,13,20
33:24 34:3 35:14
38:25 39:21 40:13
40:16 41:1 42:10
42:11,17,18,20,25
43:19 44:11,12,21
45:1,8 47:18 48:5
53:18,25 54:6,25
55:3,4,7,16,18
56:12,16,22 60:1
60:14 62:10,12,14
64:12,22 65:3,5,10
66:10,18 70:3
71:12,14,19 72:8
72:13,14,16,17,19
72:22,24 73:3
74:5,6,7,12,13,15
74:18,21 75:1,3,6
75:9 76:6,19 77:3
77:6,8,10,12 78:5
78:7,7,9,10,20
80:16 81:24 82:19
83:14,21 84:19,20
84:24 87:14,20
90:4,15,19,20,21
90:25 92:5 93:4
93:23 94:2,6 95:7
97:15 98:5,16,20
98:24 99:6,8,17,19

102:13
**knowledge** 42:22
**known** 7:14 55:5
**knows** 75:20 81:12
**kooky** 74:2,19
**kyle** 30:6

**l**

**l** 3:5
**label** 24:7
**lack** 56:6
**language** 66:20
**large** 32:1 73:23
**larger** 50:3 65:6
**late** 69:14 88:3
**lately** 23:17
**launcher** 18:1
**launchers** 19:1
**launching** 18:6
**law** 3:4,6,16 10:23
16:18 18:1,10
19:25 21:8,17
22:16 23:20 28:1
29:24 30:25 33:17
40:11 42:3 43:23
46:9,10,22 47:7,10
48:10 55:18 56:14
57:10,12 59:11
60:21 65:14 75:20
77:20 81:6 82:7
85:4,6 86:7,24
92:25 96:6,22
97:16,21,22 98:7
98:25 99:3,25
100:14 101:2,7
**law.com** 3:11
**lawful** 52:23
**laws** 47:1,2 51:2
52:21 89:8 91:24
96:9 97:7
**lawsuits** 47:18
56:17

**laying** 44:17 71:6
**layperson** 97:15
**lead** 56:7 60:25
76:2
**leader** 17:8 18:22
18:23
**leave** 26:20 43:24
64:25 97:15
**leaving** 18:3 44:11
53:21 83:25
**led** 76:19 87:17
**legal** 12:16 13:7
46:19,23 47:22,23
47:24 77:22 97:14
105:7
**legalized** 73:17
**legally** 27:2 43:18
43:22 64:3,4
97:19 99:1
**length** 12:7 83:12
**lethal** 30:1
**level** 43:3 51:7
64:25 77:23 99:5
**liberal** 100:7
**license** 47:17 98:1
98:7
**licenses** 39:21
**lieutenant** 17:11
18:19,24 48:11,23
49:1
**lieutenants** 49:5
**life** 8:1 14:5 32:23
**lifesaving** 31:8,10
**lifestyle** 28:20
**limited** 26:23
**line** 6:2 105:15
106:4 107:4,7,10
107:13,16,19
**list** 18:4
**lists** 55:13

**[litany - military]**

litany 48:3
literally 71:12,18
literature 78:10
little 18:21 27:2
  29:10 37:10 42:22
  59:7 82:25 87:11
  98:23
live 22:12
living 93:1
loaded 44:17
  46:19,21
lobbying 51:3
locally 64:12
locate 13:11
location 77:4,5,13
  80:12
lock 43:17,22
locked 102:9
  105:12 106:1
logical 27:19
long 29:23 44:6
  49:12 57:19 82:10
  83:23 87:24
longer 22:9 83:4
longest 64:24
look 12:8,17 24:5
  25:7 28:22 38:1,3
  48:23 50:10 52:13
  52:20 54:24 55:17
  55:18 56:15,19,19
  56:21,22 58:5,9,24
  59:23 60:17 61:21
  62:16 67:4,8
  69:17 76:12,12,22
  77:9 81:15,18
  84:8,9,21,23 85:2
  87:15 88:7 89:3
  90:12,24,25 91:12
  93:12,19,24 95:7
  97:18 98:6,10,14
  98:14,19 99:8,14

99:16 100:12
looked 64:15 94:6
  99:22
looking 10:20 26:2
  31:23 55:14 66:20
  76:23 77:10 80:10
  84:3 101:20
looks 24:14
looser 47:13
los 64:19
lost 56:16
lot 16:9 23:19
  28:19 31:21 36:22
  38:3 39:17 41:22
  42:20,25 43:18,22
  46:21 47:25 48:4
  48:6 53:22,23
  54:21 59:16 64:3
  65:9 83:13,17
  99:18,18
lott 100:19
louisiana 15:18
lower 98:12

**m**

m 24:8 81:20
m16a1 17:25
m2 17:25
m203 18:1
m60 17:25
machine 17:8,25
  17:25 18:6 104:8
magazine 37:4
  45:8,8
magic 59:3 70:9
maine 93:15 94:5
maintenance
  19:17
majority 37:7,10
  37:19,23 50:23
  88:2

maker 50:25
making 36:14 52:1
  70:5 72:21 83:9
  101:19
mall 86:14
man 29:6 56:23
managing 24:8
  27:3
manifest 76:16
manner 83:13
  86:4
marched 29:9
margate 56:19
mark 1:4 2:4 3:25
marked 11:22
markedly 75:18
marksmanship
  27:22 36:18 37:12
  38:5
masks 50:8
mass 62:15 78:5
  78:17
massacre 69:15
master 19:15
masterson 46:4
math 48:20
matter 10:25
matthew 3:15 7:12
  12:25
matthew.wise
  3:22
mature 39:19
maturity 39:23
mayhem 61:24
  62:3
mayor's 51:11
mcfadden 76:16
mean 13:13 24:1
  27:15 30:23 32:14
  32:15 33:4 38:13
  38:15 43:9 50:3

51:2 53:5 56:11
57:14 63:25 65:25
69:19 73:21 75:21
85:7 90:2 97:23
101:6
means 29:14,15
  35:5
meant 63:2
measure 66:7
mechanically
  27:21
mechanics 27:20
meet 23:3
member 18:20
members 51:11
  62:19 63:7,12
  98:23
mental 38:9,13,13
  38:18,20,22 74:15
mentally 40:11,12
mentioned 16:23
  17:12 18:9 29:22
  30:25 60:6 77:6
  87:1 91:21 92:4
mentioning 27:5
  100:15
mercy 26:21
mere 53:6
merely 63:17
message 21:13
methodology
  93:25
metro 34:15
metropolitan 22:5
middle 50:9 55:2
  71:15 75:5 85:15
miles 29:3
military 15:16,21
  15:21 16:24,24
  17:3,13,16 18:5
  32:15

**[millimeter - officer]**

**millimeter** 18:1
**mind** 53:13 60:8 70:6,7 88:16,20
**mine** 24:20 25:14 44:15
**mine's** 22:22
**mines** 18:2
**minimal** 17:21 45:23
**minor** 98:10
**minuses** 25:12
**minutes** 29:3 54:9
**missed** 34:14,15
**missouri** 23:11 48:2 53:21
**misstate** 59:1
**mistake** 53:2 57:7 57:14 59:17,20 65:18
**mistakenly** 60:12
**mode** 81:13
**model** 23:3 50:20 88:3,6
**modern** 87:5
**moment** 11:16 38:14 65:19 73:2 84:18 88:21
**month** 37:5
**morning** 7:10,11
**motorcycle** 48:16
**mouse** 75:14
**mouthful** 22:7
**move** 85:12,17
**movement** 78:22 84:23
**muc** 24:8
**mug** 37:20
**mugging** 24:12 37:17
**muggings** 31:24

**multiple** 20:10 89:19
**municipal** 50:4,6 50:12
**murder** 14:20 78:5,6,14
**murdered** 30:7
**mute** 101:9
**muzzle** 84:25

**n**

**nail** 97:25
**name** 7:15,15,16 24:7 58:25 59:2,6 59:8,24 90:21 104:20
**name's** 7:12
**national** 16:18,18 58:7,24
**nature** 12:13 14:24
**near** 21:12
**nebraska** 48:2
**nebulous** 66:11
**necessary** 105:14 106:3
**need** 8:4,12 21:1 27:1,13 29:11,12 29:14,15 88:21 101:11
**needed** 21:14
**needs** 23:4,7,16
**negative** 52:22,25 53:9 54:12 66:8
**neglect** 83:8
**negotiations** 80:3
**negotiators** 80:5
**neither** 104:16
**never** 16:4 25:10 33:5 44:21,24 70:10 71:3,10,19

**new** 3:9 20:15 42:11,21,23 93:16 100:7,10
**newhall** 69:15
**news** 14:3 37:3 93:13,19,21 94:2
**newsletters** 55:12
**night** 75:5
**nine** 62:16 67:4,9
**non** 24:2 25:22 40:12 85:4
**nonexistent** 57:4
**nonpolice** 37:1 48:7
**nonsworn** 24:2
**normal** 86:8
**north** 21:25 81:19
**norway** 78:11
**nose** 34:20
**notating** 105:15 106:4
**note** 64:12 85:4 93:14 101:20
**noted** 54:13 103:13
**notice** 12:18
**noticed** 66:3,4,14
**november** 105:3
**nowadays** 76:20 79:4
**nra** 37:4
**number** 13:3 50:1 50:10 93:9 100:20 105:15 106:4
**numbers** 91:1,1,2
**nypd** 59:23

**o**

**o0o** 7:7
**oath** 7:5,19
**object** 31:1 36:7 36:19 79:12 80:20

82:8 89:25 92:1,7 95:4
**objection** 8:18 26:10 27:9 28:12 33:11 34:10 38:10 39:10 40:7,23 41:19 42:7 43:8 51:21 58:3 59:14 69:6 70:16,24 72:1 73:7 77:1 80:19,20 81:8 89:10 94:12 95:23 96:17 97:4,9
**observation** 13:19 45:20 53:14 54:13 83:7 89:19 93:8
**observations** 54:1 54:17 92:18
**observed** 62:19 67:9
**observing** 90:3
**obvious** 54:7
**obviously** 17:21 27:13 29:21 38:24 46:14 54:25 76:17
**occasion** 99:14
**occurs** 29:13
**october** 1:17 2:19 7:1 105:5
**odds** 82:1
**offer** 25:25
**offering** 32:20 41:12
**office** 47:20 51:11 105:11
**officer** 14:6 18:17 19:2 20:10,17,17 21:17 22:22 24:2 30:2 31:7 36:3 40:5,21 41:17 44:14 46:10 47:10

**[officer - particularly]**

52:12 59:12 67:10
67:12 68:5,13,21
69:2,17,21 70:6,15
70:23 71:24 75:20
85:11 86:8,15,18
96:7,23 99:12
**officers** 19:4,19
20:2,7,8,8,12
22:11 37:23 40:11
41:3,8 47:7 48:16
53:3 57:13 60:24
61:1,6,12 62:18
63:6,12,17,25
69:18 81:6,23
82:7 83:18 85:6
85:16,25 86:12
98:9,22 99:11
**official** 1:7 2:7
43:2
**oh** 17:14 20:1
53:12 63:2 66:15
**ohio** 76:13
**okay** 8:22 9:9
10:14 11:14,20,25
12:11,17,21 35:21
36:12 39:6 50:11
51:19 52:13,16,18
53:5 59:6,9 60:19
61:2,5,21 62:2
63:20,21 67:8
68:3 75:16 87:10
89:1 91:8,13
101:12 102:3,20
**okie** 8:16
**oklahoma** 48:2
53:20
**old** 22:11 37:8
38:1 44:14 47:4
**olds** 39:21
**olympic** 31:20

**onboard** 22:13
**once** 22:23
**ones** 37:3 59:17
78:19 87:14
**oneself** 26:20
**online** 45:10
**onus** 34:2
**open** 47:17,19
52:21 54:15 56:10
61:23 62:3,9,17,24
63:11,15,18,22
64:5,7,20 65:13,20
65:23,25 66:8,14
66:21,23 68:9,17
68:20 70:8,9
75:17 77:3,21
82:10 89:4,16
93:2,5,9,10 94:15
96:9,15,20,23 97:2
97:8 99:1
**openly** 32:11
52:23 61:8,14
63:13 67:11 69:3
76:25 81:4 82:5
82:18
**opinion** 13:6,12,17
13:21 47:1,14
53:3 54:18 55:23
57:10 61:3,6,12,16
61:18,20 62:3,5,7
62:8 63:5,10,14,19
65:7 68:4,12,15,16
68:20,25 69:1
77:16 81:21 83:7
87:8 89:16,21,21
89:22 90:3 92:15
92:21,22 99:4
100:16,25
**opinions** 51:19
52:9 60:20

**opportunity** 9:2
**option** 26:20 27:4
30:10
**options** 15:10
25:19,23 32:4,5
**orders** 50:2,15,17
**ordinance** 50:4,6
50:12
**oregon** 46:6
**organization**
49:11 50:22
**original** 13:7
104:13 105:10,21
**orthos** 29:12
**outline** 20:6
**outside** 41:10
46:11 57:21 79:14
80:20 82:12
**overall** 37:1 75:1
**overarching** 50:5
**overcome** 31:18
**overhill** 3:7
**overland** 47:19
**overreact** 74:12
**overused** 51:24

**p**

**p.o.** 3:19
**pacing** 74:13,17
**package** 21:5 23:5
23:9,14,16 25:18
75:22
**page** 4:5 5:3 6:2
12:17 52:13 56:4
59:6 60:18 61:21
61:22 62:16 63:3
67:4,9 75:12 89:3
93:13 97:18,19
105:15 106:4
107:4,7,10,13,16
107:19

**pages** 1:24 85:2
105:14,17,17
106:3,6,6
**paid** 11:8 21:24
**paint** 68:8
**panic** 60:23 61:6
**paper** 45:8,17 56:2
81:22 88:13
**papers** 50:1 88:12
89:20
**paperwork** 91:9
**paradigm** 42:14
86:13
**paragraph** 52:20
56:4 60:17 61:22
62:16 63:2,5,20
67:4,9,13,16,17
75:12,16 77:19
85:2 89:3 93:12
97:18 98:17
**paranoid** 34:1
**pardon** 100:20
**park** 47:19
**parking** 43:18,22
65:9,10
**part** 13:13,18
15:19 20:11,18
22:2,9,13 24:4,20
25:1 29:21 32:24
35:2,3,6,17,18
47:21 49:3,10
50:20 53:15,24
62:23 63:19 71:17
75:2 78:22 80:1,7
81:21 83:12,24,24
84:20 88:5 91:8,9
92:24,25 93:7,20
**particular** 27:6
58:23 85:18 99:8
**particularly** 42:22
46:24 59:17

[party - police]

**party**  104:18
**patrol**  18:17,17
   22:3 48:15
**patrolman**  18:16
**pay**  14:7 55:10
**paycheck**  21:21
**paying**  23:21
**pd**  48:19 55:6
**pdf**  102:9 105:12
   106:1
**pederson**  1:21
   2:19 104:23
**peer**  91:22
**penalty**  103:11
   105:16 106:5
**pending**  8:14
**people**  20:1 21:6
   22:1 23:8,20
   24:16 25:16,24,25
   27:1,2,13,16,25
   28:3,19,25 29:13
   32:6,7,21,22 33:23
   36:25 37:7,10
   38:19 40:13 41:13
   42:21 44:24 47:8
   47:15,25 48:4,6,8
   51:10 54:14 55:16
   57:15,21 58:6,9
   62:9 63:17 64:3
   65:7,7,9 66:8 71:5
   71:7,12 72:4
   74:18 77:21 78:3
   78:12,25 79:1
   81:16,17 83:20,23
   83:25 84:8,9,25
   90:7,13,13,18,19
   93:11 97:19,24
   98:6,18 100:12
**people's**  23:7
   99:20

**pepper**  19:6 23:11
   25:2 29:22 30:9
   30:24 31:3 52:3
**perceived**  84:25
**perception**  20:2
   43:3 80:16
**perceptions**  81:1
**period**  64:9
   105:18 106:7
**perjury**  103:11
   105:17 106:6
**permission**  47:9
   98:19
**permit**  42:13
   47:13,14,24 48:1,5
   61:23 64:6,21,22
   100:9,11
**permits**  42:21
**permitted**  96:15
**permitting**  97:7
**person**  8:5 23:23
   24:2 25:21 26:9
   28:2 31:25 33:1,9
   33:15,21 34:2,3,8
   36:13,17 39:8
   40:22 41:18 42:2
   43:10,12 45:1
   46:20 52:23 57:24
   59:12,19 61:7,13
   66:10 67:11 69:24
   70:2 71:14 72:12
   73:6 75:17 76:6
   76:24 78:21 79:6
   81:3,7 82:1,2
   86:22 101:2
**person's**  35:22
   67:12 68:5,22
   69:4 71:2 73:3
**personal**  13:19
   25:11 26:4 45:19
   53:14,25 54:17

92:17 93:1
**personally**  26:14
   51:23 66:3 71:2
**persons**  32:10
   97:22 98:1
**pertained**  10:21
**pertains**  104:12
**pertinent**  13:25
   14:5 15:24 16:12
   73:16
**phone**  9:17
**photos**  81:15
**physical**  30:11
**physically**  28:10
   28:18 29:1,14
**pick**  29:3 33:5
   42:21
**picked**  25:17
**pickup**  71:6
**picture**  68:8 72:18
**pictures**  20:5
   44:23
**pid**  20:13
**pile**  87:11
**pipe**  79:3
**pistol**  17:24 18:5
   23:6,6 38:1 44:17
   54:3,6
**place**  31:19 64:2
   104:5
**places**  16:4 20:15
   48:3 53:23 56:16
   100:4
**plainclothes**  20:8
   20:17 86:16
**plaintiff**  1:5 2:5
   3:3
**plaintiff's**  12:21
   14:10 100:24
**plaintiffs**  7:23

**planet**  33:22 83:3
**platoon**  17:9,10
**play**  72:11 77:14
**playing**  44:22
**plays**  85:1
**please**  8:23
**pllc**  3:4
**pluck**  98:13
**pluses**  25:12
**point**  17:9 18:10
   18:23 19:12 21:3
   21:4 30:1 44:13
   48:12 56:1 59:18
   64:10,19 66:12
   73:15,17 93:1
   97:10 100:18
**points**  87:22
**police**  9:22,23
   10:21 14:6,17
   15:9,20 16:12,16
   16:22 18:14 20:10
   21:15 22:6,14
   23:10 24:2 30:2
   31:7 32:15 36:3
   37:22,23 41:3,4,5
   49:3,9,16,18,25
   50:16,22 51:7,8,25
   52:2,5,12 53:3,11
   53:16 54:21,22
   55:11 56:6,18,20
   57:1,5,7,8,19,22
   60:12,15,23,25
   61:1,6,12 62:10,18
   63:6,11,17,24
   64:13 65:3 66:5
   68:4,12 69:12
   70:11 74:3,10,22
   77:23 80:7 82:15
   83:1,3,15,18 86:9
   86:12 87:18 88:5
   93:10 95:7 98:9

Veritext Legal Solutions
866 299-5127

**[police - putting]**

99:5,9,11
**policy** 49:24,25
  50:1,5,17,18,20,25
  51:1,6,8,17 94:16
  96:1
**political** 60:24
  83:9,24 89:22
**politics** 83:7
**ponder** 40:17
**pool** 98:13
**poorly** 54:5
**popow** 56:19,22
**popular** 25:1
  99:25
**population** 94:3
**populations** 28:25
**porch** 56:24 57:1
**port** 64:15
**pose** 63:16 76:25
**posing** 75:19
**positions** 17:3
  48:10
**positive** 20:13
  54:12 81:23
**possess** 42:4 97:19
**possibilities** 32:7
**possibility** 66:6
**possible** 8:17 31:6
  32:4 55:15 80:10
  85:20
**possibly** 31:11
**post** 77:21 85:8
**posture** 84:22
**potentially** 41:25
**pounds** 29:4
**practice** 69:11,21
**practices** 10:21
**pre** 24:5,20 77:21
**prearranged**
  89:21

**precedent** 85:3
  87:2,3
**precedents** 46:24
**precise** 78:14
**prefer** 78:5
**preliminary** 91:6
**preparation** 9:16
  12:4 16:14
**prepare** 9:14 12:5
**prepared** 40:5,21
  41:17 42:5
**preparing** 14:11
**presence** 70:14,22
  71:23 82:18
**present** 3:24
**pretty** 12:8 37:14
  55:5 58:16 79:18
  82:1
**prevent** 9:11 43:5
  57:12
**prevented** 35:11
**previous** 63:1
**previously** 8:1
  77:7 101:2,6
**price** 11:9
**primarily** 22:25
  54:19
**primary** 19:15
  21:2,3
**prime** 29:2
**prior** 104:7
**prison** 25:16
**pro** 11:10
**probable** 76:4
**probably** 14:16,23
  14:25 18:3 28:4,4
  33:3 39:18,19
**problem** 29:16
  32:2 41:10 68:18
  70:8,10,11 71:20
  82:3

**problematic** 83:8
  83:10
**problems** 62:11
**procedure** 105:19
  105:20
**proceedings** 47:21
  104:4,6,8,14
**process** 33:15 35:3
  35:7 36:14 71:17
  72:21
**profession** 98:15
  99:16
**professions** 99:17
  99:18
**professor** 91:23
**profile** 59:18
**profoundly** 33:25
**program** 19:19
  20:25
**progress** 78:6,14
  79:25
**progressive** 41:12
  69:12
**promoted** 19:3
  48:22
**promotion** 48:13
**pronounce** 59:24
**proper** 20:19 56:6
  57:10
**properly** 32:11
  102:15
**property** 43:18
**proponent** 29:22
**protest** 50:9 82:17
  83:25
**protests** 50:8
**protocols** 19:21
**prove** 42:11
**provide** 12:22
  13:20 36:21 88:17
  100:24

**provided** 13:23
  14:7 102:16
  105:19 106:8
**psychotic** 34:1
**public** 15:2 27:8
  28:10 30:16 32:12
  32:14 45:4 46:1
  48:8 49:24 50:5
  51:1,6,17 52:22,22
  52:24,25 53:10
  54:16 56:7 57:5
  57:25 58:1 59:10
  60:24 62:15,19,20
  63:7,13,23 65:16
  65:20,24,25 66:22
  66:23,24 73:25
  74:21 75:19 76:25
  89:5,17 93:14,15
  93:17 94:11,13
  95:1,21 96:1
**publications** 55:11
**publicly** 96:12
**publish** 45:6
**published** 45:3
**pull** 28:1 50:9
  69:22,22 70:2
**pulling** 10:9 34:20
  74:23
**purse** 31:24
**purview** 92:3
**push** 25:21 65:7
  70:9 89:22 90:14
**pushing** 90:6,8
**put** 13:8 23:15
  24:6 39:2 66:13
  90:6 102:12,14
**putting** 25:16
  84:24 86:24

Veritext Legal Solutions
866 299-5127

[qualification - research]

| q | | | |
|---|---|---|---|
| **qualification** 41:4 | **rapidly** 67:12 68:5 | **recall** 14:7 82:15 | **related** 45:4 |
| **qualifications** | 68:22 69:4 85:19 | 82:20 | **relationship** 64:11 |
| 22:24 | **rate** 52:6 53:22 | **recess** 67:6 101:23 | 66:4,13 |
| **qualify** 17:18,24 | 64:18 98:12 | **reciprocity** 47:25 | **relative** 104:17 |
| 17:24 | **rates** 89:9 91:25 | **recognition** 20:19 | **released** 105:21 |
| **quality** 32:16 | 94:4 | 21:8 24:21 25:4 | **relevant** 65:4 |
| **quantify** 39:16 | **reach** 54:18 72:4,5 | 32:2 80:8 | **relied** 91:16 92:20 |
| 58:14 87:13 98:2 | 72:5 74:7 75:14 | **recognize** 11:25 | **religion** 95:13 |
| **quantity** 32:16 | **reached** 57:20 | **recognized** 52:7 | **rely** 13:5 54:18 |
| **question** 8:8,10,14 | **reaching** 13:5 | **recoil** 45:7 | 55:22 |
| 8:15,17,19,19,21 | **react** 73:22 81:6 | **recollection** 59:4 | **remotely** 1:16 |
| 8:23,24 39:7,12 | 82:7 | **recommend** 25:8 | **rephrase** 8:24 |
| 58:15 70:19 91:18 | **reaction** 74:23 | 25:10 27:6 28:10 | **replacement** 29:11 |
| 94:18,22 96:19 | **read** 9:19,23 10:1 | 28:17 29:19 | 29:12 |
| **questions** 6:1 36:1 | 12:4 13:7,10 14:3 | **recommends** 31:3 | **replicate** 20:14 |
| 101:8,14,25 102:3 | 24:10 45:18 61:19 | **reconnaissance** | **report** 5:4 52:14 |
| **quiet** 79:22 | 62:7 63:14 67:20 | 17:4 | 66:21 67:10 93:20 |
| **quite** 14:1 16:8 | 77:23 89:12 96:11 | **record** 7:15 9:6 | 93:22 94:3 |
| 23:18 40:13 46:2 | 103:11 | 11:16,17,18,20 | **reported** 1:21 |
| 54:4 57:6 58:12 | **reading** 13:24 | 26:5 67:5,8 88:20 | **reporter** 2:20 |
| 64:10 71:9 72:16 | 30:24 69:1 72:12 | 88:23,25 101:5 | 102:4,8 104:2 |
| 74:12 98:2 | 72:14 105:23 | 102:1 104:7,11 | **reporter's** 8:3 |
| **quote** 65:24 | 106:9 | **recording** 8:3 | **reports** 93:13 |
| r | **real** 9:15 12:8 | **recruit** 19:11,16 | **represent** 7:12 |
| **r** 3:15 7:17 107:3,3 | 79:22 99:24 | 22:11 | **request** 102:18 |
| **r&s** 106:1,9 | **realities** 90:12 | **refer** 91:14 93:13 | **requested** 104:15 |
| **rabid** 78:13 | **reality** 93:2 | 102:15 | 106:1,9,10 |
| **race** 32:17 | **realize** 33:22,24 | **referenced** 105:6 | **requests** 102:13 |
| **ragweed** 85:22 | 35:4 | **referring** 13:14 | 102:13 |
| **ran** 29:6 | **really** 10:12 13:18 | 26:6 30:18 58:22 | **require** 27:3 |
| **raney** 10:2 13:9 | 21:11 34:2 40:10 | 58:23 67:21,25 | **required** 17:18,23 |
| 61:5,11 62:2 | 40:17 43:3 51:18 | 87:2,3,6 94:14 | **requirement** 41:3 |
| 63:10 68:3,11,19 | 71:3 72:10 79:6 | **reflect** 12:9 | **requires** 25:5 |
| **raney's** 60:20 | **realm** 54:16 | **refresh** 59:4 | **rereading** 62:5 |
| 67:10,22,25 | **reason** 39:20 | **regard** 50:24 95:1 | **research** 13:11,16 |
| **range** 19:15 32:1,7 | 42:12 53:24 66:19 | 95:21 | 16:10 45:15,16,22 |
| **rankings** 93:14,22 | 91:20 107:6,9,12 | **regardless** 81:13 | 55:22 86:6 87:7 |
| **rapid** 20:4,24 21:6 | 107:15,18,21 | **regional** 19:9 94:9 | 87:10,21 88:15 |
| 79:24 85:9 88:6 | **reasons** 57:16 | 94:24 | 89:7,24 90:7 |
| | 87:20 88:4 | **regular** 14:2 55:16 | 93:25 99:7 100:15 |
| | | | 100:16,22,24 |

Veritext Legal Solutions
866 299-5127

[researcher - see]

**researcher** 51:16
100:19
**resist** 58:9,17
**resource** 48:16
**resources** 60:25
**respond** 19:22
23:23,25 24:23
43:4 82:9 86:3
**responded** 21:9
32:24
**responding** 20:19
61:7
**response** 20:4,20
20:25 21:6 25:6
39:3 50:21 52:5
79:24 85:9,24
86:9,24 87:18
88:5 94:11,13,15
95:1,21 96:1
**responsible** 19:12
**rest** 98:16
**restate** 94:21
**result** 62:3
**results** 67:16
68:14,23 71:25
**retained** 7:22 9:22
14:17,19,21
**retention** 19:8
23:12 44:5
**retired** 16:17 22:4
22:22 41:16 47:7
48:21 98:22
**retirement** 21:20
21:22 57:21
**retiring** 21:18
**return** 105:17
106:6
**review** 9:3 102:7
104:14 105:8,10
105:13 106:2

**reviewed** 10:24
51:14 91:6,22
92:3
**revolver** 34:20
**revolvers** 45:12
**richard** 1:4 2:4
**ridiculous** 53:13
**rifle** 17:25 37:9
46:15
**rifles** 18:6 71:5
**right** 19:24 33:17
38:4 42:16 48:25
55:2 57:9 61:25
62:21 67:17 75:17
83:18 84:18 85:22
86:22 89:5,8
91:23 92:18 93:16
93:17 95:11 99:2
101:18
**rights** 73:21 99:20
100:19
**riot** 55:6
**risk** 63:16
**rival** 90:20
**rmr** 1:22
**road** 3:7 22:3
**rob** 1:7 2:7
**robberies** 31:25
58:10
**robbers** 62:12
**robbery** 14:22
26:18 34:17,24
**robot** 83:16
**rocket** 18:2
**role** 11:2 17:17
19:1,17 20:21
21:2,4 49:12
**roles** 16:17 17:7
18:15 22:16
**rounds** 60:1

**routine** 70:13,21
71:22
**row** 100:1
**rub** 29:9
**rules** 106:8
**run** 21:6 29:3 64:5
65:8 70:4
**running** 38:20
56:23,25 58:19
83:20 84:11,19

**s**

**s** 1:5,10 2:5,10 3:3
3:13 107:3
**sacramento** 3:20
**safe** 44:25 69:24
**safely** 27:15 33:1,9
34:9 35:24 36:13
36:17 38:8 39:8
40:1,6,22 41:18
42:5 45:2
**safer** 26:9
**safest** 33:7 58:10
**safety** 27:18 51:1
51:6,17 52:23,25
53:1,10 54:16
56:7 57:5 63:23
65:16,20,24,25
66:22,23,25 69:21
70:6 89:5 93:14
93:15 94:11,13
95:1,21 96:1
**sailboat** 31:21,22
**saw** 76:16,16
**saying** 38:1 54:10
61:18 67:20,21
73:4 84:5
**says** 24:19 66:21
91:15
**scan** 12:14
**scarsdale** 3:9

**scenario** 20:20
24:22 25:5 32:5,6
34:23 36:10,21
37:14 38:23 39:2
55:2,8 70:18
72:15 73:12,14
79:8,25 80:4,9
**scenarios** 24:23
26:15 30:13 34:13
**scene** 67:11 69:3
80:15 83:18 84:11
84:12,19,21 86:12
86:23 88:9
**schedule** 105:10
**schizophrenic**
34:1
**scholarly** 45:17
**school** 48:16
**science** 16:2,10
**scope** 79:14 80:21
82:12
**scratch** 20:23
**screen** 11:14,21
38:21 52:16
**screws** 21:21
**se** 33:14
**seat** 72:4
**seats** 71:7 72:6
**second** 48:14
62:25 67:15 68:13
68:23 71:24 72:10
72:23 77:9 101:16
**seconds** 38:2
88:21
**secure** 44:1,2
**security** 22:22
25:18
**see** 11:21 37:8,12
37:22 48:7 52:16
53:22,23 54:6
56:24 62:25 64:8

Veritext Legal Solutions
866 299-5127

[see - sort]

64:20 65:4,11,12
66:3,10 69:19
70:11 71:4,9,10,18
72:9,20 73:21
74:5,10 76:17
78:24 79:5 81:25
83:20 91:12
**seeking**  41:10
**seen**  20:5 72:4
83:11
**segueing**  83:21
**self**  27:12
**selling**  90:22
**send**  11:7 12:15
102:9
**sending**  102:7
**sensation**  80:15
**sense**  28:7
**sent**  91:12
**sentence**  67:3
**sentencing**  94:7
**separate**  14:23
**sergeant**  17:9
18:17 19:3
**serial**  78:6,14
**series**  14:22,23
**seriously**  21:11
**serve**  16:24
**served**  14:13
16:23 48:10 49:12
49:15,18,21 96:6
**service**  19:11,16
21:5 23:9
**serving**  27:12
**set**  9:25 85:18
104:5
**setting**  24:12
65:19
**seven**  52:13
**share**  11:14

**shawnee**  22:14
**sheriff**  22:12
49:22
**sheriff's**  21:25
49:20
**shift**  18:19 48:11
48:14,14 49:7
**shifts**  49:6,6
**shirt**  24:19
**shoot**  27:2,21
34:25 41:4 53:13
61:12 63:12
**shooter**  20:4 21:9
77:25 78:1,8,16,17
78:23 79:2,7 81:5
82:16 85:5,25
86:2 87:14
**shooters**  87:4
**shooting**  20:17
35:18 55:5 56:8
56:23 57:14,15
59:20 61:1 62:18
63:6,17 78:17,25
79:9,20 81:25
82:20 86:14
**shootings**  37:2
53:2 57:8,12
59:17 65:3,18
99:12
**shoots**  37:9
**shopping**  75:24
**short**  21:24
**shorthand**  2:20
104:1,9
**shortly**  21:18 22:1
**shorts**  81:18,20
**shot**  44:15,18,22
57:1 58:2,15,16
59:11,20 60:3,12
60:15

**shotgun**  46:15
**shotguns**  71:5
**shots**  38:2
**show**  11:15 42:10
53:11 85:17 88:3
**showed**  20:9 57:7
79:21 85:15
**showing**  86:12
**side**  22:21 31:10
40:16
**sidewalk**  73:25,25
74:13 75:6
**sign**  12:11,14
24:18 105:16
106:5
**signature**  104:23
105:21,23,23
106:9
**signed**  12:19,19,22
**significant**  38:20
39:3 64:14
**signs**  43:16
**silly**  75:13
**similar**  37:15
49:21 50:12
**simple**  27:16
**simply**  60:22
61:13
**simultaneously**
48:14
**sinks**  31:21
**sir**  7:24 10:6 11:1
12:10,20 14:9,14
21:18 22:18 45:18
48:11 49:17,19
51:15 52:17 56:2
89:6,13
**situation**  33:10
34:8,24 35:10,11
35:23 80:8

**situational**  73:11
**situations**  26:24
27:3 30:2,3 31:18
34:7 35:22
**six**  18:18
**size**  34:18
**skills**  24:24 44:5
**slow**  80:4 98:23
**small**  44:22 74:1
**smaller**  45:11
**smart**  27:25
**snatchings**  31:24
**sneaky**  24:17
**sniper**  18:22
**snub**  34:20
**solo**  85:24 87:18
88:5
**solutions**  105:7
**solve**  29:16 68:18
70:11
**solving**  70:8
**somebody**  33:19
33:25 39:2 44:16
54:3,8,9 69:19,22
69:23 74:2 75:2,8
76:20 78:6 84:11
86:21 90:15,16
99:22
**somebody's**  53:6
**someplace**  43:16
43:25 54:2 75:7
84:10
**sorry**  26:7 39:14
61:22 63:2 85:21
101:10
**sort**  16:2 26:19
27:14,23 41:13
51:3 55:21 58:10
62:15 64:14 71:8
77:11 85:1 91:2,4
98:11 99:20

Veritext Legal Solutions
866 299-5127

[sounds - susceptible]

**sounds** 27:11

**sources** 100:20

**south** 49:3

**space** 65:10

**speak** 8:5 10:4,20
25:12 92:25

**speaking** 42:14
65:5 97:21

**speaks** 76:13

**specialist** 17:4

**specialties** 44:4

**specific** 14:8 19:23
44:13 56:2 70:17
74:21 88:13,15
90:20 94:17

**specifically** 82:11
90:4 94:13 100:17

**speculation** 60:21

**speech** 95:11

**speeding** 44:18,19
69:22

**spell** 7:15

**split** 67:15 68:13
68:23 71:24 72:10
72:23

**spoke** 12:6 60:2

**spontaneously**
62:18 63:12

**spot** 62:5

**spray** 19:7 23:12
25:2 29:23 30:9
30:24 31:3 52:3

**springsteen** 60:2

**squad** 17:8 18:22

**square** 86:14

**stabber** 78:9

**stabbing** 78:25

**stability** 39:23

**stacks** 99:16

**staff** 21:13

**stakeholder** 51:6
51:12

**stalker** 25:17

**standard** 69:11,21

**start** 8:10 33:6
75:13 81:25

**started** 17:2 18:16
46:8,22 64:12
66:15

**starts** 82:20

**state** 1:8 2:8 7:14
15:7,14,17,18,18
15:25 19:10 28:1
32:19 33:19 38:9
38:13,14,23 39:9
41:2,6 42:10
43:17 46:3,11,16
47:22 51:2 52:20
60:20 61:22 62:17
63:15,22 65:13,23
73:18 75:16 85:3
89:4 93:2,3 95:11
95:12,14,14 97:3
97:19 99:1 100:9
103:17 104:2
105:9,12

**stated** 28:2 82:18
83:22

**statement** 9:24
11:12 83:10 90:14

**statements** 100:2

**states** 1:1 2:1
53:18 64:16 67:10
87:5 89:19 93:3,3
93:4,15 94:5 95:8
95:16 98:9 100:6

**stating** 56:6

**statistic** 58:19

**statistical** 64:11
92:2

**statistically** 58:11
58:16 90:10 97:21
98:6

**statistician** 92:8
92:12 93:24

**statistics** 58:22
59:1,7 66:13
89:20 93:25 97:25
99:15

**stats** 58:7 64:16

**stay** 55:9,20 99:3

**steps** 27:6 30:15
30:18,23,25

**stimulus** 79:5
80:11

**stipulation** 105:20

**stolen** 43:6,9,12
44:9,15

**stop** 35:15 69:23
70:14,21 71:22
76:4,5,19,20

**stopped** 44:19

**stops** 71:4 86:23

**storage** 44:25

**store** 43:20,21

**strategos** 16:20

**street** 3:17 24:10
31:23 34:17 37:13
37:15,16,16 41:22
54:14 59:25 77:23
90:13 99:5

**stress** 36:14

**strict** 47:12

**strictly** 45:10

**stuck** 44:23

**studied** 45:19
83:11

**studies** 89:15 90:5
91:21,22 92:5,6,17
92:21,23

**study** 87:5

**stuff** 50:23,24
53:23 55:12 66:15

**stunt** 74:22

**subdivision** 74:1

**subject** 30:11 81:1
88:13

**submissions** 91:7

**subscribed** 104:20

**subway** 34:15

**success** 88:6

**successful** 87:16
87:17,23,23,24
88:1,10

**successfully** 86:23

**suffer** 58:18

**suffered** 83:7

**suffering** 74:15

**sufficient** 30:3

**suit** 81:16

**suite** 3:8,18

**sunny** 54:11

**supervising** 19:3

**support** 13:17,21
55:15,22 92:22

**supports** 87:7
100:16,25

**suppose** 27:25

**supposed** 38:21
43:19,21

**sure** 8:6 13:13
30:23 32:13 35:20
38:17 39:16 41:14
58:14 60:5 61:9
62:6 63:4 73:13
78:20 88:21 91:11
94:19 100:1
102:17

**surprise** 24:16

**susceptible** 28:22

Veritext Legal Solutions
866 299-5127

**[suspect - tool]**

**suspect** 37:1,25
56:25 72:18 80:11
80:13
**suspects** 85:5,19
**swat** 18:20 80:5
81:20 84:15
**swimmer** 31:20
**switched** 100:9
**swords** 78:11
**sworn** 22:13 104:7
**sympathy** 29:1
**system** 41:6 47:13
47:14

**t**

**t** 24:19 107:3,3
**tactfully** 32:13
**tactic** 19:17
**tactical** 16:21 45:9
57:17
**tactics** 19:7 52:4,5
69:25 70:4 78:21
83:6 85:18
**take** 8:12,15 21:22
27:7 30:14 31:15
37:2 38:17 51:9
71:15 77:9 85:13
87:4 90:24 97:24
101:11 102:10
**taken** 2:17 7:25
21:11 44:7 104:4
**takes** 87:24 88:10
**talk** 10:11 24:13
34:2 36:2 43:14
53:25 77:25 78:4
90:13
**talked** 13:23 45:10
**talking** 24:1 26:12
36:2,5 37:13 38:4
59:2 60:7 73:14
73:16 76:14 82:9
84:5 87:12,13

93:8 95:16 98:24
101:20
**talks** 62:23
**targeted** 66:9
**taser** 19:6 52:4
55:8
**taught** 29:23
**teach** 78:21
**teaching** 44:6 55:3
**team** 18:20,23
85:9,11,17 86:1,8
87:19,23 88:2
**teams** 80:5 86:11
**technicality** 21:19
**tell** 10:17 14:2
17:6 54:5 71:2
84:1
**tells** 98:3
**tend** 37:18 98:12
100:13
**tends** 88:10
**tennessee** 95:10
**tense** 79:18 80:25
**term** 17:5 51:23
62:13 78:2,15
86:20
**terminal** 52:2
**terms** 36:3 89:16
93:15
**terrific** 13:1
**territory** 90:23
**terry** 76:5,13,20
**testified** 7:6 15:1
55:25
**testifying** 7:18,19
9:12 96:18 104:7
**testimony** 31:2
92:9 103:14
104:11
**texas** 48:2 53:20

**thank** 59:9 88:19
88:24 101:22
102:22
**thanks** 36:6
101:18
**that'd** 100:23
**thing** 8:13 14:22
16:2 20:13 26:19
27:19 28:21 45:10
50:3 51:4 54:25
55:20,21 57:23
58:10 64:14 71:8
73:11 74:11,11,24
75:10 77:11 85:1
91:2,4 97:12
98:11 99:2,21
**things** 14:3,4,6
15:18 16:1,10,11
18:7 19:6,8 20:9
22:24 23:8 24:21
27:1,25 31:24,25
37:20,20 39:17,22
41:8 42:24 43:2
44:1,20,25 45:12
45:18,19 46:4,6,14
46:15,18,24 50:2
50:17 51:8,9 52:6
54:7,20,22,23 55:4
58:1,8,9 59:11
61:17 62:10 64:13
64:17 65:3,9,18
66:11 70:1,5 72:4
72:6,8,9,25 74:25
77:6 79:22 80:2,3
80:5,6 87:17
90:23,25 94:7
95:9 98:10,11,18
99:6,8,13
**think** 11:12 17:12
27:5,22 31:19
34:4 39:1,17

40:13 50:2 51:15
51:23 58:16 60:14
63:1 70:7 73:15
79:3,13,23 83:17
86:9 91:8 100:15
**thinking** 9:11 36:9
**thirty** 77:20
**thought** 29:13
57:22 74:2
**thoughts** 12:7,9
**threat** 20:19 43:3
75:19 76:25
**threatening** 24:11
**three** 19:14 29:12
34:17,19 37:25,25
38:2,2,2 49:5,5
85:16 93:14
**throat** 26:13
**throwing** 79:3,21
**ties** 81:17
**time** 8:5,12 22:2,9
22:13 29:4,23
31:7 44:6 46:9,22
47:5 54:13 58:13
64:9,24 75:13
77:5,13 84:16
86:1,15 88:2
93:18 104:5
105:10,18,24
106:7
**timeframe** 48:18
**timely** 86:4
**times** 14:15,25
29:9,25 90:9
**titles** 88:12 100:21
**today** 9:4,10 10:23
45:24
**today's** 9:14
**toddler** 44:3,12
**tool** 26:23,25 27:3
30:1,11

Page 22

**[tools - utah]**

**tools**  29:15
**top**  55:9,20 93:14
**topeka**  1:16 2:17
  7:1 16:16 18:14
  21:15 22:5 48:19
  49:4 50:7,15
  64:18 79:19
**topics**  45:4
**totality**  52:11
  76:21
**totally**  67:1
**touched**  16:7
  22:17
**touching**  37:21
**tough**  38:5
**town**  54:3 75:7
**traffic**  70:14,21
  71:22
**tragedies**  20:14
**tragic**  69:14
**trail**  46:6
**train**  17:18,24
  23:25 30:14 43:5
  69:13
**trained**  18:8 81:11
  81:22 83:3
**trainer**  16:18
  18:25 21:3 53:16
  53:18 57:19
**trainers**  21:4
**training**  10:21
  13:7 14:20 16:11
  16:19 19:2,3,4,11
  19:11,13,16,20
  20:12,18,22 21:5
  21:11 22:3,25
  23:1,16,18,19,20
  23:21 24:4 25:1
  25:24,25 26:1
  27:12,14,23 28:5
  29:21 30:24 31:17

32:16,20 33:2
  37:11 41:1,10,12
  41:13 49:9 52:1
  52:11 53:20,20
  56:7,13,20 57:5,9
  57:11,22 63:24
  65:14,16,19 80:1,7
  81:24 83:5,6,6
  85:11
**trainings**  23:22
**transcribed**  104:9
**transcript**  9:3,5
  103:12 104:10,13
  104:15 105:6,8,10
  105:13,13,21
  106:2,2
**transition**  79:23
**transitioned**  80:8
**transports**  43:1,2
**travel**  48:5 93:3
**travelling**  53:18
**travels**  45:20
**trend**  85:8
**trends**  55:9,18,18
**trial**  14:20
**trials**  14:24
**tried**  47:4,19
**tries**  68:8
**trolley**  86:14
**trouble**  36:9
**truck**  17:20 71:6
  82:6
**true**  93:18 97:5
  103:15 104:10
**truth**  75:21
**truthfully**  9:12
  11:9
**try**  8:4,7,9,24
  11:14 13:16 23:3
  32:3 33:24 55:9
  71:15 80:12

**trying**  55:20 60:8
  71:13 74:9 84:8,9
  84:24 92:5 98:25
  99:2
**tuesday**  1:17 2:19
  7:1
**turn**  51:19 65:5
  74:9 88:22
**turned**  14:23 55:6
  74:20 91:16
**turning**  34:23
  35:17
**two**  10:13 21:9
  23:11,12 29:3,11
  30:12 33:14 88:1
  97:11 100:10
**type**  21:11 23:4
  24:2,11,21,21
  42:10,14 44:20
  45:8,10,17 74:10
  74:22 80:9 97:12
**typically**  85:11

**u**

**u**  24:8
**u.s.**  93:13,19,21
  94:2
**ugly**  33:18
**uh**  14:12 56:5
  92:11
**ultimately**  60:25
**unarmed**  56:9
  58:2 59:13
**uncommon**  68:4
  68:12
**unconcealed**  47:23
**unconstitutional**
  47:2
**undercover**  40:21
  82:2
**undersigned**  104:1

**understand**  7:18
  8:23,25 61:5,11,17
  62:2 63:10 68:3
  68:11,19
**understanding**
  10:22 35:20 60:5
  94:18 96:14
**unfortunately**
  41:2
**uniform**  82:3
**uniformed**  20:9,16
  36:3
**unit**  17:11 18:25
  48:16 60:1
**united**  1:1 2:1
  64:16 87:5 95:8
  95:16 98:8
**university**  15:7,15
  15:17,19,25 16:1
  23:10
**unknown**  24:8
**unlawfully**  98:18
**unsecured**  44:16
**update**  23:12,12
**upgraded**  18:5,6
**upper**  62:23
**ups**  54:23
**uptick**  64:23 65:2
**usage**  78:3
**use**  14:17 16:12
  19:5,12,18 30:3,4
  35:1 40:5,22
  41:17 42:5 50:17
  51:8,12,25,25 52:3
  58:17 83:5 86:20
  95:8 99:9,13
**uses**  33:1,9 36:13
  36:17 38:8 39:8
  40:1
**utah**  53:21 86:14

Veritext Legal Solutions
866 299-5127

**ER416**

[utility - works]

**utility** 26:24
**utilize** 58:11 70:3 71:17 78:3 80:5 88:3 89:20
**utilized** 52:5 83:15
**utilizing** 18:25 39:19 45:11

**v**

**v** 7:14 56:17,19 76:13 95:9
**vacation** 21:24
**valid** 56:20
**variety** 20:7 94:7
**vast** 37:7,9,19,23 50:23 88:2
**vehicle** 17:7
**verbal** 16:13 24:24 24:24 33:24 34:22 35:14
**veritext** 102:9 105:7,9,11
**vermont** 100:7,8
**version** 12:19
**versus** 56:21 72:13 82:19 86:24 87:18 94:5 95:9,12,14
**vicinity** 83:25
**victim** 26:17 37:22 58:17
**victimized** 38:24 39:6,11
**victims** 55:17 58:6 84:25
**video** 72:19 74:22 81:18
**view** 37:1 89:15
**views** 45:25
**violating** 99:20
**violence** 64:13
**violent** 26:17 89:9 91:25

**virtually** 28:20 29:6 98:8
**visible** 54:4 72:13 73:23,24
**volume** 1:18 2:16 4:3
**volunteered** 11:10
**vs** 1:6 2:6 105:4 107:1
**vulnerable** 28:24

**w**

**wait** 85:16 86:1,5
**waited** 20:3
**waiting** 87:18
**waived** 105:23,23
**waiving** 105:20
**walk** 34:16 54:1,8
**walked** 71:4
**walking** 73:24 75:5,23
**wallet** 60:2
**walmart** 54:2 75:8
**want** 20:14 23:11 25:20,24 26:1 27:17 28:4,5,21 35:25 43:24 44:10 50:10 59:1 60:5 62:13 64:20 71:16 78:4,14 80:4 83:22 98:14,14 102:5
**wanted** 10:17 20:24
**washington** 15:17
**waste** 60:24,25
**watershed** 19:25 21:7
**way** 33:7,14 46:9 47:4 58:10 61:10 67:2 73:5 99:2

**ways** 32:3 67:3
**we've** 14:1 45:24 65:15 78:10 101:20
**weapon** 19:8 23:12 44:5 70:3,3 71:17
**weapons** 71:9
**wearing** 71:7 73:23 81:16,18,20
**week** 31:13,14
**weeks** 9:25
**weigh** 15:10
**weight** 34:3
**weirdly** 46:20
**went** 47:6,12 64:2 78:19 86:2
**whack** 90:22
**wheel** 28:6
**whereof** 104:19
**wide** 20:6 77:3
**wider** 19:1
**win** 34:18
**window** 71:5
**wire** 45:9
**wise** 3:15 4:6 7:9 7:12 11:18,19,24 13:1,2 26:22 28:8 29:17 30:22 32:9 34:6 35:9 36:5,11 38:6,16 39:13 40:19 41:15 42:1 42:15 43:11 52:8 56:3 58:21 60:4 67:7,23,24 69:9 70:19,20 71:21 73:1,13 75:11 77:15,18 80:14 81:2 82:4,14 88:24 89:2,14 91:5,17,19 92:4,11

92:14 94:15,19,23 95:18 96:3,20 97:1,6,17 101:13 101:17,22 102:1,6 102:12,17,20,22
**witness** 4:1 10:20 11:23 14:13,17,21 26:12 27:11 28:14 28:17 30:20 31:5 33:13 34:12 36:9 36:24 38:12 40:9 40:25 41:21 42:9 51:23 56:1 58:5 59:16 69:8 71:1 72:3 73:9,15 77:3 79:17 80:24 81:10 89:1,12 90:2 91:13 95:6,25 97:10 101:19 102:7 104:19 105:13,16 106:2,5 107:24
**witnesses** 104:6
**word** 17:5 25:3 32:13 33:18 51:12 79:17
**wording** 67:3
**words** 62:7
**work** 11:5 12:21 18:13 21:16 50:11 50:13 68:4,12 70:12 77:23 88:16 99:5 100:23
**worked** 25:13 44:21 50:25 51:5 51:16
**working** 19:19 21:15 22:9 31:13 41:9 48:17
**works** 21:22 27:21

Veritext Legal Solutions
866 299-5127

**ER417**

**[world - zuchel]**

| | z |
|---|---|
| **world**  54:22 56:18 | **zuchel**  56:17 |
| 57:8,22 64:2,6,6 | |
| 64:13 69:12 93:13 | |
| 93:20,21 94:2 | |
| **worried**  71:10,11 | |
| 71:19 | |
| **worrisome**  72:9 | |
| 72:25 | |
| **worry**  32:21 71:3 | |
| **wrap**  101:16 | |
| **write**  54:23 | |
| **writing**  50:18 | |
| 102:14 | |
| **written**  45:7,9 | |
| 50:1,4,17 69:16 | |
| **wrong**  57:15 63:17 | |
| **wrote**  12:7 85:24 | |
| **wyatt**  46:4 | |
| **wyoming**  53:21 | |

| x |
|---|
| **x**   106:1 |

| y |
|---|
| **yards**  37:25 38:2 |
| **yeah**  12:24 23:15 |
| 33:3,3 36:5 45:12 |
| 60:10 62:25 67:23 |
| 84:2 88:15 100:23 |
| 101:10 |
| **year**  10:12 22:4 |
| 37:8 39:21 49:14 |
| 53:19 55:1 58:8,8 |
| 58:20 |
| **yearly**  17:19 |
| **years**  18:18,21 |
| 19:14 41:22 49:1 |
| 49:1 55:19 66:17 |
| 77:20 93:9 99:5 |
| **yep**  9:1 |
| **york**  3:9 20:15 |
| 42:11,21,23 |

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

COSCA LAW CORPORATION
CHRIS COSCA   SBN 144546
1007 7th Street, Suite 210
Sacramento, CA 95814
916-440-1010

AMY L. BELLANTONI
THE BELLANTONI LAW FIRM, PLLC
2 Overhill Road, Suite 400
Scarsdale, NY 10583
Telephone: 914-367-0090
Facsimile:  888-763-9761
*Pro Hac Vice*

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

-------------------------------------------------------x

MARK BAIRD and
RICHARD GALLARDO,

                    Plaintiffs,

          v.

ROB BONTA, in his official capacity
as Attorney General of the State of California,

                    Defendant.

-------------------------------------------------------x

**Case No.: 2:19-cv-00617-KJM-AC**

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

NOW COME Plaintiffs, MARK BAIRD and RICHARD GALLARDO, by and through their counsel, and allege against Defendant California Attorney General Rob Bonta as follows:

### NATURE OF THE ACTION

1.  This is an action for declaratory and injunctive relief proximately caused by the actions of the defendant for violations of the plaintiffs' Second and Fourteenth Amendments to the United States Constitution pursuant to 42 U.S.C. § 1983. This action seeks to turn back the hands of time to pre-Mulford Act California and the free exercise of the Right to open carry a handgun for self-defense, consistent with this Nation's history and Second Amendment traditions.

2. In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, the Supreme Court declared, "In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." 142 S. Ct. 2111, 2126 (2022).

3. Plaintiffs' right to carry a handgun open and exposed throughout the State of California, loaded or unloaded, is conduct covered by the plain text of the Second Amendment and presumptively protected by the U.S. Constitution.

4. The *Bruen* Court continued, "To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." *Id.* c*i*ting, *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n. 10 (1961).[1]

5. Firearms have been part of this Nation's history since the colonists arrived.[2] The colonists would not have been able to defeat the English military in the Revolutionary War had the colonists not possessed and had access to firearms and ammunition – the colonists had no 'military' and, as *Heller* confirmed, the right to keep and bear arms is an *individual* right, not the collective right of some type of militia or otherwise. *D.C. v. Heller*, 554 U.S. 570, 591 (2008) ("…even if 'keep and bear Arms' were a unitary phrase, we find no evidence that it bore a military meaning...Putting all of these textual elements together, we find that they guarantee the individual right to possess and carry weapons in case of confrontation.").

---

[1] "Rather than begin with its view of the governing legal framework, the dissent chronicles, in painstaking detail, evidence of crimes committed by individuals with firearms. See post, at 2163 - 2168 (opinion of BREYER, J.). The dissent invokes all of these statistics presumably to justify granting States greater leeway in restricting firearm ownership and use. But, as Members of the Court have already explained, "[t]he right to keep and bear arms ... is not the only constitutional right that has controversial public safety implications." *McDonald v. Chicago*, 561 U.S. 742, 783, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (plurality opinion)." *Bruen*, 142 S. Ct. at 2126, n. 3.

[2] https://www.guns.com/news/2011/07/06/who-were-the-colonists-and-what-were-they-firing-guns-of-the-american-revolution;
http://www.revolutionarywarjournal.com/rifles-in-the-revolutionary-war/#:~:text=Settlers%20who%20moved%20west%20of%20the%20Cumberland%20Mountains,making%20it%20the%20rifle-making%20center%20of%20the%20colonies.

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

6.      To be sure, "when the able-bodied men of a nation are trained in arms and organized, they are better able to resist tyranny." *Heller*, at 598.

7.      Handguns are weapons in common use for lawful purposes and are therefore covered by the plain text of the Second Amendment. *Heller*, at 629 ("It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon.").

8.      No permission from the government, licensing, registration, or any other action was required (or even imagined) for people to exercise the God-bestowed, preexisting right that was later codified in the Second Amendment. The very purpose of codifying the right to keep and bear arms and declaring that it "shall not be infringed"[3] was to prevent *any encroachment* of that right by the government. Yet, here we are.

9.      Plaintiffs seek a judicial declaration that California Penal Code sections 25850 and 26350 violate the Second and Fourteenth Amendments to the U.S. Constitution and request an Order temporarily and permanently enjoining their enforcement.

10.     The conduct being regulated under California Penal Code sections 25850 and 26350 is protected by the Second Amendment and the regulations are wholly inconsistent with this Nation's historical traditions of firearm regulation.

**JURISDICTION AND VENUE**

11.     The Court's jurisdiction over Plaintiffs' federal claims is authorized pursuant to 28 U.S.C. § 1331 and § 1343. The Court's jurisdiction over Plaintiffs' claims for injunctive and declaratory relief is authorized by 28 U.S.C. § 2201 and § 2202. The Court's jurisdiction over Plaintiffs' federal claims and for statutory attorney's fees is authorized pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988.

12.     Venue in this judicial district is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

---

[3] Infringe: encroach, limit, offend. https://www.merriam-webster.com/thesaurus/infringe
While, for example, the Fourth Amendment protects against "unreasonable" searches and seizures, the Second Amendment prohibits *any measure* of intrusion.

3

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**THE PARTIES**

13.     Plaintiff, MARK BAIRD ("Plaintiff" or "Mr. Baird") is a United States citizen and a resident of Siskiyou County, California which, according to the most recent census, has a population under 200,000.

14.     Plaintiff, RICHARD GALLARDO ("Plaintiff" of "Mr. Gallardo") is a United States citizen and a resident of Shasta County, California which, according to the most recent census, has a population under 200,000.

15.     Defendant ROB BONTA ("Defendant" or "Defendant Bonta") is the Attorney General of the State of California. Defendant Bonta is sued herein in his official capacity only. Pursuant to California State Constitution Article V, Section 13, as the Attorney General for the State of California, Defendant is the chief law enforcement officer of the State whose duty it is to ensure that the laws of the State are uniformly and adequately enforced.

16.     Defendant Bonta has direct supervision over every district attorney and sheriff and over such other law enforcement officers as may be designated by law, in all matters pertaining to the duties of their respective offices and may require any of said officers to make reports concerning the investigation, detection, prosecution, and punishment of crime in their respective jurisdictions as to Defendant may seem advisable.

17.     Whenever in the opinion of the Defendant any law of the State is not being adequately enforced in any county, it shall be Defendant's duty to prosecute any violations of law of which the superior court shall have jurisdiction. In such cases Defendant shall have all the powers of a district attorney. When required by the public interest or directed by the Governor, Defendant shall assist any district attorney in the discharge of the duties of that office.

**STATEMENT OF FACTS**

***Plaintiff Mark Baird***

18.     Mark Baird is an individual of unquestionably good moral character, a law-abiding citizen, and has never been charged with, summoned, or arrested for any violation of the California Penal Code or any other criminal offense.

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF    ER 424

19.     Mr. Baird is not prohibited by state or federal law from possessing, receiving, owning, or purchasing a firearm. Mr. Baird lawfully possesses firearms (handguns and long guns) in his home for self-defense.

20.     Mr. Baird does not hold a California firearm license and does not fall within any of the exemptions to California Penal Code sections 25850 and 26350 criminalizing the possession of firearms.

21.     Mr. Baird has a present intention to carry a handgun open and exposed for self-defense, loaded or unloaded, throughout the State of California, today and every day for the remainder of his natural life.

22.     Mr. Baird intends to exercise the rights protected by the Second and Fourteenth Amendments without seeking permission from the government, including applying for and obtaining a license under California's licensing scheme, Penal Code sections 26150 and 26155.

23.     Mr. Baird presently faces imminent arrest, prosecution, fines, and other criminal penalties for carrying a handgun in public without a license under Penal Code sections 25850 and 26350, as well as other civil penalties including loss of property.

24.     On more than one occasion, Mr. Baird has tried to apply for an open carry license in Siskiyou County, but there is no Open Carry license application available from the DOJ and, even if there were, no open carry licenses are issued anywhere in California, and he has been advised by the licensing authority in his county that no open carry licenses will be issued.

25.     The County of Siskiyou, California, according to the most recent federal census, has a population of less than 200,000 people. As a resident of the County of Siskiyou, Mr. Baird is prohibited from applying for a handgun carry license in any other county in California. Even if issued an open carry license, such license would be invalid outside of Siskiyou County under Penal Code sections 26150 (b)(2) and 26155(b)(2). If Mr. Baird were to carry open and exposed outside of Siskiyou County with or without a license, he would be arrested, prosecuted, and subject to other criminal and civil penalties.

26.     Upon information and belief, the licensing authorities' described conduct is performed at the direction of and/or with the knowledge and approval of Defendant Bonta.

5

27.     There is no administrative appeal process available for challenging the denial of an application for an open carry license. Even if there were an available administrative appeal process to challenge the denial of Mr. Baird's application for an open carry license, such 'process' would have been futile because Mr. Baird has been informed that no open carry licenses will be issued.

28.     More importantly, there is no historical tradition in this Nation of requiring a license or other permission to open carry a handgun outside of one's home for self-defense. Requiring any such license violates the Second and Fourteenth Amendments.

***Plaintiff Richard Gallardo***

29.     Richard Gallardo is an individual of unquestionably good moral character, a law-abiding citizen, and has never been charged with, summoned, or arrested for any violation of the California Penal Code or any other criminal offense.

30.     Mr. Gallardo is not prohibited by state or federal law from possessing, receiving, owning, or purchasing a firearm.

31.     Mr. Gallardo does not hold a California firearm license and does not fall within any of the exemptions to the California Penal Code sections criminalizing the open carriage of a handgun firearms, whether loaded or unloaded.

32.     Mr. Gallardo lawfully possesses firearms (handguns and long guns) in his home for self-defense.

33.     Mr. Gallardo has a present intention to carry a handgun open and exposed for self-defense, loaded or unloaded, throughout the State of California, today and every day for the remainder of his natural life.

34.     Mr. Gallardo intends to exercise the rights protected by the Second and Fourteenth Amendments without seeking permission from the government, including applying for and obtaining a license under Penal Code sections 26150 and 26155.

35.     Mr. Gallardo presently faces imminent arrest, prosecution, fines, and other criminal penalties for carrying a handgun in public without a license under Penal Code sections 25850 and 26350, as well as other civil penalties including loss of property.

6

36.     On more than one occasion, Mr. Gallardo tried to apply for an open carry license in Shasta County, but there is no Open Carry application available from the DOJ and, even if there were, no open carry licenses are issued anywhere in California, and he has been advised by the licensing authority in his county that no open carry licenses will be issued.

37.     The County of Shasta, California, according to the most recent federal census, has a population of less than 200,000 people. As a resident of Shasta County, Mr. Gallardo is prohibited from applying for a handgun carry license in any other county in California. Even if issued an open carry license, such license would be invalid outside of Shasta County under Penal Code sections 26150 (b)(2) and 26155(b)(2). If Mr. Gallardo were to carry open and exposed outside of Shasta County, with or without a license, he would be arrested, prosecuted, and subject to other criminal and civil penalties.

38.     Upon information and belief, the licensing authorities' described conduct is performed at the direction of and/or with the knowledge and approval of Defendant Bonta.

39.     There is no administrative appeal process available for challenging the denial of an application for an open carry license. Even if there were an available administrative appeal process to challenge the denial of Mr. Gallardo's application for an open carry license, such 'process' would have been futile because Mr. Gallardo has been informed that no open carry licenses will be issued.

40.     More importantly, there is no historical tradition in this Nation of requiring a license or other permission to open carry a handgun outside of one's home for self-defense. Requiring a license to open carry violates the Second and Fourteenth Amendments.

## STATEMENT OF LAW

### *The Second Amendment*

41.     The Second Amendment to the United States Constitution provides: "A well regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

42.     The Second Amendment does not *bestow* any rights to the individual to possess and carry weapons to protect himself; it *prohibits the government* from infringing upon the basic, fundamental right of the individual to keep and bear weapons in common use for self-defense in

7

the event of a violent confrontation. *Heller*, supra; *McDonald*, supra; *Caetano v. Massachusetts,* 577 U.S. (2016).

43.     "Individual self-defense is the central component of the Second Amendment right." *McDonald,* 561 U.S. at 767, citing, *Heller*, 554 U.S. at 599 (internal quotations omitted). The Second Amendment protects the core right of the individual to self-protection. *Heller*, 554 U.S. at 595-599, 628.

44.     The Second Amendment is "deeply rooted in this Nation's history and tradition" and fundamental to our scheme of ordered liberty". *McDonald*, 561 U.S at 768. The Second Amendment's protections are fully applicable to the states through the Fourteenth Amendment. *McDonald*, 130 S. Ct. at 3026.

45.     The "Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding …" *Caetano v. Massachusetts*, 577 U.S. at 411.

46.     Handguns are 'bearable arms' in common use for self-defense and therefore are presumptively protected by the Second Amendment. *Heller*, 554 U.S. at 629; *Caetano,* supra.

### The "People" Protected By the Constitution

47.     *Heller* explained, "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, at 580. "[T]he people' … refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id.* (citation omitted).

48.     Plaintiffs are members of the national community with no prohibitors to the possession of firearms and are entitled to the full and unabridged protections of the Second and Fourteenth Amendments.

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF   **ER-428**

### *The Bruen Test for Second Amendment Challenges*

49.    The Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Heller*, at 592.

> "Putting all of these textual elements together, we find that they *guarantee* the individual right to possess and carry weapons in case of confrontation. This meaning is strongly confirmed by the historical background of the Second Amendment. We look to this because it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right. The very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it 'shall not be infringed.' As we said in *United States v. Cruikshank*, 92 U.S. 542, 553, 23 L.Ed. 588 (1876), '[t]his is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence. The second amendment declares that it shall not be infringed ....'"

*Id.* (emphasis added).

50.    In *Bruen*, the Supreme Court flatly rejected the tripartite, intermediate scrutiny, 'means-end' public safety balancing test[4] improperly created and applied by the Ninth Circuit[5] and others. Rather, the test that must be applied to Second Amendment challenges is as follows:

> "we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution **presumptively** protects that conduct.
>
> To justify its regulation, the government may not simply posit that the regulation promotes an important interest.
>
> Rather, **the government must demonstrate** that the regulation is consistent with this Nation's historical tradition of firearm regulation.

---

[4] Core Second Amendment rights, like the right to possess firearms in the home for self-defense, are not subject to 'interest balancing'. *Heller*, 554 U.S. at 634 ("We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach. The very enumeration of the right takes out of the hands of government--even the Third Branch of Government--the power to decide on a case-by-case basis whether the right is really worth insisting upon.").

[5] "Despite the popularity of this two-step approach, it is one step too many. Step one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history. But *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, at 2127.

9

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

> Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Bruen*, at 2126 (emphasis added) citing, *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n. 10 (1961).

### ***Bruen* Defined and Limited the Relevant Historical Time Period**

51.     Because "not all history is created equal," the *Bruen* Court held that, when deciding whether the government's regulation is consistent with this Nation's historical tradition,

> the only appropriate inquiry is what the public understanding of the right to keep and bear arms was during the ratification of the Second Amendment in 1791, and perhaps during ratification of the Fourteenth Amendment in 1868.

*Bruen*, at 2138.

52.     "Post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Bruen*, at 2137 (emphasis supplied) citing, *Heller*, 670 F.3d at 1274, n. 6 (Kavanaugh, J., dissenting); *Espinoza v. Montana Dept. of Revenue*, 591 U.S. ——, ——, 140 S.Ct. 2246, 2258–2259 (2020).

### *The Challenged Regulations Violate the Second and Fourteenth Amendments*

53.     The plain text of the Second Amendment presumptively protects Plaintiffs' conduct: the open carriage of a handgun in public for self-defense.

54.     Defendants "must demonstrate that their regulations are consistent with this Nation's historical tradition of firearm regulation. *Bruen*, at 2126. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command'." *Bruen*, at 2126.

55.     Defendants cannot meet that burden.

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**CALIFORNIA'S REGULATIONS**

***Penal Code Sections 25850 and 26350 Violate the Second and Fourteenth Amendments***

56.     In California, the possession of a handgun in one's home is lawful and requires no license or permission from the government. But the 'mere possession' of a handgun in public is a crime. An average citizen who steps outside of his home armed with a handgun for self-defense risks arrest, incarceration, prosecution, fines, and other criminal and civil penalties, including permanent loss of Second Amendment rights and loss of property (firearms).

<u>Penal Code § 25850</u>

57.     Under California Penal Code section 25850, a person is guilty of carrying a loaded firearm when he carries a loaded firearm on his person or in a vehicle while <u>in any public place</u> or <u>on any public street</u> in an incorporated city or in a prohibited area of unincorporated territory. (emphasis added).

58.     Section 25850 allows the police the unfettered ability to stop an individual to inspect their firearm to determine whether the firearm is or is not loaded; refusal to allow a peace officer to inspect a firearm constitutes probable cause for arrest.

<u>Penal Code § 26350</u>

59.     Under California Penal Code section 26350, a person is guilty of openly carrying an unloaded handgun for carrying upon his person an exposed and unloaded handgun outside a vehicle while in a <u>public place or public street</u> in an incorporated city or city and county, a <u>public street</u> in a prohibited area of an unincorporated area of a county or city and county, or a <u>public place</u> in a prohibited area of a county or city and county. (emphasis added).

60.     Penal Code sections 25850 and 26350 criminalize the mere possession of a handgun for self-defense – a right protected by the Second Amendment and enforced against the states through the Fourteenth Amendment.

61.     In *Bruen*, the Supreme Court reaffirmed that the right to carry firearms outside of the home is protected by the Second and Fourteenth Amendments. *Bruen*, supra.

11

ER 431

> "In this case, petitioners and respondents agree that ordinary, law-abiding citizens have a similar right to carry handguns publicly for their self-defense. We too agree, and now hold, consistent with *Heller* and *McDonald*, that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home."

*Bruen*, 142 S. Ct. at 2122.

62.     There is no American historical tradition of banning open carry, criminalizing the exercise thereof, or requiring a license or permission from the government exists. Indeed, while licensing schemes popped up in few areas of the country in the early 1900s, "post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Bruen*, at 2137.

63.     Until 1967 open carry was a widely accepted, and largely unremarkable, practice right here in California until the racially motivated Mulford Act outlawed possessing a loaded handgun in public, followed by banning the open carriage of an unloaded handgun in 2012.[6]

64.     In 2016, an en banc panel of the Ninth Circuit proclaimed that the "uncontradicted historical evidence overwhelmingly shows, the Second Amendment does not protect, in any degree, the right of a member of the general public to carry a <u>concealed weapon</u> in public. The Second Amendment may or may not protect to some degree a right of a member of the general public to carry a firearm in public."[7] The en banc Court continued,

**"If there is such a right, it is only a right to carry a firearm openly."**

*Peruta II,* at 942.

65.     Well, there *is* such a Right. *Heller* put that issue to bed in 2008:

> "Putting all of these textual elements together, we find that they **guarantee the individual right to possess and carry weapons**…"

---

[6] Even if open carry licenses were issued (and constitutional), which they are not, under a "may issue" licensing scheme, they can only be applied for and issued in counties with a population under 200,000 and are invalid outside of the county of issuance. Penal Code sections 26150, 26155.
[7] *Peruta v. County of San Diego*, 824 F.3d 919, 942 (9th Cir. 2016) (emphasis added).

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

ER-432

*Heller*, at 592.

66. In *Peruta II*, a Declaration "submitted by the County of San Diego indicates that *the point* of the concealed weapons licensing policy was to make concealed carry 'a very rare privilege.'" *Id.* at n. 9 (emphasis added).

67. After the *Bruen* decision was published, California rushed to create even more restrictions on what is deemed the 'privilege' to carry concealed; "good cause" having been found unconstitutional by *Bruen*, Defendant and others pushed a massive bundle of restrictions in SB918 to further restrict and prevent 'the People' - even those with a concealed carry license - from carrying a handgun in public for self-defense.

68. Lest there be any doubt, California's zealous anti-Second Amendment agenda was revealed in the 7+ page preamble to SB918 railing public policy and 'means end' lamentations that the Supreme Court has repeatedly rejected since *Heller* in 2008.

> "After an exhaustive discussion of the arguments for and against gun control, Justice BREYER arrives at his interest-balanced answer: Because handgun violence is a problem, because the law is limited to an urban area, and because there were somewhat similar restrictions in the founding period (a false proposition that we have already discussed), the interest-balancing inquiry results in the constitutionality of the handgun ban. QED.

To which the majority responded,

> "We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding "interest-balancing" approach. The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all.
>
> Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad."

*Heller*, at 634–35 (emphasis supplied).

69. *Bruen* confirmed the unconditional rejection of balancing emotions related to criminal acts against individual rights.

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

> "Like that dissent in *Heller*, the real thrust of today's dissent is that guns are bad and that States and local jurisdictions should be free to restrict them essentially as they see fit. That argument was rejected in *Heller*, and while the dissent protests that it is not rearguing *Heller*, it proceeds to do just that. See post, at 2176 - 2178."

*Bruen*, at 2160–61.

70.  Under this Nation's historical traditions – and this State's historical traditions - open carry is a Right covered by the Second Amendment and it *shall not be infringed*.

71.  Exercising the right to carry handguns publicly for self-defense cannot, therefore, be punished by criminal penalties, including Penal Code sections 25850 and 26350. Non-prohibited individuals can no longer be punished for the 'mere possession' of a handgun for self-defense.

72.  It is well-settled by a long line of decisions of the Supreme Court that an ordinance which, like this one, makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms. *Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 151 (1969) quoting, *Staub v. City of Baxley*, 355 U.S. 313, 322.

> "And our decisions have made clear that a person faced with such an unconstitutional licensing law may ignore it and engage with impunity in the exercise of the right of free expression for which the law purports to require a license."

*Id.* see also, *People v. Tony Diaz*, (Case No. 21FE019850, Sup. Ct. Sacramento) (sustaining demurrer of felony charges post-*Bruen* holding § 25850, which "subjects anyone in a public place carrying a loaded firearm on the person or in a vehicle to criminal prosecution… amounts to a total ban on public carry…cannot survive *Bruen*'s holding that public carry is presumptively legal." "As *Bruen* stated: The constitutional right to bear arms in public for self-defense is not a 'second-class right, subject to an entirely different body of rules than other Bill of Rights Guarantees'." (citation omitted).

73.  An individual cannot be prosecuted for exercising a constitutionally protected right. *Id.*

14

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1

## DECLARATORY JUDGMENT ALLEGATIONS

2     74.    There is an actual and present controversy between the parties.

3     75.    Plaintiffs' Second and Fourteenth Amendment rights are being violated and will

4 continue to be violated by the enforcement of (i) Penal Code section 25850 makes it illegal to carry

5 a loaded firearm when he carries a loaded firearm on his person or in a vehicle while in any public

6 place or on any public street in an incorporated city or in a prohibited area of unincorporated

7 territory; and allows the police the unfettered ability to stop an individual to inspect their firearm

8 to determine whether the firearm is or is not loaded; refusal to allow a peace officer to inspect a

9 firearm constitutes probable cause for arrest; (ii) Penal Code section 26350 makes it illegal to

10 openly carry an unloaded handgun for carrying upon his person an exposed and unloaded handgun

11 outside a vehicle while in a public place or public street in an incorporated city or city and county,

12 a public street in a prohibited area of an unincorporated area of a county or city and county, or a

13 public place in a prohibited area of a county or city and county.

14     76.    Penal Code sections 25850 and 26350 regulate conduct that is protected by the plain

15 language of the Second Amendment.

16     77.    Penal Code sections 25850 and 26350 have no historical analogue.

17     78.    Plaintiffs seek a judicial declaration that Penal Codes sections 25850 and 26350

18 violate the Second and Fourteenth Amendments.

19

## INJUNCTIVE RELIEF ALLEGATIONS

20     79.    Mr. Baird and Mr. Gallardo have a present intention to carry a handgun open and

21 exposed for self-defense, loaded or unloaded, throughout the State of California including those

22 areas that were not designated 'sensitive areas' prior to the enactment of the Mulford Act of 1967,

23 today and every day for the remainder of their natural lives.

24     80.    Plaintiffs intend to exercise the rights protected by the Second and Fourteenth

25 Amendments without seeking permission from the government, including applying for and

26 obtaining a license under California's licensing scheme under Penal Code sections 26150 and

27 26155.

28

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

ER435

81.     Plaintiffs face imminent arrest, prosecution, fines, and other criminal penalties for carrying a handgun open and exposed, loaded or unloaded, in public without a license, as well as other civil penalties including loss of property (firearms).

82.     Plaintiffs' conduct is protected by the plain language of the Second Amendment.

83.     The burden is exclusively on Defendant to demonstrate that the challenged regulations are consistent with the Nation's historical tradition of firearm regulation. Only then may this Court conclude that Plaintiffs' conduct falls outside the Second Amendment's 'unqualified command.' *Bruen*, supra.

84.     There is no historical analogue for the challenged regulations.

85.     Plaintiffs are being continuously injured, in fact, and will continue to be injured by the violation of their preexisting rights protected by the Second and Fourteenth Amendments by Defendant's enforcement of Penal Code sections 25850 and 26350 for the open carriage of a handgun, whether loaded or unloaded, outside of their home, including those areas of California not designated 'sensitive areas' prior to the Mulford Act of 1967.

86.     California's criminal statutes are inconsistent with the Nation's historical tradition of firearm regulation and should be temporarily and permanently enjoined.

87.     Plaintiffs should not have to risk criminal prosecution in the exercise of their fundamental right to self-protection outside of the home.

**COUNT I**

**Penal Code § 25850 Violates the Second and Fourteenth Amendments**

88.     Repeat and reallege paragraphs "1" through and including "87" as if set forth in their entirety herein.

89.     Defendant's enforcement of Penal Code § 25850 against individuals for carrying a handgun open and exposed on their person violates the Second and Fourteenth Amendments. 42 U.S.C. § 1983.

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

ER436

1

### COUNT II

2

**Penal Code § 26350 Violates the Second and Fourteenth Amendments**

3     90.     Repeat and reallege paragraphs "1" through and including "89" as if set forth in their

4   entirety herein.

5     91.     Defendant's enforcement of Penal Code § 26350 against individuals for carrying a

6   handgun open and exposed on their person violates the Second and Fourteenth Amendments.

7   42 U.S.C. § 1983.

8

### PRAYER FOR RELIEF

9     WHEREFORE, Plaintiffs request that judgment be entered in their favor and against

10  Defendant as follows:

11     •   A judicial declaration that the enforcement of California Penal Code § 25850 against

12         individuals for carrying a handgun open and exposed on their person throughout

13         California violates the Second and Fourteenth Amendments;

14     •   A judicial declaration that the enforcement of California Penal Code § 26350 against

15         individuals for carrying a handgun open and exposed on their person throughout

16         California violates the Second and Fourteenth Amendments;

17     •   An order temporarily and permanently enjoining Defendant, his officers, agents,

18         servants, employees, and all persons acting in concert with Defendant who receive

19         actual notice of the injunction, from enforcing Penal Code sections 25850 and 26350

20         against individuals who carry a handgun open and exposed on their person throughout

21         the State of California;

22     •   Reasonable statutory attorney's fees, costs, and disbursements, under 42 U.S.C.

23         § 1988 and any other applicable law; and

24     •   Grant such further and alternative relief as the Court deems just and proper.

25

26

27

28

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF     **ER487**

1    Respectfully submitted,

2    Dated: September 26, 2022                    THE BELLANTONI LAW FIRM, PLLC

3

4                                                   ___/s/ Amy L. Bellantoni, Esq._____

5                                                Amy L. Bellantoni
                                                 *Attorney for Plaintiffs*
6                                                *Pro Hac Vice*
                                                 Email: abell@bellantoni-law.com
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

18

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   Rob Bonta, State Bar No. 202668
    Attorney General of California
2   R. Matthew Wise, State Bar No. 238485
    Supervising Deputy Attorney General
3   Ryan Davis, State Bar No. 266330
    Deputy Attorney General
4     1300 I Street, Suite 125
      P.O. Box 944255
5     Sacramento, CA 94244-2550
      Telephone: (916) 210-6050
6     Fax: (916) 324-8835
      E-mail: Ryan.Davis@doj.ca.gov
7   *Attorneys for Defendant Attorney General Rob*
    *Bonta*

8

9                    IN THE UNITED STATES DISTRICT COURT

10                  FOR THE EASTERN DISTRICT OF CALIFORNIA

11

12

13

| | |
|---|---|
| 14  **MARK BAIRD and RICHARD GALLARDO,** | Case No. 2:19-cv-00617-KJM-AC |
| 15 | **DEFENDANT ATTORNEY GENERAL** |
| Plaintiffs, | **ROB BONTA'S ANSWER TO** |
| 16 | **PLAINTIFFS' SECOND AMENDED** |
| | **COMPLAINT** |
| 17  v. | |
| | Courtroom:   3 |
| 18  **ROB BONTA, in his official capacity as** | Judge:      Kimberly J. Mueller |
| **Attorney General of the State of California,** | |
| 19  **and DOES 1-10,** | Action Filed:  April 10, 2019 |
| 20 | |
| Defendants. | |

21

22          Defendant Attorney General Rob Bonta hereby answers the Second Amended Complaint

23   filed by Plaintiffs Mark Baird and Richard Gallardo as follows:

24          1.     Paragraph No. 1 consists of allegations that contain argument and legal contentions.

25   To the extent that a response to the allegations in this paragraph is required, Defendant denies

26   each and every allegation.

27

28

                                            1

2.     Paragraph No. 2 contains allegations that cite case law, which speaks for itself. Defendant denies any allegations that misstate the law.  To the extent that a further response is required, Defendant denies each and every allegation.

3.     Paragraph No. 3 consists of allegations that contain argument and legal contentions. To the extent that a response to the allegations in this paragraph is required, Defendant denies each and every allegation.

4.     Paragraph No. 4 contains allegations that cite case law, which speaks for itself. Defendant denies any allegations that misstate the law.  To the extent that a further response is required, Defendant denies each and every allegation.

5.     Defendant lacks sufficient information or belief to respond to the historical allegations in Paragraph No. 4, and on that basis denies each and every allegation.  Paragraph No. 4 also contains allegations that cite case law, which speaks for itself.  Defendant denies any allegations that misstate the law.  To the extent that a further response is required, Defendant denies each and every allegation.

6.     Paragraph No. 6 contains allegations that cite case law, which speaks for itself. Defendant denies any allegations that misstate the law.  To the extent that a further response is required, Defendant denies each and every allegation.

7.     Paragraph No. 7 contains allegations that cite case law, which speaks for itself. Defendant denies any allegations that misstate the law.  To the extent that a further response is required, Defendant denies each and every allegation.

8.     Paragraph No. 8 consists of allegations that contain argument and legal contentions. To the extent that a response to the allegations in this paragraph is required, Defendant denies each and every allegation.

9.     Paragraph No. 9 consists of allegations that contain argument and legal contentions. To the extent that a response to the allegations in this paragraph is required, Defendant denies each and every allegation.

**ER440**

1    10.    Paragraph No. 10 consists of allegations that contain argument and legal contentions.

2    To the extent that a response to the allegations in this paragraph is required, Defendant denies

3    each and every allegation.

4    11.    Paragraph No. 11 contains allegations that cite statutory provisions, which speak for

5    themselves.  Defendant denies any allegations that misstate the law.  To the extent that a further

6    response is required, Defendant denies each and every allegation.

7    12.    Paragraph No. 12 contains allegations that cite statutory provisions, which speak for

8    themselves.  Defendant denies any allegations that misstate the law.  To the extent that a further

9    response is required, Defendant denies each and every allegation.

10    13.    Defendant lacks sufficient information or belief to respond to the allegations in

11    Paragraph No. 13, and on that basis denies each and every allegation.

12    14.    Defendant lacks sufficient information or belief to respond to the allegations in

13    Paragraph No. 14, and on that basis denies each and every allegation.

14    15.    In answer to Paragraph No. 15, Defendant admits that he is the Attorney General of

15    the State of California and that he is sued in his official capacity only.  Paragraph No. 15 contains

16    allegations that cite the California Constitution, which speaks for itself.  Defendant denies any

17    allegations that misstate the law.  To the extent that a further response is required, Defendant

18    denies each and every allegation.

19    16.    Paragraph No. 16 consists of allegations that contain argument and legal contentions.

20    To the extent that a response to the allegations in this paragraph is required, Defendant denies

21    each and every allegation.

22    17.    Paragraph No. 17 consists of allegations that contain argument and legal contentions.

23    To the extent that a response to the allegations in this paragraph is required, Defendant denies

24    each and every allegation.

25    18.    Defendant lacks sufficient information or belief to respond to the allegations in

26    Paragraph No. 18, and on that basis denies each and every allegation.

27    19.    Defendant lacks sufficient information or belief to respond to the allegations in

28    Paragraph No. 19, and on that basis denies each and every allegation.

20.    Defendant lacks sufficient information or belief to respond to the allegations in Paragraph No. 20, and on that basis denies each and every allegation.

21.    Defendant lacks sufficient information or belief to respond to the allegations in Paragraph No. 21, and on that basis denies each and every allegation.

22.    Defendant lacks sufficient information or belief to respond to the allegations in Paragraph No. 22, and on that basis denies each and every allegation.

23.    Paragraph 23 consists of allegations that contain argument and legal contentions.  To the extent that a response to the allegations in this paragraph is required, Defendant denies each and every allegation.

24.    In answer to Paragraph 24, Defendant admits that the California Department of Justice does not provide a separate application for a permit to carry a handgun in an exposed (i.e., open) manner, but denies that the application it provides cannot be used in counties with populations of less than 200,000 persons to apply for a permit to carry a handgun in an exposed manner.  Defendant lacks sufficient information or belief to respond to the remaining allegations in Paragraph No. 24, and on that basis denies each and every allegation.

25.    In answer to Paragraph No. 25, Defendant admits that according to the 2020 census, Siskiyou County had a population of less than 200,000 people.  Paragraph No. 25 includes allegations that contain argument and legal contentions.  To the extent that a response to the allegations in this paragraph is required, Defendant denies each and every allegation.

26.    Defendant denies the allegation in Paragraph No. 26.

27.    Paragraph No. 27 includes allegations that contain argument and legal contentions.  To the extent that a response to the allegations in this paragraph is required, Defendant denies each and every allegation.  Regarding the allegations as to what Mr. Baird has been informed, Defendant lacks sufficient information or belief to respond, and on that basis denies the allegations.

28.    Paragraph No. 28 consists of allegations that contain argument and legal contentions. To the extent that a response to the allegations in this paragraph is required, Defendant denies each and every allegation.

4

29.     Defendant lacks sufficient information or belief to respond to the allegations in Paragraph No. 29, and on that basis denies each and every allegation.

30.     Defendant lacks sufficient information or belief to respond to the allegations in Paragraph No. 30, and on that basis denies each and every allegation.

31.     Defendant lacks sufficient information or belief to respond to the allegations in Paragraph No. 31, and on that basis denies each and every allegation.

32.     Defendant lacks sufficient information or belief to respond to the allegations in Paragraph No. 32, and on that basis denies each and every allegation.

33.     Defendant lacks sufficient information or belief to respond to the allegations in Paragraph No. 33, and on that basis denies each and every allegation.

34.     Defendant lacks sufficient information or belief to respond to the allegations in Paragraph No. 34, and on that basis denies each and every allegation.

35.     Paragraph 35 consists of allegations that contain argument and legal contentions.  To the extent that a response to the allegations in this paragraph is required, Defendant denies each and every allegation.

36.     In answer to Paragraph 36, Defendant admits that the California Department of Justice does not provide a separate application for a permit to carry a handgun in an exposed (i.e., open) manner, but denies that the application it provides cannot be used in counties with populations of less than 200,000 persons to apply for a permit to carry a handgun in an exposed manner.  Defendant lacks sufficient information or belief to respond to the remaining allegations in Paragraph No. 36, and on that basis denies each and every allegation.

37.     In answer to Paragraph No. 36, Defendant admits that according to the 2020 census, Siskiyou County had a population of less than 200,000 people.  Paragraph No. 36 includes allegations that contain argument and legal contentions.  To the extent that a response to the allegations in this paragraph is required, Defendant denies each and every allegation.

38.     Defendant denies the allegation in Paragraph No. 38.

39.     Paragraph No. 39 includes allegations that contain argument and legal contentions. To the extent that a response to the allegations in this paragraph is required, Defendant denies

5

1  each and every allegation.  Regarding the allegations as to what Mr. Gallardo has been informed,

2  Defendant lacks sufficient information or belief to respond, and on that basis denies the

3  allegations.

4       40.  Paragraph No. 40 consists of allegations that contain argument and legal contentions.

5  To the extent that a response to the allegations in this paragraph is required, Defendant denies

6  each and every allegation.

7       41.  Paragraph No. 41 contains allegations that cite a constitutional provision, which

8  speaks for itself.  Defendant denies any allegations that misstate the law.  To the extent that a

9  further response is required, Defendant denies each and every allegation.

10       42.  Paragraph No. 42 contains allegations that cite case law, which speaks for itself.

11  Defendant denies any allegations that misstate the law.  To the extent that a further response is

12  required, Defendant denies each and every allegation.

13       43.  Paragraph No. 43 contains allegations that cite case law, which speaks for itself.

14  Defendant denies any allegations that misstate the law.  To the extent that a further response is

15  required, Defendant denies each and every allegation.

16       44.  Paragraph No. 44 contains allegations that cite case law, which speaks for itself.

17  Defendant denies any allegations that misstate the law.  To the extent that a further response is

18  required, Defendant denies each and every allegation.

19       45.  Paragraph No. 45 contains allegations that cite case law, which speaks for itself.

20  Defendant denies any allegations that misstate the law.  To the extent that a further response is

21  required, Defendant denies each and every allegation.

22       46.  Paragraph No. 46 contains allegations that cite case law, which speaks for itself.

23  Defendant denies any allegations that misstate the law.  To the extent that a further response is

24  required, Defendant denies each and every allegation.

25       47.  Paragraph No. 47 contains allegations that cite case law, which speaks for itself.

26  Defendant denies any allegations that misstate the law.  To the extent that a further response is

27  required, Defendant denies each and every allegation.

28

6

48.     Defendant lacks sufficient information or belief to respond to the allegations in Paragraph No. 48, and on that basis denies each and every allegation.

49.     Paragraph No. 49 contains allegations that cite case law, which speaks for itself. Defendant denies any allegations that misstate the law.  To the extent that a further response is required, Defendant denies each and every allegation.

50.     Paragraph No. 50 contains allegations that cite case law, which speaks for itself. Defendant denies any allegations that misstate the law.  To the extent that a further response is required, Defendant denies each and every allegation.

51.     Paragraph No. 51 contains allegations that cite case law, which speaks for itself. Defendant denies any allegations that misstate the law.  To the extent that a further response is required, Defendant denies each and every allegation.

52.     Paragraph No. 52 contains allegations that cite case law, which speaks for itself. Defendant denies any allegations that misstate the law.  To the extent that a further response is required, Defendant denies each and every allegation.

53.     Paragraph No. 40 consists of allegations that contain argument and legal contentions. To the extent that a response to this paragraph is required, Defendant denies each and every allegation.

54.     Paragraph No. 52 contains allegations that cite case law, which speaks for itself. Defendant denies any allegations that misstate the law.  To the extent that a further response is required, Defendant denies each and every allegation.

55.     Paragraph No. 55 consists of allegations that contain argument and legal contentions. To the extent that a response to the allegations in this paragraph is required, Defendant denies each and every allegation.

56.     Paragraph No. 56 contains allegations that cite California law, which speaks for itself. Defendant denies any allegations that misstate the law.  To the extent that a further response is required, Defendant denies each and every allegation.

7

57.   Paragraph No. 57 contains allegations that cite statutory provisions, which speak for themselves.  Defendant denies any allegations that misstate the law.  To the extent that a further response is required, Defendant denies each and every allegation.

58.   Paragraph No. 58 contains allegations that cite statutory provisions, which speak for themselves.  Defendant denies any allegations that misstate the law.  To the extent that a further response is required, Defendant denies each and every allegation.

59.   Paragraph No. 59 contains allegations that cite statutory provisions, which speak for themselves.  Defendant denies any allegations that misstate the law.  To the extent that a further response is required, Defendant denies each and every allegation.

60.   Paragraph No. 60 contains allegations that cite statutory provisions, which speak for themselves.  Defendant denies any allegations that misstate the law.  To the extent that a further response is required, Defendant denies each and every allegation.

61.   Paragraph No. 61 contains allegations that cite case law, which speaks for itself. Defendant denies any allegations that misstate the law.  To the extent that a further response is required, Defendant denies each and every allegation.

62.   Paragraph No. 62 contains allegations that cite case law, which speaks for itself. Defendant denies any allegations that misstate the law.  To the extent that a further response is required, Defendant denies each and every allegation.

63.   Defendant lacks sufficient information or belief to respond to the allegations in Paragraph No. 63, and on that basis denies each and every allegation.

64.   Paragraph No. 64 contains allegations that cite case law, which speaks for itself. Defendant denies any allegations that misstate the law.  To the extent that a further response is required, Defendant denies each and every allegation.

65.   Paragraph No. 65 contains allegations that cite case law, which speaks for itself. Defendant denies any allegations that misstate the law.  To the extent that a further response is required, Defendant denies each and every allegation.

Defendant Attorney General Rob Bonta's Answer to Plaintiffs' Second Amended Complaint
(2:19-cv-00617-KJM-AC)

**ER446**

66.     Paragraph No. 66 contains allegations that cite case law, which speaks for itself. Defendant denies any allegations that misstate the law.  To the extent that a further response is required, Defendant denies each and every allegation.

67.     Paragraph No. 67 consists of allegations that contain argument and legal contentions. To the extent that a response to the allegations in this paragraph is required, Defendant denies each and every allegation.

68.     Paragraph No. 68 consists of allegations that contain argument and legal contentions. To the extent that a response to the allegations in this paragraph is required, Defendant denies each and every allegation.

69.     Paragraph No. 69 contains allegations that cite case law, which speaks for itself. Defendant denies any allegations that misstate the law.  To the extent that a further response is required, Defendant denies each and every allegation.

70.     Paragraph No. 70 consists of allegations that contain argument and legal contentions. To the extent that a response to the allegations in this paragraph is required, Defendant denies each and every allegation.

71.     Paragraph No. 71 consists of allegations that contain argument and legal contentions. To the extent that a response to the allegations in this paragraph is required, Defendant denies each and every allegation.

72.     Paragraph No. 72 contains allegations that cite case law, which speaks for itself. Defendant denies any allegations that misstate the law.  To the extent that a further response is required, Defendant denies each and every allegation.

73.     Paragraph No. 73 contains allegations that cite case law, which speaks for itself. Defendant denies any allegations that misstate the law.  To the extent that a further response is required, Defendant denies each and every allegation.

74.     Paragraph No. 74 consists of allegations that contain argument and legal contentions. To the extent that a response to the allegations in this paragraph is required, Defendant denies each and every allegation.

75.     Paragraph No. 75 consists of allegations that contain argument and legal contentions. To the extent that a response to the allegations in this paragraph is required, Defendant denies each and every allegation.

76.     Paragraph No. 76 consists of allegations that contain argument and legal contentions. To the extent that a response to the allegations in this paragraph is required, Defendant denies each and every allegation.

77.     Paragraph No. 77 consists of allegations that contain argument and legal contentions. To the extent that a response to the allegations in this paragraph is required, Defendant denies each and every allegation.

78.     Paragraph No. 78 consists of allegations that contain argument and legal contentions. To the extent that a response to the allegations in this paragraph is required, Defendant denies each and every allegation.

79.     Defendant lacks sufficient information or belief to respond to the allegations in Paragraph No. 79, and on that basis denies each and every allegation.

80.     Defendant lacks sufficient information or belief to respond to the allegations in Paragraph No. 80, and on that basis denies each and every allegation.

81.     Defendant lacks sufficient information or belief to respond to the allegations in Paragraph No. 81, and on that basis denies each and every allegation.

82.     Paragraph No. 82 consists of allegations that contain argument and legal contentions. To the extent that a response to the allegations in this paragraph is required, Defendant denies each and every allegation.

83.     Paragraph No. 83 consists of allegations that contain argument and legal contentions. To the extent that a response to the allegations in this paragraph is required, Defendant denies each and every allegation.

84.     Paragraph No. 84 consists of allegations that contain argument and legal contentions. To the extent that a response to the allegations in this paragraph is required, Defendant denies each and every allegation.

Defendant Attorney General Rob Bonta's Answer to Plaintiffs' Second Amended Complaint
(2:19-cv-00617-KJM-AC)

**ER448**

85.     Paragraph No. 85 consists of allegations that contain argument and legal contentions. To the extent that a response to the allegations in this paragraph is required, Defendant denies each and every allegation.

86.     Paragraph No. 86 consists of allegations that contain argument and legal contentions. To the extent that a response to the allegations in this paragraph is required, Defendant denies each and every allegation.

87.     Paragraph No. 87 consists of allegations that contain argument and legal contentions. To the extent that a response to the allegations in this paragraph is required, Defendant denies each and every allegation.

88.     Defendant incorporates by reference the answers in Paragraphs 1 through 87 above.

89.     Paragraph No. 89 consists of allegations that contain argument and legal contentions. To the extent that a response to the allegations in this paragraph is required, Defendant denies each and every allegation.

90.     Defendant incorporates by reference the answers in Paragraphs 1 through 89 above.

91.     Paragraph No. 91 consists of allegations that contain argument and legal contentions. To the extent that a response to the allegations in this paragraph is required, Defendant denies each and every allegation.

## <u>AFFIRMATIVE DEFENSES</u>

In addition, without admitting any allegations contained in the Second Amended Complaint, Defendant asserts the following defenses based on information and belief:

### FIRST AFFIRMATIVE DEFENSE

The Second Amended Complaint, and the claims for relief alleged therein, fails to state facts sufficient to constitute a cause of action.

### SECOND AFFIRMATIVE DEFENSE

Plaintiffs' claims in this action are barred in that they do not have standing to bring them.

### THIRD AFFIRMATIVE DEFENSE

The Second Amended Complaint, and each cause of action therein, is improper because Plaintiffs have an adequate remedy at law.

11

1

**FOURTH AFFIRMATIVE DEFENSE**

2      The Second Amended Complaint, and each cause of action therein, is barred by the

3   equitable doctrines of estoppel, laches, unclean hands, and/or waiver.

4

**FIFTH AFFIRMATIVE DEFENSE**

5      To the extent Defendant has undertaken any conduct with respect to the subjects and events

6   underlying the Second Amended Complaint, such conduct was, at all times material thereto,

7   undertaken in good faith and in reasonable reliance on existing law.

8

**SIXTH AFFIRMATIVE DEFENSE**

9      Defendant has not knowingly or intentionally waived any applicable affirmative defense.

10   Defendant reserves the right to assert and rely upon additional affirmative defenses as may

11   become available or apparent during discovery proceedings or as may be raised or asserted by

12   others in this case, and to amend the Answer and/or affirmative defenses accordingly.  Defendant

13   further reserves the right to amend the Answer to delete affirmative defenses that they determine

14   are not applicable after subsequent discovery.

15      WHEREFORE, Defendant prays that:

16      1.      This Court deny Plaintiffs' Second Amended Complaint in its entirety and dismiss

17   this case with prejudice.

18      2.      Plaintiffs take nothing by the Second Amended Complaint.

19      3.      Defendant be awarded his costs incurred in defending this action.

20      4.      The Court grant such other and further relief in favor of Defendant and adverse to

21   Plaintiffs that the Court deems just and proper.

22

23

24

25

26

27

28

Defendant Attorney General Rob Bonta's Answer to Plaintiffs' Second Amended Complaint
(2:19-cv-00617-KJM-AC)

**ER450**

1    Dated:  October 31, 2022                    Respectfully submitted,

2                                               ROB BONTA
                                                Attorney General of California
3                                               R. MATTHEW WISE
                                                Supervising Deputy Attorney General
4
                                                /s/ *Ryan R. Davis*
5
                                                RYAN R. DAVIS
6                                               Deputy Attorney General
                                                *Attorneys for Defendant Attorney General*
7                                               *Rob Bonta*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendant Attorney General Rob Bonta's Answer to Plaintiffs' Second Amended Complaint
(2:19-cv-00617-KJM-AC)

**ER451**

# CERTIFICATE OF SERVICE

Case Name:   **Baird, Mark v. Rob Bonta**          No.   **2:19-cv-00617-KJM-AC**

I hereby certify that on October 31, 2022, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**DEFENDANT ATTORNEY GENERAL ROB BONTA'S ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on October 31, 2022, at Sacramento, California.

| Ritta Mashriqi | */s/Ritta Mashriqi* |
|:---:|:---:|
| Declarant | Signature |

SA2019101934
36683598.docx

**ER452**

1   COSCA LAW CORPORATION
    CHRIS COSCA   SBN 144546
2   1007 7th Street, Suite 210
3   Sacramento, CA 95814
    916-440-1010
4

5   AMY L. BELLANTONI
    THE BELLANTONI LAW FIRM, PLLC
6   2 Overhill Road, Suite 400
    Scarsdale, NY 10583
7   Telephone: 914-367-0090
    Facsimile:  888-763-9761
8   *Pro Hac Vice admission forthcoming*

9   Attorneys for Plaintiffs

10                  **UNITED STATES DISTRICT COURT**

11                  **EASTERN DISTRICT OF CALIFORNIA**

12

13  MARK BAIRD and                        Case No.
14  RICHARD GALLARDO,
                        Plaintiffs,
15          v.                            **COMPLAINT FOR**
                                          **DECLARATORY AND**
16  XAVIER BECERRA, in his official       **INJUNCTIVE RELIEF**
17  capacity as Attorney General of the State of   **42 U.S.C. §§ 1983, 1988**
    California, and DOES 1-10,
18

19                  Defendants.

20          NOW COME Plaintiffs, MARK BAIRD and RICHARD GALLARDO, by and through

21  their counsel, and allege against Defendants California Attorney General Xavier Becerra and

22  Does 1-10 as follows:
23
            1.  This is an action for declaratory and injunctive relief proximately caused by
24
25  California's statutory firearms licensing scheme and the actions of the defendants for violations of

26  Plaintiffs' fundamental human rights under, *inter alia*, the Second, Fourth, and Fourteenth

27  Amendments to the United States Constitution pursuant to 42 U.S.C. §1983.

28

                                        1

            COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**JURISDICTION AND VENUE**

2.  The Court's jurisdiction over Plaintiffs' federal claims is authorized pursuant to 28 U.S.C. §1331 and §1343.

3.  The Court's jurisdiction over Plaintiffs' claims for injunctive and declaratory relief is authorized by 28 U.S.C. §2201 and §2202.

4.  The Court's jurisdiction over Plaintiffs' federal claims and for statutory attorney's fees is authorized pursuant to 42 U.S.C. §1983 and 42 U.S.C. §1988.

5.  Venue in this judicial district is proper under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

**THE PARTIES**

6.  Plaintiff, MARK BAIRD ("Plaintiff" or "Mr. Baird") is a United States citizen and a resident of Siskiyou County, California.

7.  Plaintiff, RICHARD GALLARDO ("Plaintiff" of "Mr. Gallardo") is a United States citizen and a resident of Shasta County, California.

8.  Defendant XAVIER BECERRA ("Defendant" or "Defendant Becerra") is the Attorney General of the State of California. Defendant Becerra is sued herein in his official capacity only. Pursuant to California State Constitution Article V, Section 13, as the Attorney General for the State of California, Defendant is the chief law enforcement officer of the State whose duty it is to ensure that the laws of the State are uniformly and adequately enforced.

9.  Defendant Becerra has direct supervision over every district attorney and sheriff and over such other law enforcement officers as may be designated by law, in all matters pertaining to the duties of their respective offices, and may require any of said officers to make reports concerning the investigation, detection, prosecution, and punishment of crime in their respective jurisdictions as to Defendant may seem advisable.

2

10.  Whenever in the opinion of Defendant Becerra any law of the State is not being adequately enforced in any county, it shall be Defendant's duty to prosecute any violations of law of which the superior court shall have jurisdiction. In such cases Defendant shall have all the powers of a district attorney. When required by the public interest or directed by the Governor, Defendant shall assist any district attorney in the discharge of the duties of that office.

11.  Becerra and Defendants "DOES 1-10" are personally and otherwise responsible for formulating, executing, and administering the California Penal Code, which include those related to the possession of firearms, licensing, and manner of carry.

12.  The true names or capacities of Defendants DOES 1-10, whether individual, corporate, or otherwise, are presently unknown to Plaintiffs and are therefore sued herein as "Does 1-10".

13.  Plaintiffs reserve the right to request leave of the Court to amend this complaint to identify the true names and/or capacities of one or more of Defendants Does 1-10 within a reasonable time of discovering their identities.

## STATEMENT OF FACTS

14.  In every county in California having a population under 200,000, where a law-abiding individual has met the criteria for the issuance of an open carry license, the Sheriff of such county has discretion to deny the application due to the "may issue" language of the statutes. (Penal Codes §26150 and §26155).

15.  The California Department of Justice ("DOJ") creates and provides to the state Sheriff's Offices standard Concealed Carry ("CCW") Application Forms.

16.  The California DOJ has not created, does not provide to the public via its website, and does not distribute to the various Sheriff's Offices in the state, a standard application for an open carry license.

3

17.  None of the counties in California that have populations of less than 200,000 people (aka "26150(b)(2) counties") have issued open carry licenses since 2012.

18.  California Penal Code §26225 requires that a copy of all firearms licenses issued in each county (open carry and concealed carry) be "filed immediately" with the DOJ.

19.  For the time period encompassing 2012 to the present, the DOJ's records reflect no open carry licenses have been issued in the State of California.

***Plaintiff Mark Baird: Siskiyou County***

20.  Plaintiff Mark Baird is an individual of unquestionably good moral character, a law-abiding citizen, and has never been charged with, summoned, or arrested for any violation of the California State Penal Code or any other criminal offense.

21.  Mr. Baird does not hold a California firearm license and does not fall within any of the exemptions to the California Penal Code sections criminalizing the possession of firearms, whether loaded or unloaded.

22.  Mr. Baird possesses firearms in his home for self-defense. Under California law, no license is required to possess a firearm in one's home for self-defense.

23.  Mr. Baird seeks to carry a handgun loaded and exposed (hereinafter "open carry") for self-defense outside of his home and in public.

24.  Mr. Baird seeks to carry a firearm loaded and exposed for self-defense in public without the need to demonstrate any "cause" or "reason" for the issuance thereof.

25.  Mr. Baird is a resident of the County of Siskiyou, California, which according to the most recent federal census has a population of less than 200,000 people. Based on the population of Siskiyou County, its residents are eligible to apply for an open carry firearm license under California's statutory firearms licensing scheme.

4

ER456

***Siskiyou County Application Process Devoid of "Open Carry" Option***

26.   The Siskiyou County written criteria for the issuance of a carry license does not contain an option for applying for an open carry license.

27.   The Siskiyou County written instructions for a "carry" license only identify an option for concealed carry, not open carry.

28.   The Siskiyou County handgun licensing procedure has no option for a law-abiding individual to apply for an open carry license.

29.   The Siskiyou County Sheriff's Office Information Form is entitled, "CONCEALED WEAPON LICENSE RENEWAL/CHANGE".

30.   The Siskiyou County Sheriff's Office has no form for an "Open Carry Renewal/ Change".

31.   The second page of the Siskiyou County Sheriff's Office Information Form indicates, "Signature of CCW holder".

32.   There are no forms used by the Siskiyou County Sheriff's Office, or available to the law-abiding residents of Siskiyou County, for the purpose of applying for an "Open Carry" handgun license.

33.   The Siskiyou County Sheriff's website only provides "Concealed Carry Weapon Information", and not "Open Carry Weapon Information". The Siskiyou County Sheriff's website has no information related to obtaining and/or applying for an open carry license.

34.   The Siskiyou County Sheriff's Office provides to carry license applicants an approved firearm application form issued by the State of California Department of Justice (the "DOJ Application"). The DOJ Application contains a section for the applicant to indicate the type of license being applied for, which is to be filled out by the applicant.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**ER457**

35.  The "type of license" section on the DOJ Application handed out by the Siskiyou County Sheriff's Office is pre-populated by the Siskiyou County Sheriff's Office and indicates, "STANDARD CCW".

36.  By filling in the "type of license" section on the DOJ Application, the Siskiyou County Sheriff's Office eliminates the ability for Siskiyou County residents to apply for an open carry license.

37.  By filling in the "type of license" section on the DOJ Application, the Siskiyou County Sheriff's Office purposely conceals from its residents their right to choose the type of handgun license to apply for, to wit, open carry.

38.  On more than one occasion, Mr. Baird applied to Siskiyou County Sheriff Jon Lopey ("Sheriff Lopey") for an open carry license for self-defense in public pursuant to California Penal Code §26150.

39.  Sheriff Lopey has denied each of Mr. Baird's requests for an open carry firearms license.

40.  In Siskiyou County, even where an applicant has met the criteria for the issuance of an open carry license, the "may issue" language of California's licensing scheme gives Sheriff Lopey the authority to deny the application. (Penal Code §26150(b)).

41.  Mr. Baird has met the criteria for the issuance of an open carry license, yet Sheriff Lopey has denied his applications. Sheriff Lopey was authorized to deny Mr. Baird's applications because California's licensing scheme contains the language "may issue".  (Penal Code §26150(b)).  Upon information and belief, Sheriff Lopey's described conduct is performed at the direction of and/or with the knowledge and approval of Defendant Becerra.

42.  There is no administrative appeal process available for challenging Sheriff Lopey's denial of Mr. Baird's applications for an open carry license.

6

ER458

43.  Even if there were an available administrative appeal process to challenge Sheriff Lopey's denial of Mr. Baird's application for an open carry license, such 'process' would be futile because Sheriff Lopey informed Mr. Baird that he will not issue "open carry" licenses.

44.  Upon information and belief, Sheriff Lopey has not issued any open carry firearm licenses during his tenure as Sheriff of Siskiyou County.

45.  If the language of California's licensing scheme provided that the Sheriffs "shall issue" an open carry license to applicants who meet the criteria under Penal Code §26150(a) for the issuance thereof, Sheriff Lopey would be required by law to issue an open carry license to Mr. Baird.

46.  Mr. Baird would apply for an open carry license in a county other than Siskiyou County, but is prohibited by California Penal Code 26150(b)(2). California law requires open carry license applications be made in the county of residence. Mr. Baird's application for an open carry license in another county would be futile as none of the Sheriff Offices in California will issue an open carry license.

47.  Mr. Baird does not have a residence outside of Siskiyou County and is, therefore ineligible under §26150 and/or §26155 to apply for an open carry license in any other county.

48.  Mr. Baird seeks to carry a firearm loaded and exposed for self-protection outside of Siskiyou County, but is precluded by California State Penal Code §26150(b) and 26155(b), which provide that an open carry license is only valid in the county of issuance.

49.  If Mr. Baird is ultimately issued an open carry license, his Second Amendment right to possess firearms for self-protection in public will exist only within Siskiyou County. The moment Mr. Baird steps over the line from Siskiyou County into any other county in California, his open carry license will become invalid, leaving him subject to physical harm, criminal prosecution and incarceration. (Penal Codes §25850, §26150, and §26155).

ER459

50.  Mr. Baird, in fact, travels outside of Siskiyou County and intends to carry loaded and exposed for self-protection during such travels throughout the State of California.

51.  Irrespective of the frequency of Mr. Baird's travels outside of Siskiyou County, his right to open carry while traveling outside of his county of residence is being infringed and violated by California State Law and Defendants who, *inter alia,* enforce and direct the enforcement of such laws.

52.  Mr. Baird intends to exercise his Second Amendment right to open carry in Siskiyou County and throughout the State of California, with or without an open carry license, as he is a law-abiding citizen, with no state or federal prohibitors to the possession of firearms, and seeks to exercise a core right protected by the Second Amendment, to wit, the right to open carry a firearm in public for self-protection.

**Plaintiff Richard Gallardo: Shasta County**

53.  Plaintiff Richard Gallardo is an individual of unquestionably good moral character, a law-abiding citizen, and has ever been charged with, summoned, or arrested for any violation of the California State Penal Code or any other criminal offense.

54.  Mr. Gallardo possesses firearms in his home for self-defense. Under California law, no license is required to possess a firearm in one's home for self-defense.

55.  Mr. Gallardo seeks to carry a handgun loaded and exposed ("open carry") for self-defense outside of his home and in public.

56.  Mr. Gallardo seeks to carry a firearm loaded and exposed for self-defense in public without the need to demonstrate any "cause" or "reason" for the issuance thereof.

57.  Mr. Gallardo is a resident of Shasta County, California. Shasta County has a population of less than 200,000 people. The residents of Shasta County are eligible to apply for an open carry firearm license under California's statutory firearms licensing scheme.

8

*Shasta County Application Process Devoid of "Open Carry" Option*

58.  The Shasta County written criteria for the issuance of a carry license does not contain an option for applying for an open carry license.

59.  The Shasta County written instructions for a "carry" license identify only "concealed carry".

60.  The Shasta County handgun licensing procedure has no option for a law-abiding individual to apply for an open carry license.

61.  The Shasta County Sheriff's Office Criteria and Requirements Form only mentions the process for applying for a Concealed Carry License.

62.  The Shasta County Sheriff's Office has no application form for an "Open Carry Renewal/Change".

63.  There are no forms available or used by the Shasta County Sheriff's Office for the purpose of applying for an "Open Carry" handgun license.

64.  The Shasta County Sheriff's website only provides information pertaining to applying for a "Concealed Carry Weapon" license, and no information pertaining to applying for an "Open Carry" license.

65.  The Shasta County application instructions entitled, "Concealed Weapon Permit Application Process" only pertains to applying for a concealed carry license. Shasta County has no instructions pertaining to applying for an open carry license.

66.  The Shasta County Sheriff's Office provides the approved firearm application form issued by the State of California Department of Justice (the "DOJ Application"), which is entitled, "Standard Application for License to Carry a Concealed Weapon (CCW)."

67.  Shasta County Sheriff Tom Bosenko ("Sheriff Bosenko") has not issued any open carry firearm licenses during his tenure in Shasta County.

9

ER461

68.  Sheriff Bosenko has publicly declared that he will never issue an open carry firearm license because open carry would cause a lot of angst, fear, and concern for his deputies.

69.  Sheriff Bosenko stated publicly that, based on conversations during his regular meetings with the Sheriffs around the State, none of the Sheriffs serving in 26150(b)(2) counties in California have ever issued "open carry" pistol licenses.  Upon information and belief, Sheriff Bosenko and all other Sheriffs in the State of California are refusing to issue open carry firearm licenses at the direction of and/or with the encouragement, knowledge and/or approval of Defendant Becerra.

70.  Mr. Gallardo applied to Sheriff Bosenko's office for an open carry license on more than one occasion.  Each of Mr. Gallardo's applications for an open carry license were denied by the Shasta County Sheriff's Office.

71.  The Shasta County Sheriff's Office explained, "We don't offer a license to carry loaded and exposed in Shasta County.  This type of license is only good in the county issued and we would have to extend this option to all permit holders."

72.  Mr. Gallardo has met the criteria for the issuance of an open carry license, yet the "may issue" language of California's licensing scheme gives Sheriff Bosenko the authority to deny the application. (Penal Code §26150(b)).

73.  If the language of California's licensing scheme provided that the Sheriffs "shall issue" an open carry license to applicants who meet the statutory criteria under Penal Code §26150(a) for the issuance thereof, Sheriff Bosenko would be required by law to issue an open carry license to Mr. Gallardo.

74.  Mr. Gallardo would apply for an open carry license in a county other than Shasta County, but is prohibited by California Penal Code §26150(b) and §26155(b). California law requires open carry license applications be made in the county of residence. Open carry licenses

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

are invalid outside of the county of issuance.

75.  Mr. Gallardo does not have a residence outside of Shasta County and is, therefore, ineligible to apply for an open carry license in any other county. Even if Mr. Gallardo were eligible to apply for an open carry license in a county having a population less than 200,000 other than Shasta County, such application would be futile as no Sheriff Offices in California issue open carry licenses.

76.  There is no administrative appeal process available for challenging Sheriff Bosenko's denial of Mr. Gallardo's applications for an open carry license.

77.  Even if there were an available administrative appeal process to challenge Sheriff Bosenko's denial of Mr. Gallardo's application for an open carry license, such 'process' would be futile because Sheriff Bosenko affirmatively stated that he does not, and will not, issue open carry licenses in Shasta County.

78.  Mr. Gallardo seeks to carry a firearm loaded and exposed for self-protection outside of Shasta County, but is precluded by California State Penal Code §26150(b)(2), which provides that an open carry license is only valid in the county of issuance.

79.  If Mr. Gallardo is ultimately issued an open carry license, his Second Amendment right to self-protection in public will exist only within Shasta County. The moment Mr. Gallardo steps over the line from Shasta County into any other county in California, his open carry license would become invalid, leaving him subject to physical harm, criminal prosecution, and incarceration. (See, Penal Codes §25850, §26150, and §26155).

80.  Mr. Gallardo, in fact, travels outside of Shasta County and intends to carry loaded and exposed for self-protection during such travels throughout the State of California.

81.  Irrespective of the frequency of Mr. Gallardo's travels outside of Shasta County, his right to open carry while traveling outside of his county of residence is infringed and violated by

11

California State Law.

82.  Mr. Gallardo intends to exercise his Second Amendment right to open carry in Shasta County and throughout the State of California, with or without an open carry license, as he is a law-abiding citizen, with no state or federal prohibitors to the possession of firearms, and seeks to exercise a core right protected by the Second Amendment, to wit, the right to open carry of a firearm in public for self-protection.

### STATEMENT OF LAW[1]

#### *Law Enforcement Has NO DUTY to Protect the Individual*

83.  Despite the common misconception that law enforcement is required to "Serve and Protect", police officers have no duty to protect any individual from physical harm caused by a third person. Citizens have no constitutional right to be protected by the state from physical attack by private third parties, absent some special relationship between the state and the victim or the criminal and the victim that distinguishes the victim from the general public. *Balistreri v Pacifica Police Dept.*, 901 F2d 696, 699-700 (9th Cir 1988) (dismissing complaint where police failed to take steps to respond to the continued threats, harassment and violence by estranged husband because "there is, in general, no constitutional duty of state officials to protect members of the public at large from crime."); *Martinez v. California*, 444 U.S. 277, 284-85, 62 L. Ed. 2d 481, 100 S. Ct. 553 (1980); *Ketchum v County of Alameda*, 811 F2d 1243, 1244-47 (9th Cir 1987); *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982).

84.  California state laws cloak police officers with immunity from liability where police are alleged to have failed to deploy prospective protective services, such as by failing to provide armed security on buses, failing to provide police personnel to patrol a parking lot where a sexual assault subsequently occurred, or failing to dispatch police to a residence where a woman claimed

---

[1] The Statement of Law is integral to Plaintiffs' claims and prayers for declaratory and injunctive relief.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

her estranged husband had threatened to kill her. See, e.g., *So v Bay Area R.T.*, 2013 US Dist LEXIS 149807, at *17-18 [ND Cal Oct. 17, 2013, No. C-12-05671 DMR] citing, *Gates v. Superior Court*, 32 Cal. App. 4th 481, 505-07, 38 Cal. Rptr. 2d 489, 503-04 (1995) (summarizing cases; applying Section 845 immunity to LAPD officers sued for withdrawing from an area at the start of a riot).

85.   Neither a public entity nor a public employee is liable for injury caused by the failure to make an arrest or by the failure to retain an arrested person in custody. California Government Code §846. See also, *So v Bay Area R.T.*, 2013 US Dist LEXIS 149807 at *27-29, n 8 [ND Cal Oct. 17, 2013, No. C-12-05671 DMR] citing, *Sullivan v. City of Sacramento* (1987) 190 Cal.App.3d 1070, 1077, 235 Cal.Rptr. 844 (cases finding police officers not liable for failure to protect are generally grounded in the common law distinction between misfeasance and nonfeasance); *City of Sunnyvale v. Superior Court*, (1988) 203 Cal.App.3d 839, 842, 250 Cal.Rptr. 214) ("One who has not created a peril is not liable in tort for merely failing to take affirmative steps to assist or protect another, absent a special relationship giving rise to a duty to so act.") (internal citations omitted). See, e.g., *Adams v. City of Fremont*, 68 Cal. App. 4th 243, 80 Cal. Rptr. 2d 196 (Cal. Ct. App. 1999) (asserting NIED and wrongful death actions against police who failed to prevent suicide); *Williams v. State of California*, 34 Cal. 3d 18, 192 Cal. Rptr. 233, 664 P.2d 137 (1983) (negligence claim against police officers who did not investigate or pursue owner of a passing truck whose brake drum broke off and was propelled through the windshield of plaintiff's car); *M.B. v. City of San Diego*, 233 Cal.App.3d 699, 284 Cal. Rptr. 555 (Cal. Ct. App. 1991) (negligence claim against police who failed to investigate or take precautions against man who later raped woman who reported her fear of him to the police); *Von Batsch v. American District Telegraph Company*, 175 Cal. App. 3d 1111, 222 Cal. Rptr. 239 (Cal. Ct. App. 1985) (wrongful death complaint against city and burglar alarm company for

failure to investigate and discover unauthorized entry of intruder who later killed plaintiffs' husband and employee); *Carpenter v. City of Los Angeles*, 230 Cal. App. 3d 923, 281 Cal. Rptr. 500 (Cal. Ct. App. 1991) (negligent failure to warn witness of threats); *Wallace v. City of Los Angeles*, 12 Cal. App. 4th 1385, 16 Cal. Rptr. 2d 113 (Cal. Ct. App. 1993) (negligent failure to warn witness of danger); *McCorkle v. City of Los Angeles*, 70 Cal.2d 252, 74 Cal. Rptr. 389, 449 P.2d 453 (1969).

86.  Because law enforcement has no duty, legal or otherwise, to protect any individual from physical harm, each and every individual is responsible for protecting themselves from personal harm and danger.

87.  The government cannot prevent law-abiding individuals from exercising their fundamental right to possess firearms in public to protect themselves from physical harm.

### The U.S. Constitution Codifies Pre-Existing Human Rights

88.  We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain inalienable Rights, that among these are Life, Liberty and the pursuit of Happiness. *The Declaration of Independence*, 1 U.S.C. § XLIII (1776).

89.  Among the "self-evident truths" the Framers of the Constitution believed was that God endowed people with certain inalienable rights, rights no government could take away; these rights were inalienable by the government because they were derived from a source more powerful than, and entitled to more respect than, the government--even a democratically elected government. *Newdow v Rio Linda Union Sch. Dist.*, 597 F3d 1007, 1029 (9th Cir 2010) (analyzing whether the government's inclusion of the phrase "under God" in the Pledge of Allegiance established a religion; ultimately holding it did not.).

90.  "The Declaration of Independence was the promise; the Constitution was the fulfillment." The Constitution fulfilled the promise of the Declaration by creating a government

14

of limited powers, divided into three coequal but separate branches that would check and balance one another to ensure the government remained *limited*, and the people's rights secure. *Newdow v Rio Linda Union Sch. Dist.*, 597 F3d at 1030-1031.

91. The pre-existing human rights codified in the Bill of Rights (the first 10 Amendments to the U.S. Constitution) are attached to the *individual*.

92. The Bill of Rights protects pre-existing freedoms, *inter alia,* freedom of speech, religion, and the press, freedom from governmental intrusion by soldiers into one's home, security in one's person and home from warrants lacking probable cause, freedom from unreasonable governmental searches, freedom from cruel and unusual punishment by the government, freedom from being prosecuted twice for the same criminal offense, the right to a trial by jury, freedom from self-incrimination in the face of criminal charges, and *inter alia,* the right to confront witnesses against you. See, e.g., *Carpenter v United States*, ___US___ , ___, 138 S Ct 2206, 2257 (2018) ("As the plain language of the Fourth Amendment makes clear, Fourth Amendment rights are personal."), citing, *Rakas v. Illinois*, 439 U. S. 128, 140, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978).

### The Constitutional Amendments Are Fully Applicable to the States

93. Decades ago, the United States Supreme Court abandoned the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights. *McDonald v City of Chicago*, 561 US at 785-786, citing, *S New York*, 268 US 652, 654 (1925); *Cantwell v. Connecticut*, 310 U.S. 296 (1940); *Louisiana ex rel. Gremillion v. NAACP*, 366 U.S. 293 (1961)], the prohibition of unreasonable searches and seizures of the Fourth Amendment, [*Ker v. California*, 374 U.S. 23 (1963)], and the right to counsel guaranteed by the Sixth Amendment, [*Gideon v. Wainwright*, 372 U.S. 335 (1963)] are all to be enforced against the States under the Fourteenth Amendment according to

15

ER467

the same standards that protect those personal rights against federal encroachment.").

94.  Likewise, the Second Amendment right to keep and bear arms for the purpose of self-defense is fully applicable to the states. *McDonald v City of Chicago*, supra.

**The Second Amendment**

95.  The rights codified in the Bill of Rights are self-evident – the individual has no burden to prove their entitlement to the exercise of these rights. Because these are pre-existing rights, the individual automatically benefits from, and is protected by, such rights.

96.  No individual is required to seek permission from the government before enjoying the benefits of the rights codified in the Bill of Rights. The Bill of Rights limits the *government's conduct*; it does not give anything to the individual other than freedom from governmental oppression.

97. "A well-regulated militia, being necessary to the security of a free State, the right of the people to keep and bear arms, shall not be infringed." *United States Constitution, Amendment II.*

98.  The Second Amendment does not *give* the individual the right to possess and carry weapons to protect himself; it *prohibits the government* from infringing upon the basic, fundamental right of the individual to (1) keep arms and (2) bear arms for self-defense. *United States Constitution, Amendment II.*

99. "Individual self-defense is *the* central component of the Second Amendment right." *McDonald v City of Chicago*, 561 US at 767, citing, *District of Columbia v. Heller*, 554 U.S. 570, 599 (emphasis added) (internal quotations omitted). The Second Amendment protects the core right of the individual to self-protection. *District of Columbia v. Heller*, 554 US at 595-599, 628.

100.  The Second Amendment is "deeply rooted in this Nation's history and tradition" and fundamental to our scheme of ordered liberty". *McDonald v City of Chicago*, 561 US 742, 768

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**ER468**

(2010). "The right to bear arms has always been the distinctive privilege of free men. Aside from any necessity of self-protection to the person, it represents among all nations power coupled with the exercise of a certain jurisdiction…[I]t was not necessary that the right to bear arms should be granted in the Constitution, for it had always existed." *District of Columbia v Heller*, 554 US at 619, *citing,* J. Ordronaux, Constitutional Legislation in the United States 241-242 (1891).

### The Right to "Keep" and "Bear" Arms

101.  The right of law-abiding responsible citizens to use arms in the defense of hearth and home is a core right protected by the Second Amendment. *District of Columbia v. Heller*, 554 US 570, 635 (2008).

102.  But, the right of the individual to possess firearms for self-defense in the home is not *the* core right of the Second Amendment, as many judicial decisions misleadingly posit. The Supreme Court in *Heller* did not hold or even opine that the right to possess firearms *in the home* was the core right of the Second Amendment. Such a myopic view of the scope of the Second Amendment's protections would render superfluous the language pertaining to the necessity of having a "well-regulated militia" to ensure "the security of a free State". Surely, the framers of the Constitution did not envision or intend that the well-regulated militia would (or could) secure the freedom of the State from inside of their homes.

103.  The individual's right to "self-defense" is *the core* Second Amendment right identified by the Supreme Court in *Heller.  Heller*, 554 US 630.  Nowhere in *Heller* did the Supreme Court limit the scope of the Second Amendment to the possession of firearms in the home for self-defense; its holding simply found that the defendant government's prohibition of firearm possession in the home violated the Second Amendment. The right of the people to keep arms (possess) and bear arms (carry in public), are each central and integral to the *core right to self-defense* that is protected by the Second Amendment and they are of equal importance. Self-

17

defense at home and self-defense in public are equally important rights because keeping arms and bearing arms are necessary to the individual's basic human right of self-defense.

**The Basic Human Right to Self-Defense**

104.  Self-defense is a basic human right, recognized by many legal systems from ancient times to the present day. *McDonald v City of Chicago*, 561 US at 768. The fundamental right to self-defense is inseparable from the individual. The right of the law-abiding individual to possess firearms for the safety, defense, and preservation of one's own body, is as critical and fundamental *outside* of the home as it is *inside* of the home. See, *District of Columbia v. Heller*, 554 US at 595-599.

105.  The detailed analysis conducted by the Supreme Court in *Heller* bears out the Court's desire to emphasize the existence the fundamental human right of the individual to self-defense – at home or in public. The narrow issue before the Court in *Heller* could have been resolved without the Justices taking the time to call attention to the fact that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation. This meaning is strongly confirmed by the historical background of the Second Amendment. We look to this because it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right. The very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it 'shall not be infringed.' As we said in *United States v. Cruikshank*, 92 U.S. 542, 553, 23 L. Ed. 588 (1876), '[t]his is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence. The second amendment declares that it shall not be infringed…" *District of Columbia v Heller*, 554 US 570, 592 (2008) (emphasis in the original).

106.  The framers of the Constitution made clear that the core right to self-defense protected by the Second Amendment "*shall not be infringed*". The core right to keep arms at

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

home and bear arms in public *shall not* be interfered with to any extent. Infringement of a core Second Amendment right is *per se* unconstitutional.

107. An individual does not forfeit his right to self-protection by stepping outside of his home. The right to self-protection is as great outside of one's home as it is inside the home. *Moore v Madigan*, 702 F3d 933, 941 (7th Cir 2012).

108. Disarm a community and you rob them of the means of defending life. Take away their weapons of defense and you take away the inalienable right of defending liberty. *McDonald v City of Chicago*, 561 US at 776 (internal citation omitted).

### "Open Carry" is a Core Second Amendment Right

109. It is beyond cavil that law enforcement has no duty to protect the individual from harm. Because law enforcement has no duty to protect the individual, the duty of self-protection lies with the individual. Each person is solely and individually responsible for his own self-defense and self-protection, at home and in public.

110. The Supreme Court has recognized that the individual's right to self-defense is as critical and fundamental *outside* of the home as it is *inside* of the home. See, *District of Columbia v. Heller*, 554 US at 595-599; *McDonald*, 561 US at 776. Carrying firearms for self-defense outside of one's home is within the core rights protected by the scope of the Second Amendment.

111. The Courts of this Circuit have held that the "concealed carry" of firearms is merely a 'privilege' and not a core right subject to the protections of the Second Amendment. *Peruta v County of San Diego*, 824 F3d 919, 942 (9th Cir 2016) (en banc) (*Peruta II*) (cert. den.).

112. Having trampled the right of the law-abiding individual to decide for himself how to carry his firearm for self-defense in public, the only remaining option for bearing arms for self-protection in this Circuit is open carry.

113. The United States Supreme Court expressly rejected the idea that the scope of the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF **ER471**

Second Amendment right should be determined by 'judicial interest balancing'. *McDonald v City of Chicago*, 561 US at 785-786, citing, *Heller*, 554 U.S. at 633-635 ("Evidence from the period immediately following the ratification of the Fourteenth Amendment confirms that the right to keep and bear arms is considered a "fundamental" right"). (internal citations omitted).

114.  As such, the state cannot eviscerate a core right falling with the scope of the Second Amendment right to bear arms by requiring a showing of "good cause", forcing a law-abiding person to beg the government for permission to exercise his fundamental right to protect himself from physical harm.

### California Requires "Good Cause" for Open Carry Licenses

115.  In California, carrying a loaded firearm in public, whether open or concealed, without a license or some other statutory exemption is a criminal offense subjecting the offender to incarceration and other criminal penalties. (Penal Code §25850).

116.  California's firearm licensing scheme requires applicants to demonstrate "good cause" for the issuance of any carry license, whether for "concealed carry" or "open carry". (Penal Code §26150-§26225).

117.  As with the other nine (9) Amendments, the Second Amendment attaches to the *individual* and is automatic. There is no requirement that an individual demonstrate to the government "cause" before being able to exercise the core rights within the scope of the Second Amendment - to possess and carry ("keep and bear") firearms. *United States Constitution, Bill of Rights.*

118.  California Penal Code §26150(a) provides that when a person applies for a license to carry a pistol, revolver, or other firearm capable of being concealed upon the person, the sheriff of a county may issue a license to that person upon proof of all of the following: (1) the applicant is of good moral character; (2) "good cause" exists for issuance of the license; (3) the applicant is a

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF **ER472**

resident of the county or a city within the county, or the applicant's principal place of employment or business is in the county or a city within the county and the applicant spends a substantial period of time in that place of employment or business; and (4) the applicant has completed a course of training as described in Section 26165.

119.  Similarly, under California Penal Code §26155(a), when an individual applies for a license to carry a pistol, revolver, or other firearm capable of being concealed upon the person, the chief or other head of a municipal police department of any city or city and county may issue a license to that person upon proof of all of the following: (1) The applicant is of good moral character; (2) Good cause exists for issuance of the license; (3) The applicant is a resident of that city; (4) The applicant has completed a course of training as described in Section 26165.

120.  Under California Penal Codes §26150 and §26155, where an applicant has been found to be approved for the issuance of a license to carry, including demonstrating "good cause", the licensing officer[2] "may issue a license in either of the following formats:  (1) A license to carry concealed a pistol, revolver, or other firearm capable of being concealed upon the person. (2) Where the population of the county is less than 200,000 persons according to the most recent federal decennial census, a license to carry loaded and exposed in only that county a pistol, revolver, or other firearm capable of being concealed upon the person."[3]

121.  Under both licensing statutes, §26150 and §26155, an applicant for an "open carry" license in California must demonstrate "good cause" for the issuance of an "open carry" license. (Penal Code §26150(a)(2)).

**California's "Good Cause" Requirement for Open Carry
Violates the Second Amendment**

---

[2] The "sheriff" of the county pursuant to §26150 and the "chief or other head of a municipal police department" pursuant to §26155.

[3] (1) A license to carry concealed a pistol, revolver, or other firearm capable of being concealed upon the person. (2) Where the population of the county in which the city is located is less than 200,000 persons according to the most recent federal decennial census, a license to carry loaded and exposed in only that county a pistol, revolver, or other firearm capable of being concealed upon the person.

21

122.  Broadly prohibitory laws restricting a core Second Amendment right are categorically unconstitutional. *Heller*, 554 U.S. at 628-35 ("We know of no other enumerated constitutional right whose core protection has been subjected to a free-standing 'interest-balancing' approach."); *McDonald*, 130 S. Ct. at 3047-48.

123.  California's "good cause" requirement for the issuance of an open carry firearms license restricts the core right to self-defense under the protections of the Second Amendment and is *per se* unconstitutional. A law-abiding person does not lose his right to protect himself simply by walking outside of his front door. See, *District of Columbia v. Heller*, 554 US at 595-599 (The basic human right to self-defense is inseparable from the individual. The right of the law-abiding individual to possess firearms for the safety, defense, and preservation of one's own body, is as critical and fundamental outside of the home as it is inside of the home.).

124.  The Ninth Circuit upheld "good cause" requirements for the issuance of a concealed carry license based on the [unconstitutional] view that the Second Amendment does not extend to the concealed carry of firearms in public by members of the general public in *Peruta v County of San Diego*, 824 F3d at 939 ("any prohibition or restriction on concealed carry that a state may choose to impose, including a requirement of "good cause" however defined, does not violate the individual's Second Amendment rights).

125.  Eliminating the concealed carry of firearms from the scope of the rights protected by the Second Amendment leaves only one option for self-defense in public - open carry.  The *Peruta II* court acknowledged that if the Second Amendment protects the right of a member of the general public to carry a firearm in public, it is only the right to open carry. *Peruta II*, 824 F3d at 942.

126.  California's "good cause" requirement, upheld by the Ninth Circuit as a lawful restriction on the 'privilege' to carry concealed, is categorically unconstitutional when applied to

22

open carry, which is [by default] a core Second Amendment right.

127.  California's "good cause" requirement is unconstitutional because it treats a core Second Amendment right (open carry) the same way it treats what it deems to be a 'privilege' (concealed carry).

128.  The average person cannot establish "good cause", which is commonly defined in the Ninth Circuit and other circuits demonstrating a need for self-protection that is greater than the average person, requiring documented threats of violence that establish the applicant is a target and at risk for specific harm. "Good cause" can rarely be established because members of the general public have not had specific threats made against them nor can the average person demonstrate that they are being targeted for violent acts. The definition of "good cause" does not include the basic human right to self-defense in public.

129.  The factors constituting "good cause" for the issuance of a carry license vary from county to county as determined by the sheriff in office at the time; the definition is subject to change at the whim of the sitting sheriff and/or when a new sheriff is elected.

130.  Indeed, the Los Angeles Police Department has moved to cancel most of the few remaining concealed weapons permits in civilian hands, which have been held by law-abiding individuals since 1994 simply because Police Chief Michel Moore "does not believe [the concealed carry licensees] were still entitled to the permits, because he 'felt' it was 'unlikely' that they still faced 'extraordinary physical danger' to their lives.[4] "I do not believe the continued wholesale allowance for each to possess a CCW license based on circumstances that may have existed 24 years ago is in the best interest of the public," Chief Moore said. *Id.* The right to carry firearms for self-protection cannot continue to be controlled and dictated by the arbitrary and unconstitutional views of governmental officials with an unnatural and aberrant compulsion to

---

[4] See, https://bearingarms.com/tom-k/2019/04/01/lapd-wants-cancel-citizens-concealed-carry-permits/.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF    ER475

dictate whether and how law-abiding individuals exercise their fundamental right to protect themselves. Indeed, left unchallenged and unchecked, this controlling and irrational conduct will effectively leave law-abiding individuals completely vulnerable and defenseless in the presence of armed criminals, lawbreakers, and delinquents. This is true because the police have no duty to protect anyone and criminals, by definition, do not follow the law.

131.  Aside from Defendants' *de facto* ban on open carry and the issuance of open carry licenses since 2012, the state's statutory "good cause" requirement amounts to a total ban on public carry for the typical law-abiding citizen. When the "good cause" requirement is analyzed regarding its effect on the typical law-abiding citizen, it prevents and precludes the typical member of society from self-protection outside of their home. See, *Wrenn v. District of Columbia*, 864 F.3d 650, 665-666 (DC Cir 2017) ("…the good-reason law is necessarily a total ban on most D.C. residents' right to carry a gun in the face of ordinary self-defense needs, where these residents are no more dangerous with a gun than the next law-abiding citizen.").

132.  The "good cause" and "proper cause" requirements in this Circuit and others are intentionally imposed by the government for the sole purpose of severely restricting the issuance of concealed carry licenses. The very goal of the "good cause" requirement is to eliminate the public carrying of firearms. Because the average person cannot establish "good cause" as defined under California jurisprudence, few "concealed carry" licenses are issued in this state.

133.  The "good cause" requirement has, in fact, prevented the issuance of any open carry license in the State of California since 2012.

134.  The "good cause" requirement is *per se* unconstitutional and violates the Second Amendment because it requires individuals to distinguish themselves from the typical law-abiding citizen, however, fundamental rights like the right to self-protection are *the same* for every law-abiding individual.

24

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

135.  No law-abiding individual should be required to prove they are entitled to protect themselves from harm, particularly when law enforcement has no duty to protect the individual.

136.  Plaintiffs' right to self-protection exists wherever they are – whether in public or at home – its value and inalienability does not change based on their location.

137.  Those portions of California Penal Code §26150 and §26155 requiring an applicant to show "good cause" for the issuance of an "open carry" firearm license should be declared a violation of the Second Amendment, enjoined from enforcement, and stricken as unconstitutional.

**California's "May Issue" Language for "Open Carry" is Unconstitutional**

138.  California Penal Code §26150(a) provides that a sheriff of a county **may** issue a license to that person upon proof of all of the following: (1) the applicant is of good moral character; (2) good cause exists for issuance of the license; (3) the applicant is a resident of the county or a city within the county, or the applicant's principal place of employment or business is in the county or a city within the county and the applicant spends a substantial period of time in that place of employment or business; and (4) the applicant has completed a course of training as described in Section 26165. (emphasis added).

139.  California Penal Code §26150 provides that "where an applicant has been approved" for the issuance of a license to carry a pistol, revolver, or other firearm capable of being concealed upon the person, the sheriff **may issue** a license to carry loaded and exposed ("open carry") where the population of the county is less than 200,000 persons according to the most recent federal decennial census. (emphasis added).

140.  Similarly, Penal Code §26155 provides, "the chief or other head of a municipal police department **may issue** an "open carry" license…where the population of the county in which the city is located is less than 200,000 persons according to the most recent federal decennial census..." (emphasis added).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

141. Where a law-abiding person has no state or federal prohibitors to firearm possession, the government is prohibited from interfering with and infringing that individual's ability to exercise the basic human right to self-defense outside of the home. The right to self-protection outside of the home is as much a core and fundamental right falling within the scope of the Second Amendment as the right to self-protection inside of the home.

142. The "may issue" language of California Penal Codes §26150 and §26155 should be declared a violation of the Second Amendment, enjoined from enforcement, and stricken as unconstitutional.

### California's Geographical Restrictions on "Open Carry" Are Unconstitutional (Second Amendment Violation)

143. Applications for an open carry license must be made in the applicants' county of residence.[5] (Penal Codes §26150(a)(3) and §26155(a)(3)).

144. There are certain exceptions to the general prohibitions on "open carry" in California, but Plaintiffs do not fall within any of the statutory exceptions that would permit the "open carry" of a firearm throughout the State of California without criminal penalties.

145. Open carry licenses can only be issued in counties that have a population less than 200,000 and are only valid in the county of residence/issuance. (Penal Codes §26150(b) and §26155(b)).

146. If an individual who is duly issued an open carry license carries his firearm loaded and exposed in a county other than his county of residence (the county of issuance) he will be subject to criminal penalties and sanctions, up to and including imprisonment. (Penal Code §25850).

147. Individuals who are issued an open carry license in their home county are rendered

---

[5] Statutory language relating to business ownership and/or employment have been omitted as immaterial to the instant matter. Plaintiff is not substantially employed in any other county or city and state law preempts local authorities from issuing handgun "open carry" licenses, except as provided by law.

26

ER478

unarmed and defenseless when traveling to any other part of California.

148.  If Plaintiffs are issued an open carry license and thereafter choose to leave their firearms home while traveling to other counties in California, they will be left defenseless and unarmed.

149.  While governmental regulations on sensitive areas, such as schools and courthouses have been upheld by the courts as presumptively lawful (*Heller*, 554 US at 626), California's broad and overreaching geographical (1) limitation on the validity of open carry licenses; and (2) ban on the issuance of an open carry license based on population size, eviscerates a core right of the individual to "open carry" for self-protection outside of the home.

150.  Restricting the open carry of firearms from entire counties in the state based on population size unlawfully implicates a core Second Amendment right, serves no legitimate governmental interest, and has no provable or quantifiable effect on public safety.

151.  Indeed, the danger to the individual and need for the protections of the Second Amendment increase in direct proportion to the increase in population density, due to the corresponding increase in criminals and criminal activity in highly populated areas. Preventing open carry by law-abiding individuals in high crime/highly populated areas does not increase public safety. To the contrary, the open carry of firearms by law-abiding people in highly populated, high crime areas will decrease the rate of criminal activity.

A.  *County of Issuance*

152.  Those provisions of California Penal Code §26150(b) and §26155(b) restricting "open carry" to the county of issuance infringe on and violate a core right of the Second Amendment, to wit, the right to self-protection via "open carry" outside of the home in every other county in California.

153.  Those portions of §26150(b) and §26155(b) restricting "open carry" to the county of

27

issuance should be declared a violation of the Second Amendment, enjoined from enforcement, and stricken as unconstitutional.

B. *Counties With Populations Less Than 200,000*

154.  Those provisions of California Penal Code §26150(b) and §26155(b) restricting "open carry" to counties with a population under 200,000 infringe on and violate a core right of the Second Amendment, to wit, the right to self-protection via "open carry" outside of the home.

155.  Those portions of California Penal Code §26150(b) and §26155(b) restricting "open carry" to counties with a population under 200,000 should be declared a violation of the Second Amendment, enjoined from enforcement, and stricken as unconstitutional.

**California's Geographical Restrictions on "Open Carry" Are Unconstitutional
(Fourteenth Amendment Violation)**

156.  The right to travel "was recognized as a right fundamental to the national character of our Federal government" before the Fourteenth Amendment was ratified. *Edwards v California*, 314 US 160, 178 (1941). The fundamental constitutional right to travel is protected by the Privileges and Immunities Clause of Article IV, §2 of the U.S. Constitution, and the Privileges and Immunities and Equal Protection clauses of the Fourteenth Amendment to the U.S. Constitution.  See, *Att'y Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 902 (1986).  This right "protects the right of a citizen of one State to enter and to leave another State." *Saenz v. Roe*, 526 U.S. 489, 500 (1999); see *United States v. Guest*, 383 U.S. 745 (1966); *Edwards v. California*, 314 U.S. 160 (1941).

157.  In *Bell v Maryland*, 378 US 226 (1964), the Supreme Court queried, "Is the right of a person to eat less basic than his right to travel, which we protected in *Edwards v. California*, 314 U.S. 160? Does not a right to travel in modern times shrink in value materially when there is no accompanying right to eat in public places? The right of any person to travel interstate

28

**ER480**

irrespective of race, creed, or color is protected by the Constitution. Certainly his right to travel intrastate is as basic. Certainly his right to eat at public restaurants is as important in the modern setting as the right of mobility. In these times that right is, indeed, practically indispensable to travel either interstate or intrastate." *Bell v Maryland*, 378 US at 255 (vacating the convictions of 12 African American students charged with Criminal Trespass after they participated in a "sit-in" demonstration at a privately-owned restaurant that refused to serve members of their race.).

158.  The fundamental right to interstate and/or intrastate travel, in order to exercise the basic right to eat for self-preservation, is common sense.

159.  The United States Supreme Court recognized that eating is a basic necessity for the body to continue its existence, but if the body succumbs to death from a physical attack, what good is food then?  Protection of the body from physical harm is even more fundamental to human existence than food; if the body does not exist, neither does the need for travel, food, or water.

160.  The right of any person to travel interstate irrespective of race, creed, or color is protected by the Constitution. *Edwards v. California*, supra. "Certainly [the] right to travel intrastate is as basic. Certainly [the] right to eat at public restaurants is as important in the modern setting as the right of mobility. In these times that right is, indeed, practically indispensable to travel either interstate or intrastate."

161.  The statutory ban on open carry (i) outside of one's own county and (ii) in counties having a population over 200,000 violates Plaintiffs' fundamental right to travel by forcing them to choose which constitutional right they would rather exercise:  the right to travel or their Second Amendment right to self-defense in public.

162.  California Penal Codes §26150(b) and §26155(b) *per se* interfere with and deter Plaintiffs' right to intrastate travel by forcing Plaintiffs to choose between self-protection (Second

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

ER481

Amendment) and their right to travel. See, e.g., *Soto-Lopez*, 476 U.S. at 903.

163. California Penal Codes §26150(b) and §26155(b) discriminate against individuals based on the exercise of their Second Amendment rights.

164. If Plaintiffs are granted an open carry license and carry a firearm outside of their respective counties of residence, which they each intend to do, they will risk having their open carry licenses revoked for failing to remain in the county of issuance while armed, which will deprive them of their Second Amendment right to open carry.

165. If Plaintiffs carry openly outside of their counties of issuance, which they intend to do, they will risk criminal prosecution because they will be carrying open and loaded without a valid license based on the restrictions of Penal Code §26150(b) and §26155(b). See, *Harman v. Forssenius*, 380 U.S. 528, 540 (1965) ("It has long been established that a State may not impose a penalty upon those who exercise a right guaranteed by the Constitution.").

A. *County of Issuance*

166. Those portions of California Penal Codes §26150(b) and §26155(b) restricting the validity of an "open carry" license to the county of issuance violate the Fourteenth Amendment right to travel.

167. Those portions of California Penal Codes §26150(b) and §26155(b) restricting the validity of an "open carry" license to the county of issuance should be declared a violation of the Fourteenth Amendment right to travel, enjoined from enforcement, and stricken as unconstitutional.

B. *Counties With Populations Less Than 200,000*

168. Those portions of California Penal Codes §26150(b) and §26155(b) restricting the issuance of "open carry" license to counties with a population under 200,000 violate the Fourteenth Amendment right to travel.

30

169. Those portions of California Penal Codes §26150(b) and §26155(b) restricting the issuance of "open carry" licenses to counties with a population under 200,000 should be declared a violation of the Fourteenth Amendment right to travel, enjoined from enforcement, and stricken as unconstitutional.

### California's Geographical Restrictions on "Open Carry" Are Unconstitutional
### (Dormant Commerce Clause)

170. The Constitution grants Congress the power to "regulate Commerce … among the several States." U.S. Const. art. I, §8, cl. 3. "Although the Constitution does not in terms limit the power of States to regulate commerce, [the Supreme Court] ha[s] long interpreted the Commerce Clause as an implicit restraint on state authority, even in the absence of a conflicting federal statute." *United Haulers Ass'n, Inc. v. Oneida Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007).

171. The Commerce Clause's implied restriction on state authority, referred to as the "dormant Commerce Clause," is driven by a concern about economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors. *McBurney v. Young*, 133 S. Ct. 1709, 1719 (2013) (internal quotations omitted); *Maine v. Taylor*, 477 U.S. 131, 151 (1986) ("The Commerce Clause significantly limits the ability of States and localities to regulate or otherwise burden the flow of interstate commerce." (emphasis added)).

172. Plaintiffs intend to carry their firearms openly while traveling outside of their counties of issuance and into other counties within the State of California for all lawful purposes, including those activities that affect interstate and intrastate commerce.

173. California Penal Codes §26150(b) and §26155(b) violate the Dormant Commerce Clause by discriminating against interstate commerce, imposing burdens on commerce that far

31

ER483

exceed any purported local benefits, and impermissibly attempting to control economic activity that takes place entirely (i) outside of the county issuing an open carry license, and (ii) outside of counties having a population under 200,000.

174.  California Penal Codes §26150(b) and §26155(b) impermissibly and negatively affect the regulation of commerce within and without counties having populations of 200,000 or less.

A.  *County of Issuance*

175.  Those provisions of California Penal Codes §26150(b) and §26155(b) restricting "open carry" to the county of issuance violate the Dormant Commerce Clause.

176.  Those provisions of California Penal Codes §26150(b) and §26155(b) restricting "open carry" to the county of issuance should be declared a violation of the Dormant Commerce Clause, enjoined from enforcement, and stricken as unconstitutional.

B.  *Counties With Populations Less Than 200,000*

177.  Those provisions of California Penal Codes §26150(b) and §26155(b) restricting "open carry" to counties with a population under 200,000 violate the Dormant Commerce Clause.

178.  Those provisions of California Penal Codes §26150(b) and §26155(b) restricting "open carry" to counties with a population under 200,000 should be declared a violation of the Dormant Commerce Clause, enjoined from enforcement, and stricken as unconstitutional.

**California's Unloaded Carry Restrictions Are Unconstitutional
(Second Amendment Violation)**

179.  A core right of the Second Amendment is the right of the law-abiding individual to carry a firearm ("bear arms") outside of the home. See cases cited, *supra.* An open carry license issued under §26150(b) or §26155(b) would permit Plaintiffs to carry a firearm in public "loaded and exposed".

32

180.  California Penal Code §26350 makes it a crime to open carry an unloaded handgun, whether on one's person, inside a vehicle, or on a vehicle. A violation of §26350 carries penalties of imprisonment up to one year and/or fines.

181.  Should Plaintiffs be issued open carry licenses and encounter a circumstance wherein their respective handguns are in an unloaded state while in public, Plaintiffs would face criminal prosecution and penalties, including imprisonment.

182.  Should Plaintiffs be issued open carry licenses, they may also face circumstances wherein they possess their handgun inside of their respective vehicles in an unloaded state, and would therefore face criminal prosecution and penalties including imprisonment under Penal Code §26350.

183.  California Penal Code §26350 should be declared unconstitutional as applied to open carry licensees, enjoined from enforcement, and stricken as unconstitutional.

### Demarcating the Manner of Personal Carry Violates the Second Amendment

184.  A core right protected by the Second Amendment is the right to bear arms for self-defense. The term "bears a firearm" refers to an individual "carrying the weapon on or about his person for the purpose of being armed and ready for offensive or defensive action in case of a conflict." *Muscarello v United States*, 524 US 125, 139-140 (1998) (Justice Ginsberg, dissenting opinion), citing, Black's Law Dictionary 214 (6th ed. 1990) (defining the phrase "carry arms or weapons"). "On or about his person" necessarily means one's body or within his area of reach.

185.  The government's interference with the manner in which a law-abiding individual can bear arms in public unlawfully infringes upon the Second Amendment and fails to promote any significant, substantial, or important government objective. *Pena v Lindley*, 898 F3d 969, 979 (9th Cir 2018), citing, *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 965 (9th Cir. 2014).

**ER485**

186.  The law-abiding individual with no legal or factual prohibitors to firearm possession, such as Plaintiffs, is fit to possess firearms *in the first instance*.

187.  A firearm in the hands of the law-abiding person, such as Plaintiffs, is a tool of self-protection, and sometimes, a tool of protection for law enforcement officers and fellow neighbors as well.

188.  A law-abiding person carrying a firearm, such as Plaintiffs, is no more likely to commit a crime with that firearm than he is likely to commit a crime with the car he drives, the knife in his tackle box, or the axe in his shed.

189.  California strives to eliminate the public carry of firearms altogether, as borne out by California's licensing scheme which requires of "good cause" for the issuance of any type of carry license whether for concealed carry or open carry.

190.  Defendant Becerra, dubbed "The Enemy of the Second Amendment"[6], has consistently taken steps in his professional capacity to restrict Second Amendment rights.

191.  A law-abiding individual who cannot demonstrate "good cause" as defined by Defendants, and California state and federal courts, should not face criminal prosecution simply because s/he has made the tactical decision to carry a lawfully owned firearm in the small of the back holster, in a pocket, or underneath a sweater or jacket.

192.  Concealed carry is the universally preferred method of law-abiding individuals, including Plaintiffs, to carry a firearm, for reasons including tactical advantage over an attacker, convenience of carry location, accessibility to one's firearm for self-defense, and practical considerations relating to one's wardrobe.

193.  With the commencement of governmental regulation of the possession of firearms, legislative statutes and judicial case law have unconstitutionally redefined the term "concealed".

---

[6] NRA-ILA, January 7, 2017.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

"Concealment" was historically synonymous with an intention to hide or cover up forbidden

conduct and/or objects, denoting malintent and a criminal *mens rea*.

194.  A law-abiding individual who is lawfully carrying a firearm on their person in public

– whether openly such that the firearm can be readily seen, or in a waistband holster covered by a

winter jacket – is simply "carrying" their firearm. A law-abiding person has no malintent; they

have no intention to use their firearm to commit a crime. There is no legitimate governmental

objective served by regulating how law-abiding people can carry their firearms.

195.  The definition of "open carry" or "exposed carry" cannot even be conclusively

established and creates an unlawful legal burden and risk of criminal prosecution on the law-

abiding individual.  An individual with a duly-issued open carry license who puts on a coat in the

wintertime, is now 'concealing' his firearm. A woman wearing a dress upon which it would be

impossible to secure a firearm "exposed", will necessarily be stripped of the right to protect

herself in public because she will be prosecuted as a criminal if she carries her firearm holstered

underneath her dress or in her purse.

196.  In 1863, California passed legislation banning concealed carry of firearms due to the

high rate of crime during the Gold Rush.[7] As the San Francisco newspaper The Daily Alta

California explained it:

> "During the thirteen years that California has been a State, there
> have been more deaths occasioned by sudden assaults with weapons
> previously concealed about the person of the assailant or assailed,
> than by all other acts of violence which figure on the criminal
> calendar…. Heretofore there has been no law passed which would
> remedy the evil. Public opinion, as expressed through the action of
> our legislators, seems to have sanctioned the custom, barbarous
> though it be. For many sessions prior to the last, ineffectual efforts
> were made to enact some statute which would effectually prohibit
> this practice of carrying concealed weapons. A radical change of

[7] NRA Institute for Legislative Action, Tuesday January 1, 2013, *citing,* "Three Years in California", Borthwick, J.D. (1857); Gunfighters, Highwaymen, & Vigilantes", McGrath, Roger (1984).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

public sentiment demanded it, but the desired law was not passed until the last Legislature, by a handsome majority, enacted the subjoined act, entitled "An Act to prohibit the carrying of concealed weapons."

197.  Only 7 years later, California repealed the concealed carry ban. The Sacramento Daily Union published an editorial discussing the 1870 repeal of the concealed-carry ban:

> "There is reason to believe it was generally observed by the vast majority of good citizens. There is as good reason to believe it was not observed by the vast majority of roughs, fighting men, and predatory characters. In many cases of assault between quiet citizens and these last named characters, it was found that the good citizen had to defend himself unarmed against the predacious one with arms, the former suffering for his respect of the law. It was also found that the police were apt to arrest any quiet citizen on whom they discovered concealed weapons, while they paid little attention to the roughs who were known to carry arms habitually."[8]

198.  Criminals, by definition, do not follow the law. No governmental purpose is served by restricting law-abiding people from carrying their firearms in the manner they feel most comfortable and are better able tactically to protect themselves.

199. "Laws preventing law-abiding citizens from carrying firearms for self-protection… become an abomination in practice…plac[ing] the peaceful citizen completely at the mercy of a class whose offenses against order it was intended to check, but did not, owing to the remissness in duty of the guardians of the law." Sacramento's experience was the immediate cause of the "repealing movement … where bands of armed roughs, scorning the law against carrying concealed weapons, were perpetrating highway robberies on quiet, unarmed citizens, who could not prepare for self-defense without danger of being arrested and fined every day."

200. "The editorial acknowledged that one of the good things hoped for had happened in the intervening months:

---

[8] NRA Institute for Legislative Action, Tuesday January 1, 2013.

36

> "It was reasoned with much plausibility that if the roughs once
> knew that quiet citizens might prepare to defend themselves without
> danger of being punished for misdemeanor, the bare suspicion that
> such a person had about him a weapon would disarm the roughs
> and prevent robberies. This has in fact been one of the results."

201.  Arguing against the reasons, the State of California repealed the ban on concealed carry. The Daily Alta newspaper editorialized, in part, "To put a thing in its customary and convenient receptacle is not concealment. Concealment is a matter of motive…"[9]

202.  California Penal Code §25850 makes it a crime to carry a loaded firearm on one's person or in a vehicle, without regard to whether it is carried concealed or openly, while in any public place or on any public street in an unincorporated city, or any public place or public street in a prohibited area of an unincorporated territory.

203.  Plaintiffs seeks to carry their firearms in public in the manner of their choosing, concealed or open, throughout the State of California.

204.  By eliminating Plaintiffs' ability to choose how to defend themselves in public and their tactical decision-making ability regarding how to carry their firearms, California's firearm licensing scheme unlawfully burdens and infringes upon Plaintiffs' Second Amendment rights.

205.  There is no legitimate, measurable, or quantifiable impact on public safety that justifies California's interference with Plaintiffs' ability to choose how to carry their firearms for self-defense in public.

206.  California's firearm licensing scheme stripping law-abiding people, including Plaintiffs, of the ability to choose how to carry their firearms for self-defense in public is unconstitutional and serves no legitimate purpose.

207.  California's firearm licensing scheme restricting how Plaintiffs may carry their firearms for self-defense in public unlawfully infringes upon and violates Plaintiffs' Second

---

[9] NRA Institute for Legislative Action, Tuesday January 1, 2013, *citing,* The Daily Alta California, 1869.

37

Amendment right to bear arms for personal protection.

208.  California's firearm licensing scheme deprives Plaintiffs of the ability to protect and defend themselves from physical harm in the manner they choose.

209.  California's firearm licensing scheme controlling a licensee's manner of carrying his firearm in public should be declared a violation of the Second Amendment, enjoined from enforcement, and stricken as unconstitutional.

**Demarcating the Manner of Personal Carry Violates the Fourth Amendment**

210.  The protections of the Fourth Amendment are not limited to privacy interests; its protections encompass possessory and liberty interests even when privacy rights are not implicated. *Soldal v. Cook County*, 506 U.S. 56, 63-64, 113 S. Ct. 538, 121 L. Ed. 2d 450 & n.8 (1992). A reasonable expectation of privacy is not required for Fourth Amendment protections to apply." *United States v. Jones*, 565 U. S. 400, 406, 132 S. Ct. 945, 950 (2012). "[E]ven in the absence of a trespass, a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable…In *Katz*, this Court enlarged its then-prevailing focus on property rights by announcing that the reach of the Fourth Amendment does not turn upon the presence or absence of a physical intrusion." *Jones*, 565 at 414 (internal citations omitted) (Sotomayor, J., concurring).

211.  A seizure for Fourth Amendment purposes may occur when there is some meaningful interference with an individual's possessory interest in property. *Kincaid v City of Fresno*, 2008 US Dist LEXIS 38532, at *10-11 (ED Cal May 12, 2008, No. CV-F-06-1445 OWW) citing, *Soldal v. Cook County, Ill.*, 506 U.S. 56, 63, 113 S. Ct. 538, 121 L. Ed. 2d 450 (1992).

212.  A reasonable expectation of privacy is not required to trigger Fourth Amendment protection against seizures. See, e,g, *Miranda v. City of Cornelius*, 429 F.3d 858, 862 n.2 (9th Cir.

38

ER490

2005) (the city's seizure/impoundment of parked car was subject to the Fourth Amendment's reasonableness standard based on its interference with plaintiff's property interests regardless of whether there is an invasion of privacy"); *United States v. Paige*, 136 F.3d 1012, 1021 (5th Cir. 1998) ("The Supreme Court recently made clear that the protection afforded by the Fourth Amendment extends to an individual's possessory interests in property, even if his expectation of privacy in that property has been completely extinguished.") (citing *Soldal*)); *Lenz v. Winburn*, 51 F.3d 1540, 1550 n.10 (11th Cir. 1995) ("It is true that a possessory interest is all that is needed for the Fourth Amendment's reasonableness requirement to apply to a seizure.") (citing *Soldal*); *Bonds v. Cox*, 20 F.3d 697, 702 (6th Cir. 1994) ("[O]ur finding that Bonds had no reasonable expectation of privacy in the house at 4174 Dunn Avenue does not affect our conclusion that Bonds has standing to challenge the seizure of her property.").

213.  Plaintiffs have a possessory interest in their firearms, inside of their homes and in public.

214.  California's firearm licensing scheme unreasonably interferes with Plaintiffs' possession and use of their personal property.

215.  Analogous to a "prior restraint" of free speech, California's firearms licensing scheme unnecessarily restricts Plaintiffs' right to enjoyment and use of their personal property in public.

216.  California has enacted this statutory scheme because of the *type* of property that is involved, in the absence of any inherent danger related to the manner of carry.

217.  There is no inherent danger created by the manner in which Plaintiffs carry their firearm in public for self-defense because they are law-abiding individuals with no statutory prohibitors to firearms possession.

218.  California has no legitimate governmental interest in controlling and/or interfering

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

ER491

with the way law-abiding individuals, including Plaintiffs, carry their firearms in public.

219.  California's interference with Plaintiffs' ability to choose how to carry their firearms for self-defense in public is not substantially related to any legitimate governmental interest.

220.  California's firearm licensing scheme interference with, and restriction on, how a licensee can carry his firearms in public should be declared a violation of the Fourth Amendment, enjoined from enforcement, and stricken as unconstitutional.

**Demarcating the Manner of Personal Carry Violates the Fourteenth Amendment
(Procedural Due Process)**

221.  Plaintiffs have a demonstrated property interest in their firearms.

222.  California's firearm licensing scheme deprives Plaintiffs of the right to enjoyment of their property without due process, which interferes with and restricts the use and enjoyment of their personal property.

223.  There is no valid governmental interest is at stake that justifies the statutory interference with Plaintiffs' use and enjoyment of their property outside of their home and in public.

224.  California has no procedure in place to address the due process violations caused by its statutory scheme prior to the actual interference with the property rights of law-abiding individuals, including Plaintiffs.

225.  California has no additional or substitute procedural safeguards to prevent this due process violation.

226.  The only purpose of California's statutory scheme is to deprive its law-abiding residents of the right to carry firearms in public by creating a "good cause" requirement for concealed carry, deemed by the state to be a mere 'privilege', a standard that the general member of the public cannot attain, including Plaintiffs.

227.  It is unconstitutional to require Plaintiffs to demonstrate "good cause" before being

40

1   able to use and enjoy their property.

2       228.  California's licensing scheme unlawfully interferes with and restricts the

3   constitutional right to the use and enjoyment of property and should be declared a violation of the

4   Fourteenth Amendment right to due process, enjoined from enforcement, and stricken as

5   unconstitutional.

6

7   **Demarcating the Manner of Personal Carry Violates the Fourteenth Amendment**
    **(Substantive Due Process)**

8

9       229.  The Constitution does not explicitly mention any right of privacy. In a line of

10  decisions, going back as far as *Union Pacific R. Co. v. Botsford*, 141 U.S. 250, 251 (1891), the

11  Court has recognized that a right of personal privacy, or a guarantee of certain areas or zones of

12  privacy, does exist under the Constitution. *Roe v Wade*, 410 US 113, 152-153 (1973) (citing the

13  "roots of that right" in the First Amendment, *Stanley v. Georgia*, 394 U.S. 557, 564 (1969); in the

14  Fourth and Fifth Amendments, *Terry v. Ohio*, 392 U.S. 1, 8-9 (1968), *Katz v. United States*, 389

15  U.S. 347, 350 (1967), *Boyd v. United States*, 116 U.S. 616 (1886), *Olmstead v. United States*, 277

16  U.S. 438, 478 (1928) (Brandeis, J., dissenting); in the penumbras of the Bill of Rights, *Griswold*

17  *v. Connecticut*, 381 U.S., at 484-485; in the Ninth Amendment (Goldberg, J., concurring); or in

18  the concept of liberty guaranteed by the first section of the Fourteenth Amendment, see *Meyer v.*

19  *Nebraska*, 262 U.S. 390, 399 (1923)) (internal quotations omitted).

20

21      230.  The Supreme Court has a long history of recognizing unenumerated fundamental

22  rights as protected by substantive due process, even before the term evolved into its modern

23  usage. *Raich v Gonzales*, 500 F3d 850, 863 (9th Cir 2007) citing, *Casey*, 505 U.S. 833, 112 S. Ct.

24  2791, 120 L. Ed. 2d 674 (to have an abortion); *Roe v. Wade*, 410 U.S. 113, 93 S. Ct. 705, 35 L.

25  Ed. 2d 147 (1973) (same); *Eisenstadt v. Baird*, 405 U.S. 438, 92 S. Ct. 1029, 31 L. Ed. 2d 349

26  (1972) (to use contraception); *Griswold*, 381 U.S. 479, 85 S. Ct. 1678, 14 L. Ed. 2d 510 (to use

27  contraception, to marital privacy); *Loving v. Virginia*, 388 U.S. 1, 87 S. Ct. 1817, 18 L. Ed. 2d

28

41

1010 (1967) (to marry); *Rochin v. California*, 342 U.S. 165, 72 S. Ct. 205, 96 L. Ed. 183 (1952)

(to bodily integrity); *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 62 S. Ct. 1110, 86 L.

Ed. 1655 (1942) (to have children); *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S. Ct. 571, 69 L.

Ed. 1070 (1925) (to direct the education and upbringing of one's children); *Meyer v. Nebraska*,

262 U.S. 390, 43 S. Ct. 625, 67 L. Ed. 1042 (1923) (same); *Lawrence v. Texas*, 539 U.S. 558,

578, 123 S. Ct. 2472, 156 L. Ed. 2d 508 (2003) (recognizing narrowly defined fundamental right

to engage in consensual sexual activity, including homosexual sodomy, in the home without

government intrusion).

231. "The above decisions make it clear that …personal rights that can be deemed

'fundamental' or 'implicit in the concept of ordered liberty' are included in this guarantee of

personal privacy." *Roe v. Wade*, 410 US at 152.

232. Abortion is a recognized, but unenumerated, fundamental right protected by

substantive due process. *Roe v. Wade*, 410 U.S. 113, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973).

233. Abortion is believed to be the right of a woman to choose what happens to her own

body during pregnancy.

234. Abortion is *not* an enumerated fundamental right under the Bill of Rights.

235. The right to bear arms *is* a "fundamental" "personal right". The right to self-

protection with a firearm inside and outside of one's home is "fundamental" by the very fact that

it is *enumerated* in the Bill of Rights and protected by the Second Amendment.

236. The right to bears arms, therefore, is more fundamental and more inalienable, than

the unenumerated right to have an abortion.

237. The right to bear arms is a right protected by substantive due process.

238. As a woman is free to choose the manner in which she handles her pregnancy based

on an unenumerated right, the law-abiding individual has a greater right to choose the manner in

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

which s/he carries a firearm to protect her/his body in public, which is an enumerated right.

239.  How could the right to decide what happens to one's body in one circumstance, which has been argued to be for the protection of the life of the mother, be more fundamental than the right of the individual to decide how to protect her/his life and preserve her/his body *in the first instance*?

240.  Forcing the law-abiding general member of the public, who cannot meet the "good cause" criteria, to carry openly, thereby stripping her/him of any element of surprise or tactical advantage s/he may have over a criminal assailant, violates the individual's right to personal liberty.

241.  The Second Amendment provides that the right to keep and bear arms "*shall not be infringed*". Whatever historical reasons or infringements on the manner of carry have occurred throughout the years, the "we've always done it that way" excuse fails.

242.  There is no "compelling state interest" justifying California's interference with how an individual carries her/his firearm for self-protection in public. *Cf., Roe v Wade*, 410 US at 156 (1973) (internal citations omitted). Unlike an abortion, which affects the rights of two beings - the woman and her unborn baby, the right to bear arms *only* affects the individual and her/his right to self-protection.

243.  There is no compelling state interest justifying such an intrusion into the very personal choice of how one carries, and trains mentally and physically to carry, a firearm and the circumstances under which it is employed for self-preservation.

244.  California's licensing scheme should be declared a violation of the Fourteenth Amendment right to substantive due process, enjoined from enforcement, and stricken as unconstitutional.

43

**DECLARATORY JUDGMENT ALLEGATIONS**

245.  There is an actual and present controversy between the parties. Plaintiffs contend that: (1) California Penal Codes §26150 and §26155 violate Plaintiffs' fundamental right to open carry, a core right protected by the Second Amendment, by requiring "good cause" for the issuance thereof; (2) California Penal Codes §26150 and §26155 violate Plaintiffs' fundamental right to open carry, a core right protected by the Second Amendment, by restricting the authority and validity of open carry licenses to the county of issuance; (3) California Penal Codes §26150 and §26155 violate Plaintiffs' fundamental right to open carry, a core right protected by the Second Amendment, by geographically restricting open carry licensees from carrying firearms in various counties based on the population size of the county; (4) the "may issue" language of California Penal Codes §26150 and §26155 is unconstitutional because open carry is a core and fundamental right protected by the Second Amendment, not subject to the subjective whims of a licensing authority; (5) the geographical and population restrictions on open carry licenses set forth in California Penal Codes §26150 and §26155 violate the Dormant Commerce Clause; (6) the geographical and population restrictions on open carry licenses set forth in California Penal Codes §26150 and §26155 violate Plaintiffs' Fourteenth Amendment right to interstate and intrastate travel; (7) California Penal Code §26350 violates Plaintiffs' Second, Fourth, and Fourteenth Amendment rights to open carry of an unloaded handgun outside of their homes; (8) California Penal Code §25850 criminalizing the open carry of a loaded firearm violates Plaintiffs' rights under the Second Amendment, Fourth Amendment, and Fourteenth Amendment; and that (9) California's statutory licensing scheme unconstitutionally interferes with Plaintiffs' Second, Fourth, and Fourteenth Amendment (substantive and procedural) rights by artificially and subjectively demarcating the manner in which they choose to carry their property, to wit, firearms, in public. Defendants deny these contentions.

**ER496**

246.  Plaintiffs are seeking a judicial declaration that California Penal Codes §26150, §26155, §25850, and §26350 are (a) facially unconstitutional, and (b) as applied to Plaintiffs violate their constitutional rights in the manner described in detail herein.

247.  Plaintiffs also seek a judicial declaration that California's licensing scheme violates Plaintiffs' Second Amendment right to open carry, Fourth Amendment right to the use and enjoyment of their personal property without unlawful governmental interference, Fourteenth Amendment right to travel, Fourteenth Amendment right to procedural due process, and Fourteenth Amendment right to substantive due process.

248.  Plaintiffs should not have to risk criminal prosecution in order to exercise their core and fundamental human rights, as detailed above, and they should not have to choose between their fundamental rights and criminal prosecution.

**INJUNCTIVE RELIEF ALLEGATIONS**

249.  Injunctive relief is necessary to prevent Defendant from enforcing California's carry restrictions and corresponding criminal penalties. Plaintiffs are being continuously injured, in fact, by (1) Defendants' enforcement of  California Penal Codes §26150 and §26155 requiring "good cause" for the issuance of an open carry license, a core fundamental right protected by the Second Amendment; (2) Defendants' enforcement of California Penal Codes §26150 and §26155 restricting the authority and validity of open carry licenses to the county of issuance, in violation of the Second Amendment; (3) Defendants' enforcement of California Penal Codes §26150 and §26155 banning open carry licensees from carrying firearms in certain counties based on population size, in violation of the Second Amendment; (4) Defendants' enforcement of the "may issue" language of California Penal Codes §26150 and §26155 leaving the open carry licensing process to the subjective whims of the licensing authority, in violation of the Second Amendment; (5) Defendants' enforcement of the geographical and population restrictions of open carry set

45

**ER497**

forth in California Penal Codes §26150 and §26155, in violation of the Dormant Commerce

Clause; (6) Defendants' enforcement of the geographical and population restrictions of open carry

set forth in California Penal Codes §26150 and §26155, in violation of the Fourteenth

Amendment right to interstate and intrastate travel; (7) Defendants' enforcement of California

Penal Code §26350, which violates Plaintiffs' Second, Fourth, and Fourteenth Amendment rights

to open carry unloaded handguns in public; (8) Defendants' enforcement of California Penal

Code §25850 criminalizing the open carry of a loaded firearm where an open licensee carries in

public outside of the county of issuance, which violates Plaintiffs' rights under the Second

Amendment, Fourth Amendment, and Fourteenth Amendment; and (9) Defendants' enforcement

of California's statutory licensing scheme, which unconstitutionally interferes with Plaintiffs'

Second, Fourth, and Fourteenth Amendment (a) substantive and (b) procedural Due Process

rights by artificially and subjectively demarcating the manner in which they choose to carry their

personal property, to wit, firearms, in public.

250.  The aforementioned statutes, customs, and policies prohibit Plaintiffs from openly

carrying a firearm in public for self-defense. If an injunction does not issue, Plaintiffs will

continue to be irreparably harmed by the continued violation of their fundamental rights as

guaranteed and protected by the United States Constitution. Plaintiffs should not have to risk

criminal prosecution in order to exercise the core fundamental rights detailed above and they

should not have to choose between exercising their fundamental rights and being subject to

criminal prosecution, incarceration, and other legal penalties.

251.  If not enjoined, Defendants will continue to enforce theses statutes, policies, and

customs in derogation of Plaintiffs' constitutional rights. Plaintiffs have no speedy and adequate

remedy at law. Damages are indeterminate and/or unascertainable and would not fully redress any

harm suffered by Plaintiffs as a result of being unable to engage in activity protected by, *inter*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

*alia,* the Second, Fourth, and Fourteenth Amendments.

252.  The injunctive relief sought herein would eliminate the irreparable harm and allow Plaintiffs to exercise their core, fundamental rights as described herein, to wit, open carry of a firearm throughout the State of California, loaded or unloaded, and the ability to choose the manner in which they carry their personal property, to wit, firearms for self-defense in public. Accordingly, injunctive relief is appropriate.

253.  Upon information and belief, Defendants deny the contentions stated herein.

**COUNT I**
**Second Amendment "Good Cause" Requirement**

254.  Repeat and reallege paragraphs "1" through and including "253" as if set forth in their entirety herein.

255.  Defendants have violated a core right protected by the Second Amendment, to wit, Plaintiffs' right to bear arms publicly by means of open carry by the enforcement of Penal Codes §26150 and §26155 requiring "good cause" for the issuance of an open carry license. Defendants, who bear the burden of justifying the restrictions placed on the exercise of fundamental rights, have no viable legal justification for the constitutional violations detailed herein.

256.  Under the theory that Defendants are liable to Plaintiffs for violations of their constitutional rights pursuant to 42 U.S.C. §1983, Plaintiffs are entitled to declaratory and preliminary injunctive relief against such unconstitutional statutes, customs and policies as set forth herein and in Plaintiffs' Prayer for relief.

**COUNT II**
**Second Amendment Open Carry License Restriction by County**

257.  Repeat and reallege paragraphs "1" through and including "256" as if set forth in their entirety herein.

258.  Defendants have violated a core right protected by the Second Amendment, to wit,

47

Plaintiffs' right to bear arms publicly by means of open carry by the enforcement of Penal Codes §26150 and §26155 which restrict the validity and authority of an open carry license to the county of issuance. Defendants, who bear the burden of justifying the restrictions placed on the exercise of fundamental rights, have no viable legal justification for the constitutional violations detailed herein.

259. Under the theory that Defendants are liable to Plaintiffs for violations of their constitutional rights pursuant to 42 U.S.C. §1983, Plaintiffs are entitled to declaratory and preliminary injunctive relief against such unconstitutional statutes, customs and policies as set forth herein and in Plaintiffs' Prayer for relief.

**COUNT III**
**Second Amendment Open Carry License Restriction by Population Size**

260. Repeat and reallege paragraphs "1" through and including "259" as if set forth in their entirety herein.

261. Defendants have violated a core right protected by the Second Amendment, to wit, Plaintiffs' right to bear arms publicly by means of open carry by the enforcement of Penal Code §26150 and §26155 which restricts Plaintiffs' ability to open carry based on county population size. Defendants, who bear the burden of justifying the restrictions placed on the exercise of fundamental rights, have no viable legal justification for the constitutional violations detailed herein.

262. Under the theory that Defendants are liable to Plaintiffs for violations of their constitutional rights pursuant to 42 U.S.C. §1983, Plaintiffs are entitled to declaratory and preliminary injunctive relief against such unconstitutional statutes, customs and policies as set forth herein and in Plaintiffs' Prayer for relief.

**COUNT IV**
**Second Amendment "May Issue" Language for Open Carry License**

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

ER500

263.  Repeat and reallege paragraphs "1" through and including "262" as if set forth in their entirety herein.

264.  Defendants have violated a core right protected by the Second Amendment, to wit, Plaintiffs' right to bear arms publicly by means of open carry by enforcing the "may issue" language of Penal Codes §26150 and §26155 permits the subjective and unconstitutional denial of open carry license applications by law-abiding individuals. Defendants, who bear the burden of justifying the restrictions placed on the exercise of fundamental rights, have no viable legal justification for the constitutional violations detailed herein.

265.  Under the theory that Defendants are liable to Plaintiffs for violations of their constitutional rights pursuant to 42 U.S.C. §1983, Plaintiffs are entitled to declaratory and preliminary injunctive relief against such unconstitutional statutes, customs and policies as set forth herein and in Plaintiffs' Prayer for relief.

**COUNT V**
**Dormant Commerce Clause Violation – County of Issuance**

266.  Repeat and reallege paragraphs "1" through and including "265" as if set forth in their entirety herein.

267.  Defendants' enforcement of Penal Codes §26150 and §26155 restricting the open carry of a loaded firearm to the county of issuance violates the [Dormant] Commerce Clause, U.S. Const. art. I, §8, cl. 3. Defendants, who bear the burden of justifying the restrictions placed on the exercise of fundamental rights, have no viable legal justification for the constitutional violations detailed herein.

268.  Under the theory that Defendants are liable to Plaintiffs for violations of their constitutional rights pursuant to 42 U.S.C. §1983, Plaintiffs are entitled to declaratory and preliminary injunctive relief against such unconstitutional statutes, customs and policies as set forth herein and in Plaintiffs' Prayer for relief.

49

**COUNT VI**
**Commerce Clause Violation – County Population Size**

269.  Repeat and reallege paragraphs "1" through and including "268" as if set forth in their entirety herein.

270.  Defendants' enforcement of Penal Codes §26150 and §26155 restricting open carry of a loaded firearm to counties having a population under 200,000 violates the [Dormant] Commerce Clause, U.S. Const. art. I, §8, cl. 3. Defendants, who bear the burden of justifying the restrictions placed on the exercise of fundamental rights, have no viable legal justification for the constitutional violations detailed herein.

271.  Under the theory that Defendants are liable to Plaintiffs for violations of their constitutional rights pursuant to 42 U.S.C. §1983, Plaintiffs are entitled to declaratory and preliminary injunctive relief against such unconstitutional statutes, customs and policies as set forth herein and in Plaintiffs' Prayer for relief.

**COUNT VII**
**Fourteenth Amendment Violation – County of Issuance**
**(Right to Intrastate Travel)**

272.  Repeat and reallege paragraphs "1" through and including "271" as if set forth in their entirety herein.

273.  Defendants' enforcement of Penal Codes §26150 and §26155 restricting the open carry of a loaded firearm to the county of issuance violates Plaintiffs' Fourteenth Amendment right to intrastate travel. Defendants, who bear the burden of justifying the restrictions placed on the exercise of fundamental rights, have no viable legal justification for the constitutional violations detailed herein.

274.  Under the theory that Defendants are liable to Plaintiffs for violations of their constitutional rights pursuant to 42 U.S.C. §1983, Plaintiffs are entitled to declaratory and preliminary injunctive relief against such unconstitutional statutes, customs and policies as set

50

ER502

1   forth herein and in Plaintiffs' Prayer for relief.

2

### COUNT VIII
### Fourteenth Amendment Violation – County Population Size
### (Right to Intrastate Travel)

275.  Repeat and reallege paragraphs "1" through and including "274" as if set forth in their entirety herein.

276.  Defendants' enforcement of Penal Codes §26150 and §26155 restricting open carry of a loaded firearm to the county of issuance violates Plaintiffs' Fourteenth Amendment rights to intrastate travel. Defendants, who bear the burden of justifying the restrictions placed on the exercise of fundamental rights, have no viable legal justification for the constitutional violations detailed herein.

277.  Under the theory that Defendants are liable to Plaintiffs for violations of their constitutional rights pursuant to 42 U.S.C. §1983, Plaintiffs are entitled to declaratory and preliminary injunctive relief against such unconstitutional statutes, customs and policies as set forth herein and in Plaintiffs' Prayer for relief.

### COUNT IX
### Second, Fourth, and Fourteenth Amendment Violation
### (Penal Code §25850)

278.  Repeat and reallege paragraphs "1" through and including "277" as if set forth in their entirety herein.

279.  Defendants' enforcement of California Penal Code §25850, to the extent that the statute criminalizes the open carry of a loaded firearm by an open carry licensee in a county other than the county of issuance, whether on one's person or in a vehicle while in any public place or on any public street in an unincorporated city, or any public place or public street in a prohibited area of an unincorporated territory, violates Plaintiffs' Second, Fourth, and Fourteenth Amendment rights. Defendants, who bear the burden of justifying the restrictions placed on the

51

ER503

exercise of fundamental rights, have no viable legal justification for the constitutional violations detailed herein.

280.  Under the theory that Defendants are liable to Plaintiffs for violations of their constitutional rights pursuant to 42 U.S.C. §1983, Plaintiffs are entitled to declaratory and preliminary injunctive relief against such unconstitutional statutes, customs and policies as set forth herein and in Plaintiffs' Prayer for relief.

**COUNT X**
**Second, Fourth, and Fourteenth Amendment Violation**
**(Penal Code §26350)**

281.  Repeat and reallege paragraphs "1" through and including "280" as if set forth in their entirety herein.

282.  Defendants' enforcement of California Penal Code §26350, to the extent that the statute criminalizes the open carry of an unloaded firearm by an open carry licensee on one's person or in a vehicle while in any public place or on any public street in an unincorporated city, or any public place or public street in a prohibited area of an unincorporated territory, violates Plaintiffs' Second, Fourth, and Fourteenth Amendment rights. Defendants, who bear the burden of justifying the restrictions placed on the exercise of fundamental rights, have no viable legal justification for the constitutional violations detailed herein.

283.  Under the theory that Defendants are liable to Plaintiffs for violations of their constitutional rights pursuant to 42 U.S.C. §1983, Plaintiffs are entitled to declaratory and preliminary injunctive relief against such unconstitutional statutes, customs and policies as set forth herein and in Plaintiffs' Prayer for relief.

**COUNT XI**
**Second Amendment Violation**
**Demarcation of Manner of Carry**

284.  Repeat and reallege paragraphs "1" through and including "283" as if set forth in

52

**ER504**

their entirety herein.

285.  Defendants have violated a core right protected by the Second Amendment, to wit, Plaintiffs' right to carry their firearms in public for self-protection in a manner of their choosing by dictating the manner in which they carry their firearms while in public through a statutory licensing scheme, including Penal Codes §26150 and §26155, and criminal statutes §26350 and §25850, which are based on artificial and speculative beliefs and ideas having no actual effect on a legitimate governmental interest. Defendants, who bear the burden of justifying the restrictions placed on the exercise of fundamental rights, have no viable legal justification for the constitutional violations detailed herein.

286.  Under the theory that Defendants are liable to Plaintiffs for violations of their constitutional rights pursuant to 42 U.S.C. §1983, Plaintiffs are entitled to declaratory and preliminary injunctive relief against such unconstitutional statutes, customs and policies as set forth herein and in Plaintiffs' Prayer for relief.

**COUNT XII**
**Fourth Amendment Interference with Property and Possessory Interests**

287.  Repeat and reallege paragraphs "1" through and including "286" as if set forth in their entirety herein.

288.  Defendants have violated a core right protected by the Fourth Amendment, to wit, Plaintiffs' fundamental possessory right to their private property by dictating the manner in which they carry their firearms in public through a statutory licensing scheme, including Penal Codes §26150 and §26155, and criminal statutes §26350 and §25850, which are based on artificial and speculative beliefs and ideas having no actual effect on a legitimate governmental interest. Defendants, who bear the burden of justifying the restrictions placed on the exercise of fundamental rights, have no viable legal justification for the constitutional violations detailed

53

ER505

herein.

289.  Under the theory that Defendants are liable to Plaintiffs for violations of their

constitutional rights pursuant to 42 U.S.C. §1983, Plaintiffs are entitled to declaratory and

preliminary injunctive relief against such unconstitutional statutes, customs and policies as set

forth herein and in Plaintiffs' Prayer for relief.

**COUNT XIII**
**Fourteenth Amendment Violation – Procedural Due Process**
**Demarcation of Manner of Carry**

290.  Repeat and reallege paragraphs "1" through and including "289" as if set forth in

their entirety herein.

291.  Defendants are violating a core right protected by the Fourteenth Amendment, to

wit, Plaintiffs' right to procedural due process by enacting and enforcing a statutory scheme

having criminal penalties that interfere with and extinguish their ability to decide how to carry

their private property while in public through a statutory licensing scheme, including Penal Codes

§26150 and §26155, and criminal statutes §26350 and §25850, which are based on artificial and

speculative beliefs and ideas having no actual effect on a legitimate governmental interest,

without the opportunity to be heard.

292.  Defendants' actions constitutes an unreasonable, unjustified and unlawful

interference with, and deprivation of, the full use and enjoyment of Plaintiffs' property.

Defendants, who bear the burden of justifying the restrictions placed on the exercise of

fundamental rights, have no viable legal justification for the constitutional violations detailed

herein.

293.  Under the theory that Defendants are liable to Plaintiffs for violations of their

constitutional rights pursuant to 42 U.S.C. §1983, Plaintiffs are entitled to declaratory and

preliminary injunctive relief against such unconstitutional statutes, customs and policies as set

54

forth herein and in Plaintiffs' Prayer for relief.

**COUNT XIV**
**Fourteenth Amendment Violation – Substantive Due Process**
**Demarcation of Manner of Carry**

294.  Repeat and reallege paragraphs "1" through and including "293" as if set forth in their entirety herein.

295.  Defendants are violating a core fundamental human right protected by the Fourteenth Amendment, to wit, Plaintiffs' substantive right to due process by enacting and enforcing a statutory scheme having criminal penalties that removes Plaintiffs' ability to decide how to carry their private property while in public through a statutory licensing scheme, including Penal Codes §26150 and §26155, and criminal statutes §26350 and §25850, which are based on artificial and speculative beliefs and ideas having no actual effect on a legitimate governmental interest. Defendants, who bear the burden of justifying the restrictions placed on the exercise of fundamental rights, have no viable legal justification for the constitutional violations detailed herein.

296.  Under the theory that Defendants are liable to Plaintiffs for violations of their constitutional rights pursuant to 42 U.S.C. §1983, Plaintiffs are entitled to declaratory and preliminary injunctive relief against such unconstitutional statutes, customs and policies as set forth herein and in Plaintiffs' Prayer for relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that judgment be entered in their favor and against Defendants as follows:

1.  A declaration that the open carriage of firearms by law-abiding individuals for self-defense in public is a core and fundamental right protected by the Second Amendment.

2.  A declaration that state laws prohibiting the open carriage of firearms in public by law-

55

abiding individuals for self-defense is facially unconstitutional and as applied to Plaintiffs.

3.  A declaration that the "good cause" language of California Penal Codes §26150 and §26155 for the issuance of an open carry firearm license is facially unconstitutional and as applied to Plaintiffs as it violates the Second Amendment.

4.  A declaration that the "may issue" language of California Penal Codes §26150 and §26155 for the issuance of an open carry firearm license is facially unconstitutional and as applied to Plaintiffs as it violates the Second Amendment.

5.  A declaration that the ability of law-abiding individuals to choose the manner in which they possess and/or carry their property [firearms] in public for self-defense is a fundamental right protected by the Second, Fourth and Fourteenth Amendments.

6.  A declaration that state laws demarcating and/or interfering with the manner in which law-abiding individuals possess and/or carry their property [firearms] in public for self-defense are facially unconstitutional and as applied to Plaintiffs.

7.  A declaration that California Penal Codes §26150 and §26155 are facially unconstitutional and as applied to Plaintiffs because they unlawfully and unjustifiably interfere with Plaintiffs' use and enjoyment of their property, to wit, firearms in violation of the Second, Fourth, and Fourteenth Amendments.

8.  A declaration that California's restrictions on the geographical validity of a carry license to the county of issuance violates the Second, Fourth, and Fourteenth Amendments, and the Dormant Commerce Clause.

9.  A declaration that restricting the validity of a carry license to a particular county/counties based on their population size the Second, Fourth, and Fourteenth Amendments, and the Dormant Commerce Clause.

10.  A declaration that Penal Codes §26150, §26155, §26350, and §25850 are facially

56

unconstitutional and as applied to Plaintiffs as they preclude law-abiding individuals from openly carrying a firearm in public for self-defense.

11.  An Order preliminarily and permanently enjoining the Attorney General of California and all officers, agents, servants, employees, and persons acting in concert and under his authority from enforcing the "good cause" requirement for the issuance of open carry license as provided for in California Penal Codes §26150 and §26155.

12.  An Order preliminarily and permanently enjoining the Attorney General of California and all officers, agents, servants, employees, and persons acting in concert and under his authority from enforcing the "may issue" language for the issuance of open carry license as provided for in California Penal Codes §26150 and §26155.

13.  An Order preliminarily and permanently enjoining the Attorney General of California and all officers, agents, servants, employees, and persons acting in concert and under his authority from enforcing the "county of issuance" limitation of the validity and effectiveness of open carry licenses as provided for in California Penal Codes §26150 and §26155.

14.  An Order preliminarily and permanently enjoining the Attorney General of California and all officers, agents, servants, employees, and persons acting in concert and under his authority from enforcing geographical restrictions on the issuance of open carry licenses based on the population of the county as provided for in California Penal Codes §26150 and §26155.

15.  An Order preliminarily and permanently enjoining the Attorney General of California and all officers, agents, servants, employees, and persons acting in concert and under his authority from enforcing California Penal Codes §25850 and §26350 against open carry licensees for openly carrying loaded and/or unloaded firearms.

16.  An Order preliminarily and permanently enjoining the Attorney General of California and all officers, agents, servants, employees, and persons acting in concert and under his authority

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF **ER509**

from interfering with and/or infringing upon the manner in which law-abiding individuals carry their firearm in public as provided for in California Penal Codes §26150 and §26155.

17.  An Order preliminarily and permanently enjoining the Attorney General of California and all officers, agents, servants, employees, and persons acting in concert and under his authority from enforcing any other laws that interfere with and/or deny the fundamental right of Plaintiffs and other law-abiding individuals to openly carry a firearm in public for self-defense.

18.  An Order preliminarily and permanently enjoining the Attorney General of California and all officers, agents, servants, employees, and persons acting in concert and under his authority from enforcing any other laws that interfere with and/or deny the fundamental right of Plaintiffs and other law-abiding individuals to choose the manner in which they possess and/or carry a firearm in public for self-defense.

19.  Reasonable statutory attorney's fees, costs of suit, and disbursements pursuant to 42 U.S.C. § 1988.

20.  Any such further or alternative relief as the Court deems just and proper.

Respectfully submitted,

Dated: April 9, 2019                        COSCA LAW CORPORATION

/s/ Chris Cosca
Chris Cosca
Counsel for Plaintiffs
Email: coscalaw@gmail.com

Amy L. Bellantoni (AB3061)
The Bellantoni Law Firm, PLLC
2 Overhill Road, Suite 400
Scarsdale, New York 10583
abell@bellantoni-law.com
(914) 367-0090 (t)
(914) 367-0095 (f)
*Pro Hac Vice Application Forthcoming

58

1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   MARK BAIRD, et al.,                          No.  2:19-cv-00617-KJM-AC

12                Plaintiffs,

13        v.                                      ORDER

14   XAVIER BECERRA, et al.,

15                Defendants.

16

17

18          In this case brought under 42 U.S.C. § 1983, plaintiffs challenge the

19   constitutionality of California's open carry licensing regime under the Second, Fourth, Fifth and

20   Fourteenth Amendments to the U.S. Constitution.  Plaintiffs move for a preliminary injunction on

21   their Second Amendment claim and defendants move to dismiss plaintiffs' other constitutional

22   claims.  The court resolves the motion for a preliminary injunction and the motion to dismiss

23   below.

24   I.      BACKGROUND

25          California Penal Code section 26350 criminalizes the act of publicly carrying an

26   unloaded firearm, and section 25850 criminalizes the act of publicly carrying a loaded firearm.

27   There is an exception to these rules that allows an individual to publicly carry a firearm without a

28   license, where the individual "reasonably believes that any person or the property of any person is

ER511

1   in immediate, grave danger and that the carrying of the weapon is necessary for the preservation

2   of that person or property," and local law enforcement has had a chance to respond.  Cal. Pen.

3   Code § 26045;[1] Mot. to Dismiss ("MTD"), ECF No. 10-1, at 9.  Additionally, California has

4   established a firearm licensing scheme at Penal Code sections 26150 to 26155.  To qualify for a

5   concealed carry[2] permit, the law requires that an applicant demonstrate: (1) good moral character;

6   (2) "good cause exists for issuance of the license"; (3) residency in the county or city to which

7   she is applying; and (4) completion of necessary training.  Cal. Penal Code §§ 26150(a) &

8   26155(a).  Where the population of a county is less than 200,000 persons, a county sheriff or head

9   of a municipal police department may issue an open carry permit subject to the same

10  requirements as a concealed carry permit, with the permit valid only in the county of issuance.

11  Cal. Penal Code § 26150(a), (b)(2); *id.* § 26155(a), (b)(2).

12          Plaintiff Baird is a resident of Siskiyou County, a county with less than 200,000

13  residents, who meets all the requirements for a concealed carry or open carry license except, he

14  alleges, the "good cause" requirement.  Compl. ¶¶ 20, 25.  Plaintiff wishes to carry a firearm in

15  public openly, but alleges the Siskiyou County Sheriff has chosen not to make open carry licenses

16  available in that county, exercising his discretion under the "may issue" language in California

17  Penal Code sections 26150(b), 26155(b).  *Id.* ¶¶ 39, 40, 43.  Because plaintiff resides only in

18

19

---

20          [1] The statute provides, in relevant part:

21                  Nothing in Section 25850 is intended to preclude the carrying of any
22                  loaded firearm, under circumstances where it would otherwise be
                    lawful, by a person who reasonably believes that any person or the
23                  property of any person is in immediate, grave danger and that the
                    carrying of the weapon is necessary for the preservation of that
24                  person or property.

25  Cal. Pen. Code § 26045(a).

26          [2] The court uses the terms "concealed carry" and "open carry" to mean, respectively,
27  carrying a concealed firearm on one's person and carrying a firearm on one's person openly and
    unconcealed.  The court uses the term "public carry" to mean carrying a firearm in public, either
28  in a concealed or unconcealed fashion.

2

**ER512**

1    Siskiyou County, he is not eligible to apply for an open carry license in any other county. *Id.*

2    ¶ 47. Plaintiff Gallardo, a resident of Shasta County, makes similar allegations. *Id.* ¶¶ 53–82.

3          On April 9, 2019, plaintiffs filed the instant suit against the Attorney General

4    challenging the constitutionality of California Penal Code sections 26150, 26155, 26350 and

5    25850 under the dormant Commerce Clause and the Second, Fourth and Fourteenth

6    Amendments. *See* Compl. As confirmed at hearing, plaintiffs have not named the sheriffs of

7    their respective counties as defendants in this suit. As violations of the Second Amendment,

8    plaintiffs challenge: (1) the requirement of "good cause" for an open carry license (claim 1), *id.*

9    ¶¶ 254–56; (2) the provision limiting licenses' validity to the county of issuance (claim 2), *id.*

10   ¶¶ 257–259; (3) the restriction of the ability to open carry based on county population size (claim

11   3), *id.* ¶¶ 260–62; (4) the provision that sheriffs "may issue" open carry licenses (claim 4), *id.*

12   ¶¶ 138–42. *See also id.* ¶¶ 284–86 (claim 11)   Plaintiffs also bring several other constitutional

13   claims that derive from these challenges: (5) violation of the dormant Commerce Clause (claim

14   5); violation of the Commerce Clause (claim 6); violation of the right to interstate travel (claims

15   7, 8); violation of the Second, Fourth and Fourteenth Amendments (claims 9, 10); violation of

16   procedural due process (claim 13); and violation of substantive due process (claim 14).

17          Defendants move to dismiss plaintiffs' claims based on the dormant Commerce

18   Clause and the Fourth and Fourteenth Amendments. MTD, ECF No. 10-1. Plaintiffs oppose,

19   MTD Opp'n, ECF No. 19, and defendants have replied, MTD Reply, ECF No. 26. Plaintiffs also

20   move for a preliminary injunction to prevent the enforcement of the aforementioned statutes,

21   Prelim. Inj. Mot. ("PI Mot."), ECF No. 14, defendants oppose, PI Opp'n, ECF No. 20, and

22   plaintiffs have replied, PI Reply, ECF Nos. 27–28.

23   II.    MOTION FOR PRELIMINARY INJUNCTION

24          Plaintiffs move for a preliminary injunction enjoining defendants from enforcing

25   California Penal Codes sections 26150, 26155, 26350 and 25850, on the basis that the statutes

26   violate the Second Amendment.[3] PI Mot. at 5.

27   _____

28          [3] In a footnote, plaintiffs assert their preliminary injunction request is also based on
     "constitutional violations not relied upon herein," but detailed in their complaint. Mot. Prelim.

3

**ER513**

1        A.      Legal Standard

2                "A preliminary injunction is an extraordinary remedy never awarded as of right[,]"

3    *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted), and should not

4    be granted unless the movant carries the burden of proving this extraordinary remedy is warranted

5    by clear and convincing evidence, *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) ("A

6    preliminary injunction . . . should not be granted unless the movant, by a clear showing, carries

7    the burden of persuasion." (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997))).  In

8    determining whether to issue a preliminary injunction, federal courts must consider whether the

9    moving party "[1] is likely to succeed on the merits, . . . [2] is likely to suffer irreparable harm in

10   the absence of preliminary relief, . . . [3] the balance of equities tips in [the movant's] favor, and

11   . . . [4] an injunction is in the public interest."  *Winter*, 555 U.S. at 20.

12               The Ninth Circuit has "also articulated an alternate formulation of the *Winter*

13   test[.]"  *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012).  That formulation is referred to as

14   the "serious questions" or the "sliding scale" approach: "'serious questions' going to the merits

15   and a balance of hardships that tips sharply towards the plaintiff can support issuance of a

16   preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable

17   injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*,

18   632 F.3d 1127, 1131–35 (9th Cir. 2011) ("[T]he 'serious questions' approach survives *Winter*

19   when applied as part of the four-element *Winter* test.").  Under the "serious questions" approach

20   to a preliminary injunction, "[t]he elements of the preliminary injunction test must be balanced,

21   so that a stronger showing of one element may offset a weaker showing of another."  *Lopez*,

22   680 F.3d at 1072.  In each case and irrespective of the approach to a preliminary injunction, a

23   court must balance the competing alleged harms while considering the effects on the parties of the

24   granting or withholding of the injunctive relief.  *Winter*, 555 U.S. at 24.  In exercising that

25   discretion, a court must also consider the public consequences of the extraordinary remedy.  *Id.*

26   /////

27   _____

28   Inj. at 5 n.1.  Plaintiffs' counsel clarified at hearing that the motion relies on the Second
     Amendment claim.

                                                    4

B.   Discussion

1.   Likelihood of Success on the Merits

In order to show a likelihood of success on the merits, plaintiffs must show the California's regime likely violates the Second Amendment.  Plaintiffs argue that strict scrutiny applies to any law that burdens one's right to openly carry a firearm, based on their reading of the Supreme Court's holdings in *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago, Illinois*, 561 U.S. 742 (2010).  Namely, plaintiffs argue, those cases define the "core component" of the Second Amendment right as "self-defense," and therefore the right to carry a weapon in self-defense, even outside the home, is protected by the Second Amendment. PI Mot. at 7 (citing *Peruta v. County of San Diego*, 742 F.3d 1144, 1154 (9th Cir 2014) (*Peruta I*), *vacated en banc by Peruta v. Cty. of San Diego*, 824 F.3d 919, 939 (9th Cir. 2016) (en banc) (*Peruta II*), *pet. for cert. denied*, 137 S. Ct. 1995 (2017)).  Because the Second Amendment does not protect concealed carry, plaintiffs argue, open carry must be protected, and therefore, strict scrutiny should apply to any law that burdens one's right to open carry.  PI Mot. at 8–9 (citing *Peruta II*, 824 F.3d 939).  No controlling authority expressly supports this reading, and therefore plaintiffs cannot show a likelihood of success on the merits of their Second Amendment claims, as explained below.

In *Heller*, the Supreme Court held the core protection of the Second Amendment is "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 635.  In *McDonald*, the Court held the Second Amendment applied to the states through the Fourteenth Amendment and explained that *Heller* stands for the proposition that "individual self-defense is 'the *central component*' of the Second Amendment right."  561 U.S. at 767–68 (emphasis in original) (quoting *Heller*, 554 U.S. at 599).  The Ninth Circuit has interpreted these two cases to mean the Second Amendment's "core purpose" is to provide "self-defense in the home," and has developed a two-step inquiry for reviewing Second Amendment challenges based on the degree to which a law burdens that "core" right.  *Silvester v. Harris*, 843 F.3d 816, 820–21 (9th Cir. 2016).  To determine the proper level of scrutiny with which to review a challenged law that is subject to Second Amendment protection, the court must consider: (1)

5

1  "how close the challenged law comes to the core of the Second Amendment right, and (2) the

2  severity of the law's burden on that right."  *Id.* at 821 (citation omitted).

3          In *Peruta I*, the Ninth Circuit addressed the issue of whether the right to "bear

4  arms" included the right to carry a firearm outside the home in the context of a challenge to the

5  "good cause" requirement for a concealed carry permit in California.  742 F.3d at 1147–48 (citing

6  Cal. Penal Code §§ 26150, 26155).  The court concluded the Second Amendment protects the

7  right to carry a firearm "in public for the lawful purpose of self-defense[.]"  742 F.3d at 1175

8  (citing *Moore,* 702 F.3d at 941).  However, two years later, in *Peruta II*, the court vacated and

9  reversed *Peruta I* and held "the protection of the Second Amendment . . . simply does not extend

10  to the carrying of concealed firearms in public by members of the general public."  824 F.3d at

11  927.  Therefore, the court concluded, a "good cause" requirement for a concealed carry license

12  does not violate the Second Amendment.  *Id.* at 939.  The court explicitly left open the "question

13  whether the Second Amendment protects some ability to carry firearms in public, such as open

14  carry."  *Id.* at 927.

15          In *Young v. Hawaii*, 896 F.3d 1044, 1068 (9th Cir. 2018), the court answered that

16  question in part, holding "the Second Amendment encompasses a right to carry a firearm openly

17  in public for self-defense" and that right is at the "core" of the Amendment.  *Id.* at 1068, 1071.

18  The Ninth Circuit has since granted rehearing en banc, *Young v. Hawaii*, 915 F.3d 681, 682 (9th

19  Cir. 2019), and had stayed the en banc proceedings pending resolution of the Supreme Court's

20  decision in *New York State Rifle & Pistol Ass'n, Inc. v. City of New York, New York*, 140 S. Ct.

21  1525, 152 (2020).[4]  *Young v. Hawaii* (9th Cir.), No. 12-17808, ECF No. 219, 308 (scheduling oral

22  argument September 24, 2020).  As such, the original opinion in *Young v. Hawaii* is no longer

23  precedential.  *Young,* 915 F.3d at 682 ("The three-judge panel disposition in this case shall not be

24  cited as precedent by or to any court of the Ninth Circuit.").

25  /////

26

27          [4] *New York State Rifle* was recently remanded after the Supreme Court found the
    plaintiff's claims for injunctive relief were mooted by a change in the New York statute.  *New*
28  *York State Rifle*, 140 S. Ct. at 152.

**ER516**

1    Thus, no controlling authority has held that the Second Amendment right protects

2 an individual's right to open carry.  However, where "difficult legal questions require more

3 deliberate investigation," the court may grant a preliminary injunction to preserve the status quo

4 so long as plaintiff demonstrates "that serious questions going to the merits were raised," the

5 balance of the hardships tips sharply in the plaintiff's favor," and plaintiff meets the other *Winter*

6 requirements.

7    Upon review of the legal landscape relevant to plaintiffs' constitutional argument,

8 the court finds plaintiffs do raise "serious questions" going to the merits of their Second

9 Amendment claim, and that this complex legal question requires further deliberation.  The court

10 makes this finding particularly in light of the likelihood that the Ninth Circuit will further clarify

11 the scope of the Second Amendment as it applies to plaintiffs' claims, in the relatively near

12 future.  For example, a similar dispute is the subject of another stayed appeal in *Nichols v.*

13 *Newsom* (9th Cir.), No. 14-55873, ECF No. 119, which may soon be resolved in light of the

14 Supreme Court's *New York Rifle* decision.  *See Nichols v. Harris*, 17 F. Supp. 3d 989 (C.D. Cal.

15 2014) (rejecting similar challenge to California regime, based on *Peruta I*), *appeal pending sub*

16 *nom., Nichols v. Newsom* (9th Cir.), No. 14-55873; *see id.* at ECF No. 1199 (March 11, 2019)

17 (submission of case remains vacated pending issuance of mandate in *Young v. Hawaii*); *see also*,

18 *Flanagan v. Harris*, No. LACV1606164 JAK ASX, 2018 WL 2138462, at *6 (C.D. Cal. May 7,

19 2018) (rejecting challenge to same "good cause" requirement for open carry license), *appeal*

20 *pending,*  No. 18-55717 (9th Cir.); *see id.* at ECF No. 57 (July 30, 2019) (staying appeal pending

21 resolution of *New York State Rifle*).

22    Furthermore, there is some support in the case law to suggest plaintiffs' legal

23 arguments have merit.  For example, in *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012), the

24 Seventh Circuit struck down a law banning all public carry, concealed or open, finding that the

25 Second Amendment "confers a right to bear arms for self-defense, which is as important outside

26 the home as inside."  *Id.* at 935–36, 942; *see also Murphy v. Guerrero*, No. 1:14-CV-00026, 2016

27 WL 5508998, at *23 (D. N. Mar. I. Sept. 28, 2016) (following *Moore* and finding Second

28 Amendment applies to some degree outside the home).

**ER517**

1    In sum, "Second Amendment law is evolving."  *Silvester v. Harris*, No. 1:11-CV-

2  2137 AWI SAB, 2014 WL 6611592, at *3 (E.D. Cal. Nov. 20, 2014).  Taking plaintiffs'

3  allegations as true, the challenged statutes effectively ban open carry in California, except in the

4  case of immediate danger occurring directly outside one's home.  *See* Cal. Pen. Code § 26045.  In

5  light of the original holding in *Young*, the pending appeals in the Ninth Circuit, and the still-open

6  question of whether and to what extent the Second Amendment protects a right to carry a firearm

7  openly in public, the court finds plaintiffs' Second Amendment claim raises serious questions

8  going to the merits of their Second Amendment claim.  Given this landscape and the existing

9  authority in support of plaintiffs' arguments, which is persuasive though not controlling, these

10  questions are "substantial, difficult and doubtful, as to make them a fair ground for litigation and

11  thus for more deliberative investigation," and plaintiffs have a chance if not a "fair chance of

12  success on the merits."  *Gilder v. PGA Tour, Inc*., 936 F.2d 417, 422 (9th Cir. 1991).

13    C.    Balance of Equities & Public Interest

14    Having found plaintiffs raise "serious questions going to the merits" of their

15  Second Amendment claim, the court next considers the balance of equities and whether the public

16  interest favors an injunction.  These two factors merge when the government is the party

17  opposing the injunction.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Plaintiffs do not address this

18  prong in depth, arguing the balance of hardships weighs in their favor, because they risk criminal

19  penalties if they exercise their "right to self-protection via open carry."  PI Mot. at 21.  The

20  government argues the public interest "favors preserving the State's duly enacted laws designed

21  to protect the public safety and reduce gun violence."  PI Opp'n at 28 (citing *Tracy Rifle & Pistol*

22  *LLC v. Harris*, 118 F. Supp. 3d 1182, 1193–94 (E.D. Cal. 2015)).

23    When balancing the hardships "of the public interest against a private interest, the

24  public interest should receive greater weight."  *F.T.C. v. Affordable Media*, 179 F.3d 1228, 1236

25  (9th Cir. 1999) (internal quotation marks omitted).  In assessing the burden on plaintiffs, the court

26  considers the following: that plaintiffs are able keep guns in their homes without a license, *see*

27  Baird Decl. ¶ 6, ECF No. 27-3; Gallardo Decl. ¶ 7, ECF No. 27-4; they would apparently be

28  eligible for a concealed carry license if they could establish "good cause," Cal. Pen. Code

**ER518**

1   § 26045; and California law allows them to carry a firearm near the home, if they are in

2   immediate danger and local law enforcement does not respond, *see* Cal. Pen. Code § 26045(a).

3   Moreover, as plaintiffs' counsel represented at hearing, the harm plaintiffs suffer from the lack of

4   an injunction has been ongoing since the Mulford Act was signed in 1967, suggesting the harm is

5   not imminent or life-threatening.  *See* Cal. A.B. 1591 (April 5, 1967) (amending Cal. Penal Code

6   § 12031 to repealing law that allowed for open carry of loaded firearms).  Plaintiffs' hardship is

7   weighed against the hardship to defendant, who will be prevented from enforcing a law intended

8   to "protect public safety and reduce gun violence."  Opp'n at 28.

9          The court in *Rupp v. Becerra*, No. 817CV00746 JLS JDE, 2018 WL 2138452, at

10  *13 (C.D. Cal. May 9, 2018), conducted a similar balancing exercise when it considered a

11  challenge to the Assault Weapons Control Act, which banned certain weapons in California.

12  2018 WL 2138452, at *1–3 (assessing Cal. Penal Code §§ 30510, 30680, 30900(b)(1), 30915).

13  The court found the balance of hardships weighed in the state's favor, even though plaintiff's

14  Second Amendment rights were implicated, because the state would suffer harm from being

15  "enjoined from enforcing a law intended to increase public safety." *Id.,* at *13.  In contrast, in

16  addressing a preliminary injunction motion challenging a state law that criminalized the

17  possession of high-capacity magazines, the court in *Duncan v. Becerra*, 265 F. Supp. 3d 1106,

18  1136 (S.D. Cal. 2017), *aff'd*, 742 F. App'x 218 (9th Cir. 2018), did not discuss the hardship on

19  the state.  Rather, the court focused on the possible criminal sanctions plaintiff would face for

20  failure to dispossess themselves of the newly-banned magazines and found the balance of

21  hardships weighed in plaintiffs' favor.  Here, plaintiffs do not face any criminal sanctions for

22  failure to act, making the reasoning in *Duncan* less persuasive in the context of this case.

23          Furthermore, the potential harm to the government and the public interest here is

24  significant.  *See* PI Opp'n at 28 (citing *Tracy Rifle & Pistol,* 118 F. Supp. 3d at 1193–94).  As the

25  court in *Tracy Rifle* explained, "[t]he costs of being mistaken, on the issue of whether the

26  injunction would have a detrimental effect on handgun crime, violence, and suicide, would be

27  grave. These costs would affect members of the public, and they would affect the Government

28  which is tasked with managing handgun violence."  118 F. Supp. 3d at 1193–94.  By contrast, the

9

1   harm from complying with the challenged laws "appears to render little harm to Plaintiffs, outside

2   of the inherent harm imposed by a violation of their [Second] Amendment Rights." *Id.*

3          For these reasons, following the Ninth Circuit's guidance in *F.T.C.* and

4   considering plaintiffs' available options for self-defense, plaintiffs have not shown the "balance

5   of hardships . . . tips sharply in the plaintiff's favor." *Alliance for the Wild Rockies*, 632 F.3d at

6   1131–35 (9th Cir. 2011)

7          D.      Conclusion

8          Though plaintiffs have raised "serious questions" going to the merits of their

9   Second Amendment claim, the balance of equities does not tip "sharply" in their favor.

10  Accordingly, the court declines to issue a preliminary injunction.  The motion is DENIED

11  without prejudice to plaintiff's re-filing their request after the Ninth Circuit decides one of the

12  aforementioned stayed appeals, if that decision affects plaintiffs' legal grounds for an injunction

13  such that reconsideration is warranted, and assuming an operative complaint asserts claims on

14  which an injunction can rest.

15  III.    MOTION TO DISMISS

16         A.      Legal Standard

17         Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may move to

18  dismiss a complaint for "failure to state a claim upon which relief can be granted."  A court may

19  dismiss "based on the lack of cognizable legal theory or the absence of sufficient facts alleged

20  under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.

21  1990) (citation omitted).

22         Although a complaint need contain only "a short and plain statement of the claim

23  showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), in order to survive a motion

24  to dismiss this short and plain statement "must contain sufficient factual matter . . . to 'state a

25  claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting

26  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A complaint must include something

27  more than "an unadorned, the-defendant-unlawfully-harmed-me accusation" or "'labels and

28  conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Id.* (quoting

10

**ER520**

1    *Twombly*, 550 U.S. at 555). Determining whether a complaint will survive a motion to dismiss

2    for failure to state a claim is a "context-specific task that requires the reviewing court to draw on

3    its judicial experience and common sense." *Id.* at 679. Ultimately, the inquiry focuses on the

4    interplay between the factual allegations of the complaint and the dispositive issues of law in the

5    action. *See Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

6             In making this context-specific evaluation, this court must construe the complaint

7    in the light most favorable to the plaintiffs and accept as true the factual allegations of the

8    complaint. *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007). This rule does not apply to "'a legal

9    conclusion couched as a factual allegation,'" *Papasan v. Allain*, 478 U.S. 265, 286 (1986) *quoted*

10    *in Twombly*, 550 U.S. at 555, nor to "allegations that contradict matters properly subject to

11    judicial notice" or to material attached to or incorporated by reference into the complaint.

12    *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988–89 (9th Cir. 2001), *as amended on denial*

13    *of rehearing at* 275 F.3d 1187 (9th Cir. 2001). A court's consideration of documents attached to

14    a complaint or incorporated by reference or matter of judicial notice will not convert a motion to

15    dismiss into a motion for summary judgment. *United States v. Ritchie*, 342 F.3d 903, 907-08

16    (9th Cir. 2003); *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995); *compare*

17    *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002) (noting that even

18    though court may look beyond pleadings on motion to dismiss, generally court is limited to face

19    of the complaint on 12(b)(6) motion).

20             Defendants move to dismiss claims 5 through 8 and 12 through 14 on the grounds

21    plaintiffs fail to state a claim for relief. In addition, defendants move to dismiss plaintiffs' Fourth

22    and Fourteenth Amendment allegations in claims 9 and 10. The court addresses each of these

23    claims of plaintiffs below.

24         B.     <u>Dormant Commerce Claims (Claims 5 & 6)</u>

25             Plaintiffs bring two claims based on the dormant Commerce Clause: claims 5 and

26    6. In their opposition, plaintiffs withdraw their Dormant Commerce Clause claims. MTD Opp'n

27    at 6 n.1; *see also Nationwide Biweekly Admin., Inc. v. Owen*, 873 F.3d 716, 737 (9th Cir. 2017)

28    ("[I]ntrastate commerce is beyond the scope of the Dormant Commerce Clause[.]"), *cert. denied*

1   *sub nom. Nationwide Biweekly Admin., Inc. v. Hubanks*, 138 S. Ct. 1698 (2018).  Accordingly,

2   claims 5 and 6 are DISMISSED with prejudice.

3            C.      <u>Intrastate Travel Claims (Claims 7 & 8)</u>

4            "The Supreme Court has recognized a fundamental right to interstate travel."  *See*

5   *Miller v. Reed*, 176 F.3d 1202, 1205 (9th Cir. 1999) (citing *Attorney General of New York v.*

6   *Soto–Lopez*, 476 U.S. 898, 903 (1986) (Brennan, J., plurality opinion)); *see also United States v.*

7   *Guest*, 383 U.S. 745, 759 (1966) ("Although there have been recurring differences in emphasis

8   within the Court as to the source of the constitutional right of interstate travel . . . .  All have

9   agreed that the right exists.").  As plaintiffs admit, "[n]either the Supreme Court nor the Ninth

10  Circuit have yet decided the issue of the right to intra-state travel."  MTD Opp'n at 18.

11  Nevertheless, plaintiffs argue it is "plausible" that the Constitution protects the "right of the law-

12  abiding person to travel freely within [] his/her own state" unrestricted.  *Id.* at 18–19.

13           Claims 7 and 8 respectively allege that California has banned open carry

14  (1) outside of one's own county and (2) in counties with populations over 200,000.  *Id.* at 19.

15  According to plaintiffs, these requirements are unconstitutional because they force plaintiffs to

16  choose between their Second Amendment right to carry a weapon openly and their right to travel

17  outside their county of residence.  *Id.*  Therefore, the success of plaintiffs' claim depends on the

18  resolution of two open questions of constitutional law: whether there is a Second Amendment

19  right to open carry and whether there is a constitutional right to intrastate travel.

20           Even assuming the Constitution protects both rights, plaintiffs would have to show

21  the statutes they challenge penalize travel by denying a "very important benefit [or] right" to

22  those who travel outside their counties.  *See Attorney Gen. of New York v. Soto-Lopez*, 476 U.S.

23  898, 907 (1986).  The "very important . . . right" plaintiffs argue is threatened is the right to bear

24  arms unconcealed for self-defense in public.  However, the right recognized by the existing case

25  law is the right to "bear" arms in public for self-defense, *McDonald*, 561 U.S. at 767; that right is

26  not denied as a result of plaintiffs' traveling outside their home counties, because a concealed

27  carry permit is not limited to one's county of residence, but is valid throughout California.  *See*

28  Cal. Pen. Code § 26150 (a).  Only open carry licenses are limited to the county of issuance.  *Id.*

**ER522**

1    § 26150(b)(2).  In other words, by traveling outside their counties, plaintiffs are "penalized" only

2    by having to switch from openly carrying their weapons to carrying them concealed.  Plaintiffs

3    have not cited, nor has the court located any viable authority suggesting there is a right to one

4    method of "bearing" arms over another, with the possible exception of the vacated decision in

5    *Young v. Hawaii*, 896 F.3d at 1070, which is not authoritative.  *Peruta II*, 824 F.3d at 946

6    (Callahan, J., dissenting) ("While states may choose between different manners of bearing arms

7    for self-defense, the right [to bear arms for self-defense] must be accommodated.").

8           Assuming the right to open carry is an "important right," plaintiffs' right to travel

9    argument is still untenable.  The basis of plaintiffs' Second Amendment, Fourth Amendment and

10   Fourteenth Amendment claims is that they are unable to obtain an open carry license because the

11   sheriff in each of their counties refuses to issue them.  *See* Compl.¶¶ 39, 68–70.  Plaintiffs do not

12   plead they have obtained or could obtain an open carry license within their counties.  *See*

13   *generally* Compl.  Plaintiffs cannot be deprived of an open carry license as a result of travel if

14   they have never had a license or cannot obtain one in the first place.  Therefore, plaintiffs have

15   not pled facts showing they have been or will be penalized for traveling outside their counties,

16   and thus have not sufficiently pled they have standing to bring their intrastate travel claims.

17   Claims 7 and 8 are DISMISSED.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992)

18   (requiring "actual or imminent" injury).

19         D.    Fourth Amendment Unreasonable Seizure Claim (Claims 9, 10 & 12)

20          Plaintiffs allege the challenged statutes violate their Fourth Amendment rights

21   because the statutes interfere with their "possessory and liberty interests" in their firearms by

22   controlling how plaintiffs "wear, carry, or possess their handgun in public" and preventing them

23   from "fully us[ing] and enjoy[ing] their property."  MTD Opp'n at 9.

24          The Fourth Amendment protects against "unreasonable searches and seizures."

25   *Virginia v. Moore*, 553 U.S. 164, 168 (2008).  A "'seizure' of property occurs when there is some

26   meaningful interference with an individual's possessory interests in that property."  *United States*

27   *v. Jacobsen*, 466 U.S. 109, 113 n.5 (1984).  One can have a legitimate possessory interest in a

28   lawfully owned handgun.  *See Stutes v. Parrish*, No. 14-CV-02016-LHK, 2015 WL 8770720, at

13

**ER523**

*6 (N.D. Cal. Dec. 15, 2015); *but see United States v. Janik*, 723 F.2d 537, 547 (7th Cir. 1983) (no lawful property interest in unregistered gun); *United States v. Uu*, 293 F. Supp. 3d 1209, 1214 (D. Haw. 2017) (defendant has diminished possessory interest in "contraband (such as the firearm)"); *cf. Nichols v. Harris*, 17 F. Supp. 3d 989, 1008–09 (C.D. Cal. 2014) (finding no reasonable expectation of privacy in one's publicly carried firearm).  Plaintiffs allege they own their firearms lawfully, but challenge the state's ability to regulate how they use those firearms.

   Plaintiffs' Fourth Amendment claim is atypical in that it does not challenge a state actors' physical interference with plaintiffs' firearms, but rather a regulation forbidding certain ways of using a firearm.  The parties have identified one controlling case involving a Fourth Amendment challenge to a regulation; it does not support plaintiffs' claims.  In *Cedar Point Nursery v. Shiroma*, 923 F.3d 524 (9th Cir. 2019), plaintiff brought a Fourth Amendment challenge against a regulation allowing union organizers access to the plaintiff company's property under certain, limited circumstances.  Plaintiffs argued the regulation constituted a meaningful interference with their possessory interests in their property.  *Id.* at 535.  The court found the "controlled, non-disruptive visits" limited "in time, place, and number of union organizers" at issue there did not constitute a meaningful interference in plaintiffs' possessory interest in the property.  *Id.* at 536.  By contrast, the Ninth Circuit has recognized that "constant physical occupation" such as when a regulation allows the public to "freely and regularly" trespass on one's land would constitute a meaningful interference with one's possessory interest in one's property such that a seizure occurs.  *Presley v. City of Charlottesville*, 464 F.3d 480, 487 (4th Cir. 2006) (quoted in *Cedar Point Nursery*, 923 F.3d at 535); *see also Soldal v. Cook Cty., Ill.*, 506 U.S. 56, 72 (1992) (removing mobile home from its foundation and towing to another location was seizure); *Freeman v. City of Dallas*, 242 F.3d 642, 647 (5th Cir. 2001) (demolition of plaintiffs' apartment buildings was seizure); *Severance v. Patterson,* 566 F.3d 490, 502 (5th Cir. 2009) (plaintiff's allegation that State appropriated an easement over her beachfront property sufficiently alleged potential seizure to survive motion to dismiss)).    Even assuming the regulations at issue effectively ban open carry in California, the factual allegations here are

**ER524**

still more like those underlying *Cedar Point Nursery* than *Presley*. Plaintiffs are still able to "possess" their licensed firearms in a limited manner; they are limited to keeping them in their home and, when they can meet the requirements for concealed carry, they may possess them concealed in public. The challenged statutes do not "deprive[] [plaintiffs] of the use of [their] property" *Presley*, 464 F.3d at 487, such that they meaningfully interfere with their possessory interest in the firearms.

This conclusion is bolstered by the Supreme Court's decision in *Heller*, in which the Court explained that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626. "For example," the Court goes on, "the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." *Id.* The Court endorsed certain regulations on the possession of firearms, such as "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27. Such an endorsement can be fairly read to imply one's constitutionally protected property interest in a firearm, including one's Second Amendment right to keep a firearm, is necessarily limited. *Id.*

Therefore, a Fourth Amendment challenge is not legally cognizable here, because plaintiffs have not alleged a search or seizure has occurred. Defendants' motion to dismiss plaintiffs' ninth, tenth and twelfth claims are DISMISSED, to the extent they rely on a claim under the Fourth Amendment. *Hill v. Opus Corp.*, 841 F. Supp. 2d 1070, 1082 (C.D. Cal. 2011) (court may dismiss portion of claim, while allowing remainder to proceed).

E.      Substantive Due Process Claim (Claims 9, 10 and 14)

Substantive due process "prevents the government from engaging in conduct that 'shocks the conscience,' or interferes with rights 'implicit in the concept of ordered liberty.'" *United States v. Salerno*, 481 U.S. 739, 746 (1987) (citations omitted). "To establish a substantive due process claim, a plaintiff must, as a threshold matter, show a government

**ER525**